UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION


UNITED STATES OF AMERICA,        )       CASE NO:  7:18-CR-00855
                                 )
                Plaintiff,       )            CRIMINAL
                                 )
        vs.                      )         McAllen, Texas
                                 )
JORGE ZAMORA-QUEZADA,            )       Monday, December 9, 2019
MEISY ANGELICA ZAMORA,           )
ESTELLA SANTOS NATERA,           )       (9:15 a.m. to 12:11 p.m.)
FELIX RAMOS,                     )
                                 )          MORNING SESSION
                Defendants.      )
_____      )


JURY TRIAL - DAY 4

BEFORE THE HONORABLE RICARDO H. HINOJOSA,
UNITED STATES DISTRICT JUDGE


Appearances:            See next page


Court Interpreter:      M. Foraker / Steven Mines (Standby)

Court Recorder [ECRO]:  Antonio Tijerina

Transcribed By:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, Texas 78468
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>

Plaintiff:                    ADRIENNE FRAZIOR, ESQ.
                              EMILY GURSKIS, ESQ.
                              REBECCA YUAN, ESQ.
                              CYNTHIA VILLANUEVA, ESQ.
                              Office of the United States Attorney
                              1701 W. Business Hwy. 83
                              Suite 600
                              McAllen, TX 78501

Jorge Zamora-Quezada:         BENIGNO TREY MARTINEZ, III, ESQ.
                              TOMAS TIJERINA, ESQ.
                              STEPHEN LEE, ESQ.
                              1201 E. Van Buren St.
                              Brownsville, TX 78520

Meisy Zamora:                 CHRISTOPHER SULLY, ESQ.
                              5804 N. 23rd St.
                              McAllen, TX 78504

Estella Natera:               AL ALVAREZ, JR., ESQ.
                              4409 N McColl Rd
                              McAllen, TX 78504

Felix Ramos:                  JAIME PENA, ESQ.
                              Pena Garza PLLC
                              900 Kerria Ave
                              McAllen, TX 78501

3

1                              INDEX

2    GOVERNMENT'S WITNESS      DIRECT      CROSS      REDIRECT    RECROSS

3    TRACY COUFAL

4      BY MS. VILLANUEVA        28                     116

5      BY MR. LEE                           43/76                  120

6      BY MR. SULLY                           98

7      BY MR. ALVAREZ                        103

8      BY MR. PENA                          104

9

10   GOVERNMENT'S EXHIBITS                                      RECEIVED

11   B-19                                                          36

12   288                                                           96

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          **McAllen, Texas; Monday, December 9, 2019; 9:15:44 a.m.**

2                              **Call to Order**

3          **(Official Interpreter Utilized for Translation)**

4          **(Outside the presence of the Jury)**

5              **THE COURT:**  Please be seated.  We're back on the

6   issue of Dr. Alvarez and her testimony, whether she should be

7   called back.

8              I have looked at both of you-all's filings.  There

9   seemed to be a conflict here from the standpoint of what the

10  facts really are.

11             The Government claims that she really had these

12  patient files beforehand.  They claim that she only saw them

13  that morning.

14             **MS. FRAZIOR:**  No, your Honor.

15             **THE COURT:**  Right before she testified.

16             **MS. FRAZIOR:**  No, the Government produced those files

17  to Defense Counsel.  She took a look at them before she came in

18  to testify.  That was two days before.

19             **THE COURT:**  Right.  But their complaint is when you

20  designated experts you said that those people had looked at all

21  of these files.

22             **MR. LEE:**  No, your Honor, that's not, no.  Our

23  understanding from disclosures and based on the filing that the

24  Government made --

25             **THE COURT:**  Well, let's put -- let's start with this

1  point:  the ones that were designated as experts with regards

2  to his decision that there was rheumatoid arthritis, both sides

3  agreed that those people have had the doctor's files with

4  regards to how he treated this patient, is that not true?

5        **MR. LEE:**  We know the Government at least planned to

6  show files, we don't know which files were shown, we don't

7  actually know what --

8        **THE COURT:**  Well, but you know that those individuals

9  actually saw files.

10        **MR. LEE:**  We were told that they would see files,

11  yes.

12        **THE COURT:**  Okay.

13        **MR. LEE:**  So from those from Sofa (phonetic) Brown,

14  Ruderman and Mizesko, those are the adequate (indisc.) --

15        **THE COURT:**  Right.  I just want to make sure that

16  both sides agree that you were told beforehand that they

17  already had those files or would see them and they were

18  designated as experts.

19        **MR. LEE:**  In that regard, yes.

20        **THE COURT:**  Right, and so obviously you would have to

21  guess that they would be subject to either Direct or Cross

22  examination on those files.

23        **MR. LEE:**  Yes.

24        **THE COURT:**  You are claiming now that with regards to

25  Dr. Alvarez, if I have this right, is that she didn't get to

1   see any of those files till the morning of when she was going

2   to testify.

3           **MR. LEE:**  Or perhaps two days before.  And then as

4   what -- based on what the Prosecutor just said and so we had

5   no --

6           **THE COURT:**  Yeah, but then the Prosecution says on

7   Page 2 of their filing when Dr. -- in the first full paragraph:

8               "When Drs. Alvarez, Garcia, Nunnery and Toro were

9               noticed on June 17, 2018, the only patient files

10              previously produced to Counsel for the patients they

11              shared with Defendant were, in fact, Defendant's

12              patient files."

13          And so that's -- she didn't see those.

14          **MS. FRAZIOR:**  No, your Honor.  What we were saying is

15  that at that point in time Dr. Alvarez was a little tricky to

16  get with because of her busy, busy schedule, and so we gave her

17  those --

18          **THE COURT:**  Well, I don't know any exception to the

19  rules because of the doctor's busy, busy schedules.

20          **MS. FRAZIOR:**  I understand, sir, but I'm just trying

21  to explain the facts.

22          **THE COURT:**  I don't know a single doctor who never

23  ever says that they don't have a busy, busy schedule.

24          **MS. FRAZIOR:**  I know, I agree.

25          **THE COURT:**  And I'm sure she does.

1          **MS. FRAZIOR:**  I agree.  Well, but what our filing is

2    trying --

3          **THE COURT:**  My only comment is lawyers also have

4    busy, busy schedules.

5          **MS. FRAZIOR:**  I agree with you, absolutely, and

6    Judges, too.

7          But the point that we're trying to make here is that

8    the notice to Defense Counsel that she would be reviewing and

9    basing her opinions on those files was all the way back in June

10   of 2018, and so Defense Counsel knew because the issue is

11   whether Defense Counsel knew --

12         **THE COURT:**  No, but then at that point the Government

13   had a totally different viewpoint as to -- in fact, stated that

14   she was only going to testify.

15         **MS. FRAZIOR:**  No.

16         **THE COURT:**  So she did have them or didn't have them

17   then?

18         **MS. FRAZIOR:**  She did not have Dr. Zamora-Quezada's

19   files in June 2018, but she did review them prior to her

20   testimony which is --

21         **THE COURT:**  The morning of.

22         **MS. FRAZIOR:**  I don't --

23         **THE COURT:**  But you didn't designate her as an expert

24   with regards to what to what he --

25         **MS. FRAZIOR:**  (indisc.), your Honor, we did.

8

1          **THE COURT:**  She was designated as somebody who

2   treated him and, therefore, was going to say she didn't see any

3   rheumatoid arthritis in him.

4          **MS. FRAZIOR:**  She was designated as somebody who was

5   going to testify that the patients were falsely diagnosed based

6   on the patient files she would review, her own and Dr. Zamora-

7   Quezada's.

8          **THE COURT:**  Can I see where you say you designated

9   her that way?

10          **MS. FRAZIOR:**  Yes, sir, yes.

11          **THE COURT:**  And I don't think you said Dr. Quezada's

12   files also.

13          **MS. FRAZIOR:**  That's correct, we said "the patient

14   files that she had" and the only -- the patient files --

15          **THE COURT:**  Well, they had no way of knowing that she

16   had those patient files because you had never told them that

17   she had them --

18          **MS. FRAZIOR:**  No, when we --

19          **THE COURT:**  -- and, in fact, she never had them until

20   the morning of the testimony, and she wasn't designated as an

21   expert with the ones who had actually viewed them and seen them

22   beforehand, which are these three doctors.

23          **MS. FRAZIOR:**  She had, your Honor, I'll show you

24   that's the disclosure.  If you'll allow me a moment to explain

25   it, your Honor.

1       **MR. LEE:**  Your Honor, I think the -- whatever the

2  Government's claim is about the June 2018 disclosure is

3  contradicted -- what she's claiming now is contradicted by the

4  Government's filing with this Court about a month later.

5       The Defense -- Defendant filed a Motion regarding the

6  disclosure about these treating physicians.

7       The Government responded with a filing that made it

8  clear --

9       **THE COURT:**  Well, and responded with a filing that

10  said:

11            "The Defendant's Motion argues that the Government's

12            disclosures were insufficient with respect to

13            treating physician's testimony about specific

14            patients.  The testimony -- this testimony, however,

15            is based on the doctor's own factual observations and

16            personal knowledge and not their expertise, it is not

17            expert testimony.  Consequently the rule does not

18            apply to require the Government to provide any notice

19            of this testimony."

20       So they said they were just going to testify about

21  what they had treated him.

22       **MS. FRAZIOR:**  It's because it's lay testimony and

23  expert testimony, your Honor, there's a distinction, and so

24  they could (indisc.) --

25       **THE COURT:**  Well, no, these were strictly doctors.

1          **MS. FRAZIOR:**  But they give factual testimony about

2    the actual facts that happened --

3          **THE COURT:**  I mean, the problem is you didn't

4    designate her that way, you designated the ones that actually

5    looked at his records beforehand and were going to be the

6    witnesses with regards to their comparison as to the present

7    situation.

8          **MS. FRAZIOR:**  I think we did, your Honor.  Can I show

9    you the experts designation?

10         **THE COURT:**  Sure.

11         **MR. LEE:**  This is also attached as exhibits

12   (indisc.).

13         **MS. FRAZIOR:**  I highlighted right under Dr. -- where

14   it says "Naiara Alvarez."

15         **THE COURT:**  And, I mean, why would you not disclose

16   to them -- you didn't even disclose until they objected here

17   that they said she had actually looked at any files that

18   morning.

19         **MS. FRAZIOR:**  Because we disclosed it in there, your

20   Honor, that she was going to be relying on the patient files

21   that at that time had been produced to Defense Counsel which

22   were the Zamora files.  No other files at the time of

23   disclosure had been provided but the Zamora files to Defense

24   Counsel.

25         **(Pause)**

1          **THE COURT:**  It says she's a rheumatologist practicing

2    in McAllen, Texas, but I guess it's really Harlingen is where

3    she sees most of her clients.

4          **MS. FRAZIOR:**  Yes.  So I believe --

5          **THE COURT:**  And then it tells us she obtained her

6    degree from the Dominican Republic, her license to practice

7    medicine in the State of Texas.  She completed her residency in

8    Internal Medicine at Texas Health Presbyterian Hospital in

9    Dallas.  She completed her fellowship -- it goes through all of

10   her education.

11         But then you say "Dr. Alvarez will testify about the

12   standard of care in rheumatology."  She did that.

13         "The standard physical evaluation and tests that

14   rheumatologists perform to confirm a diagnosis."  She did that.

15         "The standard of care in treating diseases in the

16   area of rheumatology."  She did that.

17         "And may opine on hypotheticals relating to the

18   foregoing:"

19         Well, yes, but you didn't -- I don't know that you --

20   you probably did ask her something about "if such and such and

21   such and such," you never say --

22         **MS. FRAZIOR:**  We didn't --

23         **THE COURT:**  -- that she's going to testify with

24   regards to his treatment other than hypotheticals about

25   treatment.  You never -- that never indicates that she actually

12

```
 1    went through all of his records and will testify that whatever
 2    he did was totally wrong.
 3            MR. LEE:  Your Honor, the disclosure goes onto the
 4    next page.  That's where she discloses -- that's where the
 5    disclosure was about that one specific patient.  But that the
 6    basis was going to be her personal knowledge as well as the
 7    medical records associated with that patient.
 8            MS. FRAZIOR:  Yes, the issue.
 9            MR. LEE:  And then -- then because the Alvarez
10    interview reports only asks her about her own files.
11            And then when the Government -- when the Defendant
12    filed a Motion, again, when the Defendant filed a Motion about
13    a month later seeking additional disclosure on this expert,
14    that's when the Government said in a filing with this Court --
15            THE COURT:  Well, because it says "the basis for
16    Dr. Alvarez's testimony about specific patients and her
17    personal knowledge of this patient and others," that's Elijah
18    Perez, "as well as the medical records associated with such
19    patients which were previously produced to Counsel."
20            That would mean to me not the medical records of
21    Dr. Zamora, but the medical records that you showed them that
22    she would be relying on because why would you have to tell them
23    the medical records of his --
24            MS. FRAZIOR:  Well, agreed, but except that the
25    patient files that had been produced at that point in time were
```

1    the Zamora patient files, not the Alvarez patient files.  So

2    indicating to them that she would be relying on the files

3    "previously produced" means the Dr. Zamora-Quezada files.

4              **THE COURT:**  She obviously had not seen them because

5    obviously she didn't see them till that morning.

6              **MS. FRAZIOR:**  Sure, your Honor, but there's no real

7    problem with that.  The fact is that --

8              **THE COURT:**  There is a real problem because the

9    problem is that they didn't know that she was going to come

10   testify about his records as opposed to her treatment which was

11   not listed with the people that were going to testify about his

12   records.

13             **MS. FRAZIOR:**  Why was the -- why would they not -- I

14   just don't -- I think that's just -- I think that's not clear,

15   your Honor.  I mean, from Defense Counsel's perspective that

16   that notice didn't tell them that she was going to testify

17   about the records previously produced in the Zamora case out of

18   patient files that they had had for a year and we produced the

19   Memorandum of Interview, and now they're saying that they

20   didn't know?  That's absurd in a healthcare fraud case like

21   this, your Honor, where the whole issue --

22             **THE COURT:**  No.  No.  Why would you have to say

23   "which were previously produced to Counsel?"  They already know

24   what his records are, he's the Defendant, they have access to

25   his records.

14

1          This would indicate "which were previously produced

2    by you to them."

3          **MS. FRAZIOR:**  Yes.

4          **THE COURT:**  They don't -- they don't need for you to

5    produce his records to them other than whatever records she was

6    going to -- that were not in their hands already.

7          **MS. FRAZIOR:**  Well, we did because we had a search

8    warrant so we had to provide those patient files to them --

9          **THE COURT:**  What?

10         **MS. FRAZIOR:**  -- but that's why the Government

11   outlined --

12         **THE COURT:**  He had his patients -- I mean, he has his

13   records, those are his records.

14         **MS. FRAZIOR:**  Right, but by indicating that the

15   patient files had been previously produced we're drawing them

16   to the Zamora-Quezada patient files that we had just produced

17   like right before this (indisc.).

18         **THE COURT:**  But you didn't have to produce them, they

19   already knew what his records were.  This would lead me to

20   believe that you're talking about other records that they may

21   have not seen that you produced to them.  Why would you have to

22   produce their own records to him?

23         **MS. FRAZIOR:**  But that's just not the case at that

24   point in time.  Factually what we had produced was their own

25   records back to them, we had not produced Alvarez records at

1    that point in time.

2            **MR. LEE:**  Your Honor, if I may?

3            **THE COURT:**  Sure.

4            **MR. LEE:**  It's clear from expert disclosures that

5    there were three witnesses, three expert witnesses, who were

6    specifically said -- who were specifically going to review

7    Dr. Zamora's patient records.  That explicitly said Dr. Brown,

8    Dr. Ruderman and Dr. Mizesko.

9            We're lawyers.  We can read -- we can distinguish

10   groups.  We can see that if the Government is saying that

11   they're going to show Dr. Zamora's records to three people and

12   they don't say that about other treating physicians we can

13   distinguish that they're not all going to be treated the same,

14   and that's consistent with what was said in the filings and

15   that was consistent with what was said to you, I believe, on

16   prior arguments about these Motions.

17           I believe my co-counsel in this case and the

18   Government's earlier prosecutor argued this --

19           **THE COURT:**  Well, you were told, which I think they

20   may be able to -- "and may opine on hypotheticals related to

21   the foregoing."  She probably can testify as to if such and

22   such and such and such with this person had rheumatoid

23   arthritis.

24           **MR. LEE:**  And those -- I believe those questions were

25   allowed regarding rheumatoid factor, sports and things like

```
 1   that.

 2             MS. FRAZIOR:  They were not because Defense objected.

 3             MR. LEE:  Your Honor, it was clear from --

 4             THE COURT:  What?

 5             I mean, she can be called back to talk about her

 6   hypotheticals.

 7             As far as his records that's -- I think, and

 8   unfortunately for the Government, they didn't disclose that and

 9   put her in as an expert with regards to his records.

10             As far as her, they did disclose that she would be

11   talking about hypotheticals and that if such and such was shown

12   that this would not indicate rheumatoid arthritis, and that I

13   think they can.  She has been truncated anyway, so I don't have

14   a problem with the Government calling her for that reason.  But

15   as far as going through his records and saying "based on these

16   records," no.

17             Hypotheticals, yes.

18             MS. FRAZIOR:  Well, then --

19             MR. LEE:  And that's consistent with what Defense

20   understood.

21             MS. FRAZIOR:  9:27:20 your Honor --

22             MR. LEE:  -- was going to happen in this trial.

23             MS. FRAZIOR:  The Government's going to have to move

24   to strike the Defense experts, too, because their expert

25   disclosure mirrors the Government's, it's exactly the same.  It
```

```
 1    does not outline specific patient files either and that's the

 2    position we're in then, is moving to strike the Defense expert.

 3    We have reached out to him and --

 4            THE COURT:  Well, you --

 5            MS. FRAZIOR:  -- we have reached out to the Defense

 6    and asked if we could come to an agreement on this and they

 7    pointed to this issue and said "No, they don't think it's the

 8    same."

 9            We have repeatedly asked for --

10            THE COURT:  Well, what is -- what did you think their

11    expert was going to testify about?

12            MS. FRAZIOR:  I'm just saying -- well, your Honor,

13    it's not about what we thought the expert was going to testify

14    about, it's what the disclosure is, and that's what you're

15    holding us to is this disclosure.

16            THE COURT:  Yours is very different than theirs.

17    They have an expert.  In fact, all of the ones that you

18    designated as experts with regards to that, yes, they're all

19    experts.

20            She was designated as an expert with regards to her

21    treatment.  I'm being a little bit liberal from the standpoint

22    of saying okay, you had also mentioned hypotheticals, they

23    should have known that, and I think you have already asked

24    those questions of some of these witnesses, they didn't object

25    to it.  You have every right to go into it.
```

1           They designated an expert.  Well, yes, he is their

2    expert, what did you think he was going to testify about?

3           **MS. FRAZIOR:**  I don't know because their records did

4    not show -- say that he has --

5           **THE COURT:**  You have the records and the records that

6    say what he has seen.

7           **MS. FRAZIOR:**  Their disclosure does not say that

8    their expert is going to review specific patient files either.

9           **MR. LEE:**  Your Honor, if I may?

10          The Government's disclosure about Dr. Freundlich is

11   consistent with the adequacy of the disclosure the Government

12   made with regards to Dr. Brown, Dr. Ruderman -- and Dr. Brown

13   and Dr. Ruderman.

14          As you know, we have asked repeatedly for additional

15   information about Dr. Brown or Dr. Ruderman because the

16   disclosure said that he would give opinions about 10 or more

17   patients, but we have only seen -- we have only seen actual

18   opinions for four specific patients.  So our disclosure is very

19   similar in kind to what the Government did about Dr. Brown and

20   Dr. Ruderman.

21          Now at this point, in terms of Dr. Freundlich, I will

22   say that, yes, the Judge is correct, it is not unreasonable to

23   assume the, the Defense expert, will testify that his review

24   that the testimony he gives will be a patient that he reviews

25   and that he does not think that the Defendant's diagnoses of

1  rheumatoid arthritis were unreasonable given the information

2  that he can see in the files.  I don't think that should come

3  as a big surprise (indisc.) --

4       **THE COURT:**  Okay, well, do you have your wording with

5  regards to how you designated your expert?

6       **(Pause)**

7       **MS. FRAZIOR:**  I do, your Honor, (indisc.) --

8       **MR. LEE:**  "Dr. Freundlich will provide testimony

9            regarding the patients listed in the Superseding

10           Indictment to the effect that based upon the review

11           of clinical notes, labs and imaging results from Dr.

12           Zamora and other consulting physicians, the diagnosis

13           and treatment of various types of arthritis,

14           including, but not limited to, rheumatoid arthritis,

15           are reasonable and justified."

16      **THE COURT:**  Well, how could you not state that they

17  told you that he's going to rely on his records, basically, his

18  notes.  What else would that be?

19      **MS. FRAZIOR:**  Because "other consulting physicians,"

20  we've got a note written on ours, too, which specific patients

21  are we talking about?

22      They say "in the Superseding Indictment."  They

23  complained that ours is not specific enough, but there's a

24  whole (indisc.) --

25      **THE COURT:**  Well, I think they mentioned Dr. Zamora

1    and his notes, but what else did you think that was?

2              **MR. LEE:**  Your Honor --

3              **MS. FRAZIOR:**  Other physicians --

4              **MR. LEE:**  -- the Defendant has provided to Defense

5    copies of Defense exhibits which include records from

6    Dr. Zamora and records from many other physicians.  Those

7    records have been shown --

8              **MS. FRAZIOR:**  Exactly.

9              **THE COURT:**  You made it quite clear as to what she

10   was going to testify --

11        **(Talkovers)**

12             **THE COURT:**  She will testify about the standard of

13   care in rheumatology, which she did.

14             The standard physical evaluation and tests that

15   rheumatologists perform to conform a diagnosis, which she did.

16             The standard of care in treating diseases in the

17   areas of rheumatology, which she did.

18             `And may opine on hypotheticals relating to the

19   foregoing.

20             Never once with regards to his records, other than

21   you being able to ask her if such and such and such and such

22   was in there, what did you think that that was -- you can do

23   that, I don't have a problem with that.

24             But to then say "I have reviewed these records" which

25   she saw that morning, parts of them, "and therefore I'm saying

1   that he was totally wrong," well, no, because she was never

2   disclosed as such but, yes, you can go through hypotheticals

3   with her, even hypotheticals that are in those records.

4         **MS. FRAZIOR:**  Right --

5         **THE COURT:**  Those records will be admitted anyway so

6   you do have testimony from that standpoint, but not to say that

7   she -- I don't think she was ever meant by you to be an expert

8   with regards to going through his records or you wouldn't have

9   talked about hypotheticals relating to the foregoing.  And so,

10  yes, you can do that, and you can bring her whenever it's

11  convenient for her, but to then just show the records and say

12  "based on these records as opposed to a hypothetical on those

13  records," yes, you can do that, but not anything else.

14        **MS. FRAZIOR:**  Your Honor, is this ruling specifically

15  for Dr. Alvarez because the other doctors were more

16  accommodating and we were able to go through patient files with

17  them a different -- an earlier day?  If we need to supplement

18  our disclosure we can do that, your Honor --

19        **MR. LEE:**  Your Honor, again, this is a -- you

20  cannot --

21        **(Talkovers)**

22        **THE COURT:**  You can't do it at this late time

23  announce that.  You disclosed the ones that were going to

24  testify about his records, you disclosed that.  You could have

25  disclosed that at this point but, no, they were going to

1    testify about hypotheticals.

2              **MS. FRAZIOR:**  We didn't just want limited

3    hypotheticals, sir, we add -- said it was going to be based on

4    the  records previously produced.  I don't know --

5              **THE COURT:**  But -- but one would never think that the

6    records previously produced to counsel are their own records.

7              **MS. FRAZIOR:**  Yeah, but it would have to be, Judge --

8              **THE COURT:**  No, it wouldn't have to be.  There are

9    these records.  I mean, you would normally say "based on his

10   records that we have."

11             **MS. FRAZIOR:**  But we didn't have the Dr. Alvarez

12   records at that point in time.

13             **THE COURT:**  I'm not talking about her records, I'm

14   talking about Dr. Zamora's records previously produced to them.

15   You don't have to produce to Dr. Zamora's lawyers their own

16   records.

17             **MS. FRAZIOR:**  We do, your Honor, because they're from

18   search warrants.  We have -- we actually do have to --

19             **THE COURT:**  That would be stretching it to say that

20   that's what you meant when you said "previously produced to

21   counsel."  That would not be the normal logical way that one

22   would address it in English with regards to "I'm going to give

23   you previously produced to you which are your own records."  It

24   should have been specific.  His records because that's what

25   people may have looked at.  You name those, you actually named

23

1   those people that have actually done his records, you didn't

2   say previously produced on the other ones that you designated.

3   On those you actually said that they have the records that he

4   had produced.

5          **MS. FRAZIOR:**  Just because those were not treating

6   physicians at the time that was a separate set of expert

7   (indisc.) --

8          **THE COURT:**  I don't care whether they were or they

9   weren't --

10         **MS. FRAZIOR:**  Sure.

11         **THE COURT:**  -- but that's how they were designated.

12  I don't see what the problem is for you from the standpoint I

13  think I'm being generous in saying at least should be covered

14  from hypotheticals, and I think you have done that with some of

15  the other witnesses who have appeared here.  And then it's up

16  to you as to how you make your argument because his records are

17  obviously in evidence.

18         **MR. LEE:**  Your Honor, the Defense would also raise a

19  concern, you know, what the Prosecutor just said.  The Defense

20  is also concerned that the Government met with Dr. Alvarez the

21  morning of trial, apparently elicited some information --

22         **THE COURT:**  Well, it's very strange for her to want

23  to be -- now become an expert on those when something that she

24  saw parts of his files that morning --

25         **MR. LEE:**  Right --

1          **THE COURT:**  And the admission she didn't go through

2     all of his files that morning, she went through some files, the

3     ones that the Government wanted her to see.

4          **MS. FRAZIOR:**  No, (indisc.) --

5          **MR. LEE:**  Right.  And that gives (indisc.) --

6     **(Talkovers)**

7          **MS. FRAZIOR:**  Dr. Alvarez --

8          **THE COURT:**  She went through all of those records

9     that morning?

10          **MS. FRAZIOR:**  Yes, she did, she went through all of

11     Dr. Zamora's --

12          **THE COURT:**  Pages and pages --

13          **MS. FRAZIOR:**  Yes, your Honor, absolutely.  I would

14     not give her portions of a file, I would never do something

15     like that.  We gave her the entire file for her to look at and

16     say "Does anything in this file change your opinion based on

17     what you diagnosed this patient with?" and her answer was "No."

18          **THE COURT:**  Okay, fine.

19          **MS. FRAZIOR:**  So --

20          **THE COURT:**  You can hypothetically ask her that, but

21     you didn't designate her like you did the ones that had gone

22     through all of the records.  We're going to say there is no way

23     this person had rheumatoid arthritis based on those records,

24     you have those -- that testimony, those you have already

25     designated.  You can bring her back and say hypothetically and

1    I will give you that.  And we have truncated her anyway so I

2    don't have a problem with that.

3            **MS. FRAZIOR:**  We're not going to bring her back,

4    Judge.  That's okay, I --

5            **THE COURT:**  Well, I mean -- I just want the record to

6    be clear that I gave you the opportunity to do as much as you

7    had offered her for.

8            **MS. FRAZIOR:**  Yes.  Yes.

9            **THE COURT:**  Okay.

10           **MS. FRAZIOR:**  I understand that.

11           **THE COURT:**  Do you want to bring the jury -- what?

12           **MR. LEE:**  The Defense would understand that based on

13   your ruling this should apply to other -- the other treating

14   physicians whom the Government did not disclose?

15           **THE COURT:**  I haven't seen what she disclosed about

16   the others.

17           **MR. LEE:**  It's in the -- it's described in the

18   Defense filing and in the exhibits to the Defense filing.  The

19   other treating physicians were described in exactly the same

20   way as Dr. Alvarez, and so again --

21           **THE COURT:**  Okay, well, then I think she'll be able

22   to figure this out pretty well as to how she's going to handle

23   it and I think she'll do what she wants to do from the

24   standpoint of prosecution.  She's going to hypothetically ask

25   him and at one point those records are in evidence and so

 1   she'll be able to make that argument.

 2           **MR. LEE:**  And we have no objection to hypotheticals.

 3           **THE COURT:**  Well, right, and -- but she then is going

 4   to be able to make the argument that "Oh, by the way, these are

 5   records that are in evidence, and you heard the doctors testify

 6   to such and such and that that would not be rheumatoid

 7   arthritis," she's going to be able to do that.

 8           **MR. LEE:**  Yes, that would be for closing arguments,

 9   we would agree to that.

10           **THE COURT:**  All right.  Yes.  Is that clear to

11   everybody?

12           What -- that you will be allowed to make those

13   comparisons --

14           **MS. FRAZIOR:**  Yes.  Yes.

15           **THE COURT:**  -- on anything that's in evidence and any

16   doctor that testifies "No, that would not be rheumatoid

17   arthritis," and that would not be the appropriate diagnosis,

18   that you will be able to make those arguments?

19           **MS. FRAZIOR:**  Yes.  Yes, your Honor.  Thank you.

20           **THE COURT:**  I think we can bring the jury in.  Is

21   everybody okay with that?

22           I only got one nod from one -- and I thank her for

23   giving the nod.

24           **MR. LEE:**  Yes, your Honor.

25           **MS. FRAZIOR:**  Oh -- yes.

27

1          THE COURT:  Yes, she's the only one that was

2    listening to the Court.

3          Go ahead and bring them in.  You-all know we're not

4    having Court on Friday, right?

5          MS. VILLANUEVA:  Yes, your Honor.

6      (Pause)

7          COURT SECURITY OFFICER:  All rise for the jury.

8      (Jurors enter courtroom at 9:37:20 a.m.)

9          THE COURT:  Please be seated.  Good morning, ladies

10   and gentlemen.  I hope you-all had a good weekend.

11         Go ahead and call your next witness, ma'am.

12         MS. VILLANUEVA:  Good morning, your Honor.  Cynthia

13   Villanueva for the United States of America.  Call Tracy

14   Coufal.

15     (Pause)

16         THE COURT:  Ma'am, if you don't mind coming up to the

17   front so you can be sworn in?

18         THE CLERK:  Raise your right hand.

19          TRACY COUFAL, GOVERNMENT'S WITNESS, SWORN

20         THE WITNESS:  I do.

21         THE COURT:  Go ahead and have a seat right up here,

22   please, ma'am.

23         Go ahead.

24         MS. VILLANUEVA:  Thank you, your Honor.

25   //

1                        **DIRECT EXAMINATION**

2    **BY MS. VILLANUEVA:**

3    Q     Good morning, Ms. Coufal?

4    A     Good morning.

5    Q     Can you please state your name for the record and spell

6    it?

7    A     My name is Tracy Coufal **(s/l soulful),** I'll spell it,

8    T-R-A-C-Y, last name is C-O-U-F-A-L.

9    Q     Thank you.  And where do you currently work?

10   A     I work for the Defense Health Agency in the office of

11   Program Integrity.

12   Q     And is that also a part of TRICARE?

13   A     We administer the TRICARE Program.

14   Q     Can you please give the jury a brief description of your

15   educational and professional background?

16   A     Yes, I have a four year degree in Psychology and I have

17   worked at the Defense Health Agency for 15 years.

18   Q     And before working at the Defense Agency were you

19   previously in the Armed Services?

20   A     Yes, I was, I was active duty in the Air Force from 1982

21   to 1992.

22   Q     Do you have any current certifications?

23   A     Yes, I do.  I have a credential as a Certified Fraud

24   Examiner and that's from the Association of Certified Fraud

25   Examiners.

1    Q    What is TRICARE?

2    A    TRICARE is the -- is a Federally-funded health benefits

3    program for active duty and retired military members and their

4    eligible family members, and certain components of the Reserve.

5    Q    And how exactly is TRICARE funded?

6    A    TRICARE is funded through annual appropriations from

7    Congress.   The TRICARE budget is on the Federal budget so

8    taxpayer dollars will fund it as well.

9    Q    And can you briefly describe to the jury what you've done

10    for TRICARE in the past 15 years?

11    A    Yes.   For the past 15 years I've been a Healthcare Fraud

12    Specialist in the office of Program Integrity.

13    Q    And what exactly does that entail?

14    A    The Office of Program Integrity is the primary office

15    within the Defense Health Agency that's responsible for

16    addressing fraud and abuse risks, fraud and abuse that's

17    occurring against the program.   We assist in the detection and

18    the deterrence and the prevention of healthcare fraud against

19    TRICARE.   We support law enforcement when they are

20    investigating allegations of healthcare fraud.

21    Q    And how exactly do you support law enforcement through

22    these fraud investigations?

23    A    We'll provide claims data if the provider that is under

24    review or investigation also has submitted claims to TRICARE

25    then we'll provide, as I mentioned, the claims data.

1           We will provide regulation and policy support,

2    technical support, basically whatever they request we'll try to

3    get that information and documentation to them.

4    Q    What portion of your day is spent supporting law

5    enforcement and fraud investigation?

6    A    The majority of my day, most of my day is spent responding

7    to requests for data, for information, you could say 80 percent

8    of my day.

9    Q    You mentioned claims.  What is a claim?

10   A    A claim, a medical claim is submitted by providers, by

11   doctors, hospitals, facilities, medical providers.  They submit

12   claims to TRICARE requesting payment and the claim represents

13   or reflects the medical service that they provided to our

14   beneficiary.

15   Q    In addition to providers who else -- who usually submits

16   claims?

17   A    Well, the medical providers, facilities, a beneficiary

18   could submit a claim as well.

19   Q    What information is contained in a claim for payment that

20   a provider submits to TRICARE?

21   A    There is a variety of information.  Of course, the primary

22   piece of information would be the name of the patient, the name

23   of the beneficiary, the name of the provider, whoever is

24   rendering the care, the date that the care was provided, the

25   type of care which is represented by medical codes, procedure

1    codes or diagnosis codes, the charge amount, the amount that

2    the provider is charging, additional provider identifying

3    information.

4    Q    If all of this information that you just described is

5    contained on the claim what are the chances that TRICARE will

6    pay the provider for this claim?

7    A    The chances are pretty good if the -- if the information

8    is filled out in the appropriate way, if the claim form

9    contains all of the information that's requested, if the

10   beneficiary is or the patient is determined to be a TRICARE

11   beneficiary, if the services are a covered benefit, then the

12   chances are fairly good that --

13   Q    And why is that?

14   A    Well, we -- we trust that the information on the claim

15   form is accurate and truthful information that accurately

16   represents the services that were provided by the provider.

17   There are so many claim forms that come in, we've got 9.5

18   million beneficiaries.  Again, we have -- we trust the

19   information, it's an automated system.  It's not possible to

20   individually review each claim that comes in.

21            THE COURT:  And how do you become a beneficiary of

22   TRICARE?

23            THE WITNESS:  You become a beneficiary by your status

24   or your relationship to either an active duty or retired

25   service member.

1    BY MS. VILLANUEVA:

2    Q    How does Tricare know if a claim contains true and

3    accurate information?

4    A    Well, we -- we often -- we don't know.  We presume that

5    it's truthful and accurate unless we're told otherwise.

6    Q    How does Tricare know if a claim for services -- a claim

7    for services, if they were medically necessary?

8    A    Again, if we're just looking at the claim form and the

9    information and the codes that are on the claim form, again, we

10   presume.  We expect that the services that are reflected on

11   that form and the services that were rendered, we expect and

12   presume that they're medically necessary.

13   Q    Does Tricare review all medical records for every claim

14   that it pays before a claim is paid?

15   A    No.

16   Q    And why not?

17   A    Again, it's not possible, and there is not a requirement

18   for a medical record to be sent with every claim form.  Again,

19   it would be -- we would not -- claims processing would grind to

20   a halt.  We wouldn't be able to timely pay the providers that

21   have rendered care to our beneficiaries.  You know, providers

22   expect to be paid after they've rendered a service; we want to

23   pay them, and we want them to see our beneficiaries.  We want

24   our beneficiaries to have access to care.

25   Q    Is Tricare considered a trust-based system?

1    A    Yes.

2    Q    And why is that?

3    A    Again, we have to rely on the information that's on the

4    claim form.  We, again, presume that the information that's on

5    that form is true and accurate information.

6    Q    If Tricare knew a claim contained false information, would

7    it pay the provider for that claim?

8    A    Had we known, no.

9    Q    If Tricare knew that a claim for services was submitted

10   that the services were not medically necessary for the

11   beneficiary, would Tricare pay for that?

12   A    No.

13   Q    If Tricare knew that a claim for services was submitted

14   and those services were never actually provided to the

15   beneficiary, would Tricare pay for that?

16   A    No.

17   Q    If Tricare knew that a claim submitted to them contained

18   false information about a patient's diagnosis, would Tricare

19   pay that claim?

20   A    No.

21   Q    So, even though Tricare does not require providers to

22   submit their patient files before payment claim, does Tricare

23   require providers to maintain patient files?

24   A    Yes.

25   Q    And why is that?

1    A    Providers need to -- are required to maintain patient

2    files, what we refer to as patient records, medical records.

3    It's a requirement based on our policy and regulation.  It's

4    usually a state requirement, and the medical records and

5    documentation, that's the only way we can verify the

6    information that's on a claim form.  That's the way we would

7    verify what services were actually rendered.

8    Q    Does Tricare ever review patient files?

9    A    Yes.

10   Q    And, generally, in what circumstances does Tricare review

11   these patient files?

12   A    It would be our managed care support contractors, would

13   generally review patient files if they had a complaint or if

14   there was some reason they needed to look further into the

15   claims being submitted by a provider.  There are multiple

16   instances.

17   Q    If Tricare reviews patient files, what has to be

18   documented in the file for Tricare to pay that claim?

19   A    What needs to be documented in the patient file or the

20   medical record is the services that were rendered, and that

21   medical record needs to support what was billed on the claim

22   form.

23   Q    What is the process for a doctor or his or her medical

24   practice to go through to become a Tricare network provider?

25   A    To become a Tricare network provider, the provider would

1    enter into a contract or an agreement with our managed care

2    support contractor.

3    Q    And does that agreement include a written agreement?

4    A    Yes.  That's a written agreement.  It's executed with

5    signature.

6    Q    Were Dr. Jorge Zamora-Quezada and the Centers for

7    Arthritis and Osteoporosis network providers for Tricare?

8    A    Yes.

9    Q    And approximately when did they become in network

10   providers?

11   A    Two thousand and five.

12           MS. VILLANUEVA:  Your Honor, may I approach the

13   witness?

14           THE COURT:  Sure.

15   BY MS. VILLANUEVA:

16   Q    Ms. Coufal, I'm going to show you what's been previously

17   marked as Government's Exhibit B-19.

18   A    Okay.

19   Q    Do you recognize this document?

20   A    Yes.

21   Q    What is it?

22   A    This is a network contract between Humana Military Health

23   Services and -- I'm going to go to the last page.  Oh, it's on

24   the back.  So, I'm sorry; this is a network contract that was

25   executed between Humana Military Healthcare Services -- that's

Coufal - Direct / By Ms. Villanueva                    36

1   a Tricare contractor -- and the signature on the back is Jorge

2   Quezada, M.D.

3   Q    And had you personally reviewed this document before

4   today?

5   A    I have.

6   Q    And are these documents that you're in possession right

7   now true and accurate copies of business records by Tricare?

8   A    Yes.

9   Q    And were they kept in the ordinary course of business?

10  A    Yes.

11  Q    Were they kept by people who had knowledge of the

12  activities contained in them?

13  A    Yes.

14        **MS. VILLANUEVA:**  Your Honor, I move to admit Exhibit

15  B-19.

16        **THE COURT:**  Is there any objection?

17        **MR. LEE:**  No objection, your Honor.

18        **MS. VILLANUEVA:**  Permission to publish, your Honor?

19        **THE COURT:**  Yes, and it's admitted.

20     **(Government's Exhibit Number B-19 was received in**

21  **evidence)**

22  **BY MS. VILLANUEVA:**

23  Q    Okay.  So, we're going to go to page --

24        **THE COURT:**  And you said that was B-19?

25        **MS. VILLANUEVA:**  Yes, your Honor.

1    **BY MS. VILLANUEVA:**

2    Q    We're going to go to page one of B-19.

3         **(Pause; voices and whispers off the record)**

4              **THE COURT:**  Has he disappeared?

5         **(Pause; voices and whispers off the record)**

6    **BY MS. VILLANUEVA:**

7    Q    Do you see B-19 on your screen?

8    A    I do.  It's very difficult to read.

9              **THE COURT:**  We can expand that, right?

10             **MS. VILLANUEVA:**  We are going to zoom in on that.

11             **THE WITNESS:**  Okay.

12   **BY MS. VILLANUEVA:**

13   Q    Okay.  So, going to B-19, top half of the page, what kind

14   of document is this?

15   A    It's titled Specialist Agreement.

16   Q    Is this the document required to enroll in Tricare as a

17   specialist?

18   A    As a network; yes, network specialist.

19   Q    And what is the information that is provided in this type

20   of application?  Between which parties?

21   A    It's an agreement between Humana Healthcare Services and

22   the provider.

23   Q    And who is Humana Healthcare -- Humana Military Healthcare

24   Services?

25   A    They are a managed care support contractor for the Tricare

1   program.  They administer the Tricare program in previously

2   what we called the South Region, and now it's called the East

3   Region.

4   Q     And the provider which you previously testified to is

5   Dr. Jorge Zamora-Quezada; is that correct?

6   A     Correct.

7   Q     And on page nine of B-19, what office site is this

8   application for?

9   A     This is Edinburg, Texas.

10  Q     And what's the name of the office?

11  A     Arthritis and Osteoporosis Center.

12  Q     And do you know who owns that facility?

13  A     Dr. Zamora-Quezada.

14  Q     And this agreement has another Attachment B, page 10, and

15  what does it mean if multiple Attachment B's are for this

16  contract?

17  A     There can be multiple provider facilities or locations.

18  Q     And according to this second Attachment B, page 10, what

19  facility is that?

20  A     This is Arthritis and Osteoporosis Center located in

21  Brownsville, Texas.

22  Q     And who is the owner of that facility?

23  A     Dr. Zamora-Quezada.

24  Q     And according to page six, who signed this application on

25  behalf of the Osteo -- Arthritis and Osteoporosis Center, both

1    Edinburg and Brownsville?

2    A    The name reflected there is Jorge C. Quezada, M.D.

3    Q    And if we can turn to page 11, zoom in on paragraph five,

4    what provisions are there for paying a provider for medically

5    unnecessary services?

6    A    No payment will be made for medically unnecessary

7    payment -- or services.

8    Q    What would Tricare -- would Tricare pay a provider if it

9    knew that the provider was performing medically unnecessary

10   procedures?

11   A    No.

12   Q    Would Tricare pay a provider if it knew it submitted false

13   information?

14   A    No.

15   Q    Page four, section 23; can you read for us the title of

16   that section?

17   A    Compliance with regulatory requirement.

18   Q    What penalty does a provider face if it violates a federal

19   law according to section 23 of this document?

20   A    Well, let me review it real quick.

21   Q    Humana can terminate the agreement with the provider if

22   they violate that section 23.

23   Q    How are the Tricare laws, regulations, and program

24   instructions made available to providers?

25   A    They're made available through -- there's a Tricare public

Coufal - Direct / By Ms. Villanueva                40

1   website, a manuals website, so it's available to everyone.

2   A    They're made available through -- there's a TRICARE public

3   website -- a manuals website.  So it's available to everyone.

4        When providers first become network providers, they

5   are given a welcome package.  It gives information about

6   TRICARE.

7        There's a TRICARE handbook that's included that gives

8   detailed information, guidance to the provider.  And there's

9   contact numbers and websites that they can -- they can access

10  information.

11  Q    So there are multiple outlets and individuals to reach out

12  to; is that correct?

13  A    Yes.

14  Q    You previously testified that TRICARE does not requires

15  its providers to submit patient files before paying a claim.

16       But TRICARE requires providers to maintain patient

17  files, correct?

18  A    Excuse me.  There can be some incidences where -- case by

19  case, where a medical record or a page from a medical record

20  may be required.

21       Generally speaking, it's not required to -- to submit

22  the medical record -- I'm sorry.  I got lost in --

23  Q    It's okay.  My question, more specifically, was, if we

24  will look at page 3, of B-19, Section 11 -- and can you tell me

25  the title of that section?

Coufal - Direct / By Ms. Villanueva                          41

1    A    "Medical Records."

2    Q    And, per that Section 11, on B-19, TRICARE -- what does

3    TRICARE require of its providers?

4    A    To maintain medical records for the services that they

5    render to beneficiaries.

6    Q    Thank you.

7              **MS. VILLANUEVA:**  Your Honor, may I approach the

8    witness?

9              **THE COURT:**  Yes, ma'am.  And you don't need to ask

10   that question with regards to the witness anymore.

11             **MS. VILLANUEVA:**  Thank you.

12   **BY MS. VILLANUEVA:**

13   Q    Ms. --

14   A    -- Coufal.

15   Q    I'm going to hand you what's marked as Government's

16   Exhibit B-3.  This exhibit has been previously admitted by the

17   Defense.  Therefore, my questions to you are going to be kind

18   of limited about it.

19             So I've given you what's been marked as B-3, already

20   admitted by the Defense.  Can you tell me what that is?

21   A    Yes.  This is a CD, containing TRICARE claims data.

22   Q    And how does TRICARE maintain its claims data?

23   A    In a data repository.

24   Q    Does this CD contain specific claims data for Dr. Jorge

25   Zamora-Quezada and his clinics?

1    A    Yes.

2    Q    And how do you know that?

3    A    Because I reviewed the data that's on his CD, and I've

4    confirmed with the individual who pulled the data, that this is

5    the TRICARE claims data for this provider.

6    Q    And you've marked that CD, indicating you've reviewed that

7    particular one, correct?

8    A    Yes.  I signed it and dated it.

9    Q    And all the data contained in that CD is for -- on behalf

10   of TRICARE beneficiaries alone, correct?

11   A    Yes, it's just TRICARE beneficiaries.

12   Q    You mentioned Dr. Jorge Zamora-Quezada was -- became a

13   TRICARE network provider in 2005.

14   A    Correct.

15   Q    What is the current status of Dr. Jorge Zamora-Quezada's

16   network contract with TRICARE?

17   A    He's still contracted, but he's on -- we suspended

18   payments back in 2018.

19   Q    And what basis did you suspend payments on?

20   A    On the basis of the ongoing investigation and proceedings.

21        **MS. VILLANUEVA:**  Your Honor, I pass the witness.

22        **THE COURT:**  Mr. Lee?

23        **MR. LEE:**  Thank you, your Honor.

24   //

25   //

1                          **CROSS EXAMINATION**

2    BY MR. LEE:

3    Q    Morning, Ms. Coufal.

4    A    Yes.

5    Q    Am I pronouncing that right?

6    A    Yes, Coufal.

7    Q    Thank you.  First of all, you and I have never met,

8    correct?

9    A    Correct.

10   Q    You've met with the Government before, correct?

11   A    Yes.

12   Q    And you've met with them multiple times, correct?

13   A    A couple.

14   Q    Okay, did you meet or talk with them in the past few days?

15   A    Yes.

16   Q    Okay, now, Ms. Coufal, you said that you are a certified

17   fraud investigator, correct?

18   A    No.  Certified fraud examiner.  That's --

19   Q    I'm sorry.

20   A    That's the title.

21   Q    Certified fraud examiner.  And in your -- as a certified

22   fraud examiner, you're familiar with claims data, correct?

23   A    Yes.

24   Q    And you're familiar with data analysis, correct?

25   A    Yes.

Coufal - Cross / By Mr. Lee                              44

1   Q    And you're familiar with the idea that data analysis --

2   analysis of claims data is an important tool in conducting

3   investigations, correct?

4   A    Yes.

5            MS. VILLANUEVA:  Objection, your Honor.  She's

6   already stated she doesn't actually do investigations.

7            THE COURT:  She didn't have any knowledge about

8   anything that goes with the rest of the investigations?

9            THE WITNESS:  I'm sorry, your Honor?

10           THE COURT:  Do you have any knowledge with the rest

11  of what leads to an investigation?

12           THE WITNESS:  I'm sorry.  I don't understand the

13  question.  Do I have knowledge --

14           THE COURT:  Well, at some point, TRICARE does decide

15  to investigate something, right?

16           THE WITNESS:  We decide to conduct further review.

17  And then we will -- if it meets certain criteria, we will

18  forward it to law enforcement.

19           We're not investigators.

20           THE COURT:  But you do decide, well, at some point,

21  "Maybe this should be investigated"?

22           THE WITNESS:  Yes, sir.

23           THE COURT:  And you send it to whoever you think

24  would be doing that?

25           THE WITNESS:  Yes.  And for further review and in law

Coufal - Cross / By Mr. Lee                    45

1  enforcement investigation.  We don't do interviews.  We don't

2  do that.

3          We leave that up to the trained law enforcement

4  professionals that act on behalf of TRICARE, which is the

5  Defense Criminal Investigative Service or, you know, FBI or

6  Department of Justice.

7          **THE COURT:**  Go ahead.

8  **BY MR. LEE:**

9  Q    So, Ms. Coufal, just to be clear, you said that, in the

10 course of review, one might look at data, but then there might

11 be further review based on the review of the data?

12 A    Yes.

13 Q    Okay, but you wouldn't take an action against a provider

14 simply based on a review of the data, correct?

15 A    Correct.

16 Q    All right.  Now, you were asked, on direct examination,

17 about Exhibit B-3, correct?

18 A    Yes.

19 Q    And that's a CD you have in front of you, right?

20 A    Yes.

21 Q    And that contains data that was requested by the

22 Government, correct?

23 A    Yes.

24 Q    And TRICARE provided that to the Government --

25 A    Yes.

1  Q      -- correct?

2         And, in doing that, someone at TRICARE went to the data

3  repository you mentioned and pulled the data, correct?

4  A      Yes.

5  Q    And then someone at TRICARE also did some quality control

6  review to make sure that the data was accurate, correct?

7  A    It would be the same individual who pulled the data.

8  Q    Right.  But the person who pulled the data didn't just

9  pulled the data; they also did some things to make sure that

10 the data was accurate, correct?

11 A    Yes, I would assume so.

12 Q    Okay, all right.  Now, let's see.  And you reviewed this

13 data prior to testifying here, correct?

14 A    Yes.

15 Q    Okay, I'm going to --

16        **MR. LEE:**  If we can switch to the Defense table.

17 **BY MR. LEE:**

18 Q    Ms. Coufal, I have on the screen -- which you will,

19 hopefully, see soon -- a copy of Exhibit B-3.  And I'm opening

20 the folder.

21       And do you see the Excel file that's titled, "Center for

22 Arthritis and Osteoporosis TRICARE Claims Data"?

23 A    Yes.

24 Q    And is that the claims data you were talking about

25 earlier?

                          Coufal - Cross / By Mr. Lee                    47

1   A    That's the spreadsheet.

2   Q    Okay, I'm going to open the spreadsheet -- which may take

3   a moment -- all right, and I'm going to turn on the full-screen

4   view, and I'm going to turn the view on to zoom 200 percent.

5   A    Okay.

6   Q    And let's scroll all the way to the left.  Now, first of

7   all, I'll direct your attention to the bottom, left-hand corner

8   of the screen.

9        Does that show that there are three different worksheets

10  in this spreadsheet?

11  A    Yes.

12  Q    All right.  And each worksheet contains different data,

13  correct?

14  A    Yes.

15  Q    Now, the first one states -- is, "All TRICARE claims since

16  2000," correct?

17  A    Yes.

18  Q    And the next one is, "Williams P.A.," correct?

19  A    Yes.

20  Q    And the third one is, "Zamora-Quezada," correct?

21  A    Yes.

22  Q    Now, am I right in understanding that the first worksheet,

23  "All TRICARE claims data since 2000," contains the entirety of

24  the data, with the two other sheets, being specific to two

25  specific individuals?

1   A    I would assume so.  I didn't verify that.  I didn't pull

2   the data.  I would assume that it's based on the description of

3   that tab.

4        But I also know, when we pull claims data, there's -- you

5   know, there may be specific other criteria that was requested,

6   and I didn't have visibility on that.

7        So I don't know.

8   Q    You weren't the one who pulled the data, right?

9   A    That's correct.

10  Q    And you weren't the one who received the specific request

11  from the Government, correct?

12  A    Correct.

13  Q    Okay, all right.  Well, for purposes of this, I'm going to

14  focus on the third tab, the one that says, "Zamora-Quezada."

15  A    Okay.

16  Q    I'm going to go to that one.  And I'm going to do the zoom

17  thing again; zoom 200 percent.  And I'm going to scroll all the

18  way to the left.

19       Now, looking at the line numbers, on the left-hand side --

20  A    Uh-huh.

21  Q    -- does this particular worksheet indicate there are

22  68,359 lines of data corresponding to the data on this

23  particular worksheet?

24  A    Claim lines, yes.

25  Q    Right.  And the line number, on the side, says 68,360; but

Coufal - Cross / By Mr. Lee                          49

1  that's one more because that's counting the header row?

2  A    Yeah.

3  Q    Okay.

4  A    That's correct.

5  Q    And I'm going to go all the way to the top.

6       All right, now, I'm going to go through and explain now --

7  am I right, is it that -- am I right to say that, basically,

8  each one of these columns represents a different data point,

9  corresponding to the particular line, which is a service that

10 was billed to TRICARE?

11 A    Yes, yes.  The claim line would come from the claim

12 information.

13 Q    Okay, so when a provider submitted a claim, it can be the

14 provider might submit multiple services in the same claim,

15 correct?

16 A    Yes.

17 Q    So and each of the lines in the spreadsheet is specific to

18 a service, and a claim may have -- may contain one or more

19 services, correct?

20 A    Yes.

21 Q    Okay, all right.  Now, looking at the column headings -- I

22 want to go through the column headings and see what -- just

23 make sure the jury understands what these are all for.

24      Column A, "Claim Number"; what does that represent?

25 A    That's the unique identifier for this particular claim.

1       I would also refer to this TRICARE data as our TRICARE

2  encounter data.  So it's a record, based upon the claim

3  information.

4  Q    Okay, now, looking the -- line 2, it starts off with the

5  four digits, "2002."

6       Do you see that?

7  A    Yes.

8  Q    And you see the next three digits here, are "246."

9  A    Yes.

10 Q    Now, does that indicate that this particular claim was

11 received by TRICARE on the 246th day of 2002?

12 A    Yes.

13 Q    Okay, and that -- so that's what that number tracks,

14 correct?

15 A    Yeah.  It's a Julian date.

16 Q    It's a Julian date.  And Julian is a type of calendar,

17 correct?

18 A    Yes.

19 Q    Okay, all right.  And so that's how we can indicate --

20 that's what indicates when TRICARE received the claim, correct?

21 A    When the -- yes.  When the contractor -- the claims

22 processor received the claim.

23 Q    And, in this case, that would be Humana, correct?

24 A    It was Humana.

25 Q    All right, okay.  Now, the next, Column B --

1        Oh, and, actually, in terms of Column A -- in terms of the

2   date here, the 246th day of 2002, for line 2, that indicates

3   when Humana received the claim, right?

4   A    Yes.

5   Q    Okay, and that doesn't necessarily track when the claim

6   was submitted by the provider, correct?

7   A    It's my understanding that that's when the claim was

8   submitted by the provider; that Julian date -- that's my

9   understanding -- is when the provider submitted the claim to

10  the contractor.

11       It may not necessarily be the date that the service was

12  rendered, but that's the date that it was submitted.

13  Q    Right.  Because there can be differences between the date

14  of service and the date of submission, correct?

15  A    Correct, yes.

16  Q    Okay.  All right, the next column, "Line Item Number,"

17  does that indicate that, when multiple services are billed and

18  put through claim, the line number just helps keep those

19  services separate?

20  A    Yes.

21  Q    Okay, and looking at lines 2, 3, and 4, why is the claim -

22  - is the claim number in blue there because those are claims

23  that -- that always corresponds to the Line Item Number One for

24  that claim?

25  A    I think that's how he did it, yeah.

1  Q    Okay.  All right, the next two columns, C and D, what do

2  those represent?

3  A    C is the four-year, calendar year date obtained from that

4  next column, Column D, from the date of service.

5  Q    Okay, and here, the number for date of service, it's

6  written as an eight-digit number, "20001216."

7       Does that indicate that the date of service for this

8  particular claim was December 16, 2000?

9  A    Yes.

10 Q    Okay, now, I'm going to turn on the filter function.  Just

11 want to help that make a little clearer.  And I'm going to

12 filter the claim numbers for 2014001.

13      All right, and do you see that it pulls up -- there's four

14 different claim numbers associated with that, that I'm now

15 filtering for?

16 A    Yes.

17 Q    Okay, and here, looking at line 36317, does that

18 indicate -- does the claim number of that indicate that the

19 claim was submitted or received -- submitted to or received by

20 Humana, on the first day of 2014?

21 A    That's my understanding, that that's the date that the

22 claim was submitted.  Excuse me.  It may also be a date that,

23 if there was -- I don't know, perhaps an adjustment or a

24 resubmission.

25      But, yeah.  I don't know for sure.

Coufal - Cross / By Mr. Lee                                    53

1   Q    Okay, all right.  But when you look at the D-column there,

2   that indicates the date of service was December 9th of 2013,

3   correct?

4   A    That's what it says.

5   Q    All right.  And that's not the same as January 1st, 2014,

6   correct?

7   A    Yes, that's correct.

8   Q    Right.  So, here, the date of service is different than

9   the date of submission, correct?

10  A    It appears to be, yes.

11  Q    Okay.  All right, I'm going to un-filter that, and

12  continue with the columns.

13       All right, the next column, Column F, "Patient DOB," that

14  represents the patient's date of birth, correct?

15  A    Correct.

16  Q    "Sponsor I.D.," what does that represent?

17  A    That looks to be the sponsor Social Security Number.

18  Q    Okay, and is that referring to -- under TRICARE system, is

19  it that there can be the member of TRICARE is a sponsor, but

20  there might -- the TRICARE service might also cover people's

21  relatives, and that's why the patient -- a patient might not

22  necessarily be the sponsor?

23  A    That's correct.  The patient can be the sponsor; but the

24  patient, yes, can also be a family member associated with --

25  with the sponsor.

1        And the sponsor is either the active-duty or retired

2   military member.

3   Q    Right.  Okay, the next two columns, H and I, "Place of

4   Service Code; Place of Service Code Description" --

5   A    Uh-huh.

6   Q    What do those track?

7   A    Basically what it says.  It's a code for where the place

8   of service occurred.

9   Q    Okay, the next two columns, "Dx Code" and "Dx Code

10  Description," what do those track?

11  A    That's diagnosis code.  And then a diagnosis code -- and

12  it's short description.

13  Q    Right.  And so -- and, Dx, that's just terminology for

14  diagnosis?

15  A    You're right.  The abbreviation that we use, yeah.

16  Q    Right.  And so -- and the diagnosis codes, those

17  correspond to the ICD-9 or ICD-10 codes that are -- that

18  providers use, correct?

19  A    Correct.

20  Q    And those are things that providers across the country

21  use, correct?

22  A    Yes.

23  Q    Okay, the next two columns, L and M, what do those track?

24  A    L would be the procedure code.  There's two medical sets;

25  the CPT or the HCPCS codes; again, procedure codes.

1   Q    Right.  And, again, and those numbers and those

2   descriptions -- those are used throughout the country, correct?

3   A    They are.  They're industry standard.

4   Q    Okay, and, "Modifier," that's used in case there's

5   something different about that service that's billed, so that

6   that can be taken into account, correct?

7   A    Yes.

8   Q    Okay, "Line Item Billed; Line Item Allowed"; what do those

9   track?

10  A    The Line Item Billed is the billed or charged amount on --

11  that the provider submitted on the claim.  And the Line Item

12  Allowed is the determined allowable amount after the claim has

13  been fully processed and adjudicated.

14  Q    All right.  And the next column, "OHI," what does that

15  track?

16  A    Other health insurance.

17  Q    Okay, so if a patient is covered by TRICARE, as well as by

18  someone else -- like Medicare or Humana or Blue Cross Blue

19  Shield, that would be tracked there?

20  A    Yes.  You would see dollar values there if the other

21  health insurance paid.

22  Q    Okay, Column R, "Line Item Paid"; what does that track?

23  A    That's the TRICARE paid amount to the provider.

24  Q    All right, Column S and Column T, "Adjustment Denial Code"

25  and "Adjustment Denial Description"; what do those track?

Coufal - Cross / By Mr. Lee                              56

1   A    Again, basically what the title says.  Those are a column

2   for, if adjustments or denials occurred.

3        And you would see a value there -- a code.  And if there

4   was a code there, then you would see a short description -- or

5   a long description, for that matter -- under Column T.

6   Q    Okay, and the next few columns, Columns U through Column

7   AB; does that contain information that helps identify the

8   specific provider who billed the services and various points of

9   data about that service provider?

10  A    Yes.

11  Q    Okay, and, finally, Column AC and Column AD, "Contractor

12  Code" and "Contractor Name"; what do those track?

13  A    Contractor code; that is the internal code set that we use

14  to identify TRICARE contractors over time.

15       The contracts change, and so the companies that get those

16  contracts change.

17  Q    All right, now, going back over here, I'm going to

18  highlight the Column R.

19  A    Uh-huh.

20  Q    And by seeing column -- now that I've highlighted Column

21  R, I want to direct your attention to the bottom right-hand

22  corner of the screen.

23       When you look at the count, does that indicate there are

24  68,361 lines of records that correspond -- that are stuck being

25  in that column?

Coufal - Cross / By Mr. Lee                           57

1   A    I'm not sure.

2   Q    Let me -- maybe I'll scroll down.

3   A    Okay.

4   Q    Let me scroll down.  I'm going to scroll down to the

5   bottom of -- I'm scrolling down to the bottom of the Excel

6   worksheet --

7   A    Uh-huh.

8   Q    -- until we stop seeing numbers and just see -- okay.

9        So here, we see the -- there are about 68,359 lines here,

10  correct?

11  A    Yes.

12  Q    Okay, now -- and then below that line, 68,361; that

13  contains a sum total of the preceding entries, correct?

14  A    That's what I would assume that would be, yes.

15  Q    Okay, and so that indicates that, in this worksheet, all

16  the services that are contained here, they add up to a total

17  payment of $1,661,984.40, correct?

18  A    That appears to be what that is representing, yes.

19  Q    Okay.  All right, now -- and now I'm going to go back to

20  the top of the sheet, and scroll my way back up.

21       Now, looking at that, are you familiar with the filter

22  function in Excel?

23  A    Yes.

24  Q    All right, I'm going to turn on the filter function --

25  A    Uh-huh.

1   Q    -- for the DX code description, and I'm going to filter

2   for R-E-R-H-E-U.

3        And do you see that it then pulls up -- it filters already

4   down to a certain number of diagnosis in the window that I'm

5   pointing to on the screen?

6   A    Yes.

7   Q    Okay, and I'm going to now -- I'm going to leave check

8   marked the one that begins, "O-t-h-r-e-r-h-e-a-r-t-h."  I'm

9   going to leave those check marked.

10       Then I'm going to take off the polymyalgia.  I'm going to

11  de-check that.  And I'm going to de-check rheumatism.

12       All right.  And now that I've filtered that, we're now

13  down to -- this takes the records down to 36,346 records,

14  correct?

15  A    According to that bottom left corner.

16  Q    Right.

17  A    On the screen sheet.

18  Q    That's something that you're familiar with from using

19  Excel, correct?

20  A    Yes.

21  Q    That's how filter works, correct?

22       Okay, and then, with that, I'm now going to highlight Line

23  R again.

24       And that sums up the total line item paid for all the

25  services that match the diagnosis codes and descriptions that

1   we selected for, correct?

2   A    Yes.

3   Q    Okay, can you read the total there; the total sum there?

4   A    Oh, I'm sorry.  $810,584.57.

5   Q    Okay, and that's less than the total we were looking at

6   before, correct?

7   A    Yes.

8   Q    I'm now going to turn off the filter for the diagnosis

9   codes.  And I'm now going to turn to the CPT-HCPCS codes.  And

10  I'm now going to filter for the word, "New."

11       And do you see that that filters down to two different CPT

12  code descriptions?

13  A    No.

14  Q    Do you see --

15  A    Where are we?

16  Q    If you look at Column M --

17  A    Yeah.

18  Q    -- do you see that I've now filtered -- again, I'm going

19  to do it again.

20  A    Okay.

21  Q    Filtered for the word, "New."

22  A    Yes.  I'm sorry.  I see that, yes.

23  Q    Okay, and then one of the option this pulls up is, "Office

24  Out-patient Visit New," corresponding to the code 99204; do you

25  see that?

Coufal - Cross / By Mr. Lee                          60

1   A    That's one of the codes I can see on the screen.

2   Q    Right.

3   A    Yes.

4   Q    And that's one of the CPT codes that's used when a

5   provider sees a patient for the first time and bills it as a

6   new patient visit, correct?

7   A    Correct.

8   Q    Okay, and the other option here -- and there are other

9   options.

10       There's -- this also corresponds to -- this is also

11  picking up the 99202, 99203, and 99205 codes, correct?

12  A    Correct.

13  Q    And, again, those are also codes that providers use when

14  they bill for the first time that they see a patient, correct?

15  A    Yes.

16  Q    Okay, and now that we filter this way, how many records

17  are shown here?

18  A    617.

19  Q    All right, so based on this billing data, this reflects

20  that Dr. Zamora-Quezada saw 617 TRICARE patients for new

21  patient visits during the period covered by this data, correct?

22  A    I don't necessarily know how many patients it is.  It's

23  617 line items.

24  Q    Right.  Okay, would the system track it if someone billed,

25  let's say, multiple times for new patient visits for the same

Coufal - Cross / By Mr. Lee                              61

1   patient?

2   A    It would be documented.

3        If claims came in like that, yes, that information is

4   passed to these -- to the data.

5   Q    Okay.

6   A    And it would be in the data.

7   Q    All right, but at least, based on his billing data,

8   Dr. Zamora-Quezada billed for 617 new patient visits, correct?

9   A    Yes, yes.

10  Q    For TRICARE?

11  A    Instances.

12  Q    617 new patient visit instances that he billed to TRICARE

13  during the period covered by this data, correct?

14  A    Correct.

15  Q    Okay.

16           **THE COURT:**  So these would all be new patients.  They

17  wouldn't be possibly the same patient more than once on this

18  617?

19           **THE WITNESS:**  It depends on time frame.

20           I know that, with some of these new patient codes,

21  there's a certain time frame where, if someone has -- was a new

22  patient and then you haven't seen them for a while and they

23  come back they can be new again.

24           But I don't know what the time frame is.

25           //

Coufal - Cross / By Mr. Lee                          62

1    BY MR. LEE:

2    Q    Based on your experience as -- with working at TRICARE,

3    based on your experience working with claims data, it's typical

4    that a provider -- when a provider sees a patient for the first

5    time, it's a new-patient visit; if they see the patient for a

6    follow-up within the next few months, that would be an

7    established patient visit?

8    A    Correct.

9    Q    Correct?

10        And what you just described would be a situation of

11   where -- let's say a patient was seen for a new patient visit,

12   let's say, in 2004 --

13   A    Uh-huh.

14   Q    -- wasn't seen again for ten years; came back.  Well, then

15   the provider couldn't probably bill that as a new patient visit

16   at the time of 2014?

17   A    Yes.

18   Q    Okay, all right.  All right, and so let me just make sure

19   we have that.  So that was NP visits, at 617.

20        Okay, I'm now going to filter for CPT code 86431.

21        All right, and that corresponds to the description,

22   "Rheumatoid Factor Quant," correct?

23   A    Yes.

24   Q    How many times -- and how many records correspond to that?

25   A    I see 2,104 claim lines.

1   Q    All right, and that's about three or more -- about three

2   or so times the number of new patient visits we were just

3   looking at, correct?

4   A    Yes.

5   Q    All right, so that indicates that -- well, all right.  We

6   have that.

7        All right, now I'm going to filter for 86140.

8        And that corresponds to the description, "C-Reactive

9   Protein," correct?

10  A    Yes.

11  Q    And what's the number of records associated with that?

12  A    1,602.

13  Q    All right.  I'm now going to filter for 85651; and that

14  corresponds to "RBC sed rate not automated", correct?

15  A    Yes.

16  Q    And how many records are filtered -- when we filter, how

17  many records appear for that?

18  A    1,523 claim lines.

19  Q    And again that's -- again, the number at the bottom left-

20  hand corner of the screen.

21  A    Yes.  Yes.

22  Q    Okay.  All right.  So, for each of those we just looked

23  at, the number of procedures billed was more than the number of

24  new patient visits, correct?

25  A    Yes.

Coufal - Cross / By Mr. Lee                                    64

1    Q    Okay.  Now, I want to direct your attention to -- I'm

2    going to filter now for 80053, and that's for "Comprehen

3    metabolic panel", correct?

4    A    Yes.

5    Q    And what's the number of records associated with that?

6    A    744 claim lines.

7    Q    All right.  And that's a bit more than the 617 new patient

8    visits we saw earlier, correct?

9    A    Yes.

10   Q    All right.  I'm now going to filter for 83735.  How many

11   records appear for that?

12   A    Based on the bottom of the spreadsheet, it says 121.

13   Q    All right.  And that's less than the number of new patient

14   visits we looked at earlier, correct?

15   A    Yes.

16        MS. VILLANUEVA:  Objection, your Honor; improper

17   foundation.  He did not state what the code he inputted was

18   for.

19        MR. LEE:  Oh, thank you.  Thank you.  I'll go back to

20   that.  Sorry.

21   BY MR. LEE:

22   Q    That's for -- that description for that 83735 is "Assay of

23   magnesium", correct?

24   A    Yes.

25   Q    Okay.  Thank you.  And going back now that -- now that the

Coufal - Cross / By Mr. Lee                    65

1  prosecutor has caught that I missed that, again, how many

2  records are associated with that particular CPT code?

3  A    121.

4  Q    Okay.  Thank you.

5         **MR. LEE**:  And thank you, the prosecutor.

6  Q    All right.  I'm now going to turn to CPT Code 86644.  How

7  many records are -- oh, again; sorry.  I'm going to go back and

8  scroll all the way up, and that corresponds to "CMV antibody",

9  correct?

10  A    Yes.

11  Q    And how many records show up for that CPT code?

12  A    Twenty-one.

13  Q    All right.  And that's well under the 617 new patient

14  visits we saw earlier, correct?

15  A    Yes.

16  Q    All right.  Now, I'm going to filter for 86663.  All

17  right.  And that's -- the description for that CPT code is

18  "Epstein-Barr antibody", correct?

19  A    Yes.

20  Q    And how many records -- how many records are there

21  corresponding to that CPT code?

22  A    Nineteen claim lines.

23  Q    All right.  And again, that's well under the 617 new

24  patient visits we saw earlier, correct?

25  A    Yes.

Coufal - Cross / By Mr. Lee                    66

1   Q    I'm now filtering for 86665.  Okay.  And again here it

2   shows the CPT description as "Epstein-Barr antibody", correct?

3   A    Yes.

4   Q    All right.  And that's similar to the one we saw earlier,

5   correct?

6   A    Yes.

7   Q    All right.  But they're different procedure codes,

8   correct?

9   A    They're different codes.

10  Q    So they are probably different procedures; just the

11  descriptions are similar.

12  A    Yes; yes.  These are short descriptions, yeah.

13  Q    So, and the doctors and providers may well understand what

14  the differences are, but the data just doesn't give you enough

15  here.

16  A    Yes.

17  Q    Okay.  And how many records are associated with this CPT

18  code?

19  A    Nineteen.

20  Q    Okay.  And again, well under the 617 new patient visits,

21  correct?

22  A    Yes.

23  Q    Now, I'm filtering for 86618; that corresponds to "Lyme

24  disease antibody", correct?

25  A    Yes.

Coufal - Cross / By Mr. Lee                    67

1   Q    And how many records are associated with that CPT code?

2   A    Twenty-eight.

3   Q    And I'm now filtering for CPT code 84100, and that

4   corresponds to the description "Assay phosphorus", correct?

5   A    Yes.

6   Q    How many records are associated with that CPT code?

7   A    Nineteen.

8   Q    All right.  So, for some of the tests we saw as we

9   filtered through these, some of them were more than the number

10  of new patient visits, correct?

11  A    Yes.

12  Q    And some of them were less than the number of new

13  patients, correct?

14  A    Yes.

15  Q    All right.  I'm now going to unfilter the CPT codes.

16       All right.  And I want to focus on a particular

17  patient.

18  A    Okay.

19  Q    So, I'm going to do that by filtering the patient name.

20  So, I am filtering for "Hitchcox, Cynthia".  And it appears

21  that that person shows up multiple -- her name shows up in

22  multiple ways, correct?

23  A    Yes.  Yeah.

24  Q    All right.  But when it shows -- her name may show up in

25  different ways, but that may still just be showing this,

1   referring to the same person, it's just how the name was input

2   into the system.

3   A    Yes.

4   Q    Sometimes the full name, sometimes just the first and last

5   names, sometimes the first name, middle initial, and last name,

6   correct?

7   A    Yes.

8   Q    Okay.  And that's typical; that's not uncommon, correct?

9   A    Is common.

10  Q    Okay.  Looking at this, I'm going to turn on the filter

11  for "DOS", and that shows that her first date of service was

12  February 11, 2004, correct?

13  A    Yes.

14  Q    And if I scroll all the way down, it shows that her last

15  date of service was April 26, 2012, correct?

16  A    Yes.

17  Q    Okay.  So, that spans about eight years, correct?

18  A    Yes.

19  Q    Okay.  All right.  Now, looking at the line item paid,

20  what's the total amount of payments that were made on these

21  services for this patient over that timespan?

22  A    $27,945.28.

23  Q    All right.  Now, I'm going to filter for "Rheumatoid

24  arthritis", and that shows up -- how many line items correspond

25  to that particular diagnosis code for this patient?

Coufal - Cross / By Mr. Lee                                    69

1    A    230.

2    Q    All right.  And what is the total paid amount for this

3    patient and that diagnosis?

4    A    $14,612.40.

5    Q    So, not the total amount that we were looking at?

6    A    No.

7    Q    And that means other services were billed for other

8    conditions, correct?

9    A    Yes.

10   Q    Okay.  And when you take account all the conditions, all

11   the diagnoses, what are the average amount of payment on the

12   various services that were billed?

13        MS. VILLANUEVA:  Objection, your Honor.  Counsel

14   stated "all"; this is only accounts for Ms. Hitchcox --

15        MR. LEE:  Oh, I'm sorry; I meant --

16        THE COURT:  Well, I think he meant all for that one

17   patient.

18        MR. LEE:  -- for this patient.  Yes.

19        MS. VILLANUEVA:  But only being seen by Dr. Jorge

20   Zamora-Quezada; not being seen at his clinic in general,

21   because there is another tab for all TRICARE data for the

22   whole -- under the whole contract which Ms. Coufal had

23   previously testified included two clinics.

24        THE COURT:  But they're his clinics, right?

25        MR. LEE:  Yes.

1    **BY MR. LEE:**

2    Q    Ms. Coufal, just to be clear, Zamora-Quezada -- now, you

3    didn't pull this data, but --

4    A    No.

5    Q    -- it's your understanding that this reflects the data

6    for -- that Dr. Zamora billed at any location to TRICARE?

7    A    I can't say that with 100% certainty; I didn't pull the

8    data.

9    Q    Okay.  You know what, I'm going to -- I can switch to the

10   other worksheet; that's no problem.  So, I'll go there; we'll

11   do this again.

12            All right.  I'm going to all TRICARE claims since

13   2000.  I'm filtering for "Hitchcox, Cynthia".  And let's go to

14   provider, and if I turn on that button, that indicates that two

15   different providers saw this patient according to claims data,

16   Jorge Zamora-Quezada and Lou Ann Woodard (phonetic), correct?

17   A    Correct.

18   Q    Okay.  And if we go over to -- okay.  Now, I'm going --

19   just to be clear, now we're looking at all TRICARE claims since

20   2000.  Again, just to be clear, I'm going to do the total, and

21   the total there -- what is the total now that we're looking at

22   this worksheet for this patient?

23   A    $27,962.16.

24   Q    Okay.  All right.  Now, and just to be -- so everyone is

25   clear, I'm now going to filter "Rheumatoid arthritis", and now

Coufal - Cross / By Mr. Lee                                          71

1    go back to paid amount.  What was the paid amount corresponding

2    there?

3    A    $14,629.28.

4    Q    All right.  And, you know what, I'm going to ask you --

5         **MR. LEE:**  May I approach, your Honor?

6         **THE COURT:**  Sure.

7    **BY MR. LEE:**

8    Q    I'm going to hand you a calculator.  I'm not going to ask

9    you to do this in your head, but if you could -- that's

10   $14,629.28 divided by the total $27,962.16.

11   A    Okay.

12   Q    What percentage is that?

13   A    I don't know.  Okay, 14,629.28; I'm sorry, divided by

14   what?

15   Q    27,962.16.

16   A    Okay.  I got a .52.

17   Q    It's about 52%.

18   A    Oh, times 100, yeah; I forgot to do that.  Okay.  Yes.

19   Q    Okay.

20   A    That is correct.

21   Q    So, just about half the payments were associated with

22   rheumatoid arthritis, correct?

23   A    Yes.  Yes.

24   Q    Okay.  And this spans an eight-year period, correct?

25   A    According to this data.

Coufal - Cross / By Mr. Lee                72

1  Q    Yeah, okay.  And what was the average amount of payment

2  for each of those services as shown by the right-hand corner?

3  A    Oh, $60.45.

4  Q    All right.  I'm now going to turn off the filtering for

5  rheumatoid arthritis, but still leave it filtered for this

6  patient.  I'm also going to sort the CPT codes by numerical

7  order.

8         Okay.  So, I'm going to scroll through.  Now, I'm

9  going to scroll through, and looking at this, does the data

10 show that this patient received one or more services billed

11 with the code 86431 for "Rheumatoid factor"?

12 A    Yes.

13 Q    Okay.  Scrolling up, does it show that this patient

14 received one or more services billed using the code 86140 for

15 "C-reactive protein"?

16 A    Yes.

17 Q    Does the data show that the patient received one or more

18 services for the service billed using 85651, "RBC sed rate"?

19 A    Yes.

20 Q    All right.  I'm just going -- now, does the data show that

21 she received services billed using 83735, "Assay magnesium"?

22 A    Yes.

23 Q    Does it show that she received services billed using 80053

24 for "Comprehensive metabolic panel"?

25 A    Yes.

Coufal - Cross / By Mr. Lee                        73

1   Q    Does it -- now, again, since the data is sorted by

2   ascending order numerically, does the data show that this

3   patient received a service billed using 8644?

4   A    No.

5   Q    Does it show that she received a service billed using

6   86663?

7   A    No.

8   Q    Does it show that this patient received a service that was

9   billed to TRICARE using the code 86665?

10  A    No.

11  Q    Does it show that this patient received a service that was

12  billed using the CPT code 86618?

13  A    No.

14  Q    Does the data show that this patient received a service

15  that was billed using the CPT code 84100?

16  A    No.

17  Q    And just to be clear, this was a patient who was seen for

18  the first time in 2004, correct?

19  A    According to this data.

20  Q    Okay.  And we can help confirm that.  I'm going to go to

21  the CPT code and sort for "New"; and that pulls up one record

22  for this patient, corresponding date, February 11, 2004,

23  correct?

24  A    Correct.

25  Q    So, according to the billing data, that's when Dr. Zamora

Coufal - Cross / By Mr. Lee                          74

1    saw this patient for the first time, correct?  Or had a new

2    patient visit.

3    A    If this data is complete.

4    Q    Okay.  Yes.  But just again, this is the data that the

5    Government asked you for, correct?

6    A    This is the data that the Government asked my coworker

7    for.

8    Q    Yes.  Okay.  The defendant, we didn't ask you to create

9    this document, correct?

10   A    No, no.

11   Q    And we did not -- the defendant did not create this

12   document, correct?

13   A    Correct.

14   Q    Okay.  All right.  All right.  So, now I'm going to turn

15   to another patient from the -- from around 2004.  So, I'm going

16   to unfilter for the patient and I'm going to unfilter for the

17   CPT code.

18          All right.  I'm now going to filter the name,

19   "Ocadiz, Josephina" (phonetic).  All right.  And just to be

20   clear, how many records are associated with this patient?

21   A    Forty.

22   Q    All right.

23          **THE COURT:**  Are you going to have the same number of

24   questions with regards to this patient as in the other one?

25   I'm just trying to determine whether we should take our break

1    now.

2         **MR. LEE:**  This would be a fine time.  This will be

3    fine.

4         **MS. VILLANUEVA:**  Your Honor, before, if I may enter

5    my objection.  This is outside the scope.  This beneficiary is

6    not within the indictment.

7         **MR. LEE:**  Your Honor, given the testimony that's

8    already been presented by the Government in this case, I wanted

9    to show an example -- I'm not -- I just want to show an example

10   using the billing data that the Government admitted regarding a

11   point made by one of the Government's witnesses.

12        **THE COURT:**  That's fine.  We'll take a short break,

13   ladies and gentlemen.

14        Please rise for the jury.

15      **(Jurors exit courtroom at 10:48 a.m.)**

16        **THE COURT:**  We'll see you-all at 11:05.  And you'll

17   be back on the stand, ma'am.

18        **THE WITNESS:**  Thank you.

19        **THE COURT:**  Sure.

20      **(Recess was taken from 10:49 to 11:13 a.m.)**

21      **(Jurors present)**

22        **THE COURT:**  Mr. Lee, you can go ahead and proceed,

23   sir.

24        **MR. LEE:**  Thank you, Your Honor.

25        **THE COURT:**  Please be seated.

1          **CROSS EXAMINATION (CONTINUED)**

2    BY MR. LEE:

3    Q    All right, Ms. Coufal, before the break we were just

4    starting to look at the data which I filtered for a patient

5    named Josephina Ocadiz (phonetic), correct?

6    A    Yes.

7    Q    Okay.  Now, to make things go a little bit faster, I'm

8    going to scroll -- I'm going to filter -- I'm going to --

9    sorry, not filter.  I'm going to sort the CPT codes by number

10   and I'm going to ask you about the test that I asked you about

11   earlier, but in numerical order as opposed to jumping around.

12   All right.  So, looking at the data -- so, now the data's

13   filtered for Josephina Ocadiz and for -- for Josephina Ocadiz.

14   And I'm clicking on the data service, the downward arrow, and

15   that reflects that this patient came in for multiple dates of

16   services, correct?

17   A    Yes.

18   Q    And it reflects, too, this patient came in for about six

19   different dates of service, correct?

20   A    Yes.

21   Q    All right.  Spanning from May 2004 through February 2005,

22   correct?

23   A    Yes.

24   Q    Okay.  And that's more than three --

25   A    Yes.

Coufal - Cross / By Mr. Lee                              77

1   Q    -- visits, correct?

2   A    Yes.

3   Q    All right.  So, scrolling over to the CPT codes, which I

4   sorted and I'll sort again, just to be clear, in ascending

5   order, and do you see here now that it's sorted so that the

6   number goes up as you go down the screen?

7   A    Yes.

8   Q    Okay.  So, looking at this, do you see that this

9   Dr. Zamora-Quezada or Linda Williams billed for a procedure

10  using 80053 for this patient?

11  A    Yes.

12  Q    Scrolling down, do you see that there was a service billed

13  for this patient using the CPT code 83735?

14  A    No.

15  Q    Do you see a service billed for this patient using CPT

16  code 84100?

17  A    No.

18  Q    Do you see one or more services billed for this patient

19  using CPT code 85651?

20  A    Yes.

21  Q    Do you see one or more services billed for this patient

22  using CPT code 86140?

23  A    Yes.

24  Q    Do you see one or more services, -- according to the data,

25  where one or more services billed for this patient using CPT

Coufal - Cross / By Mr. Lee                        78

1    code 86431?

2    A    Yes.

3    Q    Based on the data, were one or more services billed for

4    this patient using CPT code 86618?

5    A    No.

6    Q    Were one or more -- according to the data, were one or

7    more services billed for this patient using CPT code 86644?

8    A    No.

9    Q    According to the data, were one or more services billed

10   for this patient using CPT code 86663?

11   A    No.

12   Q    According to the data, were one or more services billed

13   for this patient using CPT code 86665?

14   A    No.

15   Q    Now, Ms. Coufal, if someone were to have claimed that

16   every patient of Dr. Zamora in this time period received every

17   one of the tests that we just went through, that would be

18   incorrect, correct?

19        MS. VILLANUEVA:  Objection, Your Honor.  She keeps --

20   Counsel's impeaching over somebody else's statement with

21   Ms. Coufal's?

22        THE COURT:  How can she do that?

23        MR. LEE:  I'll withdraw the question, Your Honor.

24        THE COURT:  Sure.

25   //

1    **BY MR. LEE:**

2    Q    All right.  I'm now going to filter for another patient

3    from that time period, Norma Soto.

4         **MS. VILLANUEVA:**  Objection, Your Honor.  I'm going to

5    state my previous objection, which is relevance and outside the

6    scope of the evidence.

7         **THE COURT:**  The relevance is?

8         **MR. LEE:**  Your Honor, given the testimony from the

9    prior witness about this time period and about how every

10   patient received certain procedures --

11        **THE COURT:**  No.  Go ahead.

12   **BY MR. LEE:**

13   Q    All right.  So, I've sorted billed for the data for Norma

14   Soto.  And, again, looking at the date of service, does this

15   show that this patient came in for multiple visits spanning a

16   time from October 5th, 2004, through January 7th, 2005?

17   A    Yes.

18   Q    All right.  And, again, that's about five visits, correct?

19   A    Yes.

20   Q    So, more than three, correct?

21   A    Yes.

22   Q    And I'm going to sort the CPT codes by number and going to

23   the beginning.  All right.  I'm going to go through the CPT

24   codes I asked you about before and I'm going to scroll down.

25   Do you see one or more services billed for this patient using

Coufal - Cross / By Mr. Lee                    80

1  CPT code 80053?

2  A    Yes.

3  Q    Do you see one or more services billed for this patient

4  using CPT code 83735?

5  A    Yes.

6  Q    Do you see one or more services billed for this patient

7  using CPT code 84100?

8  A    No.

9  Q    Do you see one or more services billed for this patient

10  using CPT code 85651?

11  A    Yes.

12  Q    Do you see one or more services billed for this patient

13  using CPT code 86140?

14  A    Yes.

15  Q    Based on the billing data, do you see one or more services

16  billed for this patient using 86431?

17  A    Yes.

18  Q    Based on the data, do you see one or more services billed

19  for this patient using CPT code 86618?

20  A    No.

21  Q    Based on the billing data, do you see one or more services

22  billed for this patient using CPT code 86644?

23  A    No.

24  Q    Based on the billing data, do you see one or more services

25  billed for this patient using CPT code 86663?

Coufal - Cross / By Mr. Lee                           81

1   A    No.

2   Q    Based on the billing data, do you see one or more services

3   billed for this patient using CPT code 86665?

4   A    No.

5   Q    All right.  Now, I'm going to go back up and filter for

6   another patient, Katie Woodall.  All right.  And looking at the

7   bottom left-hand score on the screen, how many records are

8   associated with this patient?

9   A    One hundred and thirty-one.

10  Q    All right.  And clicking on the date of service, does that

11  indicate this patient came in for approximately four visits, a

12  span of time from November 8th, 2016, through May 9th, 2017?

13  A    Yes.

14  Q    All right.  I'm sorting the CPT codes in numerical order -

15  - in ascending numerical order -- and I'm going to go through

16  the same test that I asked you about before.  According to the

17  billing data, were one or more services billed using CPT code

18  80053?

19  A    No.

20  Q    According to the billing data, were one or more services

21  billed using CPT code 83735?

22            MS. VILLANUEVA:  Your Honor, may we approach?

23            THE COURT:  Sure.

24  //

25  //

Coufal - Cross / By Mr. Lee                           82

1           **(Begin bench conference at 11:21 a.m.)**

2                   **MS. VILLANUEVA:** Your Honor, --

3                   **THE COURT:** Just wait a minute --

4                   **MS. VILLANUEVA:** Okay, sir.  I think, Your Honor,

5    that this is going to try and push evidence into the doctor's

6    good conduct.  These (indisc.) are not probative of the false

7    claims in the indictment.  It's outside the scope.  It's very

8    misleading to the Jury.

9                   **THE COURT:** I don't think it's misleading.  He's

10   trying to defend himself by saying, first of all, he doesn't

11   admit that those were wrong.  Second, (indisc.) they painted

12   somehow that everything was backward, neglected, have these

13   patients and they were fine.

14                  **MS. VILLANUEVA:** I --

15                  **THE COURT:** (Indisc.) I may find from the standpoint

16   of they did the right thing.

17                  **MS. VILLANUEVA:** Well, this data is based on Tricare

18   beneficiaries only, Your Honor, not the whole patient

19   population and --

20                  **THE COURT:** But you cannot defend yourself if you

21   can't prove -- you can't just have all these -- get the

22   impression that everything is fraudulent and, at the same time,

23   not be allowed to show these weren't fraudulent.  They claim

24   (indisc.) out there, see for all these other patients that --

25                  **MS. VILLANUEVA:** She's already testified that she

1    doesn't investigate fraud and that these are paid claims that

2    weren't necessarily investigated as a fraud process.

3              **THE COURT:**  Right.  And I think you can cross -- you

4    can take on direct (indisc.) have that question (indisc.) the

5    problem.  Thank you.

6              **MR. LEE:**  Thank you, Your Honor.

7              **THE COURT:**  I take it you would make another

8    objection?

9              **MR. LEE:**  I'm objecting to the objection, Your Honor.

10         **(End bench conference at 11:23 a.m.)**

11             **THE COURT:**  Go ahead, Mr. Lee.

12             **MR. LEE:**  Thank you, Your Honor.

13   **BY MR. LEE:**

14   Q    All right.  Based on -- I don't remember exactly where I

15   was.  But I think I was at --

16             **THE COURT:**  You were right where you're standing.

17   Q    -- all right.  Ms. Coufal, I'm just going to ask you just

18   a -- I'm going to ask you, according to the billing data, does

19   the data show that one or more services were billed using CPT

20   code 83735?

21   A    No.

22   Q    According to the billing data, were one or more services

23   billed using CPT code 84100?

24   A    No.

25   Q    According to the billing data, were one or more services

Coufal - Cross / By Mr. Lee                              84

1    billed using CPT code 85651?

2    A    Yes.

3    Q    According to the billing data, were one or more services

4    billed using 86140?

5    A    Yes.

6    Q    According to the billing data, were one or more services

7    billed using 86431?

8    A    Yes.

9    Q    According to the billing data, were one or more services

10   billed using 86618?

11   A    No.

12   Q    According to the billing data, were one or more services

13   billed using 86644?

14   A    No.

15   Q    According to the billing data, were one or more services

16   billed using 86663?

17   A    No.

18   Q    According to the billing data, were one or more services

19   billed using CPT code 86665?

20   A    No.

21   Q    I'm now going to filter for one more patient, Giovanni

22   Hernandez.  And according to the data, does it show that this

23   patient had three different dates of services spanning the time

24   from July 9th, 2014, to September 9th, 2014?

25   A    Yes.

Coufal - Cross / By Mr. Lee                          85

1    Q    All right.  I'm going to sort the CPT codes in ascending

2    numerical order.  I'm going to scroll to the top and then I'm

3    going to ask you about the same tests that I've asked you about

4    before.  According to the billing data, were one or more

5    services billed for this patient using CPT code 80053?

6    A    No.

7    Q    According to the billing data, were one or more services

8    billed using CPT code 83735?

9    A    No.

10   Q    According to the billing data, were one or more services

11   billed using CPT code 84100?

12   A    No.

13   Q    According to the billing data, were one or more services

14   billed using CPT code 85651?

15   A    Yes.

16   Q    According to the billing data, were one or more services

17   billed using CPT code 86140?

18   A    Yes.

19   Q    According to the billing data, were one or more services

20   billed using CPT code 86431?

21   A    Yes.

22   Q    According to the billing data, were one or more services

23   billed using CPT code 86618?

24   A    No.

25   Q    According to the billing data, were one or more services

Coufal - Cross / By Mr. Lee                              86

1   billed using CPT code 86644?

2   A    No.

3   Q    According to the billing data, were one or more services

4   billed using 86663?

5   A    No.

6   Q    According to the billing data, were one or more services

7   billed using 86665?

8   A    No.

9   Q    Now, Ms. Coufal, if a provider orders or performs a test

10  but does not bill the test, the provider won't get paid for the

11  test, correct?

12  A    Correct.

13  Q    And if a provider billed for a particular test or service,

14  that would show up in the data here, correct?

15  A    Again, I didn't pull the data.  If the data is complete,

16  if we received a claim, I would expect to see it in the claims

17  data.

18  Q    All right.  And, again, the Defendant didn't create this

19  spreadsheet that we've been looking at?

20  A    Correct.

21  Q    Tricare created it?

22  A    Yes.

23  Q    And Tricare provided it to the Government, correct?

24  A    Based on a request that I didn't have visibility on, but

25  yes.

Coufal - Cross / By Mr. Lee                              87

1   Q    Okay.  Now, you were asked on direct examination about the

2   contract -- the contract or contracts that Tricare had with

3   Dr. Zamora.  I just want to be clear.  Tricare -- prior to his

4   being charged in this case, Tricare never terminated his

5   contract, correct?

6   A    Correct.

7   Q    And, again, actually to be clear I think you said you

8   suspend him, correct?

9   A    Payment suspension.

10  Q    Right.  But he --

11  A    Yes.

12  Q    -- has not actually been terminated, correct?

13  A    The contract hasn't been terminated and we use the term

14  "exclusion."

15  Q    Okay.

16  A    Yeah.

17  Q    All right.  But, again, all of that -- none of that

18  happened before he was charged in this case, correct?

19  A    Correct.

20  Q    Okay.  And you're not a medical professional yourself,

21  correct?

22  A    Correct.

23  Q    And so, you're not here to offer any opinion one way or

24  another as to whether these claims are fraudulent or true or

25  anything?  You have no idea, correct?

Coufal - Cross / By Mr. Lee                          88

1   A    Correct.

2   Q    All right.  And that's why you had -- and when you said

3   you were -- earlier you said that if data -- if you noticed

4   something unusual in data, you would refer it, possibly, to law

5   enforcement to investigate, correct?

6   A    Either to law enforcement or back to our contractors to

7   conduct an audit.

8   Q    All right.  And if you referred it to law enforcement or

9   for an audit, you'd expect that they would do additional work,

10  correct?

11  A    Yes.

12  Q    Okay.  All right.  Now, I want to go back to one issue --

13  go back to the claims data for Katie Woodall.  All right.  And,

14  again, we were looking earlier at the different dates of

15  service, correct?

16  A    Yes.

17  Q    And there were four dates of service, correct?

18  A    Yes.

19  Q    All right.  Okay.  And I want to focus on the first date

20  of service, November 8th, 2016.  Okay.  So, I filtered for that

21  one date.  All right.  Now, looking at this, Ms. Coufal, can

22  you tell us where the data -- it shows when the claim for this

23  date of service was submitted to Tricare?

24  A    The date that it was -- the claim was submitted to Tricare

25  would be under Column A, which is titled "Claim Number," and it

1   would have been submitted based on the claim number.  So, if

2   we're looking at the first line, the year 2016 and the 315th

3   day of 2016.

4   Q    Okay.  And, in fact, actually, if you look at it, there

5   are multiple claims submitted, correct?

6   A    Yes.

7   Q    Okay.  And so, it means the services were broken up or

8   some -- and for some reason they were submitted -- there were

9   multiple submissions, correct?

10  A    Or -- and -- perhaps, not mul -- maybe not multiple.

11  Well, what's on the screen right now, I don't know that that's

12  multiple claims.  But it's multiple claim lines.  Okay.  The

13  blue.  Yeah.  It's kind of sorted out of -- it's out of the

14  sort for the line item number.

15  Q    Okay.

16  A    But it's multiple claim lines.

17  Q    All right.

18  A    Yeah.

19  Q    And, again, so based on this, we can see from this data

20  that we're looking at here, that the claim -- that the services

21  from November 8th, 2016, were submitted to Tricare --

22  A    Uh-huh.

23  Q    -- on the 315th day of 2016 and some on the 345th day --

24  A    Yes.

25  Q    -- of 2016, --

Coufal - Cross / By Mr. Lee                                    90

1    A    Yes.

2    Q    -- correct?

3    A    Yes.  Yes.

4    Q    Okay.  Now, Ms. Coufal, can you tell us what was the date

5    corresponding to the 315th day of 2016?

6    A    I don't know.

7    Q    Okay.  Did the Government ask you to check this before

8    testifying today?

9    A    To check this specific date in these specific claims?

10   Q    Yes.

11   A    No.

12   Q    Okay.  If we were to show you a calendar for 2016, would

13   that help you determine what the submission date for these

14   claims would be?

15   A    Yes.

16            THE COURT:  Ms. Coufal, to be clear, the submission

17   date isn't necessarily the day the doctor may have seen

18   somebody, right?

19            THE WITNESS:  That's --

20            THE COURT:  It's just when the bill was actually sent

21   to Tricare?

22            THE WITNESS:  That's correct, Your Honor.  When the

23   claim was received.

24            THE COURT:  Received by you.

25            THE WITNESS:  Receipt by the contractor.

Coufal - Cross / By Mr. Lee                               91

1    Q    Right.  And that's -- that's an important distinction,

2    right?  Because when a claim comes in, Tricare marks it -- they

3    know -- when Tricare receives a claim, they know when they

4    received the claim, correct?

5    A    Yes.  They give it a unique identifier.

6    Q    And that's the claim number, correct?

7    A    That's a portion of it.  Yes.  They put a date timestamp

8    on there and then these other digits are a unique identifier

9    because you can have more than one claim come in on the 315th

10   day of 2016.  So, each claim is given a unique identifier in

11   addition to the year and the day.

12   Q    But the claim receipt is different -- is not necessarily

13   the same as the time -- the date the claim was submitted,

14   correct?

15   A    Oh.  I see what you're saying.  You mean submitted by the

16   provider --

17   Q    Yes.

18   A    -- if the provider electronically submitted it and pushed

19   a button?

20   Q    Yes.

21   A    I don't know.  I know that the sys -- well, yeah, when I

22   was thinking of date submitted, I'm thinking of date that the

23   contractor received it.

24   Q    Right.  And that's the only thing that's shown in the

25   claim number, correct?

Coufal - Cross / By Mr. Lee                    92

1   A    Yes.

2   Q    Okay.

3   A    And that date.

4   Q    Right.  So, now, if submission was electronic, it's

5   probably reasonably near the date received, correct?

6   A    I would -- I think that's reasonable to say that.  Yes.

7   Q    So, for a provider or a biller or someone if the button on

8   the computer at twelve o'clock, twelve noon, on a particular

9   day and it's -- that's reasonably -- it's reasonable to assume

10  that it prob -- and received probably that same day?

11         **THE COURT:**  I don't know that she can make that

12  assumption.  I suspect that every doctor's office or whatever

13  is different.

14         **MR. LEE:**  Right.

15         **THE COURT:**  And you're just asking her to make an

16  assumption.  Well, she can't really tell us what the practice

17  is in any particular place.

18         **MR. LEE:**  Thank you, Your Honor.

19  **BY MR. LEE:**

20  Q    So, to be clear, this just shows when the claim is

21  received, correct?

22  A    Correct.

23  Q    So, it doesn't show us when the claim was actually

24  submitted, correct?

25  A    Correct.

1    Q    Okay.  All right.  I'm going to hand you --

2            THE COURT:  And most of these are done

3    electronically.  Is that right, or -- the claims submissions?

4            THE WITNESS:  Looking at this timeframe, Your Honor,

5    and knowing this was a network provider, I would assume that

6    these would come in electronically.

7    Q    But you don't know for sure?

8    A    I don't know.  I -- no.  I don't know for sure.

9    Q    All right.  Nothing in this data tell us specifically

10   whether it's electronic or by mail, correct?

11   A    Not what I'm looking at.  No, it doesn't.

12   Q    Okay.  All right.

13           MR. LEE:  May I approach, Your Honor?

14           THE COURT:  Go ahead.

15   Q    I'm going to hand you what's marked as Defendant's Exhibit

16   287.  This is --

17           MS. VILLANUEVA:  Objection, Your Honor.  This is not

18   on the Exhibit List.

19           MR. LEE:  I'm not seeking to admit this.

20           MS. VILLANUEVA:  Then what is --

21           THE COURT:  Okay.  So, what is it?  What are we doing

22   with it?

23           MR. LEE:  The witness said that if she were to see a

24   calendar, that might help her answer my earlier question.

25           THE COURT:  Is that a calendar?

1          **MR. LEE:**  Yes.

2          **THE COURT:**  Go ahead.

3    **BY MR. LEE:**

4    Q    All Right.  So look at this calendar, which -- just for

5    the record, it's a printout of a website from a NASA-dotgov

6    website -- looking at this, does this show -- this is a

7    calendar for 2016, which also shows the month and day,

8    corresponding to the date, but also which day of the year it is

9    in terms of 1 through 365?

10   A    Yes.

11   Q    Okay.  So, looking at this, according to that -- according

12   to what you see before you, does that help you determine what

13   the 315th day of 2016 was?

14   A    If this calendar is accurate -- I'm looking under

15   November.  The 315th day shows as the 10th day of November.

16   Q    Okay.  And, according to the calendar, what is the 345th

17   day of 2016?

18   A    According to the calendar, the 345th day is December 10th.

19   Q    Okay.  Just to be clear, those dates -- November 10th and

20   December 10th -- are different from the date of service,

21   correct?

22   A    Yes.

23   Q    So, if someone were to claim --

24          **MS. VILLANUEVA:**  Objection, Your Honor.  Improper

25   impeachment.

1          **MR. LEE:**  That's fine.  We'll withdraw the question

2     for now.

3          **THE COURT:**  Okay.

4     **BY MR. LEE:**

5     Q    I'm now going to filter the data.  I'm going to unfilter

6     the claim numbers and the date of service.  And I'm now going

7     to filter or the other name -- another name we looked at

8     earlier, Giovanni Hernandez.  And, again, the data shows that

9     there were multiple visits -- multiple dates of service

10    connected to this patient, correct?

11    A    Yes.

12    Q    Okay.  And I want to focus on the date of service for

13    August 21st, 2014.  And that shows -- and we filter that,

14    what's the claim number -- what would the -- according to the

15    data, what was the date that this claim for this date of

16    service was received by Tricare?

17    A    That would be the 238th day of 2014.

18    Q    All right.  And, again, Ms. Coufal, sitting here today, do

19    you know what the 238th day of 2014 was?

20    A    No.

21    Q    Did the Government ask you to check this prior to

22    testifying today?

23    A    No.

24    Q    Would a calendar for 2014 help determine what that actual

25    day is?

Coufal - Cross / By Mr. Lee                                96

1   A     Yes.

2   Q     Ms. Coufal, I'm handing you what's been marked as

3   Defendant's Exhibit 288, which is, again, a hard copy of a

4   calendar for 2014 printed off a NASA-dotgov website.

5            **MS. VILLANUEVA:**  Your Honor, re-object to this based

6   on the same Exhibit, the previous calendar.  Same objection.

7   It's not provided in the Defendant's Witness Li -- I mean,

8   Exhibit List, and, I mean, it's outside the scope.  It's not

9   relevant.

10            **THE COURT:**  What is the relevance of the 200th -- of

11   the calendar?

12            **MR. LEE:**  Your Honor, there were certain claims and

13   allegations made in the charging document --

14            **MS. VILLANUEVA:**  Your Honor, may we approach?

15            **THE COURT:**  Yes, but -- I mean, calendars -- one can

16   take judicial notice of them.  But you all can come on up here.

17            **MS. VILLANUEVA:**  Withdraw it, Your Honor.  We'll just

18   withdraw.

19            **THE COURT:**  Okay.  It's admitted.

20            **(Government's Exhibit Number 288 received in evidence)**

21   **BY MR. LEE:**

22   Q     All right.  So, Ms. Coufal, looking at the calendar, what

23   is the 238th day of 2014?

24            **THE COURT:**  Is it a calendar that actually tells you

25   what the -- or are you going to make her count every single

1  day?

2          **MR. LEE:**  Your Honor, I should show you.  May I

3  approach her and show you the calendar?  I mean --

4          **THE COURT:**  Well, I -- it has the number, the date --

5  the 300th --

6          **MR. LEE:**  Yes.

7          **THE COURT:**  Okay.

8          **MR. LEE:**  Perhaps, I could put it on the ELMO

9  briefly?

10         **THE COURT:**  Yes.  Go ahead.

11     **(Pause)**

12 **BY MR. LEE:**

13 Q   All right.  So, I'm putting on the screen the first -- the

14 top of the first page of this Exhibit and this shows --

15 Ms. Coufal, do you see that it shows that for January it's the

16 same as one normally expects for a calendar, correct?

17 A   Yes.  The first day.

18 Q   Okay.  But the February 1st there's also shown as the 32nd

19 day of the year, correct?

20 A   Yes.

21 Q   And so, turning to the second page to late 2014,

22 Ms. Coufal, what is the 238th day of 2014?

23         **THE COURT:**  And everybody born in January, their day

24 is the same as the day on the calendar, right?  I'm just taking

25 judicial notice.

Coufal - Cross / By Mr. Sully                    98

1   Q    So, Ms. Coufal, again, what is the 238th day of 2014?

2   A    The 238th day of 2014 is the 26th of August.

3   Q    And, again, Ms. Coufal, that is not the same as the date

4   of service we were looking at earlier, which is August 21st,

5   2014, correct?

6   A    Correct.  Those are two different days.

7   Q    Okay.

8          MR. LEE:  Nothing further at this time, Your Honor.

9          THE COURT:  Mr. Sully, did you have any questions?

10         MR. SULLY:  Yes, briefly, Your Honor.  Thank you.

11                        CROSS EXAMINATION

12  BY MR. SULLY:

13  Q    Good morning, Ms. Coufal.  Did I pronounce that right?

14  A    Coufal.

15  Q    Okay.  All right, thank you.

16         Did you testify before the Grand Jury in this case?

17  A    No.

18  Q    No?  Okay.

19         Going back to the claims data that you've been

20  testifying about.  That's the claims data that was submitted to

21  the Government from TRICARE, right?

22  A    It was submitted to the Government from Humana --

23  Q    Okay, fine.

24  A    -- as the claims processor and contractor on behalf of the

25  Government.

Coufal - Cross / By Mr. Sully                            99

1          **THE COURT:**  If you would get closer to the

2    microphone.

3          **MR. SULLY:**  All right, fine.

4          **THE COURT:**  Maybe you can move the one that's closest

5    to where you are.

6    **BY MR. SULLY:**

7    Q    All right, so based on this data that you've been

8    testifying about and based on the timeframe that you've been

9    testifying about, it wouldn't be accurate based on that data to

10   say that every patient during that time period was receiving

11   all of the available lab procedures on the first, second, and

12   third visits, right?

13         **MS. VILLANUEVA:**  Objection, your Honor.  This data is

14   limited to TRICARE beneficiaries only.

15         **THE COURT:**  Right.  I mean you wouldn't have any way

16   of knowing that, right, ma'am?

17         **THE WITNESS:**  That's correct.

18         **THE COURT:**  And I think she's made that quite clear

19   from the start, when she was on direct examination.

20         **MR. SULLY:**  Thank you, your Honor.

21   **BY MR. SULLY:**

22   Q    So to clarify, ma'am, you can't testify as far as data

23   other providers, right?

24         **MS. VILLANUEVA:**  Objection.

25         **THE COURT:**  She -- yes, objection sustained.

1   **BY MR. SULLY:**

2   Q    Focusing on the data that you've been testifying about,

3   the data for this provider, not for some other data, based on

4   this data does it show that every patient was billed for the

5   same -- all the available lab procedures on the first, second,

6   and third visits?

7              **MS. VILLANUEVA:**  Objection, your Honor.  This is

8   not -- this again is not patient data, it's claims submitted

9   data.

10             **THE COURT:**  Right.  You have no way of knowing, is

11  that correct, ma'am?

12             **THE WITNESS:**  That is correct.  The only claims data

13  is -- that I have access to that is on the spreadsheet is for

14  TRICARE beneficiaries.

15             **THE COURT:**  Right, but you don't have any way of

16  knowing on what date something -- the submission date or how

17  many tests were done other than the amount, right?  I guess you

18  would have access, if we had more information than what's here,

19  with regards to what the claim was, right?

20             **THE WITNESS:**  I'm sorry, I'm not sure I understand.

21             **THE COURT:**  Well, I don't think I understood his

22  question either.

23             **(To Mr. Sully):**  So can you go ahead and repeat it?

24             **MR. SULLY:**  Yes, your Honor.  And I'll try to maybe

25  rephrase it in a clearer way.

Coufal - Cross / By Mr. Sully                              101

1  **BY MR. SULLY:**

2  Q    When you were responding to Mr. Lee's questions and he

3  asked you about several billing codes, do you remember that,

4  the numbers that he was asking about?

5  A    Yes.

6  Q    And there were several times, if I understood correctly,

7  that you testified that those billing codes did not appear on

8  this data for the first, second, or third visits for particular

9  patients, right?

10           **MS. VILLANUEVA:**  Objection, your Honor.  These are

11  claims data, not patient billed data for individual patients.

12  These are only claims submitted to TRICARE to be billed.  That

13  is what the data is.

14           **THE COURT:**  TRICARE receives the name of the patient,

15  right?

16           **THE WITNESS:**  Yes.  We receive the patient info --

17  yes, the patient information is on the claim form.

18           **THE COURT:**  And the reasons that they are asking for

19  a certain amount based on whatever treatments were done or

20  whatever, right?

21           **THE WITNESS:**  That's correct, that --

22           **THE COURT:**  Or testing was done?

23           **THE WITNESS:**  Yes, sir.

24  //

25  //

Coufal - Cross / By Mr. Sully                           102

1   BY MR. SULLY:

2   Q   So when you responded that certain billing codes did not

3   appear for the particular patients you were testifying about,

4   does that mean that those codes or those procedures were not

5   billed for that particular patient on those visits?

6   A   I guess --

7          THE COURT:  Maybe I can make this clearer.  If those

8   codes were not on there, that means that there was no billing

9   for that -- for whatever that particular code stands for?

10         THE WITNESS:  If the data that was provided by my

11  coworker is complete data.

12         THE COURT:  Right.

13         THE WITNESS:  If the data is complete data, then you

14  would expect -- basically whatever claim the provider

15  submitted, that information is passed into our data repository.

16  So whatever the provider submitted on the claim or whatever the

17  procedure codes were, the contractor would take that

18  information and pass it into our claims data.

19  BY MR. SULLY:

20  Q   Okay.  So --

21         THE COURT:  And that's important because that's one

22  of the ways you can tell whether there was a lot of testing

23  going on for certain things, right?

24         THE WITNESS:  That's correct.

25  //

Coufal - Cross / By Mr. Alvarez                    103

1    **BY MR. SULLY:**

2    Q    So assuming that the data that, as you testified, somebody

3    else prepared is correct, if you didn't see, for example, 84100

4    on the data, which I think was already testified about earlier,

5    that means that that code was not billed for that particular

6    patient?

7    A    Correct.

8    Q    And so it would be inaccurate to say that that code was

9    billed for that patient if it doesn't appear on that data,

10   assuming the data is correct?

11   A    Correct.

12           **MR. SULLY:**  I pass the witness, your Honor.

13           **THE COURT:**  Mr. Alvarez, did you have any questions?

14                        **CROSS EXAMINATION**

15   **BY MR. ALVAREZ:**

16   Q    Ma'am, with respect to TRICARE, was there a contact person

17   at Dr. Zamora's office if there was a question as to a bill?

18   Did you all have contact information with respect to that?

19   A    I don't have visibility on that.  That would be the

20   contractor.  The contractor is responsible for communications

21   with providers.

22   Q    And you yourself, you do not know Estella Natera?

23   A    I do not know her.

24           **MR. ALVAREZ:**  Thank you.

25           Pass the witness.

1          **THE COURT:**  Mr. Pena?

2          **MR. PENA:**  Yes, your Honor.  Thank you.

3                   **CROSS EXAMINATION**

4     **BY MR. PENA:**

5     Q    Ms. Coufal, good morning.

6     A    Good morning.

7     Q    You met with the Government today, correct?

8     A    No.

9     Q    Did you meet with them anytime this weekend?

10    A    Not this weekend.

11    Q    Okay, when did you meet with them?

12    A    I flew in on Thursday, Thursday evening.

13    Q    Okay, you were expecting to testify earlier?

14    A    Yes, on Friday.

15    Q    Okay.  And you understand that the Government has alleged

16    against some of the Defendants that they failed to comply with

17    some of the requirements of the contract that TRICARE had with

18    the Defendants or Dr. Zamora, correct?

19         **MS. VILLANUEVA:**  Objection, your Honor.  This is

20    outside the scope of this person's testimony.

21         **MR. PENA:**  It's related to B19, your Honor, which is

22    the contract which is the basis of her direct examination.

23         **THE COURT:**  Go ahead.

24    //

25    //

Coufal - Cross / By Mr. Pena                105

1   **BY MR. PENA:**

2   Q    You understand that one of the allegations in this case is

3   Dr. Zamora and some of the Defendants did not --

4         **THE COURT:**  Well, has anybody even told you what the

5   allegations are here?

6         **THE WITNESS:**  I read an Indictment.

7         **THE COURT:**  That's it?

8         **THE WITNESS:**  Yeah.  I don't have it memorized, but

9   I --

10        **MR. PENA:**  Okay.

11        **THE WITNESS:**  -- I have seen the Indictment.

12  **BY MR. PENA:**

13  Q    So they showed you a copy of the Indictment, correct?

14  A    Yes.

15  Q    Okay, when was that?

16  A    I don't recall.  It was part of the documentation that was

17  available when this matter was transferred from my coworker,

18  who had shoulder surgery and that's why it was transferred over

19  to me, sometime in 2018, if I can recall.

20  Q    Okay.  So I mean you at least understand that one of the

21  accusations here against Dr. Zamora and some of the Defendants

22  is that they didn't comply with the rules that were described

23  to you in B19, which was admitted by the Government, correct?

24  A    (No audible response)

25  Q    B19 is the contract that you testified about --

Coufal - Cross / By Mr. Pena                                        106

1    A    Yes.

2    Q    -- between Humana --

3    A    Yes, that is the contract.

4    Q    Okay, do you have it in front of you?

5    A    Yes.

6    Q    Okay.  So I want to dig a little bit deeper as into what

7    those requirements are.  Okay?

8    A    Sure.

9    Q    All right.  And I think you showed us, with Government

10   counsel you went to Attachment C.  Do you recall that?

11   A    I'm going to have to find it.  Yes, I have Attachment C.

12   Q    Okay.  Now, Attachment C's an attachment to the contract,

13   so it makes it part of the contract, correct?

14   A    Correct.

15   Q    And I think, let's see if I can zoom in here, there's a

16   particular section that describes -- right there.  You see I'm

17   pointing to this area right here.  Do you remember testifying

18   with Government counsel regarding this paragraph?

19   A    Yes.

20   Q    And that's the paragraph that describes when Humana or

21   TRICARE will make a payment under the contract, correct?

22   A    Correct.

23   Q    Okay, so let's go through it in detail.  I want to ask you

24   a few questions about this paragraph.  Okay?

25   A    Okay.

Coufal - Cross / By Mr. Pena                    107

1    Q    Okay.  First it says, "Physician understands that HMHS

2    shall make no payments to physician for covered services

3    rendered to beneficiaries which are determined by HMHS not to

4    be medically necessary."

5          Did I read that correctly?

6    A    Yes.

7    Q    Okay, so the decision on whether or not something is

8    medically necessary rests solely on Humana?

9          **MS. VILLANUEVA:**  Objection, your Honor.  It calls for

10   speculation.

11         **MR. PENA:**  I was --

12   **BY MR. PENA:**

13   Q    You're here to testify about this contract, correct?

14         **THE COURT:**  Your testimony has been that these are

15   paid, unless you see something as an ongoing situation that

16   raises some issues, and then it gets given to somebody else to

17   investigate.  That's been your testimony, right?

18         **THE WITNESS:**  Well, claims are processed by Humana.

19         **THE COURT:**  Right.

20         **THE WITNESS:**  And during that claims processing

21   claims can either be allowed, or the services on a claim,

22   right, are either allowed or denied.  And the contractor

23   applies all of the TRICARE policy regulations, claim processing

24   edits, and that's how the determination is made.  The claim is

25   adjudicated through the automated claims processing system and

Coufal - Cross / By Mr. Pena                                    108

1   again a claim line is either allowed or denied based on a

2   variety of things.

3            **THE COURT:**  But your testimony is not that every time

4   that it's paid that therefore that's a certification that it

5   was correctly done, that at some point either Humana or you

6   decide this goes to a further investigation or is going to be

7   sent to prosecution for them to decide what to do with it, if

8   there is anything in their mind that needs to be pursued?

9            **THE WITNESS:**  Yes, claims that have already been

10  processed and paid or denied can be further reviewed, they can

11  be further scrutinized, and then decisions and actions taken

12  thereafter that are appropriate.

13           **THE COURT:**  And you told us that when you were under

14  direct examination?  You testified that at some point these can

15  be sent if somebody's noticed --

16           **THE WITNESS:**  They can be referred.

17           **THE COURT:**  Referred, right.

18           **THE WITNESS:**  Yes.  Yes, your Honor.

19  **BY MR. PENA:**

20  Q    But you understand one of the reasons why TRICARE will

21  refuse to pay Dr. Zamora is because TRICARE believes that the

22  services were not medically necessary, correct?

23  A    That can be a reason for denial.

24  Q    Right.  And in this contract, which describes in this

25  paragraph one of the reasons for denial, it defines what

Coufal - Cross / By Mr. Pena                    109

1    medical necessity is, correct?

2    A    (No audible response)

3    Q    Do you see the next sentence?

4    A    Yes, I'm reading through it.  Yes, it provides definition.

5    Q    Right.  It provides a definition of what could be

6    considered not medically necessary and it lists four, correct?

7    A    There are four items listed.

8    Q    Right.  And it says here, if you read on, "The services or

9    supplies shall be provided by physician or other to identify or

10   treat an illness or injury in which in the opinion of Humana

11   are…."

12         Did I read that correctly?

13   A    You did.

14   Q    Okay, so, again, this is something that's the opinion of

15   Humana, correct?

16   A    Correct.

17   Q    All right.  Now it says, "(1) Consistent with the

18   symptoms, diagnosis, and treatment of the condition, disease,

19   and ailment or injury."

20         Did I read that correctly?

21   A    Yes.

22   Q    Second, "Appropriate with regard to standards of good

23   medical practice."  Correct?

24   A    Correct.

25   Q    Okay, and so it seems that these two issues are

Coufal - Cross / By Mr. Pena                              110

1    specifically reserved for physicians to go back and forth as

2    far as what they consider to be proper consistent with the

3    symptoms or what is considered good medical practice, correct?

4         MS. VILLANUEVA:  Objection, your Honor.  Counsel is

5    testifying and it also calls for speculation.

6         MR. PENA:  I'm on cross, your Honor.

7         THE COURT:  I know you are, but, frankly, that speaks

8    for itself.  She's not here as the expert as to whether

9    something was or wasn't.  She's already testified as to how

10   they proceed.  I don't know what else you can ask her to do

11   here.

12        MR. PENA:  About three and four, your Honor.

13        THE COURT:  Yes, it's in evidence.  Three and four

14   are in evidence.  I don't know that she can give us an opinion

15   as to whether anything that was done in payment or whatever

16   satisfied all those things or not.

17        MR. PENA:  Your Honor, I'm not going to ask about

18   whether it satisfied.  What I'm going to ask is --

19   BY MR. PENA:

20   Q    The third one is for the convenience of the patient is a

21   third reason why Humana would decide not to pay, correct?

22   A    Correct.

23   Q    And you're a fraud examiner, correct?

24        MS. VILLANUEVA:  Objection, your Honor.

25        THE COURT:  She hasn't --

1          **MS. VILLANUEVA:**  She doesn't do any of --

2          **THE COURT:**  She has not in any way been testifying as

3    a fraud examiner.  She's just came to testify as to what the

4    procedure is with regards to payment and I think she --

5          **(To the Witness):**  Didn't you testify from the very

6    start that you don't decide whether something was a fraud or

7    not, at some point where you work there's a decision made,

8    well, something here seems a little bit out of whack, we're

9    going to send it for further investigation within our system or

10   to prosecution?

11         **THE WITNESS:**  That --

12         **THE COURT:**  For them to decide whether there's

13   anything here or it's just the right thing to do.

14         **THE WITNESS:**  That is correct, your Honor.  However,

15   medical necessity determinations are made by -- they can be

16   made by the contractor and by the agency, but not by me.

17   **BY MR. PENA:**

18   Q    Not by you individually, but by the agency you work for?

19   A    By -- yes.

20         **THE COURT:**  And that would be Humana, the agency you

21   work for.

22         **THE WITNESS:**  Humana is -- yes, that --

23         **THE COURT:**  And you're not here to testify as to who

24   did that or didn't do that in this particular case?

25         **THE WITNESS:**  Correct.

1    **BY MR. PENA:**

2    Q    Can you give us your understanding of what is meant by

3    convenience of the patient?

4              **MS. VILLANUEVA:**  Objection, your Honor, calls --

5              **THE COURT:**  She's already said that that's not her

6    job here, that she doesn't --

7              **MR. PENA:**  Your Honor, she's the one that sponsored -

8    - this is an exhibit that she sponsored which was a contract

9    that they entered into.  It's in evidence.  She's here as the

10   sponsoring witness.  I'm allowed to cross examine her on it.

11             **THE COURT:**  Okay, convenient for the patient means

12   that the patient wanted it but no doctor had recommended it, is

13   that the problem, the convenient for the patient?

14             **THE WITNESS:**  The convenience to the patient could be

15   a variety of different things.  One example could be --

16             **MS. VILLANUEVA:**  Your Honor, if I may, she did not --

17   she sponsored the exhibit.  She did not write it.  She's not an

18   attorney.  She cannot testify to what each particular paragraph

19   in detail means.  She does not work for HMHS and she does not

20   make these decisions.  This is beyond the scope.

21             **THE COURT:**  I know she doesn't make the decisions.

22   She's familiar with what that might mean.

23             **(To the Witness):**  And what does that mean, for

24   convenience for the patient?

25             **THE WITNESS:**  As an example, the convenience of the

1  patient, if a patient needed a -- let's say a wheelchair but

2  they wanted maybe a powered wheelchair, but the benefit didn't

3  allow for that or the condition of the patient didn't allow for

4  a powered wheelchair, then you have to -- I mean you would have

5  to have the regular wheelchair.

6  **BY MR. PENA:**

7  Q    Okay.  So although it would be better, in the -- I guess

8  in the judgment of Humana it wasn't necessary, then they would

9  not allow for it?

10        **MS. VILLANUEVA:**  Objection, speculation.

11        **THE COURT:**  There's no such thing as for the better

12  and the issues are is what -- convenience for the parties

13  pretty much -- patients pretty much speaks for itself.  She

14  just testified if the patient wanted the motorized one as

15  opposed to the other one.  She didn't make the testimony that

16  that was better for the patient, other than that's not on the

17  list of something that's allowed.

18  **BY MR. PENA:**

19  Q    Fourth one, "The most appropriate and cost effective

20  supply, setting, or level of service that can safely be

21  provided for the patient."  Can you please describe to us your

22  understanding of that?

23  A    Yes.  If you have perhaps two equally -- two equal

24  services that are equally medically necessary and approved, we

25  would require the provider to render or choose the least costly

1   one.

2   Q    Okay.  So -- and I guess it's a decision on -- could an

3   example be if it's a service provided in-house versus to a

4   third party contractor, could that be an example?

5   A    (No audible response)

6   Q    For example, in-house labs versus sending labs out to

7   another facility?

8            MS. VILLANUEVA:  Objection, your Honor.  Beyond the

9   scope of this witness's --

10           THE WITNESS:  I don't know.

11           THE COURT:  She really --

12           MS. VILLANUEVA:  -- background.

13           THE COURT:  Yes.  Objection sustained.

14  BY MR. PENA:

15  Q    So again, if it's in the decision or I guess in the

16  judgment of Humana that the doctor does not comply with one of

17  these four, then Humana would determine whatever billed service

18  as being not medically necessary, correct?

19  A    Humana -- when a question of medical necessity or any of

20  these comes into question, if it's presented to Humana then

21  they follow whatever their standard protocols and procedures

22  are for determining if a particular service met all of the

23  requirements.  They do have the ability to make those decisions

24  at their level.  I don't know what all the rules are, but if a

25  provider disagrees with Humana's decision there are appeals

Coufal - Cross / By Mr. Pena                            115

1    processes and the provider -- Humana would provide that

2    information to the provider on what steps they would have to

3    take to either have a higher level review from Humana or to

4    forward the whole thing to the Defense Health Agency to make a

5    determination.

6    Q    Okay, so that process that you described, you're saying

7    that Humana would then provide to the doctor an explanation of

8    what it is that he would have to show, which one of those four

9    they believe he did not comply with, correct?

10   A    Well, I don't know exactly how that works and how that

11   information is conveyed to a provider.  But again, if a

12   question -- if a provider questions why a claim or a service

13   wasn't allowed or wasn't paid, the provider can contact Humana

14   and they are the experts in making those decisions and

15   informing the provider on what their decision is or what the

16   provider needs to do as a next step for further review and

17   whether --

18            THE COURT:  And the provider is in complete control

19   of what information they gave Humana.  It isn't that Humana --

20   Humana relies on whatever they say, whether it's true or not.

21   Isn't that correct?

22            THE WITNESS:  I'm sorry, your Honor, could you --

23            THE COURT:  Well, when you call and ask somebody,

24   well, what's the reason for this, it isn't like Humana sends a

25   physician over there or whatever, you rely on the information

Coufal - Redirect / By Ms. Villanueva                116

1  that's coming from the provider as to whether something

2  qualifies for any one of these things.

3          **THE WITNESS:**  Yes, your Honor.  They would have to

4  provide whatever is requested.  Humana would request whatever

5  they need and it would be the provider's responsibility to

6  provide that information to Humana to review.

7          **MR. PENA:**  Pass the witness, your Honor.

8          **THE COURT:**  Is that it?

9          **MR. PENA:**  Yes.

10          **THE COURT:**  Ms. Villanueva, did you have any other

11 questions?

12          **MS. VILLANUEVA:**  Very, very briefly, your Honor.  And

13 I'd like to just pull up the --

14          **THE COURT:**  I have a question.  What day of the

15 calendar are we today?

16     **(Laughter)**

17          **THE WITNESS:**  I don't know.

18          **THE COURT:**  Okay.  Well, that will be fine.

19                    **REDIRECT EXAMINATION**

20 **BY MS. VILLANUEVA:**

21 Q    Ms. Coufal, I'm just going to try my best to start where

22 Defense counsel left off and work my way backwards.

23          First and foremost, you don't work for Humana, is

24 that correct?

25 A    Correct.

Coufal - Redirect / By Ms. Villanueva                117

1   Q    You don't make any of their policies or procedures?

2   A    Correct.

3   Q    And you can give your best description of what those are

4   in your previous experience; however, as related to this case

5   directly you're unable to give us those.  Is that correct?

6   A    Correct.

7   Q    And you mentioned that TRICARE would not pay for claims

8   that it knew were false.  Mr. Lee walked you through numerous

9   claims.  TRICARE would not pay for false claims just because

10  some other claims may not have been false, correct?

11  A    Correct.

12  Q    And that doesn't erase the bad for the good, right?

13  A    Correct.

14  Q    And according to this exhibit which we have here, which

15  Defense counsel has gone over, is the -- do you have the CD in

16  front of you?  I'm sorry.

17  A    Yes.

18        **MS. VILLANUEVA:**  May I approach, your Honor?

19        **THE COURT:**  Sure.

20  **BY MS. VILLANUEVA:**

21  Q    Government's Exhibit B3, which we have here up on the

22  screen, this sheet does not account for a check of whether or

23  not the service was actually provided, correct?

24  A    Correct.

25  Q    This sheet is just claims that were submitted to TRICARE

Coufal - Redirect / By Ms. Villanueva                    118

1    on behalf of TRICARE beneficiaries who also happen to be

2    patients of Dr. Jorge Zamora-Quezada, correct?

3    A    That's correct.

4    Q    And TRICARE, per your previous testimony, is a healthcare

5    benefit plan for only active military, retired military, their

6    beneficiaries, and some active reserves, right?

7    A    Yes, that's correct.

8    Q    So would you agree with me that that patient population as

9    a general is a very small portion of the American population?

10            **MR. PENA:**  Objection, leading, your Honor.

11            **THE COURT:**  The objection is overruled.

12            **THE WITNESS:**  There are -- yes, it's a smaller

13   population than the overall.

14            **THE COURT:**  It's just hard -- you don't really know

15   what the percentage is, but you assume that not everybody is in

16   the military, not everybody is in the reserves, and no

17   everybody may be a beneficiary of one of those individuals.

18            **THE WITNESS:**  That's correct, your Honor.  There are

19   approximately 9.5/9.6 beneficiaries, not all using their

20   benefits.

21            **THE COURT:**  Do you mean million, or what does that

22   mean, 9.5 or 9.6?

23            **THE WITNESS:**  9.5 million/9.6 million beneficiaries.

24   //

25   //

Coufal - Redirect / By Ms. Villanueva                119

1   **BY MS. VILLANUEVA:**

2   Q    And you just stated not all using their benefits, right?

3   A    That's true.

4   Q    So does this -- this data does not account for if a

5   patient went back to Dr. Zamora-Quezada but was no longer a

6   TRICARE beneficiary?

7   A    That's true.

8   Q    Would you agree with me that a patient could have gone

9   back to Dr. Zamora-Quezada, let's just say first line,

10  Ms. Munoz, and a claim being submitted on Ms. Munoz's behalf

11  where it's not located here because she was not a TRICARE

12  beneficiary?

13  A    That's true.  You can become ineligible for TRICARE if you

14  get divorced.  Certain dependent children, as they age out they

15  lose their eligibility.

16  Q    And do you know if any of those -- we'll just go with the

17  last one you just said, age out beneficiaries, if any of

18  those -- could you name any of those directly right now?

19  A    No.

20  Q    And each claim, each line here represents a claim, not an

21  actual patient, correct?

22  A    That's correct.

23  Q    Do falsified records hinder the ability to detect fraud by

24  TRICARE?

25  A    Yes.

Coufal - Recross / By Mr. Lee                              120

1              **MS. VILLANUEVA:**  Those are all the questions I have,

2    your Honor.

3              **MR. LEE:**  Very briefly, your Honor.

4              **THE COURT:**  Go ahead, Mr. Lee.

5              **MR. LEE:**  Let me turn the screen back to Defense

6    table.

7                           **RECROSS EXAMINATION**

8    **BY MR. LEE:**

9    Q    Now, Ms. Coufal, you were asked on direct examination just

10   now about whether it was possible for a patient to be on

11   TRICARE at one point in time and then not be on TRICARE at a

12   later point in time, correct?

13   A    Correct.

14   Q    Okay.  Now, people generally don't change insurance unless

15   there are a change in circumstance, like a change in job, a

16   change in their family status, the new enrollment period

17   corresponding to the new calendar year, things like that,

18   correct?

19             **MS. VILLANUEVA:**  Objection, your Honor, calls --

20             **THE COURT:**  Ma'am, if -- I mean that's a question

21   that's not necessarily related to just TRICARE.

22             **MR. LEE:**  Right.

23             **THE COURT:**  I mean you're asking her to be an expert

24   on --

25             **MR. LEE:**  I'm asking specifically on TRICARE.

Coufal - Recross / By Mr. Lee                    121

1            **THE COURT:**  **--** what people might do --

2            **MR. LEE:**  I'm asking about TRICARE.

3            **THE COURT:**  **--** or might not do.  Go ahead.

4    **BY MR. LEE:**

5    Q    In your experience with TRICARE, is it typical for

6    patients to be on TRICARE, get off TRICARE, and get back on

7    TRICARE within a two-month time period?

8    A    I take issue with saying get on and get off.  You either

9    are eligible or you are not and you elect to use the benefit or

10   you don't.

11   Q    All right.  So when we look at the data which is filtered

12   for Giovanni Hernandez and it shows us three dates of service

13   for July 9th, 2014 through September 9th, 2014, based on the

14   data you have no reason to believe that this patient started on

15   TRICARE on July 9th, 2014, somehow got off TRICARE sometime

16   before September 9th, 2014, then got back on before

17   August 21st, 2014, correct?

18   A    It's --

19   Q    You have no reason to believe that that happened, correct?

20   A    I don't have any information that it did or didn't happen.

21   We do have beneficiaries that divorce a service member and

22   marry another service member so they become eligible again.  I

23   don't know.

24   Q    So --

25            **THE COURT:**  All you know is that there were no other

Coufal - Recross / By Mr. Lee                           122

1    claims other than that, right?  You're not here to testify as

2    to why they were or they were not, isn't that correct, ma'am?

3           THE WITNESS:  All I can testify, you're right,

4    your Honor, is what's there in the data.

5           THE COURT:  And so you can't -- it's unfair, you

6    really don't know whether that person got off, it's just all

7    you know is that there were claims on that date but you don't

8    have any idea whether there have been any more; is that

9    correct?

10          THE WITNESS:  Yes, sir.

11   BY MR. LEE:

12   Q    If a patient was insured by TRICARE for let's say a two-

13   month period, during that time period would a healthcare

14   provider bill claims for services for that patient to TRICARE?

15          MS. VILLANUEVA:  Objection, calls for speculation,

16   your Honor.

17          THE COURT:  It is speculation.

18          MR. LEE:  Nothing further, your Honor.

19          THE COURT:  Does anybody else have anything else?

20          MS. VILLANUEVA:  No, your Honor.

21          THE COURT:  And, ladies and gentlemen, when I step in

22   I don't have an opinion one way or another here.  My job is to

23   make sure that we stick to the questions that can be asked or

24   not asked and to do it in a timely fashion so that we don't

25   waste time.  So any question I have or any comment I make to

1   the lawyers doesn't indicate that I have an opinion whatsoever,

2   other than I have to preside over the trial and make the

3   decision what is brought in or not and that we do it in a

4   timely fashion, both for your sake and the Court's sake and

5   everybody else's sake.

6            **(To the Witness):**  You may be excused, ma'am.

7            **THE WITNESS:**  Thank you.

8            **THE COURT:**  Thank you very much.

9            **THE WITNESS:**  Welcome.

10           **THE COURT:**  Unless I hear otherwise --

11           **(To the Witness):**  You're not from here, right?

12           **THE WITNESS:**  I'm from Denver.

13           **THE COURT:**  Unless I hear otherwise, she can --

14   unless somebody wants her to stay here until the end of the

15   trial, she's welcome to go back to Denver, although the weather

16   is nicer here I suspect.

17           **THE WITNESS:**  It is.

18           **MS. VILLANUEVA:**  The Government is asking for

19   Ms. Coufal to be excused.

20           **MR. LEE:**  That's fine with us, your Honor.

21           **THE COURT:**  Okay, you can be excused, ma'am.  Thank

22   you very much.

23      **(Witness excused)**

24           **THE COURT:**  Ladies and gentlemen, now is the time for

25   our lunch break.  We'll go back -- we'll be back, if you can,

124

1   by 1:30.

2          Please rise for the jury.

3       **(Jurors exit courtroom at 12:11 p.m.)**

4       **(Outside the presence of the jury)**

5          **THE COURT:**  You'll have your witness ready at 1:30?

6   Your next witness.

7       **(Audio ended at 12:11:57; end of Morning Session)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>December 10, 2019</u>

           Signed                                        Dated



                    *TONI HUDSON, TRANSCRIBER*