UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  7:18-CR-00855 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | |
| JORGE ZAMORA-QUEZADA, | ) | Monday, December 9, 2019 |
| MEISY ANGELICA ZAMORA, | ) | |
| ESTELLA SANTOS NATERA, | ) | (1:36 p.m. to 4:21 p.m.) |
| FELIX RAMOS, | ) | |
| | ) | AFTERNOON SESSION |
| Defendants. | ) | |

JURY TRIAL - DAY 4

BEFORE THE HONORABLE RICARDO H. HINOJOSA,
UNITED STATES DISTRICT JUDGE


(SEALED PORTIONS OMITTED)


**Appearances:**           See next page


Court Interpreter:     M. Foraker / Steven Mines (Standby)

Court Recorder [ECRO]:   Antonio Tijerina

Transcribed By:        Exceptional Reporting Services, Inc.
P.O. Box 8365
Corpus Christi, Texas 78468
361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES FOR:</u>


Plaintiff:                    ADRIENNE FRAZIOR, ESQ.
                              EMILY GURSKIS, ESQ.
                              REBECCA YUAN, ESQ.
                              CYNTHIA VILLANUEVA, ESQ.
                              Office of the United States Attorney
                              1701 W. Business Hwy. 83
                              Suite 600
                              McAllen, TX 78501


Jorge Zamora-Quezada:         BENIGNO TREY MARTINEZ, III, ESQ.
                              TOMAS TIJERINA, ESQ.
                              STEPHEN LEE, ESQ.
                              1201 E. Van Buren St.
                              Brownsville, TX 78520


Meisy Zamora:                 CHRISTOPHER SULLY, ESQ.
                              5804 N. 23rd St.
                              McAllen, TX 78504


Estella Natera:               AL ALVAREZ, JR., ESQ.
                              4409 N McColl Rd
                              McAllen, TX 78504


Felix Ramos:                  JAIME PENA, ESQ.
                              Pena Garza PLLC
                              900 Kerria Ave
                              McAllen, TX 78501

3

1                           INDEX

2    GOVERNMENT'S WITNESS       DIRECT    CROSS      REDIRECT   RECROSS

3    JOSE TOMAS MORENO

4      BY MS. FRAZIOR       5/52/66/69

5        VOIR DIRE

6          BY MR. SULLY           49

7            BY MR. ALVAREZ       62

8      BY MR. LEE                     120

9

10   GOVERNMENT'S EXHIBITS                              RECEIVED

11   N-2                                                   15

12   E-1                                                   66

13

14

15

16

17

18

19

20

21

22

23

24

25

EXCEPTIONAL REPORTING SERVICES, INC

4

1          **McAllen, Texas; Monday, December 9, 2019; 1:36 p.m.**

2                          **(Call to Order)**

3        **(Jurors present)**

4          THE COURT:  Please be seated.  Good afternoon, ladies

5    and gentlemen.  Hope everybody had a good lunch.  Go ahead and

6    call your next witness.

7          MS. FRAZIOR:  Thank you.  The United States calls

8    Jose Tomas Moreno.

9          THE COURT:  I think it's a little hot in here.  Does

10   anybody else agree with me?

11         MS. FRAZIOR:  Yes, Your Honor.  We agree.

12         THE COURT:  Yes.

13         MS. FRAZIOR:  I can speak on behalf of this table, we

14   agree.

15         THE COURT:  Yes.  And I think we can try to do

16   something about that.  Mr. Moreno, if you don't mind coming

17   right here so you can be seated, sir.

18         THE CLERK:  Raise your right hand.

19         **JOSE TOMAS MORENO, GOVERNMENT'S WITNESS, SWORN**

20         THE COURT:  Go ahead and have a seat right up here

21   please, sir.  Go ahead, ma'am.

22         MS. FRAZIOR:  Good afternoon, sir.

23   //

24   //

25   //

Moreno - Direct / By Ms. Frazior                    5

**DIRECT EXAMINATION**

**BY MS. FRAZIOR:**

Q    Can you introduce yourself to the jury?

A    Sure.  My name is Jose Tomas Moreno.

          **MS. FRAZIOR:**  Make sure you pull --

          **THE COURT:**  Mr. Moreno, try to move the microphone a

little bit closer to you so you can --

          **THE WITNESS:**  I'll get closer, yeah.

          **THE COURT:**  So we can all hear you.

          **MS. FRAZIOR:**  Can you --

          **THE COURT:**  Go ahead, ma'am.

          **MS. FRAZIOR:**  Thank you, sir.  Can you just make sure

you speak clearly and loudly into that microphone, okay?

          **THE WITNESS:**  Sure.

**BY MS. FRAZIOR:**

Q    All right, Mr. Moreno, how are you employed?

A    I was employed --

Q    How are you currently employed?

A    Oh, right now I'm a medical assistant at Rio Grande

Regional Cardiology (indisc.) cardiology.

Q    Give us a little bit of a description about your

educational background.

A    Well, I went to school in La Joya and then I went to high

school at Valley Christian School (phonetic), graduated from

there.  And then four years later, I went to South Texas Votech

Moreno - Direct / By Ms. Frazior                6

 1   for a medical assistant.

 2   Q    What year did you get your medical assistant's license?

 3   A    Back in 2002.

 4   Q    Are you married?

 5   A    Yes.

 6   Q    Do you have children?

 7   A    Two children, beautiful girls.

 8   Q    Where do you live currently.

 9   A    In McAllen.

10       **THE COURT:**  Spoken like a good parent when you

11   described them as two beautiful girls.

12   **BY MS. FRAZIOR:**

13   Q    At some point did you come to be employed by the Center

14   for Arthritis and Osteoporosis in Edinburg?

15   A    Yes, ma'am.

16   Q    How did you get that job?

17   A    I -- when I started my internship back in 2002, that was

18   my site of externship.

19   Q    All right.

20   A    And then I got hired by them.

21   Q    How did you get an internship or an externship?  I think

22   you referred to it as both.

23   A    The internship, after you're done with your origin school

24   then they send you to a site to practice whatever you learned,

25   and that's where they send me to, Arthritis and Osteoporosis

Moreno - Direct / By Ms. Frazior                    7

1   Centers that time.

2   Q    Have you ever testified before?

3   A    No.

4   Q    Are you a little nervous?

5   A    Yes, I am.

6   Q    Okay, just make sure you speak a little slower, too, okay?

7   So you did an externship and you were sent to the Center for

8   Arthritis and Osteoporosis in Edinburg.  You -- I think you

9   mentioned 2002 was when you started.  When did you stop working

10  there?

11  A    In I want to say May, 2017.

12  Q    So approximately 15 years.  I'm sorry, yeah, 15 years.

13  A    More or less.

14  Q    As your time at the clinic, the Center for Arthritis and

15  Osteoporosis, which I'm just going to refer to it as the

16  Center --

17  A    Okay.

18  Q    -- going forward, what were your duties there?

19  A    I started as triaging, taking vital signs, blood pressure,

20  temperature, and then we started working as with the doctors as

21  a medical assistant.  We call it as personal medical assistant.

22  Q    What does a medical assistant do?

23  A    Well, they -- we take vital signs, we upgrade the

24  medication the patient is taking, take the history of any

25  surgeries.  We try to assist them in the rooms if there's any

Moreno - Direct / By Ms. Frazior                    8

1    procedures going on.

2    Q    When you say take the history, do you mean take the

3    patient's medical history?

4    A    Correct, patient medical history.

5    Q    When you were working at the Center, how were patients

6    giving you their medical history?

7    A    Verbally, and some written ones.

8    Q    At some point were you promoted in that position?

9    A    Yes, ma'am.

10   Q    When was that?

11   A    Well, I don't know the exact time but maybe like seven,

12   eight years (indisc.) I started, they asked me if I wanted to

13   be a supervisor for the medical assistants.

14   Q    And did you accept that position?

15   A    I did.

16   Q    What were your supervisory duties?

17   A    Well, just making sure that the patient flow was work is

18   mostly for the providers, checking for sometimes patient had

19   complaints and they would need to talk to somebody regarding

20   medications or orders or procedures, they would come to me.

21   Q    Could other medical assistants at the Center come to you

22   with questions?

23   A    Yes.

24   Q    About how many people would that have been that you

25   supervised?

1    A    Approximately about ten, eight to ten.

2    Q    All right, in that supervisory role, did you have an

3    occasion to be in the exam room with Dr. Zamora -- well, with

4    any other doctors --

5    A    Yes.

6    Q    -- while they were treating?  Okay, and then also in that

7    prior role, prior to your supervising, were you also in the

8    exam room frequently with the physicians as they were treating

9    patients?

10   A    Not as frequently because I was working outside doing the

11   actual orders.  But whenever they needed assistant with any

12   aspiration of the knees for -- then help -- I would help them

13   out.

14   Q    Okay.  What are some of the other duties you had in

15   addition to triaging; did you do injections?

16   A    Yes, injections, intermuscular injections, subcutaneous

17   injections.

18   Q    What other items would you have taken care of?

19   A    Also knee injections.

20   Q    Anything else?

21   A    Looking over the overtime.  Sometimes if they had

22   overtime, they'll let me know and I try to accommodate the

23   personnel that I had under my supervision.

24   Q    In your role as a supervisor in your 15 years of

25   experience at the Center, were you familiar with various areas

 1  of the building?

 2  A    Yes, ma'am.

 3  Q    Were you free to move about the building if you needed to

 4  get information from a supervisor in another section?

 5  A    Most of the time, yes.

 6  Q    Why do you say most of the time?

 7  A    Because if they were working in a certain department, for

 8  example infusions or lab departments, I usually -- if they had

 9  patients there, I would try to wait until they're done.

10  Q    Do you know who owned the Center for Arthritis and

11  Osteoporosis?

12  A    To my knowledge, just Dr. Jorge Zamora.

13  Q    Do you see Dr. Zamora-Quezada in the courtroom here today?

14  A    Yes, ma'am.

15  Q    Can you identify him by an article of clothing he's

16  wearing?

17  A    Second gentlemen with the glasses with a purple bow.  He's

18  standing up.

19  Q    With the bow tie?

20          **THE COURT:**  The record will show he's pointed out

21  Dr. Zamora, the Defendant.

22          **MS. FRAZIOR:**  Thank you.

23  **BY MS. FRAZIOR:**

24  Q    Who else did you work with at the Center?

25  A    With people that are here?

Moreno - Direct / By Ms. Frazior                    11

1    Q    Just individuals that you worked with there.  Did you work

2    with Meisy Zamora-Quezada?

3    A    As well, yes, ma'am.  Well, I mean, not really like

4    directly with her but, yes, some cases I did.

5    Q    Okay, so in some instances you worked directly with her,

6    but majority of time would you say you worked with other

7    individuals?

8    A    Correct.

9    Q    Okay.  Do you see Ms. Zamora-Quezada in the courtroom here

10   today?

11   A    Yes, ma'am.

12   Q    Can you identify her by an article of clothing she's

13   wearing?

14   A    She's the lady in the last on the table on the left-hand

15   side with a gray dress or shirt.

16          MS. FRAZIOR:  May the record reflect he's identified

17   Ms. Zamora-Quezada?

18          THE COURT:  The record will show that.

19          MS. FRAZIOR:  Thank you.

20   BY MS. FRAZIOR:

21   Q    All right, did you work with Estella Natera?

22   A    Yes, ma'am.

23   Q    Do you see her in the courtroom here today?

24   A    Yes, ma'am.

25   Q    Can you identify her by an article of clothing?

1  A    Yes.  She's right here on the right-hand side on the first

2  table with a maroonish, purple, and black jacket or --

3  Q    Jacket, all right.

4        MS. FRAZIOR:  May the record reflect that he has

5  identified Estella Natera?

6        THE COURT:  The record will show that.

7  BY MS. FRAZIOR:

8  Q    And did you work with Felix Ramos?

9  A    Yes, ma'am.

10  Q    Can you -- do you see him in the courtroom here today?

11  A    Yes, gentlemen with gray, the second one, the left-hand

12  side -- or right-hand side.

13        MS. FRAZIOR:  And may the record reflect that he's

14  identified Felix Ramos?

15        THE COURT:  He's identified Felix Ramos.

16        MS. FRAZIOR:  Oh, it's Ramos, Felix Ramos, Felix.

17        THE COURT:  The record will show that.

18        MS. FRAZIOR:  Thank you, Judge.

19  BY MS. FRAZIOR:

20  Q    All right, did you -- let's go through briefly the roles

21  of each of those individuals.  What was Dr. Jorge Zamora-

22  Quezada's role at the clinic?

23  A    Well, I mean, he's the main doctor.  He was the one who --

24  I guess the owner or CEO of the company.

25  Q    Is he the person you took direction from?

Moreno - Direct / By Ms. Frazior                    13

1    A    Most of the time.

2    Q    Would there be other people you take direction from?

3    A    Yes.

4    Q    Who else?

5    A    Sometimes Doctora Meisy.

6    Q    Okay.  And you mentioned Doctora Meisy; why do you call

7    her that?

8    A    Well, that's the way we know her because I believe she has

9    a doctor in -- she's a doctor in Mexico so I always knew her as

10   Doctora Meisy.

11   Q    Who told you to call her that?

12   A    I guess myself.  I mean, I heard them call her Doctora

13   Meisy so I called her Doctora Meisy.

14   Q    Okay.  And what was her role at the clinic?

15   A    Well, most of the time she was in some meetings and she

16   will motivate the staff, you know, to maintain positive and see

17   patients as a family.  And sometimes she will be in -- I guess

18   in meetings with some supervisors.

19   Q    Okay, we'll get into that in just a little bit but let me

20   ask you briefly what was Estella Natera's role in the clinic?

21   A    Well, when I -- she started working, I -- she started

22   working in the billing department.  And then I -- at the end,

23   she was the billing supervisor.

24   Q    And then Felix Ramos?

25   A    I really didn't know what he was -- what he used to do.  I

Moreno - Direct / By Ms. Frazior                    14

1   know he was close to the doctor but I guess under financially.

2   But I'm not really know -- I really didn't know what he was

3   doing.

4   Q    Why did you not know what he was doing?

5   A    Because it was -- he's very private on his work.  He -- I

6   mean, he didn't explain much to us.  So my understanding was

7   more financially.  Sometimes HR, he would let them know about

8   the overtimes or PTO time.

9   Q    What was your understanding of his role with respect to

10  Dr. Zamora-Quezada?

11  A    He was working very closely with him but, I mean, that's

12  up to -- that's all I know about him.

13          **THE COURT:**  What do you mean by PTO?

14          **THE WITNESS:**  PTO, we know them as your vacation time

15  or personal time --

16          **THE COURT:**  Okay.

17          **THE WITNESS:**  -- off, personal time off, that's what

18  I mean.

19  **BY MS. FRAZIOR:**

20  Q    All right, can you tell us a little bit about the kinds of

21  services that the Center had?

22  A    Well, they had their own lab department, they had

23  radiology department with the open MRI.  At a certain time,

24  they had the CT-scan, they had the bone density, and they had

25  ultrasounds.  At a time, they had therapy, an aquatic therapy,

1  infusion department.

2          **MS. FRAZIOR:**  All right, I -- at this time I move to

3  offer Government's N-2 which is agreed to by counsel for

4  Zamora-Quezada.  And I assume the other attorneys are in

5  agreement.

6          **MR. SPEAKER:**  No objection, Your Honor.

7          **MS. FRAZIOR:**  No objection.

8          **THE COURT:**  It's admitted.

9          **(Government's Exhibit Number N-2 was received in evidence)**

10         **MS. FRAZIOR:**  Thank you, Your Honor.  Okay, I'm going

11  to show you -- may I publish to the jury, Your Honor?

12         **THE COURT:**  Sure.

13  **BY MS. FRAZIOR:**

14  Q    I'm going to show you what's been marked as Government's

15  N-2.  Let me see if I can zoom out a little.  Do you recognize

16  this?

17  A    Yes, ma'am.

18  Q    What is that?

19  A    That's the Center of Arthritis and Osteoporosis center.

20  Q    Is that the building that you worked at?

21  A    Yes, ma'am.

22  Q    This is the one in Edinburg?

23  A    Correct.

24  Q    You mentioned a couple of different sections that --

25  services that the Center had within it.  I'm going to show you

Moreno - Direct / By Ms. Frazior                    16

1   Government's N-2-14, page 14.  It's a little dark but can you

2   see what that is?

3   A    Yes, ma'am.

4   Q    What is that?

5   A    That's part of the infusion department.

6   Q    Does it continue on to another location?  You said part

7   of.

8   A    It's because it -- on the -- there's another part of the

9   infusion department that's called fast track department for

10  injections.  It's in the back of the picture.

11  Q    All right.

12  A    (Indisc.) --

13         THE COURT:  And this is all --

14  A    -- picture.

15         THE COURT:  -- part of Exhibit Number 2?

16         MS. FRAZIOR:  N-2, yes.

17         THE COURT:  N-2.

18         MS. FRAZIOR:  Yes.

19  BY MS. FRAZIOR:

20  Q    And looking at this page here, can you see what is

21  happening here?  I guess I could circle it here.  What is that

22  right there?

23  A    That's one of the infusions chairs.

24  Q    Okay, do you see how many there are on the -- in the

25  picture?

1  A    Most of them, yes.

2  Q    Okay.  Do you recall how many different infusion chairs

3  they had at the Center?

4  A    I want to say seven.

5  Q    And then what is happening in the infusion center, what

6  kind of service is being -- I mean, you say "infusion" but

7  we're not medical professionals so what does that mean?

8  A    Well, they will give treatments intravenous for

9  osteoporosis, for rheumatoid arthritis, some lupus (indisc.)

10 syndrome.

11 Q    When patients were coming here to the infusion center, how

12 much time were they spending per visit?

13 A    It just varies what treatment they were getting.  It can

14 be from 35 minutes to up to four to five hours.  This is about

15 the infusion (indisc.)

16 Q    Yes.

17 A    Okay, yeah.

18         THE COURT:  Four to five or 45?

19         THE WITNESS:  No, four to five.

20         THE COURT:  Okay.

21 BY MS. FRAZIOR:

22 Q    I just want to quickly run through a couple of other

23 photos with you real quickly.  I'm showing you Government's N-

24 2, page 58; do you know what this is?

25 A    It's one of the exam rooms.

1   Q    Okay, is this a pretty typical representation of the exam

2   rooms at the Center for -- the Center?

3   A    Yes, ma'am.

4   Q    And I just want to direct you to a couple things here.

5   What's this right over here in the corner?

6   A    That's the computer.

7   Q    Who sits there?

8   A    The medical assistants and sometimes the provider, or the

9   doctor.

10  Q    Okay.  While the doctor is in the room with the medical

11  assistant and the patient, where would -- if you were a medical

12  assistant, where would you be and what would you be doing?

13  A    Most of the time I will -- you will be standing next to

14  the computer on that counter writing down the actual notes

15  given by the provider or the doctor.

16  Q    And during these examinations, I want to walk you through

17  one real quickly.  Say you were in an exam room with

18  Dr. Zamora-Quezada and it's the first visit with a patient, can

19  you walk us through what would be happening then?

20  A    Is this the sign-in?

21  Q    Yes, and it's their very first visit to the Center.

22  A    Well, I mean, they will go to the front office and they

23  will get -- fill out the history and physical, fill out the

24  personal information demographics.  From there, after the -- if

25  they have insurance, they will verify the insurance and they

1    will get -- they will print out a fee ticket or a superbill and

2    they will put it in back of the tray of the front office.

3    There was a tray with each provider's name.  And then the

4    medical assistance in triage will grab whoever got there on a

5    timely manner, grab them and pass them to triage and get their

6    height, their weight, their medications, history of any

7    surgeries.  And then after taking the vital signs, they would

8    try to input the information in the computer, the basic vital

9    signs were mentioned, and pass them into the exam rooms.

10   Q    Okay, all right, now we're in the exam room as you can see

11   on this photo here.  So tell us what is happening in the exam

12   room; where is the patient sitting?

13   A    Most of the time we'll try to sit the patient on top of

14   the exam table.

15   Q    Okay, that's -- is that right here?

16   A    Correct.

17   Q    Okay, and where's the doctor?

18   A    Doctor will be coming in and introduced to the patient,

19   and then he will -- this is a new patient so then he will start

20   asking the questions and doing the physical exam.

21   Q    Okay, and then the MA is sitting over here on the

22   computer; is that correct?

23   A    Yes.

24   Q    Or --

25   A    At that time, yes, we try to make sure that the vital

Moreno - Direct / By Ms. Frazior                    20

1   signs and the history is there.

2   Q     Okay.

3   A     And if the provider has already given orders or

4   documenting or trying to say some orders, we'll be writing that

5   on the counter and/or sitting down.

6   Q     Okay.  And describe for us what the physical examination

7   for a new patient would be like by Dr. Zamora-Quezada.

8   A     Well, he will ask if they -- of course if they have any

9   joint pain.  He will examine the hands, all the hand joints,

10  the wrist, the shoulders, and do certain movements.  And he

11  will lay the patient back and try to also check the bigger

12  joints, the hips, the knees, and sometimes he will squeeze the

13  feet.

14  Q     What's Dr. Zamora-Quezada's demeanor during these exams?

15  A     What do you mean?

16  Q     What's his demeanor, what's he like?

17  A     Well, he's very thorough and sometimes he will joke around

18  with the patient, sometimes he won't.

19  Q     Okay, is he moving quickly?

20  A     Most of the time he will -- he has a flow that he follows.

21  Q     Did he ever -- or did you ever witness him cutting off

22  patients or interrupting patients?

23  A     In some cases.

24  Q     And with respect to the medical assistant who's there

25  trying to type in those notes, is it easy to keep up with

 1  Dr. Zamora-Quezada?

 2  A    Most of the time, no.  We try to finish whatever we stay

 3  pending outside in the nurse's station.

 4  Q    Why is it not easy to get those notes as he's going?

 5  A    Because at the same time you're helping with the

 6  injections.  If he -- a patient is going to get an injection,

 7  you will pass the alcohol prep and the Band-Aids and the

 8  medication the patient's going to get administered.  Then from

 9  there, you're also writing the notes and you have a medical

10  assistant note that we try to circle whatever doctor's ordering

11  at the same time, plus a fee ticket or the superbill, it's the

12  same thing, and we try to make sure that we got everything that

13  he was mentioned.

14  Q    Is Dr. Zamora-Quezada ever taking notes in these exams?

15  A    Rarely.

16  Q    All right, after the exam is complete, what happens next?

17  A    From there, most of the patients have their labs already

18  ordered, plus the x-rays, and whatever they had ordered, any

19  MRI's or any ultrasounds, we will pass the patient to the

20  department who had less patients.  The first department usually

21  will be the lab.

22  Q    Were there times in that exam room where patients received

23  medication right then and there?

24  A    Yes, ma'am.

25  Q    Okay, tell us about that, what kinds of medication would

1   they receive?

2   A    Well, depo medros (phonetic) with lidocaine.  Those are

3   (indisc.) injections.

4   Q    What is that for?

5   A    To my knowledge, it's for pain and inflammation.

6   Q    Is that commonly known as a steroid or is -- or are you

7   talking about --

8   A    Correct.

9   Q    Okay.

10  A    To my understanding, yes.

11  Q    Would you say patients received steroid injections few, on

12  few occasions, or many occasions?

13  A    Most of the time.

14  Q    All right, let's back up just a little bit having gone

15  through the exam and let's talk about your experience with the

16  superbills; are you familiar with what a superbill is?

17  A    Yes, ma'am.

18  Q    What is it?

19  A    That's the paper that they pass from the front to each

20  department and then will circle whatever it was ordered or

21  done.  And then we will put the diagnosis there to link each

22  order.

23          MS. FRAZIOR:  May I approach the witness?

24          THE COURT:  Sure.

25  //

Moreno - Direct / By Ms. Frazior                    23

1   **BY MS. FRAZIOR:**

2   Q    I'm showing you what's marked as Government's Exhibit E-2;

3   do you know what that is?

4   A    Yes, ma'am.

5   Q    What is it?

6   A    Fee ticket or superbill.

7   Q    Okay, so fee ticket and superbill are the same thing.

8   A    Same thing.

9   Q    Okay.  Is that a document that was kept in the regular

10  course of business at the Center for Arthritis and

11  Osteoporosis?

12  A    Yes, ma'am.

13  Q    Was it made -- those fee tickets together, were they made

14  at or near the time that the events reflected in them occurred?

15  A    Yes, ma'am.

16  Q    Were they made by someone with personal knowledge of those

17  events?

18  A    Yes.

19       **MS. FRAZIOR:**  At this time, I move to admit

20  Government's E-2.

21       **THE COURT:**  Any objection?

22    **(Pause)**

23       **MR. MARTINEZ:**  Your Honor, we would object here on

24  the fact that he's not the records custodian for these fee

25  tickets, Judge.

1           **MS. FRAZIOR:**  I don't think that's necessary.

2           **THE COURT:**  It's a photograph, isn't it, or what

3    is --

4           **MS. FRAZIOR:**  No, it's a superbill, but he testified

5    that he uses these every day in his current business and

6    they're a business record.  He doesn't need to be the records

7    custodian, just somebody who could fulfill the questions --

8           **THE COURT:**  Except for that one's all filled up.

9           **MS. FRAZIOR:**  Yes, it's a -- yes.

10          **THE COURT:**  Do you -- he could do a blank one but

11   what -- is he going to testify about something in particular

12   about that one?

13          **MS. FRAZIOR:**  He's going to testify about these

14   specific ones, yes, Your Honor, these specific fee tickets.

15          **THE COURT:**  Yes, but he -- was he there when they

16   were prepared?

17          **MS. FRAZIOR:**  Yes.  It's in 2013 and 2014.

18          **MR. SPEAKER:**  I don't have a problem with a blank --

19          **THE COURT:**  But did he prepare them -- what?

20          **MR. SPEAKER:**  I don't have a problem with a blank

21   superbill or fee ticket, but since he's not the records

22   custodian for that clinic in regards to these, I do have an

23   issue with that.

24          **MR. SPEAKER:**  We'd object to improper predicate, Your

25   Honor, as to those particular (indisc.) --

1          **MS. FRAZIOR:**  It's absolutely the proper predicate to

2   authenticate.  But if Your Honor does not want me to go through

3   one that's filled out, I can just ask --

4          **THE COURT:**  Yeah, right, --

5          **MS. FRAZIOR:**  -- the questions.

6          **THE COURT:**  -- because he will -- he didn't fill it

7   out.  That's their objection, but they can't object to just the

8   form by itself.

9          **MS. FRAZIOR:**  Sure, all right.

10         **THE COURT:**  And you can have somebody else identify

11  it if it's somebody else that was a custodian at some point.

12         **MS. FRAZIOR:**  Sure, thank you, Your Honor.

13         **MR. ALVAREZ:**  Judge, we'd like to also add a hearsay

14  objection.

15         **THE COURT:**  Well, it's -- it won't be once you have

16  just the clean form.

17         **MS. FRAZIOR:**  Sure, all right, --

18         **MR. SULLY:**  For the record, Your Honor, we make the

19  same objection.

20         **THE COURT:**  Yes.  Anybody else?

21      (No audible response)

22         **MS. FRAZIOR:**  All right, --

23         **THE COURT:**  And you all make the same response

24  sitting in the U. S. Attorney's table.  Okay, go ahead.

25  //

1    **BY MS. FRAZIOR:**

2    Q    Mr. Moreno, what kind of information is contained with --

3    on the superbill?

4    A    Well, I mentioned that they would circle the -- it

5    contains injections, it contains the office visit, it contains

6    laboratory with (indisc.) codes, it contains radiology also as

7    x-rays, ultrasounds, bone densities, MRI's.

8            **THE COURT:**  I take it it doesn't say "superbill" at

9    the top.  That's just --

10           **THE WITNESS:**  No, sir.

11           **THE COURT:**  -- a term everybody uses because it will

12   include everything that has to be billed.

13           **THE WITNESS:**  Correct.

14           **THE COURT:**  And it's not about amounts, it's just the

15   different things that have to be filled out.

16           **THE WITNESS:**  Correct.

17           **THE COURT:**  Go ahead.

18   **BY MS. FRAZIOR:**

19   Q    Is it fair to say that the fee ticket or the superbill

20   contains the services that could be rendered; is that correct?

21   A    Yes.

22   Q    And does it also contain the codes that could be billed

23   for those services?

24   A    The majority, yes.

25   Q    Okay.  And the fee tickets that you've reviewed, did they

1    also contain all of the services that could be rendered by the

2    Center?

3    A     Yes.

4    Q     Okay.  Is there information on these fee tickets or blanks

5    on these fee tickets for the patient's name?

6    A     Correct.

7    Q     Whether it's a new visit or not.

8    A     Yes.

9    Q     And then date of service.

10   A     Correct.

11   Q     Okay.  Does the fee ticket also contain information about

12   the patient's diagnosis?

13   A     Yes.

14   Q     And I think you testified a moment ago that the fee ticket

15   is something you pick up at the beginning of a patient visit;

16   is that right?

17   A     Yes.

18   Q     And then does that fee ticket/superbill follow the patient

19   through the various places that they go at the clinic?

20   A     Yes.

21   Q     What happens with the fee ticket at the end of the

22   patient's visit?

23   A     They take them to the front.

24   Q     What happens at the front?

25   A     They will do the discharge, next appointment.  I don't

1    know if they -- I mean, I just know that they take them to the

2    front so they can (indisc.) next appointment.

3    Q    The fee tickets at the Center, do they also contain along

4    with them orders, forms that could be filled out for x-rays and

5    other documents that are attached?

6    A    Yes, ma'am.

7    Q    Okay, I just wanted to make sure that the fee ticket is

8    not one singular piece of paper; is that your understanding?

9    A    Yes.

10   Q    Okay.  All right, and then after the patient has their new

11   visit appointment or their next visit appointment scheduled,

12   what happens to that superbill?

13   A    That is taken to medical records.

14   Q    And then what happens to it?

15   A    Supposed to be scanned.

16   Q    And then what happens to it?

17   A    Then --

18   Q    After it's scanned.

19   A    -- they -- it was put in medical records.

20   Q    Okay.  Well, the fee ticket, is it -- are you saying it's

21   just scanned and then you never hear from it again and nobody

22   every uses it anymore?

23   A    Correct.

24   Q    Is it used to bill insurances?

25   A    I mean, if it's scanned, they would just print it out and

1   send it from there but, yes, it is used.  I want to say yes.

2   Q    Okay.

3   A    I'm not sure.

4          MR. ALVAREZ:  Your Honor, we object to him

5   speculating.  He said he wasn't sure.

6          THE COURT:  You don't know for a --

7          MR. ALVAREZ:  We're going to object to speculation.

8          THE COURT:  -- fact, is that right?

9          THE WITNESS:  Correct, because, I mean, we try to

10  input the diagnosis and orders in the electrical medical

11  records so --

12          MS. FRAZIOR:  Okay.

13          THE WITNESS:  -- it's supposed to be there.

14  BY MS. FRAZIOR:

15  Q    What would be the purpose of writing the code and checking

16  off the services to be done on the fee ticket then?  If you

17  know.

18  A    So it can go to different departments and not all

19  departments have the electronic medical records on so they will

20  do it faster.

21  Q    Okay.  And then did you ever have an occasion in your role

22  to once a patient had the fee ticket filled out and they were

23  gone, the fee ticket to be brought back to you for corrections

24  to be made?

25  A    In some cases.

1   Q    Tell us about that, what kinds of cases would that be?

2   A    Well, if they had ordered let's say certain labs and the

3   MA didn't put the diagnosis that it was -- or a symptom that

4   was going to link the lab to be covered, then they would let us

5   know, you know what, we forgot to connect one of the labs with

6   diagnosis.

7   Q    What does that mean; why does the lab need to be connected

8   with a diagnosis?

9   A    So it can be paid.

10  Q    Okay.  Who would bring that document to you?

11  A    Sometimes will be the lab department or sometimes one of

12  the billing department.

13  Q    Okay.  And if it was the billing department, who would

14  instruct the billing department person to send that lab back to

15  the other departments?

16          **MR. ALVAREZ:**  Your Honor, I would object that will

17  call for a hearsay response from this witness.  Who was

18  (indisc.)

19          **MS. FRAZIOR:**  (Indisc.)

20          **THE COURT:**  He's just not -- he's not mentioned

21  anybody except like -- first of all, lay the predicate as to

22  how he would know what -- who they would -- how they would

23  proceed.

24  //

25  //

1   BY MS. FRAZIOR:

2   Q    Okay, so you are the supervisor of the medical assistants;

3   is that right?

4   A    Yes, ma'am.

5   Q    And the medical assistants are the ones who are filling

6   out the superbill, right?

7   A    Yes, ma'am.

8   Q    Okay, so if a mistake had been made or something had been

9   left off the superbill, would you have an occasion to see, to

10  have it brought back to you to be corrected?

11  A    In some cases, yes.

12  Q    Okay, and you mentioned that that would come from the

13  billing department.

14  A    Sometimes, yes.

15  Q    Who was the person in the billing department making those

16  instructions?

17  A    Well, they had a -- the supervisor for the billing

18  department had somebody in charge of I guess reviewing the fee

19  tickets.

20  Q    Okay.

21          THE COURT:  And the reason that person's doing it,

22  not because they think the medical situation, they know that if

23  somebody put that on there, they didn't finish filling out why

24  that was done and that that needs to be put on there.

25          THE WITNESS:  Correct.

1          **THE COURT:**  They don't come in there and say, just

2    make it up.  They say it wasn't put on there; is that correct?

3          **THE WITNESS:**  Correct.

4    **BY MS. FRAZIOR:**

5    Q    Is it your understanding that certain labs would not be

6    paid for, I think you mentioned this a second ago, by the

7    insurance companies if the diagnosis did not support ordering

8    those labs?

9    A    Correct.

10   Q    Okay, so the labs would be ordered and then afterwards the

11   diagnosis code would be put on in some cases.

12   A    Yes, ma'am.

13   Q    Did you ever receive instructions from anyone at the

14   clinic about what diagnosis to put on the labs in the first

15   place?  So like while you're there with a patient and the

16   orders are being made.

17   A    We had a sheet-sheet of certain labs with certain

18   diagnosis that were covered.

19   Q    Okay, what does -- what was that, what's the purpose of

20   that?

21   A    So it will help us out whenever we were doing the actual

22   note as well to link any symptoms or any diagnosis to the right

23   plan so it will reflect the coverage correctly for the lab

24   departments or any radiology.

25   Q    Who gave you those instructions?

1    A    We had certain classes by Dr. Jorge Zamora and he would

2    teach us about diagnosis.

3    Q    Okay, when would those -- how frequently would those

4    classes happen?

5    A    At least once or twice a year.

6    Q    Okay, and who all is participating in the class?

7    A    This is the medical assistants.

8    Q    And who's leading the class?

9    A    Dr. Jorge Zamora.

10   Q    And what information, as specific as you can recall, is

11   being given to the medical assistants about matching up the

12   diagnosis code with the labs?

13   A    Symptoms of arthritis or psoriasis or any osteoarthritis

14   or fibromyalgia, sinusitis, all those diagnosis.  And then they

15   will -- he would let us know what are the symptoms and where he

16   would link them to with each labs.

17   Q    Okay, so you're being instructed on the symptoms that go

18   with each lab; is that correct?

19   A    And diagnosis as well.

20   Q    All right, so say you received a superbill and you see one

21   of the labs that's in that class that you've been instructed

22   on, what do you then know goes along with that lab that you

23   have to put on the superbill to get paid?

24   A    Well, I (indisc.) to the (indisc.) go back and check your

25   medical assistant note or the patient's history and physical,

1   if they have any -- because in the history and physical, the

2   second sheet, if I'm not mistaken, they have about maybe 40,

3   50, check -- just to check with symptoms and you have to have a

4   joint (indisc.) where they put have pain and stiffness.  And

5   they will -- the patient will circle -- well, is supposed to

6   circle them, so the patient could not do it so the MA will help

7   them out and do it for them.  So they will go back to that and

8   if they see it there, then we will -- we can put it there.

9   Q    What would happen if the MA went back to their notes and

10  they didn't see those symptoms; what was the instruction about

11  what was to be put on the superbill?

12  A    In some cases, we will put on the fee ticket some of the

13  like symptoms to cover the -- some of the labs.

14  Q    Even if they weren't in the medical assistant's notes?

15  A    Correct.

16  Q    And who instructed you to do that?

17  A    That was Dr. Zamora.

18  Q    All right, I want to talk to you a little bit about

19  rheumatoid arthritis.  Now, you worked at the clinic for 15

20  years.

21  A    Almost 15 years, correct.

22  Q    Yeah, almost 15 years, so would it be fair to say that you

23  had occasion to experience people who were diagnosed with

24  rheumatoid arthritis?

25  A    Yes.

1  Q    Okay, what is your understanding of what rheumatoid

2  arthritis is?

3  A    Well, it's a very severe condition where it caused

4  deformities, severe pain and swelling, and cause disability.

5  Q    Do you have personal experience with somebody who has

6  rheumatoid arthritis that you're close to?

7  A    Yes, ma'am.

8  Q    Who's that?

9  A    My wife.

10  Q    Where did she get treated?

11  A    With Dr. Jorge Zamora.

12  Q    Did you -- in her treatment with Dr. Jorge Zamora-Quezada,

13  did she ever have to pay for her services?

14  A    Thank to God, no, and to Dr. Jorge Zamora.

15  Q    Your wife, when she came to the clinic, did she get the

16  same types of tests and x-rays that everybody else got?

17  A    Not all the time.

18  Q    Why not?

19  A    Because they -- he would -- they will order them basic

20  ones or whatever he think that was necessary at that time.

21  Q    Okay.  Why are they ordering basic labs and x-rays for

22  her?

23         MR. SPEAKER:  Objection, Your Honor, speculation.

24         MS. FRAZIOR:  He has personal experience about his

25  wife's treatment.  He's also --

1          THE COURT:  Well, but how would he know what -- why

2  or why not something else was done?

3          MS. FRAZIOR:  I think, well, I think it's his

4  personal knowledge, Your Honor, about how the clinic was run as

5  to why his wife, who was not paying for services, would receive

6  different labs than others.

7          THE COURT:  Well I guess he was trying to save you

8  some money then.

9          THE WITNESS:  Yes, sir.

10          THE COURT:  Because you didn't have insurance.

11          THE WITNESS:  Correct.

12          THE COURT:  And so he didn't order as many things as

13  he might normally because of the fact that you weren't covered

14  by insurance.

15          THE WITNESS:  My understanding.

16  BY MS. FRAZIOR:

17  Q    Were you being -- were you paying for those services at

18  the clinic, though?

19  A    No, ma'am.

20  Q    Okay, so who was essentially fronting the bill for those?

21  A    They wouldn't charge me.

22  Q    All right, so are you saying that people who had insurance

23  would then receive different sets of lab tests?

24          MR. LEE:  Objection, Your Honor.

25          THE COURT:  Objection's sustained.

Moreno - Direct / By Ms. Frazior                    37

1        **(Pause)**

2   **BY MS. FRAZIOR:**

3   Q    All right, let's talk about the new patients who came in

4   and the types of services that you experienced them receiving;

5   was there any kind of protocol to your knowledge for labs that

6   patients would receive?

7   A    Well, they have to -- the new patient labs?

8   Q    Uh-huh.

9   A    They had the follow-up labs.  At the beginning, they had

10  the new patient labs, second visit labs, and third visit labs.

11  But then it became just new patient labs and just the follow-up

12  labs.

13  Q    All right, so at some point there was a change; is that

14  your testimony?

15  A    Yes, ma'am.

16  Q    Okay, what -- is every patient who comes in on the new

17  visit supposed to get the same labs?

18  A    The majority, yes.

19  Q    Okay.  And then during this time period when you've got

20  the one, two, three, are the people who come in on the second

21  visit supposed to get the same set of labs?

22  A    Majority, yes, ma'am.

23  Q    Okay, and then is -- on the third visit, they would

24  receive the third set of labs; is that right?

25  A    The majority, yes.

1  Q    Okay, and then at some point in time there was a change to

2  just first visit and follow-up; is that correct?

3  A    Correct.

4  Q    Okay.  Again, on that first visit and follow-up on that

5  time period, were patients receiving the same tests on the

6  first visit?

7  A    The majority.

8  Q    And the same tests on the follow-up visit.

9  A    Yes, ma'am.

10 Q    Why do you say --

11         **THE COURT:**  And by "that one," also the majority?

12         **THE WITNESS:**  Yes, --

13         **THE COURT:**  For the second --

14         **THE WITNESS:**  -- the majority.

15 **BY MS. FRAZIOR:**

16 Q    Why do you say majority?

17 A    Well, because, I mean, it just depends the patient didn't

18 have Medicare, Medicaid, or they were private pays, they don't

19 have no insurance, he will have a different set of labs,

20 different set of x-rays.

21 Q    Thank you.

22 A    Yes, ma'am.

23 Q    What about x-rays; what was your experience of the

24 practice regarding x-rays being given to patients?

25 A    My knowledge was that they were ordered because as I

Moreno - Direct / By Ms. Frazior                    39

1   mentioned, arthritis causes deformities and they ordered hands,

2   hand joint, hand, wrist, elbows, shoulders, knees, hips, and

3   ankles x-rays on the majority of the patients.

4   Q    What visit would those be ordered on?

5   A    On the first visit.

6   Q    Would there be times when patients would then receive

7   second sets of x-rays at later visits?

8   A    Yeah.  They -- certain type had (indisc.) some were done

9   every year, some every three years.

10  Q    Do you recall times when patients would come in with lab

11  work or x-rays already done from a prior physician?

12  A    Yes, ma'am.

13  Q    What would happen in those instances?

14  A    They will -- they would check the labs, and if he didn't

15  feel comfortable with the actual labs, they would repeat them

16  again.

17  Q    Okay, what about x-rays?

18  A    In some cases as well.

19       **(Pause)**

20  Q    All right, and a little while ago you discussed manager, I

21  believe you discussed managers at the clinic; was -- Estella

22  Natera was a billing supervisor; is that right?

23  A    Yes, ma'am.

24  Q    And you were the medical assistant supervisor.

25  A    Yes, ma'am.

1  Q    Was there a supervisor for the lab department?

2  A    Yes, ma'am.

3  Q    Was there a supervisor for the infusion department?

4  A    Yes, ma'am.

5  Q    Did those supervisors have any kind of weekly meetings?

6  A    Yes.  Well, sometimes weekly, biweekly, sometimes once a

7  month.

8  Q    Where would those meetings occur?

9  A    Most of the time in the conference room.

10 Q    And who would attend those meetings?

11 A    Sometimes, well, all the supervisors, sometimes Mr. Felix,

12 sometimes Doctora Meisy, sometimes Dr. Zamora.

13 Q    Okay.  I want to show you Government's N-2 which is

14 already in evidence.  This is page 116.  Is this the conference

15 room you would --

16 A    Yes, ma'am.

17 Q    -- meet in?  Okay.  And would -- where would the

18 supervisors sit in this room?

19 A    Well, some on the -- close to the table, some on the other

20 side on the -- close to the wall.

21 Q    Who's leading these meetings?

22 A    Sometimes Doctora Meisy, sometimes Dr. Zamora.

23 Q    What types of things are being discussed in these

24 meetings?

25 A    Sometimes the quota of patients and sometimes overtime.

1   And I forgot to mention also sometimes the office managers who

2   were there at that time.  Not a lot of time we have an office

3   manager but whenever we had one, there was an office manager

4   also present.

5   Q    Let's talk about the quotas; what were -- what types of

6   quotas were given to you in those meetings?

7   A    In the nurse's station, well, as I mentioned, making sure

8   that the providers had their -- a steady flow of patients but

9   they had certain amount of patient they need to receive, for

10  example the Dr. Zamora wanted to see at least 30 patients as

11  well as the midlevel provider, the Lillian Williams at that

12  time.

13          **THE COURT:**  And by you say 30 patients, you mean 30

14  patients a day.

15          **THE WITNESS:**  Correct, 30 patient a day.

16  **BY MS. FRAZIOR:**

17  Q    And was there a specific quota for Lillian Williams as

18  well?

19  A    As well 30.

20  Q    Okay, just would you remind the jury real quickly who she

21  is?

22  A    She's the physician assistant, Dr. Jorge Zamora's PA or

23  midlevel provider.

24  Q    To your knowledge, was Lillian Williams seeing patients on

25  first visits?

1   A    Rarely.

2   Q    Who saw patients on first visits?

3   A    Dr. Jorge Zamora.

4   Q    Okay.  All right, so number of patients to come to the

5   clinic per day, that's one of the quotas.  What other quotas

6   were you receiving?

7   A    Also for the -- it's the infusion department, the fast

8   track department for the arm injections, for the MRI's, for

9   bone densities.

10  Q    What about x-rays?

11  A    As well x-rays.

12  Q    Do you recall the numbers that were required?

13  A    No, ma'am, not for those departments.

14  Q    Were there any quotas specifically given to you as an MA?

15  A    For the follow-ups and the new patients that he wanted to

16  see I don't remember the amount of patient, new patients he

17  wanted to see at this time, but he had a number, yeah.

18  Q    And what -- how would staff at the clinic who were in

19  those meetings make sure that the patient numbers were met?

20  A    They will -- we will ask the front office.  The front

21  office also had a supervisor at a certain time.

22  Q    Okay, and what would the front office do?

23  A    They would do the scheduling.

24  Q    And what would they do as part of the scheduling?

25  A    I'm sorry, they will get all the new patient referrals

Moreno - Direct / By Ms. Frazior                    43

1   getting -- being called or faxed and then they will set them up

2   for each provider or each doctor.  And then the MA will print

3   out the schedule on a daily basis to see how many patients a

4   provider had.

5   Q    And what about for x-rays; how would the staff ensure that

6   the x-ray quotas were being met?

7   A    At the end of the day, we -- each department had to turn

8   in a daily count and that was given to the doctor personally or

9   to the -- his personal secretary, excuse me.  And then from

10  there, they will add up the numbers.

11  Q    Well what -- if the staff is being instructed on quotas

12  that they had to meet, how are they going to ensure that

13  they're meeting them, as opposed to reporting the appropriate

14  number, how were they going to ensure they meet those quotas

15  for the coming days, for x-rays for instance?

16  A    Well, if there was a ten, 20 percent no show rate for a

17  whole month, then they would increase the amount of patients to

18  35 patients instead of 30.

19  Q    Okay, and then if they increase the patient number, is

20  that trickle over to the x-ray numbers to be able to increase

21  the quotas?  I'm not sure I understand your answer.

22  A    What I'm trying to say, it's -- I'm talking about the --

23  because my department is the follow-up and new patients.  So

24  from there, they will send them to each department, x-rays,

25  laboratory.  But in some cases, he was not there.  So whenever

Moreno - Direct / By Ms. Frazior                    44

1    he's not there, all those patients that left without x-rays,

2    somebody will give them a call to come back to get those x-rays

3    before they come for the second visit.

4    Q    And then what about infusions, how would the staff make

5    sure that the infusion quotas were met?

6    A    They had -- as well they had from each visit, as I

7    mentioned, they were being sent to each department.  In that

8    case, they will send the patient with the fee ticket and the

9    orders to the infusion departments.  And then the infusion

10   department nurse that time, he will schedule the patient, talk

11   to his person who was in scheduling, that was he had a

12   secretary in front for the front office, and they would

13   schedule the patients for that while he worked on the patient's

14   paperwork.

15   Q    In those meetings, were staff ever motivated by

16   Dr. Zamora-Quezada or anyone else to make sure that they met

17   their quotas?

18   A    Yes, I mean, Doctora Meisy, as I mentioned, I mean, she

19   was the one who -- also Dr. Zamora and motivate us to work as a

20   family and to get those numbers steady.

21   Q    What kind of things would Dr. Zamora-Quezada say to make

22   sure that the staff made the quotas?

23   A    He wanted to receive the most amount of patients.

24   Q    Did -- was there ever any concern about payroll being made

25   or anything along those lines if the quotas weren't made?  Did

Moreno - Direct / By Ms. Frazior                    45

1   you ever have a concern about that?

2   A    Well, only to a certain point whenever they was to tell us

3   to not deposit our checks until the following Mondays, not that

4   Friday.  But it would happen once in a while.

5        **THE COURT:**  And let's say for days that you already

6   had 30 patients, you didn't add them for that day, you would

7   add them for another day.

8        **THE WITNESS:**  Correct.

9        **THE COURT:**  And so that -- they didn't take more than

10  a certain amount of people on a particular date.  So you would

11  say, we're full for that date so you would give somebody

12  another date.

13       **THE WITNESS:**  It just depends on the condition of the

14  patient.  Sometimes he was open to walk-ins.  So if you had --

15  he wanted the -- his physician assistant to see all the walk-

16  ins and then there were new patients.  And sometimes he would

17  take the time to see the patient as well.

18       **THE COURT:**  Depending on the condition of the

19  patient.

20       **THE WITNESS:**  Correct.

21  **BY MS. FRAZIOR:**

22  Q    Moving back to the quotas for just a moment, what would

23  Dr. Zamora-Quezada say if the quotas weren't met?

24  A    Numbers, if the numbers were low, I mean, sometimes he

25  would be upset.

1  Q    Okay, and how would that happen; would it happen in those

2  meetings or elsewhere?

3  A    In the -- in some cases in the meetings or sometimes in

4  his office.

5  Q    How did you know he was upset?

6  A    Oh, he would let you know.

7  Q    How?

8  A    I mean, he's -- his voice tone would get high and

9  aggressive in the way that he was speaking.

10 Q    Okay.  Were -- was some staff afraid of him for that

11 reason?

12 A    When I first --

13        **MR. SPEAKER:**  (Indisc.)

14        **MR. SPEAKER:**  Objection, Your Honor.

15        **THE COURT:**  Objection sustained.

16 **BY MS. FRAZIOR:**

17 Q    What were your feelings?

18 A    At first when I started there, I hardly work -- go -- work

19 with him or go into his office.  They all mentioned that he had

20 a bad temper so I tried to avoid him.

21 Q    Did you ever get yelled at for not making quotas?

22 A    Very -- sometimes.

23 Q    What did you do after?

24 A    Shake it off, start working.

25 Q    And with respect to Meisy Zamora, you mentioned she was in

Moreno - Direct / By Ms. Frazior                    47

1  those meetings, too.  And what was her approach to ensuring

2  that the quotas were made?

3  A     She was there some cases.  There was a time when she

4  wasn't in the office for a time.  So whenever she was in the

5  meetings, I mean, she was more calm, she was try to motivate

6  the employees in a positive way.

7  Q     How's that, like what kinds of things did she say?

8  A     That let's see each other as a family, see the patients as

9  a family, and just simple things like that.

10 Q     And I think you mentioned this just a moment a go but I'm

11 not entirely sure we caught it.  If you had to report quotas

12 and whether or not the quotas were being met, who did that --

13 who did you report to on those?

14 A     Well, I mean, each department had their supervisor so he

15 will call supervisor in charge of those numbers.

16 Q     Okay, and so how did you as a supervisor keep track of the

17 numbers for your MA's?

18 A     Regarding the follow-ups and -- I don't understand

19 (indisc.)

20 Q     For the quotas that your department had to fill, so for

21 new patients and follow-up patients, how would you keep track

22 of that?

23 A     We will make copies sometimes of the actual schedule, and

24 then at the end of the week, we'll just shred them.  But we

25 will see also we have the electronic medical records so you

1    have also the good ability to see the numbers through the

2    computer.

3    Q    Okay.  Did you have to let anybody know whether or not you

4    made your quotas or not?

5    A    Well, most of the time it was just given to him.

6    Q    To who?

7    A    To Dr. Jorge Zamora.

8    Q    Okay, when would that happen?

9    A    At the end of the day.

10   Q    Okay, where would you go to take it to him?

11   A    Sometimes to his personal secretary and sometimes to his

12   office.

13   Q    Did you ever give anybody else the quotas at the end of

14   the day or report to anybody else on numbers?

15   A    Sometimes Mr. Felix.

16        **MS. FRAZIOR:**  If I may approach the witness?  I know

17   I don't have to ask again, sorry, Your Honor.

18   Q    I'm showing you Government's Exhibit E-8; do you recognize

19   that?

20   A    Yes, ma'am.

21   Q    What is it?

22   A    This is an email that I sent to Doctora Meisy.

23   Q    Okay, and what's the subject of it?  Not reading from it,

24   but what is (indisc.)

25   A    And CC Mr. Ramos.  I'm sorry?

1   Q    Okay, and CC Mr. Ramos.  Okay, and what is the subject of

2   the email?

3   A    This is regarding the knee injections (indisc.)

4   Q    Okay, thank you.

5          **MS. FRAZIOR:**  At this time, I move to admit

6   Government's E-8, which is the email that he has just

7   described.

8          **THE COURT:**  Any objection to this?

9          **MR. SULLY:**  May I see it, Your Honor?  Your Honor,

10  there's some handwriting on here.  Can I take him on voir dire

11  on that or --

12         **THE COURT:**  Sure.

13         **MR. SULLY:**  Thank you.  Good afternoon, Mr. Moreno.

14         **THE WITNESS:**  Good afternoon, sir.

15         **MR. SULLY:**  My name is Chris Sully and I represent

16  Meisy Zamora.

17                    **VOIR DIRE EXAMINATION**

18  **BY MR. SULLY:**

19  Q    Just want to ask you about on this exhibit that you were

20  handed by the Government, I don't know if you recall there was

21  some handwriting on it; did you see that?

22  A    Yes, I did see it.

23  Q    And that handwriting was not part of the actual email,

24  right?  That's written --

25  A    Correct.

1    Q    -- on the printout.  Do you know who's handwriting that

2    was, do you recognize the writing that's on that exhibit?

3    A    No, sir.

4              MR. SULLY:  Your Honor, we would then object.  I

5    don't know if the Court wants to see it but as to the

6    handwriting that hasn't been --

7              THE COURT:  I do want to see it.

8              MR. SULLY:  -- authenticated, Your Honor, --

9              MS. FRAZIOR:  Can we have a conference real quick,

10   Judge?

11             THE COURT:  Sure.  Wait, wait.

12       **(Begin bench conference at 2:27 p.m.)**

13             MS. FRAZIOR:  (Indisc.) I'm happy to conditionally

14   offer it just as to have him read the email off and not the

15   handwriting until we can prove up the handwriting through the

16   agent.

17             THE COURT:  (Indisc.)

18             MS. FRAZIOR:  What's that?  It's a type of drug, Your

19   Honor.  And it's essentially Mr. Moreno reporting back to

20   Doctora Meisy Zamora about the services that have been done per

21   insurance.

22             THE COURT:  Well, yeah, but without this writing

23   because he doesn't know --

24             MS. FRAZIOR:  Yeah.

25             THE COURT:  -- anything about it.

51

1        **MS. FRAZIOR:**  Could I just have him describe --

2    actually, why don't I just have him describe the email and I'll

3    offer it through another witness.

4        **THE COURT:**  All right.

5        **MS. FRAZIOR:**  Thank you.

6        **MR. SPEAKER:**  (Indisc.) we agreed to it from the

7    (indisc.) --

8        **MS. FRAZIOR:**  Oh, yeah, oh, that's --

9        **MR. SPEAKER:**  -- (indisc.) not -- I just want to make

10   sure that part of N-2 --

11       **MS. FRAZIOR:**  Oh, N-2.

12       **MR. SPEAKER:**  Is -- and that's not been (indisc.)

13       **MS. FRAZIOR:**  Yes, no, it isn't (indisc.)

14       **MR. SPEAKER:**  Okay, so (indisc.)

15       **MS. FRAZIOR:**  It's a separate exhibit.

16       **MR. SPEAKER:**  Okay.

17       **MS. FRAZIOR:**  Yeah, I'll offer it separately, thank

18   you.

19       **THE COURT:**  (Indisc.)

20       **MS. FRAZIOR:**  (Indisc.)

21       **THE COURT:**  Did you all have something else?

22       **MS. FRAZIOR:**  No, I don't think so.

23       **THE COURT:**  You sure?

24       **MS. FRAZIOR:**  Yeah.

25       **(End bench conference at 2:28 p.m.)**

**DIRECT EXAMINATION (RESUMED)**

1

BY MS. FRAZIOR:

2

Q    Mr. Moreno, have you previously reviewed this email?

3

A    Yes, ma'am.

4

Q    What is contained on -- let me just ask it this way.  Did

5

you send an email to Meisy Zamora and Felix Ramos?

6

A    Yes, ma'am.

7

Q    And what kind of information was contained on that email?

8

A    The number of patients that were seen on that particular

9

week of knee injections and the insurances that the patients --

10

they were divided by insurances.

11

Q    Is that an example of the reporting of the quotas and the

12

services rendered back to management at the Center?

13

A    No.  That was very particular.

14

Q    What was it particular to?

15

A    That was -- they were -- wanted to know how many patients

16

were seen that week and how many patients were pending the

17

series of five because if I'm not mistaken, in that case, they

18

were short-handed on the high elegance (phonetic).

19

Q    Okay.  What is the series of five?

20

A    A series of five, each patient will recommended from three

21

to five injections, to my understanding, to the knee when they

22

were to have osteoarthritis.

23

Q    All right.  In your experience at the Center, what would

24

happen if a patient -- or did you have occasion to have -- to

25

1   witness patients' complaints?

2   A    Yes, ma'am.

3   Q    How would those complaints be handled, what was the

4   process?

5   A    In my department (indisc.) the nurse's station that I was

6   supervising, --

7   Q    Let's walk first through your department and then let's

8   talk about patient complaints directly to Dr. Zamora.

9   A    Okay, well, from in my side whenever they had complaints

10  about refills or certain labs or certain orders they had

11  questions, they will come to each personal MA or sometimes

12  they'll send them to me.

13  Q    All right, and what would you do when you got a patient

14  complaint?

15  A    I would try to help them out and try to explain to them as

16  my understanding of whatever they were ordering for and the

17  reason why they were ordering it for.

18  Q    Okay.  Did you ever experience patient complaints about

19  their diagnosis?

20  A    In some cases.

21  Q    What cases were those?

22  A    In patients --

23       MR. SULLY:  Objection, Your Honor, calls for hearsay

24  as to what patients may have said or --

25       THE COURT:  Well, he can't tell us what the -- who

1    the patients were.  Go ahead.

2            **MS. FRAZIOR:**  Well, your -- yes, it's not being

3    offered for the truth of the matter asserted, Your Honor.  It's

4    offered for the effect on the listener.

5            **THE COURT:**  Go ahead.

6            **MS. FRAZIOR:**  Did you have --

7            **MR. ALVAREZ:**  Your Honor, we object also to hearsay

8    because it is being offered for the truth of the matter

9    asserted.

10           **THE COURT:**  Can you all come up here?

11       **(Begin bench conference at 2:31 p.m.)**

12           **THE COURT:**  Now, how do you get him to testify

13   (indisc.) don't even know who they were?

14           **MS. FRAZIOR:**  Well, Your Honor, just generally, the

15   different people who complained about their diagnosis being

16   incorrect and the concerns they raised in front of him to

17   Dr. Zamora-Quezada.  Not -- I'm not trying to get into whether

18   those complaints were correct or not, but there's a result of

19   what Dr. Zamora-Quezada did as a result of that (indisc.)

20           **THE COURT:**  Okay, I think you can ask him in front of

21   him did anybody ever complain about their treatments --

22           **MS. FRAZIOR:**  Okay.

23           **THE COURT:**  -- to Dr. Zamora, but that's (indisc.)

24           **MS. FRAZIOR:**  Okay.

25           **THE COURT:**  -- names or anything because that is

Moreno - Direct / By Ms. Frazior                       55

 1  hearsay.

 2          **MS. FRAZIOR:**  Okay.

 3          **THE COURT:**  And the ones that complained about

 4  themselves, I suspect every doctor has somebody complain about

 5  their diagnosis or the amount of money they were charged or

 6  whatever or what's on the insurance (indisc.) so that would be

 7  hearsay.  That part you can ask, just that.

 8          **MS. FRAZIOR:**  Okay, and may I ask what the result was

 9  of patients complaining?

10          **THE COURT:**  No.  I mean, that -- he doesn't know what

11  the result was.

12          **MS. FRAZIOR:**  He does, Your Honor.  Patients were

13  then dismissed from the clinic.  They were not allowed to get

14  additional treatment or to consult again.  And it's just

15  important to what happened when patients raised their concerns.

16          **MR. ALVAREZ:**  We (indisc.) what patient we're talking

17  about, Judge.

18          **THE COURT:**  What?

19          **MS. FRAZIOR:**  Well, I --

20          **MR. ALVAREZ:**  We don't even know what patients we're

21  talking about.

22          **THE COURT:**  Okay, well I just thought you all were

23  objecting to the fact that you didn't want her to mention the

24  names of the patients.

25          **MR. ALVAREZ:**  We don't want --

1          **MS. FRAZIOR:**  Well we do have specific patients that

2     will testify to that.

3          **MR. ALVAREZ:**  What she's asking the Court is

4     (indisc.) but she's not identifying the patients because she

5     doesn't know the patient.  She just wants to know in general.

6          **THE COURT:**  (Indisc.) that's -- she's just going to

7     ask did anybody ever complain and as a result were they no

8     longer patients there.  Is that unusual?  Probably doctors do

9     that all the time.  It doesn't mean it's a fraud.

10         **MR. LEE:**  Your Honor, if we could get some clarity as

11    to how often this is happening?  Is this happening once a

12    month, is this happening -- it's very vague as to something

13    (indisc.) --

14         **THE COURT:**  Well, she can ask (indisc.) happen.

15         **MS. FRAZIOR:**  Okay.

16         **MR. LEE:**  That would be helpful for context.

17         **MS. FRAZIOR:**  Thank you.

18         **MR. SULLY:**  Your Honor, can we have (indisc.) for the

19    truth of the matter the patients (indisc.) explain what the

20    response was if that's how it's being (indisc.)

21         **THE COURT:**  For purposes of the fact that people

22    complained and they were no longer patients there.

23         **MR. SULLY:**  Yes, Your Honor.  I just wanted to make

24    sure (indisc.) --

25         **THE COURT:**  No, whether anything (indisc.) --

1           **MR. SULLY:**  -- truth of the matter (indisc.)

2           **THE COURT:**  -- was and I'm just (indisc.) patient who

3  (indisc.) go ahead.

4           **MS. FRAZIOR:**  Thank you.

5       **(End bench conference at 2:34 p.m.)**

6  **BY MS. FRAZIOR:**

7  Q    Mr. Moreno, were you aware of patients complaining about

8  their diagnosis?

9  A    In some cases, yes, ma'am.

10 Q    What would be the result of that?  Would they continue to

11 be patients of the clinic?

12 A    In some cases they do.

13 Q    Okay.  Were there other cases where they did not continue

14 to be patients of the --

15 A    Yes, ma'am.

16 Q    Okay, was that a frequent occurrence or an infrequent

17 occurrence?

18 A    Infrequent.

19          **MR. LEE:**  (Indisc.) as to what's frequent.

20          **THE COURT:**  And, ladies and gentlemen of the jury,

21 these questions are not being asked as to whether these

22 complaints were true or not but rather just were there some

23 complaints sometimes and what happened afterwards, but that's

24 it; no purpose of there were any valid complaints or truthful

25 complaints other than somebody complained.  Go ahead.

1    **BY MS. FRAZIOR:**

2    Q    Yes, were the patients being no longer treated by the

3    clinic a frequent occurrence or an infreuence occurrence?

4    A    Infrequent.

5    Q    Okay.  Are you familiar with any other occasions where

6    patients would be dismissed from the clinic?

7    A    Yes, ma'am.

8    Q    What occasions were those?

9    A    They were not being compliant with whatever the provider

10   will order.

11   Q    Okay, and which provider would that be?

12   A    Dr. Zamora.

13   Q    What does it mean to not be compliant with an order?

14   A    Not following through with whatever he ordered, for

15   example labs, x-rays, or MRI's.

16           **THE COURT:**  Or medication I guess.

17           **THE WITNESS:**  Or some medications, correct.

18           **THE COURT:**  If you're not taking your medication for

19   one, that would be --

20           **THE WITNESS:**  Not being compliant.

21           **THE COURT:**  -- not complying with the doctor's

22   recommendation.

23           **THE WITNESS:**  Yes, sir.

24   //

25   //

Moreno - Direct / By Ms. Frazior                    59

BY MS. FRAZIOR:

1

2  Q    On those instances where patients weren't compliant with

3  getting x-rays, why would that be; do you know?  I mean, what -

4  - how would they not get the x-rays if they're there at the

5  clinic already?

6  A    Some patients, well, just didn't think they will need it,

7  some patients will forget.

8  Q    And those patients would be dismissed.

9  A    In some cases.

10  Q    All right, let's talk about the fast track department;

11  what is that?

12  A    There's two fast track departments.  The first one that

13  I'm going to explain is the arm injection or the subcutaneous

14  fast track department where they get the medications for

15  arthritis, psoriasis, osteoporosis.

16  Q    Okay, and how was that department managed or who managed

17  that department?

18  A    That will be through the infusion department.

19  Q    Okay, do you know who the supervisor of that department

20  was?

21  A    Excuse me, at that time was Augustine Flores (phonetic).

22  Q    Okay.  All right, let's talk about the injections portion

23  of the fast track department; are you familiar with that?

24  A    I'm sorry, can you repeat that again?

25  Q    The injections portion of the fast track department, are

Moreno - Direct / By Ms. Frazior                        60

1   you familiar with that?

2   A    Yes, ma'am.

3   Q    How was that run, can you give us a description?

4   A    They had a medical assistant under his supervision through

5   patients will get scheduled on the first visit or second visit

6   or on a follow-up visit, let's say they will be ordered the

7   injection, and if they already had the process going, for

8   example any chest x-rays or PPD, skin tests, that was checked

9   prior to starting any biologic.  Then they will follow through

10  with the injections.  If they had it, they will be sent to that

11  person.  At that time was Mr. Carlos.  And he will administer

12  the injection and then send through the secretary and they will

13  schedule the patient for the fast track at least for the first

14  month.

15  Q    Okay, and how many patients would you see on average

16  coming through the fast track department?

17  A    On that fast track, 40, maybe 45.

18  Q    Okay, and what days of the week are they coming through?

19  A    Monday through Friday.

20  Q    All right, I want to show you Government's E-1; are you

21  familiar with that document?

22  A    Yes, ma'am.

23  Q    Is it a fair and accurate representation of the clinic

24  when you worked there?

25  A    Just the section of the x-rays.

1   Q    Okay, are all the -- well, what is that real quickly?

2   A    It -- well, the door is -- it was on the south side in

3   front of the front office.

4   Q    What is that picture of, though?

5   A    This is the office of the Edinburg office.

6   Q    Okay, is it a floorplan?

7   A    Yes, ma'am.

8   Q    Okay.  And does it look -- you mentioned that there was a

9   door that's moved there but generally does it look as the

10  office looked when you worked there?

11  A    Correct, majority.

12  Q    Is it accurate?

13  A    The majority except what I mentioned.

14  Q    Okay, we'll go over that in just a second.

15  A    Yes, ma'am.

16          **MS. FRAZIOR:**  Your Honor, at this time I move to

17  admit Government's E-1.

18          **THE COURT:**  Is there any --

19          **MR. SPEAKER:**  (Indisc.) objection to it, Judge, I

20  just want to make sure this --

21          **MS. FRAZIOR:**  We'll go through that (indisc.)

22      **(Pause)**

23          **MR. ALVAREZ:**  Your Honor, I would object that the

24  foundation's not been laid for the (indisc.) document because

25  it's not accurately reflect what he's going to testify.  That

1    document, that picture is different in how he has viewed it,

2    therefore we would object.

3              **THE COURT:**  And how do we know that it's different?

4    Do you want to take him on voir dire?

5              **MR. ALVAREZ:**  Yeah, sure, Judge.

6                         **VOIR DIRE EXAMINATION**

7    **BY MR. ALVAREZ:**

8    Q    Sir, didn't you say that this document in terms of the

9    office that you were pointing to, that it has been changed; is

10   that correct?

11   A    When I started, when I worked there, the entry department

12   is not -- the door is not there.

13   Q    Okay, so this doesn't accurately reflect the way the

14   location looked when you started, correct?

15   A    Correct.

16             **MR. ALVAREZ:**  I would object.

17             **MS. FRAZIOR:**  Your Honor, I think that just goes to -

18   - I mean, he's talking about the movement of one door in the

19   center of the building.  I think that goes to weight rather

20   than admissibility.

21             **THE COURT:**  Show it to him again.

22             **MS. FRAZIOR:**  And we would be happy to go through the

23   change.

24             **THE WITNESS:**  Yes, ma'am.

25             **THE COURT:**  What is different?

1            THE WITNESS:  Just the, I mean, --

2            THE COURT:  Can you take a pencil and circle what's

3     not --

4            MS. FRAZIOR:  Yes.

5            THE COURT:  -- what is different than what it was

6     when you were there?

7            MS. FRAZIOR:  Thank you.

8            THE WITNESS:  I'm going to put the just -- it's the

9     entry department's in the same department, just the door now is

10    on the left side, and the bone density was -- it's moved a

11    little bit down to I really can't see -- I can show you right

12    here.

13           MS. FRAZIOR:  May I ask a few follow-up questions,

14    Your Honor, or would you like to see it?

15           THE COURT:  Well, I need to see it.

16           MS. FRAZIOR:  Okay.  It's right in the center.

17           THE COURT:  Where did you mark this?  Oh.

18           THE WITNESS:  With the pencil.

19           THE COURT:  Yeah, does somebody have a -- do we have

20    a red pencil that he can mark the part that's different?

21           MR. SPEAKER:  Red pen.

22           MR. SULLY:  Your Honor, may we approach?

23           THE COURT:  Sure.

24           MS. FRAZIOR:  Would you like me to have him do it

25    again?

64

1          **THE COURT:**  They want to approach.

2          **MS. FRAZIOR:**  Okay.

3      **(Begin bench conference at 2:41 p.m.)**

4          **MR. SULLY:**  Your Honor, we don't have an objection to

5  the floorplan that's on the front side, which I think (indisc.)

6          **THE COURT:**  So if (indisc.) can't tell anything from

7  that (indisc.)

8          **MR. SULLY:**  Right, except for that part.  But on the

9  back side, there's some phone numbers and some --

10         **THE COURT:**  There's a what?

11         **MR. SULLY:**  There's some phone numbers here or fax

12  numbers, some superfluous information that he hasn't laid a

13  foundation for.

14         **MS. FRAZIOR:**  I could also --

15         **MR. SULLY:**  (Indisc.) redact that part but we do have

16  an objection to (indisc.)

17         **THE COURT:**  Can we just redact it from --

18         **MS. FRAZIOR:**  We could, Your Honor, or I could get

19  into the business record.  I mean, he --

20         **THE COURT:**  (Indisc.)

21         **MS. FRAZIOR:**  -- saw that document all the time when

22  he was there.  I could also get it in as a business record.

23         **MR. SULLY:**  Except he's not a records custodian

24  (indisc.)

25         **MS. FRAZIOR:**  He doesn't --

1         **MR. SULLY:**  -- to authenticate.

2         **THE COURT:**  I don't think --

3         **MR. SULLY:**  Phone numbers.

4         **THE COURT:**  -- (indisc.) phone numbers (indisc.)

5    nobody's going to try to call those phone numbers.

6         **MR. ALVAREZ:**  Well what's the relevancy of that

7    anyway, Judge?  It's going to be confusing if we're already

8    changing a door.

9         **MS. FRAZIOR:**  No, the door, it's --

10        **MR. ALVAREZ:**  Well, the objection is causing

11   confusion.

12        **THE COURT:**  Well what is your objection to them

13   seeing the floorplan, what's the objection to that?

14        **MR. ALVAREZ:**  Well, actually I wouldn't have any

15   objections to -- other side of it.

16        **THE COURT:**  Yes, but you can't see anything (indisc.)

17        **MR. ALVAREZ:**  (Indisc.) but on that side because of

18   the change in the door --

19        **THE COURT:**  (Indisc.) do that except he's going to

20   put that in red, the part that's different.

21        **MS. FRAZIOR:**  Okay.

22        **THE COURT:**  And you can ask him is -- were all these

23   phone numbers and everything (indisc.) you saw when you worked

24   there.

25        **MS. FRAZIOR:**  Okay, thank you (indisc.)

1          **(End bench conference at 2:43 p.m.)**

2                        **DIRECT EXAMINATION (RESUMED)**

3     **BY MS. FRAZIOR:**

4     Q    All right, Mr. Moreno, can you mark what your change is in

5     the -- with a red pen?

6     A    Yes, I can.

7          **(Pause)**

8     Q    All right, do you see that there's some phone numbers

9     listed at the top of that document?

10    A    Yes, ma'am.

11    Q    Are those phone numbers as they were at the time that you

12    worked at the Center for Arthritis and Osteoporosis?

13    A    You mean the faxes?

14    Q    Yes.

15    A    I can recall the main one.

16    Q    Okay.

17    A    And also the nurse's station.

18    Q    Okay, thank you.

19         **MS. FRAZIOR:**  At this time, we move to offer

20    Government's E-1.

21         **THE COURT:**  It's admitted.

22    **(Government's Exhibit Number E-1 was received in evidence)**

23         **MS. FRAZIOR:**  Thank you, Your Honor.

24         **MR. ALVAREZ:**  We renew our objection, Your Honor.

25         **MR. MARTINEZ:**  Judge, we have no objection (indisc.)

1   A and O Clinic.

2           **THE COURT:**  As long as what?

3           **MR. MARTINEZ:**  As long as it's just A and O Clinic.

4           **MS. FRAZIOR:**  And may I publish to the jury, Your

5   Honor?

6           **THE COURT:**  Sure.

7           **MS. FRAZIOR:**  All right, I am now putting this on the

8   ELMO.

9   **BY MS. FRAZIOR:**

10  Q    I'd like for you to --

11          **THE COURT:**  And point out what part was your red.

12  The rest of the red was already there but can you just point

13  out with your finger which part was the --

14  Q    You -- and that's a touch screen.  You can circle on it.

15  A    Oh, sorry.  This is what I -- x-ray --

16          **THE COURT:**  What --

17  A    -- department, this is where I put the line, right in here

18  (witness indicates).

19  Q    Thank you.

20  A    And the door, it's right here (witness indicates).

21  Q    Okay, what portion of the building is that?

22  A    That's the x-ray department, bone density, and CT-scan in

23  the back.

24  Q    Okay, let's walk through a little bit of this to just show

25  what different areas are.  What is this area right here, this

1    front part here?

2    A    That's infusion department, part of the fast track

3    department for the arm injections, and the pharmacy.

4    Q    Okay.  And what -- this area you said is the x-rays.

5    What's this center part here?

6    A    The -- it's a -- well, the largest part is the -- this is

7    the billing department.

8    Q    Circle it -- can you circle it on the screen?

9    A    I'm sorry, yes, billing department.

10   Q    Okay.

11   A    And then --

12        **THE COURT:**  I have an important note from the jury.

13   They would like to have a break.  And they, like the judge, get

14   to decide when we have a break.

15        **MS. FRAZIOR:**  That sounds great to me.

16        **THE COURT:**  Please rise for the jury.  And, ladies

17   and gentlemen, we do thank you very much because you are

18   patient with my schedule, the Court's schedule, and you have

19   been very attentive and we all thank you very much for that.

20   And I have not seen one frown from you all thinking we're here

21   too long or anything else like that.

22        **(Jurors exit at 2:46 p.m.)**

23        We'll see you all in a little bit.

24        **THE MARSHAL:**  All rise.

25   //

Moreno - Direct / By Ms. Frazior                69

 1      **(Recess taken from 2:46 p.m. to 3:08 p.m.)**

 2      **(Jurors present)**

 3              **THE COURT:**  Please be seated.  Go ahead and proceed

 4  now.

 5                  **DIRECT EXAMINATION (CONTINUED)**

 6  **BY MS. FRAZIOR:**

 7  Q    All right, Mr. Moreno, we were looking at Government's

 8  E-1.  Let me put this back up on the screen here.  Can you

 9  circle on this for me where Dr. Zamora-Quezada's office is?

10  A    Right here.

11  Q    Okay.  Can you circle for me where Meisy Zamora's office

12  is?

13  A    Right next to it.

14  Q    Can you circle for me where Felix Ramos's office is?

15  A    Right here.

16  Q    Okay.  Can you circle for me where the billing department

17  was?

18  A    **(No verbal response)**

19  Q    And where was the MA section where you were mostly at?

20  A    Let me see, entries -- can you move the paper a little

21  bit?

22  Q    I can but we're going to --

23  A    Oh.

24  Q    -- probably lose some of the circles.  Let's --

25  A    Okay.  It's --

1   Q    -- go back.  Hang on, let me just clear it, and we'll do

2   it real quick again.

3   A    Okay.

4   Q    Can you see it all now?

5   A    Yes, ma'am.

6   Q    Okay, go ahead and circle those areas you circled before,

7   Dr. Zamora-Quezada's office, --

8   A    Okay, you want me --

9   Q    -- Meisy Zamora's office, Felix Ramos' office, billing

10  department.  And then where is your office -- or your area?

11  A    MA, all right.

12       **(Pause)**

13  Q    Thank you.

14  A    You're welcome.

15  Q    All right.  Earlier we were talking about injections being

16  done at the clinics.  Were you aware of any problems with

17  injections in terms of what was being billed versus what was

18  being written on the superbill?

19  A    No, ma'am.

20  Q    Okay.  Did you -- did anyone voice any concerns to you

21  about any of your employees?

22       **MR. LEE:**  Objection, calls for hearsay.

23       **THE COURT:**  That would be hearsay.

24       **MS. FRAZIOR:**  Yeah, sorry.  Let's strike that.  We'll

25  move onto another portion.

1  Q    Do you remember having a conversation with Dr. Zamora-

2  Quezada about injections on the sheet -- on the superbill where

3  you had concerns as to whether they had been done or not?

4  A    Yes, ma'am.

5  Q    Okay, can you tell us about that conversation?

6  A    Are you talking --

7  Q    Between --

8  A    -- about the knee injections?

9  Q    Yes, between yourself and Dr. Zamora-Quezada, nobody else.

10  A    Yes, ma'am.

11  Q    Okay, what happened in that conversation?

12  A    It was -- well, it was three of us.

13  Q    Okay.

14  A    It was Mr. Raymundo Moreno (phonetic), --

15  Q    Okay.

16  A    -- and Dr. Zamora, and myself.

17  Q    Okay.  If you could just talk to us about what the -- what

18  your concerns that you raised with Dr. Zamora-Quezada were and

19  what he stated to you without sharing any information about

20  what anybody else said?

21  A    Correct.  Well, and just about the imaging for the

22  ultrasound that were taken and the images were lost for the

23  knee injections.

24  Q    I think we might be -- I might be confusing you just a

25  little bit.  I'm just talking about specific to knee injections

1   and concerns raised with Dr. Zamora-Quezada about the knee

2   injections.

3          **MR. LEE:**  Your Honor, could we get some time, a

4   place, more context for this?  He worked there 15 years.  It'd

5   be helpful now.

6          **THE COURT:**  So when are we talking about?

7   **BY MS. FRAZIOR:**

8   Q    Do you recall a conversation with Dr. Zamora-Quezada about

9   knee injections, about the superbills not matching the services

10  being rendered?

11  A    Well, you're saying about services not being rendered?

12  Q    Yes, if you recall.

13  A    No, ma'am.

14  Q    Okay.  All right, now let's talk about what you were

15  bringing up a moment ago.  Were you familiar with Medicare and

16  Medicaid audits happening at the clinic?

17  A    Yes, ma'am.

18  Q    Okay.  What was your role in those?

19  A    We were -- get a team, all the personnel MAs and work on

20  the notes, get them -- get the progress notes together.

21  Q    Okay, let's back up a little bit.  What happens where

22  there's a Medicare or Medicaid audit?  What's the first step,

23  the first way that the center is made aware of it?

24  A    Usually the medical record person would let us know or

25  whoever receiving the mail, they would let us know that they

Moreno - Direct / By Ms. Frazior                    73

1   were requesting some records of certain patients, then they'll

2   make a meeting and start working from thereon with teams.

3   Q    Okay, let's back up just a little bit.  So the mail is

4   received and there's a request for medical records, and is that

5   correct?

6   A    Correct.

7   Q    Okay, and that -- and your understanding is that that came

8   from some insurance provider?

9   A    Correct.

10  Q    Okay.  And after the mail is received and the person gets

11  word that certain patient files are requested, what happens

12  next, just the next step right after that?

13  A    A meeting gets going to start working --

14  Q    And who's at the meeting?

15  A    And well, Dr. Zamora, sometimes Dr. Meisy, and sometimes

16  Felix, and all the supervisors.  Well, in that case the billing

17  supervisor and the nurse's station with medical records.

18  Q    Okay.  Would that be Estella Natera (phonetic), the

19  billing supervisor?

20  A    At that time, yes.

21  Q    Okay.  Did this happen on many occasions?

22  A    It -- yes, mm-hmm.

23  Q    Okay.  So we are now talking a little bit about the

24  procedure that typically happened; is that correct?

25  A    Correct.

1    Q    Okay.  So the medical records request comes in, there's a

2    meeting, who calls the meeting?

3    A    The doctor, Dr. Jorge Zamora.

4    Q    Okay.  Where does the meeting take place?

5    A    Sometimes in the conference room, sometimes in his office.

6    Q    Okay.  And what are the instructions that are given to

7    staff about how to comply with that Medicare audit?

8    A    They would usually start getting the charts together.

9    Q    Okay.  Where would the charts be?

10   A    It was mostly done at the conference room.

11   Q    Where were the charts kept?

12   A    Well, some were already scanned so we had to print them

13   out.  And some, they were in medical records, and some, they

14   were in storage.

15   Q    Okay.  So the medical records that are printed out

16   already, where are they kept?

17   A    The ones that are printed out?  In the conference room.

18   Q    They're kept in the conference room all the time?

19   A    You -- are you talking about whatever they requested?  I'm

20   getting confused?

21   Q    No, I was talking about when you have to go look for

22   medical records.  Where are you going to look for them?

23   A    Well, I mean, in the EMR System, any kind of medical

24   records is supposed to be scanned already.

25   Q    Okay.  Are there ever medical records that are not scanned

Moreno - Direct / By Ms. Frazior                75

1    but are kept elsewhere?

2    A    In some cases, yes.

3    Q    Okay.  And where are they stored when they're not?

4    A    Some were in the -- in medical records and some they were

5    in the storage.

6    Q    Okay.  So a section within the center that was housing

7    medical records; is that correct?

8    A    And some outside the center.

9    Q    Okay.

10         THE COURT:  And those were in storage because those

11   patient hadn't been there in a while, right?

12         THE WITNESS:  Yes, sir.

13   BY MS. FRAZIOR:

14   Q    Okay.  All right.  So -- now this meeting happens and the

15   direction is to do what?

16   A    Start getting the charts together.

17   Q    Okay.  And in order to get the charts what would be your

18   process?

19   A    In the nurse's station we would get the notes.  What I

20   mean the notes, the progress notes being done by the medical

21   assistant in the EMR, but not all the notes were done.

22   Q    Okay.

23   A    So our work was get the -- work on the notes.

24   Q    Okay, let me just back up just a little bit.  When you say

25   EMR, what does that mean?

1  A    Electronic Medical Records.

2  Q    Okay, so that --

3         THE COURT:  Okay, not all the records were in the

4  electronic -- in the EMR but they were written some other

5  place, and so it was going to be put in the EMR?

6         THE WITNESS:  Yes.  When I -- when I say the EMR

7  note, it's the note that generates once you input all the

8  diagnosis and orders.

9         THE COURT:  So they had not -- some of them had not

10 been inputted?

11        THE WITNESS:  They were only halfway done.

12        THE COURT:  And so it wasn't like where they -- they

13 didn't make those up?  They went back and went to their

14 handwritten notes and then put them in?

15        THE WITNESS:  Yes, sir.

16 BY MS. FRAZIOR:

17 Q    All right.  So when you mentioned that the charts not

18 being done, if you get a patient name and you go to the EMR to

19 try and find that person, are you going to see that some of the

20 charts are not complete?

21 A    Not the notes.  The orders were input, the lab were input,

22 and the follow-up, when to come back, but not the actual plan

23 or review systems or physical.

24 Q    Okay.  Why were the notes not already added?

25 A    Because whenever they -- the -- it was called Nextgen --

Moreno - Direct / By Ms. Frazior                77

1  Q    Mm-hmm.

2  A    -- Nextgen came in.  I don't know what year was that,

3  maybe 2007.  The provider -- when I say providers, the doctors

4  or the physician assistants, they were deciding who were going

5  to work in the actual note before they were written, written by

6  the mid-level providers, and some were done -- in the cases of

7  Dr. Zamora, their personal medical assistant were writing down

8  the actual notes and they were being scanned.  But when the EMR

9  came in with this Nextgen System, it took a while to decide who

10  was going to work on the actual notes.  And in the end the MA

11  ended up working on the notes.

12  Q    Okay.

13  A    So we were not working on the daily basis notes, we were

14  working on the notes we were behind.

15  Q    How behind were you?

16  A    Sometimes a year or two.

17  Q    A year or two behind in getting the notes together?

18  A    It started becoming a real problem.

19  Q    Okay.

20  A    Because we didn't work on the notes every day.

21  Q    All right.  So when one of these -- one of these audits

22  came out and the instruction was to go to the EMR, that

23  Electronic Medical Records and get the notes out and the charts

24  and all of it together, was that difficult given that the notes

25  were not present?

1    A    Well, I mean, it was difficult to get everything together

2    on time because I know we're not done.

3    Q    Okay.  So what was the instruction about how to get the

4    notes together?

5    A    We were -- the medical assistants, the personal medical

6    assistants, not all the medical assistants but the majority who

7    were working with the doctors, they knew how to work on the

8    actual notes so everybody was working as a team trying to do

9    the notes that were in question.

10   Q    Okay.  Notes are supposed to be done -- ideally, they're

11   supposed to be done as the services are going, right?

12            **MR. LEE:**  Objection, Your Honor.

13            **MR. PENA:**  Objection, this --

14            **MR. LEE:**  This is not -- he's not an expert on --

15            **MS. FRAZIOR:**  He's --

16            **MR. LEE:**  -- how medical records are supposed to be

17   kept in an ideal state of the world.

18            **MS. FRAZIOR:**  I think he has --

19            **THE COURT:**  Your testimony is that these were done at

20   the time it was just transferring them to this particular new

21   system; isn't that -- isn't that your testimony?

22            **THE WITNESS:**  The MA note was done.  The dictation --

23   the documentation or whatever, they were talking in the room,

24   the majority was input in the system but it was not done --

25            **THE COURT:**  Into the new system?

Moreno - Direct / By Ms. Frazior                           79

1            THE WITNESS:  -- into -- into the new system --

2            THE COURT:  They were not done into the new system,

3     so all that was done was taking the records that were already

4     there and then inputting them into the new system --

5            THE WITNESS:  Yes, sir.

6            THE COURT:  -- and that was because they were going

7     to -- those records were going to be looked at?  And that was

8     the way to complete the records?

9            THE WITNESS:  We were working on the records as they

10    were coming, requests from medical records not only Medicare

11    but other records from other doctors.  We had, let's say, a

12    list of whatever their requests was, we were working on

13    different time matters.  I mean, some were six -- three months,

14    some were from last week --

15           THE COURT:  Right, and then the ones that had not

16    been -- where the records had not been put into the new system,

17    you all put them into the new system?

18           THE WITNESS:  Correct.

19           THE COURT:  But they were not made up, they were

20    records that were already there in handwriting, but then they

21    were --

22           THE WITNESS:  Correct.

23           THE COURT:  -- put into the system?

24           THE WITNESS:  Yes.  I mean, not all of them were not

25    printed, some of them were done already.

Moreno - Direct / By Ms. Frazior                          80

1              **THE COURT:**  Okay.

2    **BY MS. FRAZIOR:**

3    Q    Okay.  So are you guys holding onto them handwritten notes

4    for a year at a time to then enter them into the system a year

5    later?  Is that what you're saying?

6    A    When we -- in a case, yeah.  I mean, we had to put them on

7    hold because we didn't have the personnel to work on those

8    notes on a daily basis.

9    Q    So where are those handwritten notes from different

10   patient interviews being held?  Where are they kept?

11   A    Scanned.

12   Q    No, earlier you said that some weren't being scanned.  So

13   some were being maintained because you had to go back to the

14   system and enter them in manually, right?

15   A    Correct.

16   Q    So where are the handwritten notes then being maintained?

17   A    The ones that were not scanned --

18   Q    Yes.

19   A    -- in medical records?

20   Q    Yes.

21   A    And some of them in storage.

22   Q    Okay.  So the medical -- so the handwritten notes from the

23   patient visits are not stored with the rest of the patient

24   files at the time that you're going to go look for them; is

25   that right?

1  A    In some cases, yes.

2  Q    Okay.  Okay well, let's just talk about the some cases

3  that they weren't kept together.

4  A    Okay.

5  Q    So if the audit is occurring and you've got to get those

6  charts together because the Medicare and Medicaid wants the

7  entire patient file; is that your understanding?

8  A    Yes, ma'am.

9  Q    Okay.  So how do you go about then getting the different

10 handwritten notes to be able to type them up to put them in the

11 medical system?  Where are you going to get those?

12 A    We would go into medical records and ask the personnel

13 there if we can look into the fee tickets --

14 Q    Mm-hmm.

15 A    -- and sometimes we'll go into the storage and then try to

16 look into different boxes and --

17 Q    Let's break that down a little bit.  You said, "Go to

18 medical records and look for the fee tickets."

19 A    Fee tickets, the MA note.

20 Q    So are you saying that the fee tickets were being

21 maintained with the handwritten MA note and medical records?

22 A    If --

23         **MR. LEE:**  Objection, leading.

24         **MS. FRAZIOR:**  I'm just asking for clarification.

25         **THE COURT:**  Go ahead.

1          **MS. FRAZIOR:**  I would just ask for a little bit of

2   lee-way here, Judge, just to make sure we all understand.

3          **THE COURT:**  Well, I think we covered this already as

4   to, yes, they -- I don't know how many times you can be asked

5   the same thing over and over again, but go ahead.

6   **BY MS. FRAZIOR:**

7   Q    All right.  So what if the certain records were not

8   present, you were not able to find them, what happened then?

9   A    We would look for them on medical records or in storage.

10  Q    Okay.  And what if you couldn't find them?

11  A    Then we would base ourselves with previous history from

12  that patient.

13  Q    What if you couldn't find the previous history?

14  A    Well, we would base it with whatever we have.

15  Q    Okay, so what would you use then?  What would you

16  absolutely have to be able to work off of?

17  A    Fee tickets.

18  Q    Right --

19  A    Sometimes we couldn't find the medical assistant note

20  because they were put in different boxes --

21  Q    Mm-hmm.

22  A    -- and we would base ourselves on the fee ticket.

23  Q    Okay.  Who would give you the fee ticket to be able to

24  work off of?

25  A    We would bring it from medical records or we would go find

1   it in storage.

2   Q    Okay.  Were there instances when even the fee tickets

3   couldn't be located?

4   A    In some cases we had no fee ticket but we had the MA note.

5   But we always had something but either or.

6   Q    What about instances when an invoice had to be printed

7   out; did that ever occur?

8   A    The invoices?  That had to be done through the billing.

9   Q    Okay.  Are you familiar with instances where invoices were

10  printed out to be used?

11  A    Yes.  Mm-hmm.

12  Q    Okay.  So it's either the MA notes, the superbill, or if

13  neither the superbill or the MA note is correct, it's the

14  invoice?

15  A    We would base ourselves as (indisc.) through the MA note

16  or through the fee ticket.

17  Q    Okay.

18  A    And not through the invoices or --

19  Q    Okay.  Well, then what would be the -- what would be the

20  point of printing out the invoice if you already have the

21  superbill?

22  A    Well, if they wanted something they already requested or

23  whoever requested it --

24  Q    Oh, I understand.

25  A    -- so it -- they had to put them all together.  And

Moreno - Direct / By Ms. Frazior                    84

1    sometimes they would not ask for the whole chart they only ask

2    for a certain amount of years.  So we just print whatever we

3    have put them all together and work on the notes.

4    Q    Okay.  All right.  So you would go to medical records to

5    find them.  If you couldn't find them there, would you go off

6    site to some location?

7    A    Yes, ma'am.

8    Q    Where would you go?

9    A    The storage.  They would call it the -- it's a -- on a

10   ranch.

11   Q    Okay.  Did you personally go to this ranch?

12   A    I had to go, yeah -- yes, ma'am.

13   Q    Tell us about the time that you went to the ranch.

14   A    Well, I mean, not everything is well organized.  We had to

15   seek through boxes that were really -- it's a mess over there.

16   Q    Mm-hmm.  What was the occasion, what was the date?

17   A    The date -- I don't remember the dates but it was -- we

18   were working on this last case.

19   Q    Okay.  Do you remember a time when a Grand Jury subpoena

20   was issued to Zamora-Quezada for patient files?

21   A    If I remember what, I'm sorry?

22   Q    A Grand Jury subpoena being issued to Zamora-Quezada's

23   office for patient files?

24   A    I don't know if -- I do remember some papers coming in,

25   but I don't remember if it was that or not because I was not

Moreno - Direct / By Ms. Frazior                    85

1   really informed of everything.

2   Q    So, you may not have known the specifics of who sent the

3   request for patient files?

4   A    Correct.

5   Q    Do you remember the most recent time that you worked on

6   patient files?

7   A    Well, I was there until May 2017, let's say May or April.

8   Q    Okay.

9          **THE COURT:**  Of 2017?

10         **THE WITNESS:**  2017, right, yes, sir.  2017.

11  **BY MS. FRAZIOR:**

12  Q    Okay, was that -- let's talk a little bit about what that

13  most recent request for records entailed.  Did you follow the

14  same process before of having to go through the MA notes and

15  gather the patient files together?

16  A    Yes, ma'am.

17  Q    Okay.  Were there certain documents that you were unable

18  to locate?

19  A    Yes, ma'am.

20  Q    What were those?

21  A    In our case, there were some images for the ultrasound on

22  the knees.

23  Q    And, what kind of ultrasound, of what area?

24  A    Of the knees.

25  Q    Okay.

1    A    The knee joint.

2    Q    Are you familiar with that procedure?

3    A    Yes, ma'am.

4    Q    What does it entail?

5    A    Well, whenever the -- when we're doing the knee injections

6    hyaline support Synvisc.  In some cases, there's some patients

7    that require the ultrasound for the guidance and they were

8    archived into a, I guess, like a server and we couldn't find

9    those images.

10   Q    Okay.  So, just getting back to just the service report,

11   so we all understand what this is, is this an injection being

12   put, like a needle being put into a knee?

13   A    Yes, ma'am.

14   Q    And also guided by ultrasound so that the clinician can

15   really make sure it's going correctly?

16   A    Correct.

17   Q    Okay.  Is that a service that was done frequently at the

18   center?

19   A    Weekly.

20   Q    Weekly, okay.  And when you were given this instructions

21   to look for these patient files, where those the items that you

22   could not find?

23   A    In our case, yes.

24   Q    Do you know why that was?

25   A    Because of the -- it was called EMIT, (phonetic) had

1    broken.  There was no image found there.  We were not able to

2    open the images.

3    Q    What did you do in order to complete the patient file, if

4    you could not find those images.

5    A    We were always informing the doctor of any issues like

6    that.  So, we talked to him about it.

7    Q    Okay.  So you can't find the patient -- the ultrasound

8    images.  You go speak to Dr. Zamora-Quezada.  What does he tell

9    you?  What do you tell him about your concerns?

10   A    That we couldn't find the images and he asked how many?

11   So, we had to go back and see how many were pending at that

12   time.

13   Q    Okay.  How many were pending?  Do you recall?

14   A    I don't recall.

15   Q    Was it a few or a lot?

16   A    I want to say more than 50.

17   Q    Okay.  More than 50 ultrasound images are missing for the

18   patient files you've got to gather.  Do you go back to

19   Dr. Zamora-Quezada and tell him that?

20   A    Yes, ma'am.

21   Q    Okay.  And what does he say to you?

22   A    Well, that -- to find them.

23   Q    Okay.

24   A    It was already mentioned that they were not -- we're not

25   able to find them.  He mentioned to create them.

Moreno - Direct / By Ms. Frazior                    88

1  Q    What does he mean -- what kind of instructions did you get

2  to create them?

3  A    To create the actual image.

4  Q    What does that mean?  How do you do that?

5  A    That we get another image and create the actual report for

6  the ultrasound.

7  Q    Okay.  How are you going to get another image to create

8  the report for the ultrasound?

9  A    Through another patient.  Another patient image.

10  Q    How are you going to get that other patient image?

11  A    We had another ultrasound machine that it was archiving

12  the images.  It was called SonoSite and that's where we were

13  grabbing them and inputting the information.

14  Q    Okay.  And walk us through that, because nobody in this

15  room probably is familiar with that kind of machine, so how

16  does it work?

17  A    It's a portable ultrasound machine and taken to, that will

18  guide us into the joint.  We're in the right spot to inject the

19  viscus supplement to help with the osteoarthritis, with the

20  stiffness and swelling and cartilage damage and at that point

21  it was mentioned to grab those images and to input them.

22  Q    Okay.

23  A    And just change the name and just put the patient name.

24  Q    Okay.  So, that one machine that was storing ultrasound

25  images, were you printing off other patients images from there?

1    A    We were putting them into, I want to say, I don't remember

2    if it was into memory or into the actual computer.

3    Q    And are you changing the name on the image to make it

4    reflect the patient's files?

5    A    On those cases, yes, ma'am.  Not on all of them.

6    Q    Hold on.  Let me finish my question.  Are you changing the

7    name in order to be able to put it in the patient file that is

8    missing an ultrasound image?

9    A    Yes, ma'am.

10    Q    Okay.  And what did you do after the patient files had

11    ultrasound images inserted into them?

12    A    We take them to his office.

13    Q    Okay.  And did you leave it there or did you talk to

14    Dr. Zamora-Quezada about it?

15    A    Everything we would take it to him and ask him if it was

16    okay with him and fine and he'll sign them, sometimes we stamp

17    them.

18    Q    Okay.  Well, when you take them to him, is he looking

19    through them?

20    A    Yes, ma'am.

21    Q    Okay.  How long of a time period is that taking?  How many

22    patients are -- let me back up.  How many patient files are you

23    taking at one time?

24    A    We were putting 30 patients at a time, taking them to his

25    office.  We reviewed them and then take him another 30.

1  Q    How much time is elapsing from when you take the patient

2  files to him, and when you come back and pick them up and

3  they've been signed?

4  A    I'm sorry?

5  Q    How much time is elapsing from when you take the patient

6  files to his office and when you come back up to pick them up,

7  take them?

8  A    Sometimes it will -- by the time I take them -- we will

9  take them to his office, it can be from two to three days, just

10 depends on how many notes were actually pending.  Sometimes it

11 can be a day.

12 Q    During this time frame, were you working kind of an eight

13 to five, go in the morning and then come home in the evening,

14 or were you working extra hours?

15 A    No, we were working extra hours.

16 Q    Were people -- were MA's working on the evenings and

17 weekends?

18 A    On the weekends, yes, ma'am.

19 Q    Was it frantic?

20 A    What do you mean?

21 Q    Was it -- was there a lot of work to be done?

22 A    Yes.

23 Q    All right.  Let's walk back just a little bit.  When you

24 had that initial meeting in the conference room to discuss

25 getting the charts together for the first time, who all was

Moreno - Direct / By Ms. Frazior                     91

1    present there?

2    A    I'm sorry?

3    Q    In the first meeting that you had to discuss getting the

4    patient files together in this manner, that ended up occurring

5    as you said, who all was in that meeting, to discuss how to go

6    about getting the patient files together?

7    A    Well, let's call the billing department, Ms. Estella,

8    myself, the MA's, present MA's.  You want the names of the

9    MA's?

10   Q    No, just the supervisors essentially.  Was Dr. Zamora-

11   Quezada there?

12   A    Yes, ma'am.

13   Q    Was Meisy Zamora there?

14   A    Yes, in some cases, yes, ma'am.

15   Q    What about Felix Ramos?

16   A    In some cases, as well.

17   Q    Let's go back and we want to be clear about this.  You

18   don't want to give generals.  So, I'm talking about the meeting

19   that was had the time the Grand Jury subpoena came out, we're

20   talking April 2017 or so --

21   A    Correct.

22   Q    As the date that was given us.  Around that timeframe,

23   when the meeting was had to get the files together, who was

24   specifically in that particular meeting?

25   A    Ms. Estella, Mr. Felix, Dr. Zamora and I remember

1  Dr. Meisy.  I don't remember if she was there or not, but

2  myself and the rest of the medical assistants.

3  Q    Okay.  In other meetings that you had to discuss similar

4  things, was she present?

5  A    Yes, ma'am.

6  Q    Are you familiar with another time separate and apart from

7  the Grand Jury subpoena response, when ultrasounds were missing

8  and another tactic was taken?

9  A    Yes, ma'am.

10 Q    Will you tell us about that?

11 A    I wasn't there present, but I heard that --

12 Q    I don't want to -  not if you weren't present.

13 A    I'm sorry.

14 Q    Okay.  We don't want to hear anything that you heard from

15 other people.  Okay?

16 A    Okay.

17 Q    Were you present when an ultrasound image was taken to be

18 placed in a file?

19 A    We were doing the ultrasounds -- I was -- me and -- well,

20 Raymondo and myself, we were doing the Fast Track Department,

21 so we were doing the images.

22 Q    Okay.  When we were talking about this timeframe though,

23 where patient files are having to have ultrasound images placed

24 in them, were you present when the actual ultrasounds were

25 being printed out and put into the patient files?

Moreno - Direct / By Ms. Frazior                    93

1    A    Yes, ma'am.

2    Q    All right.  If I could have just one moment, Your Honor.

3    All right.  Going back to other audits, not the 2017 audit that

4    we're talking about, but other audits in the past, was there

5    another way in which ultrasound images ended up in patient

6    files when it was not the patient's ultrasound image?

7    A    No, ma'am.  Not the same way.

8    Q    Okay.  So you're saying every single time ultrasound

9    images were just taken off the machine?

10   A    Well, at that time there was somebody working on the

11   actual images, so at that time when we had the issue with not

12   finding the images, this happened whenever the EMIT broke and

13   we were doing the -- that person was not working there no more,

14   so that job was given to us, the MA's working with the

15   ultrasound machine.

16   Q    Okay.  But was there a time when the ultrasound machine

17   was not able to be used to print out images, and there had to

18   be another method to be able to get an ultrasound image in the

19   file?

20   A    No, because we were using the SonoSite machine.

21   Q    Okay.  Do you know somebody names Idalia Ortega?

22   A    Yes, ma'am.

23   Q    Who is she?

24   A    She used to be medical records and also used to work as

25   HR.

1    Q    Was she a patient of the clinic?

2    A    Not to my knowledge.

3    Q    Did you ever see her get an ultrasound image?

4    A    No, ma'am.

5    Q    All right.

6         **MS. FRAZIOR:**  If I may have just one moment, Your

7    Honor?

8    **BY MS. FRAZIOR:**

9    Q    Mr. Moreno, do you remember testifying before the Grand

10   Jury in this case?

11   A    Yes, ma'am.

12   Q    Do you recall when?

13        **MR. SULLY:**  Objection, Your Honor.  I believe they're

14   trying to impeach their own witness.  He hasn't testified he is

15   being able to remember anything and any kind of recollection is

16   just simply answer the question.

17        **MS. FRAZIOR:**  He did, Your Honor.

18        **MR. SULLY:**  I believe they're trying to impeach their

19   own witness, Your Honor.

20        **THE COURT:**  Yes.

21      (**Begin bench conference at 3:34:56**)

22        **THE COURT:**  Are you (indisc.)

23        **MS. FRAZIOR:**  I'm going to contradict something he's

24   already said, Your Honor.  He testified --

25        **MR. SULLY:**  (indisc.)

1          **MS. FRAZIOR:**  You can, Your Honor.  You can impeach

2  any witness (indisc.) any information that comes out that's not

3  truthful in a prior statement.

4          **THE COURT:**  (Indisc.)

5          **MS. FRAZIOR:**  That he watched Idalia Ortega receive

6  an ultrasound image and be placed into a file.  I can ask him

7  to refresh his recollection first and try that.

8          **THE COURT:**  I think he needs to do that.

9          **MS. FRAZIOR:**  Okay.

10          **MR. SULLY:**  Why are we --

11          **MR. LEE:**  Outside the jury -- (indisc.).

12          **MS. FRAZIOR:**  There's no need to waste that time,

13  Your Honor.  We can do this quickly.

14          **THE COURT:**  (indisc.) use this document to see if it

15  has refreshed his memory.  (indisc.) change his story.

16          **MR. SULLY:**  I object, because he did testify

17  (indisc.) never saw that and I'm just trying to be just, say

18  well, I (indisc.)

19          **THE COURT:**  (indisc.)impeach him.

20          **MS. FRAZIOR:**  Yeah.

21          **THE COURT:**  Can you-all come back here?  You can ask

22  him if he (indisc.) when he testified at the Grand Jury.  Did

23  he say something (indisc.) can certainly impeach him.

24          **MR. SULLY:**  I understand we can impeach him

25  (indisc.).

1           **MS. FRAZIOR:**  That's not (indisc.)  I called this

2    witness.  I would never do that (indisc.)

3           **MR. SULLY:**  (indisc.) he says something that

4    contradicts him, say well, (indisc.)

5           **THE COURT:**  (indisc.) impeach him at the time.  The

6    issue's confused.

7        (**End bench conference at 3:36 p.m.**)

8           **THE COURT:**  Go ahead.

9    **BY MS. FRAZIOR:**

10   Q    Thank you.  Mr. Moreno, you mentioned you recalled

11   testifying before the Grand Jury, is that correct?

12   A    Yes, ma'am.

13   Q    And are you aware -- were you -- you are aware -- have you

14   had a chance to review that Grand Jury testimony in the past?

15   A    No, ma'am.

16   Q    Prior preparation sessions.  Do you know if there is

17   anything that could assist you in refreshing your memory about

18   Idalia Ortega?

19   A    You want to know -- I'm sorry?

20   Q    Would you like to see your Grand Jury testimony in order

21   to --

22   A    Yes, ma'am, please.

23          **MS. FRAZIOR:**  May I approach the witness?

24          **THE COURT:**  Sure.

25   //

1  **BY MS. FRAZIOR:**

2  Q    Just read to yourself here, sir.  If you could read just

3  from half way down the page onto the next page.  Okay?  And

4  when you're ready, just look up.  Are you ready?

5  A    Yes, ma'am.

6  Q    So do you recall Idalia Ortega receiving an ultrasound at

7  the Center for Arthritis and Osteoporosis?

8  A    Yes, ma'am.

9  Q    What occurred?  Tell us about that situation.

10 A    They were requesting an ultrasound.

11      **MR. LEE:**  Objection, Your Honor.  When was this?

12 Some details before we can expect --

13      **THE COURT:**  I think we need to find out when.

14      **MS. FRAZIOR:**  Sure.

15 **BY MS. FRAZIOR:**

16 Q    Well, do you remember, -- when was the timeframe that this

17 occurred?

18 A    I'm not -- I mean, I don't remember the timing, but --

19 Q    Was it during one of the Medicare or Medicaid audits?

20 A    Possible.

21 Q    Okay.  Why do you say possible?

22 A    Because that's when --

23      **THE COURT:**  Because he doesn't really remember, isn't

24 that correct?

25      **THE WITNESS:**  Correct.

1  **BY MS. FRAZIOR:**

2  Q    Okay.  Would you like to review your Grand Jury testimony

3  again, to refresh your recollection?

4          **THE COURT:**  He's already -- he just saw it.  Right?

5  **BY MS. FRAZIOR:**

6  Q    Did you review the timeframe?

7  A    I did see that they mentioned Medicare.

8          **MR. LEE:**  Careful.  I don't want him commenting on

9  the Grand Jury transcript you just reviewed.  Again, if it

10 refreshes his recollection, that's fine.  But anything further

11 than that would be inappropriate.

12         **THE COURT:**  Right.

13 **BY MS. FRAZIOR:**

14 Q    During the recent years that you worked at the Center for

15 Arthritis and Osteoporosis, were you present when Idalia

16 Ortega -- when an employee received an ultrasound?

17 A    Yes, ma'am.

18 Q    Okay.  Who was that employee?

19 A    Idalia Ortega.

20 Q    Okay.  And what was the reason that she received the

21 ultrasound?

22         **MR. LEE:**  Your Honor.

23         **THE COURT:**  When was this?

24         **MR. LEE:**  Fifteen year time period.

25         **THE COURT:**  When was this?

Moreno - Direct / By Ms. Frazior                        99

1          **THE WITNESS:**  I don't know the timing.  She start

2   working there at least four or five years prior to my

3   dismissal.  So, I don't remember the timing.

4   **BY MS. FRAZIOR:**

5   Q    Okay.  So, your dismissal was in 2015?

6   A    17.

7   Q    17.  So, four or five years prior to that would have been

8   2013?

9   A    More or less, approximately, maybe.

10  Q    Okay.  And were you present when she received a service

11  from the Center for Arthritis and Osteoporosis.

12         **THE COURT:**  Can you-all come up here.

13         **(Sealed bench conference held from 3:40 p.m. to 3:42 p.m.**

14  **and omitted)**

15  **BY MS. FRAZIOR:**

16  Q    Okay, Mr. Moreno.  Do you know the purpose for Ms. Ortega

17  to have that procedure, that ultrasound procedure with the

18  injection done on her knee?

19  A    I believe there was some pending images.

20  Q    What does that mean, pending images?

21  A    Pending ultrasound images.

22         **THE COURT:**  Well, first of all, you believe that from

23  what?

24         **THE WITNESS:**  Because of the timing.

25         **THE COURT:**  So, other than the timing, you have no

1    other personal reason to know why?

2              **THE WITNESS:**  Correct.

3              **THE COURT:**  Okay.  He can't testify about that then.

4    **BY MS. FRAZIOR:**

5    Q    Okay.  Let's talk about where the medical records were

6    stored off-site.  I think you mentioned you had an occasion to

7    go out there.  What was the purpose of your visit to this off-

8    site storage location?

9    A    Looking for records.

10   Q    Okay.  Where was it located?

11   A    I would say it was -- I think it was Wisconsin and corner

12   of 281 Business.

13   Q    What area of town is that?

14   A    In Edinburg, Texas.

15   Q    Okay.  I'm going to show you Government's N1 and ask you

16   to look through these photographs, just the front pages of them

17   and see if you recognize them?

18   A    Yes, ma'am.

19   Q    What are they?

20   A    This is the place we call storage, at the ranch.

21   Q    Just looking through each of those photos and just see if

22   you recognize them.

23   A    I do.  Yes.

24   Q    Okay.

25   A    Yes, ma'am.  Yes.  Yes.  Yes, ma'am.  Yes.

Moreno - Direct / By Ms. Frazior                    101

1   Q    All right.  Do these photographs, are they a fair and

2   accurate representation of the barn as you saw it when you

3   visited it?

4   A    Yes, ma'am.

5   Q    At this time I move to admit Government's --

6          **THE COURT:**  When you visited it when, sir?

7          **THE WITNESS:**  When this -- 2017 -- I don't know what

8   month, but in 2017, we were looking for some records.

9          **THE COURT:**  Go ahead.

10  **BY MS. FRAZIOR:**

11  Q    And so, these photographs today, are they a fair and

12  accurate representation of the barn in 2017, when you visited

13  it?

14  A    Yes, ma'am.

15  Q    At this time, I move to admit Government's N and I'd

16  actually just like to admit excerpts from it, as opposed to the

17  entire exhibit, if I can just confer with defense counsel

18  quickly?

19         **MR. LEE:**  Your Honor, the defense objects and asked

20  if we could be heard side bar or during the (indisc.)

21      **(Sealed bench conference held from 3:45:28 to 3:47 p.m.**

22  **and omitted)**

23  **BY MS. FRAZIOR:**

24  Q    All right.  I'm now publishing Government's N1, page 2 to

25  the jury.  Can we have the Elmo.  All right.  What is this?

Moreno - Direct / By Ms. Frazior                    102

 1  A    Oh storage.  Storage at the ranch.

 2  Q    Okay.  And what is this area right here, I'm just going to

 3  circle it.

 4  A    That's the entrance for the storage.

 5  Q    Okay.  Are there doors kind of right here?

 6  A    Yes.  It was hard to close because of the, the charts.

 7  Q    Okay.  Can you see medical records kind of right in this

 8  area at the bottom, between the two doors, kind of in the way?

 9  Is that why you're saying it's hard to close?

10  A    Yes, ma'am.

11  Q    Was the door, when you visited, was the door open, or was

12  it closed?

13  A    No, it was open.

14  Q    Okay.

15          **THE COURT:**  And I take it the right may be graffiti,

16  if?

17  Q    All right.  Let's look at, and what was the condition of

18  the medical records that you, well, first of all, let me back

19  up.  What was stored within this barn?

20  A    Well, they have, they had the patients charts, fee

21  tickets, progress notes, some images.  Some other, office

22  supplies.

23  Q    All right.  What was the condition of the files that were

24  maintained in this barn?

25  A    Disorganized.  Smelled pretty bad.

1  Q    I'm going to just go into the photograph that is N004,

2  N1004, is that a little close up photo of the barn leading into

3  it?

4  A    Yes.

5  Q    Okay.  Can you see there at the bottom, the medical

6  records kind of spilling out into the grass?

7  A    And some of the x-ray, yeah, films.

8  Q    Okay.  X-ray films in there as well?

9  A    Orange paper.

10 Q    I'm going to show you a couple of other photographs,

11 N1052, what is that?

12 A    That's a paper chart.

13 Q    Okay.  And what does it look like has happened to it

14 there?

15 A    It's, termite ate it.

16 Q    A termite?

17 A    Well, that's what I'm thinking.

18 Q    Okay.  And showing you Government's N1029.  Can you see in

19 the upper right hand corner of that, there's a date, 2007, and

20 then a word above that on this box here?

21 A    Correct.

22 Q    What is that?

23 A    Superbill.

24 Q    Are those medical records?

25 A    It was, correct.

1          **(Pause)**

2    Q    And then showing you Government's N1025, what is that?

3    A    As well, paper charts.

4    Q    All right.  And can you see the dates on these here?  If

5    you have to kind of look it --

6    A    Yes.  November 6 --

7    Q    -- upside down?

8    A    -- 2012.

9    Q    Okay.  And this is, all right, and then your timeframe

10   that you're there is 2017, is that right?

11   A    Up to May, 2017.

12          **(Pause)**

13   Q    I'm just showing you one more to, can you see on this

14   N1011, is this the door on the side that's at the front of that

15   first photo we looked at?

16   A    Yes, ma'am.

17   Q    And when you went to the barn to gather medical records,

18   was it difficult to find the things that you were looking for?

19   A    Yes.

20   Q    Did you actually take records from there and bring them

21   back to the Center?

22   A    Whatever we could find, yes ma'am.

23   Q    How did you go about finding them?  Are they catalogued in

24   any way?

25   A    No, ma'am.  Well, no, we had to search by boxes, by dates.

1   Q    Okay.  So, what did you use to go in there to be able to

2   look for certain dates?

3   A    Our hands, with gloves.

4   Q    Okay.  Well, I mean, what kind of information told you

5   what date you need to go through here to pick out?

6   A    Well, whatever requests, the insurance has requested or

7   Medicare.

8   Q    Let me back up real quickly to this picture we've got

9   here.  This is N1025.  We talked about the different dates that

10  are on this, this date here being November 6, 2012, date behind

11  it being, oops, I think I just moved it up a little, November

12  2nd, 2012.  Why were the files maintained in the offsite

13  storage by date, as opposed to by patient file, by patient

14  name?

15  A    Because it --

16       **MR. LEE:**  Objection, Your Honor.  Calls for

17  speculation.

18       **THE COURT:**  How does he know?

19       **MS. FRAZIOR:**  Because he went, actually went to the

20  barn to pull them out.

21       **THE COURT:**  I know he went to the barn, but I don't

22  know that he, you've laid the predicate that he would know why

23  they were there by date, other than speculation on his part.

24       **MS. FRAZIOR:**  Okay.

25  //

Moreno - Direct / By Ms. Frazior                    106

**BY MS. FRAZIOR:**

Q    Do you know why patient, do you know how patient files were maintained at the clinic and in the storage site?

A    By office service date.

Q    Why is that, if you know?

         **MR. LEE:**  Objection, Your Honor.  Again, calls for speculation.

         **THE COURT:**  This is based on --

         **MR. LEE:**  He knows that they were kept in a way.

         **THE COURT:**  -- his experience there, with regards to how they were kept for what, by office service date, you said?

         **THE WITNESS:**  Yes, sir.

         **THE COURT:**  That means when the service was performed?

         **THE WITNESS:**  Correct.

**BY MS. FRAZIOR:**

Q    Why is that?

A    That was the way that medical records had them, by boxes, and by day of service.

Q    Did that make it difficult to be able to then pull out a patient file that would contain all of the information for that one patient?

A    They would put the superbills in one box and then progress notes in another box.  And there were some boxes that had both of them.

1      **(Pause)**

2    Q    All right.  You obviously no longer work for the Center

3    for Arthritis and Osteoporosis, correct?

4    A    Correct.

5    Q    Tell us about how you came to sever ties with the Center?

6    A    Well, approximately about two months, more or less, prior

7    to May, 27th, 2017, Reymundo and myself, we had gone to

8    Dr. Zamora's office, and we had told him that we didn't feel

9    comfortable no more doing those images.

10   Q    Okay.  Let me just back up just a second.  Who is

11   Reymundo?

12   A    Reymundo, one of the medical assistants.

13   Q    Okay.  Is he somebody that worked underneath you?

14   A    He, yeah, he used to work also with the knee injections.

15   Q    Okay.  And what was your last day at the Center?

16   A    I don't remember the date, but it was in May, 2017.

17   Q    All right.  And okay, so you and Ray, Reymundo, go to

18   Dr. Zamora-Quezada's office, is he there when you go to his

19   office?

20   A    Yes, ma'am.

21   Q    Are you, is this meeting taking place within his

22   individual office or someplace else in the Center?

23   A    In his office.

24   Q    Okay.  And what did you say to him?

25   A    We told him that we, we didn't feel comfortable no more

1   with the, doing those images.

2   Q    Why is that?

3   A    Because we got scared.

4   Q    Why did you get scared?

5   A    Because this was non-stop.

6   Q    Okay.

7   A    The notes, the whole situation with the, asking for

8   records, so we decided not to follow through with it no more.

9   Q    What happened after you told him  that you wouldn't, you

10  didn't want to participate in this anymore?

11  A    He just got quiet for a while and just mentioned just to

12  put no image found.

13  Q    Okay.  Did you end up doing that for other patient files?

14  A    In some cases, yes ma'am.

15  Q    Okay.  Is that, did you continue to work there?

16  A    Up to, I went to the office on a Thursday, the following

17  week on Wednesday, they let us go with, we had a meeting, and

18  after that we were not involved in the meeting.  And they

19  mentioned, Mr. Felix Ramos came up to me, and after that we

20  were not involved in the meeting.  And to Rey --

21       MR. SULLY:  Objection, Your Honor.  Lack of personal

22  knowledge if he's testifying about a meeting that he wasn't

23  involved in.

24       THE COURT:  He can testify to that, he's not talking

25  about what happened in the meeting other than, there was a

1    meeting.  Go ahead.

2              **MR. SULLY:**  Very well.

3    A    -- then from there, Mr. Felix Ramos came up to us and told

4    us that doctor wanted for us to be, to take some time off, with

5    some paid PTO.

6    Q    Okay.  I'm just going to back up just a second --

7              **THE COURT:**  Paid what?

8              **THE WITNESS:**  Personal time off.

9              **THE COURT:**  And this is a week after this other

10   situation?

11             **THE WITNESS:**  No, this --

12             **THE COURT:**  It wasn't --

13             **THE WITNESS:**  -- this happened on Thursday.  On

14   Friday, doc wanted a meeting with the whole staff.  And final

15   week on Wednesday.

16             **THE COURT:**  -- yes, but Thursday, is the day that you

17   and this other individual went and told the doctor that you --

18             **THE WITNESS:**  No, sir.  It was about two months

19   prior.

20             **THE COURT:**  -- two months prior.

21             **THE WITNESS:**  More or less.  Approximately.

22             **THE COURT:**  Go ahead.

23   **BY MS. FRAZIOR:**

24   Q    -- all right.  What happened on that Thursday?

25   A    The DEA and FBI and everybody came in, shut the office.

1    Q    What did they do?

2    A    They put everybody in the lobby.  And then they were

3    interviewing everybody.

4    Q    Were, was a search being conducted at the facility?

5    A    They were taking some, I guess, drives, or drivers.

6    Q    Okay.  Were boxes, did you view boxes exiting the

7    building?

8    A    I don't recall, ma'am.

9    Q    Okay.  All right.  So, the FBI and other law enforcement

10   is there at the clinic on the Thursday.  And then what was the

11   following date where you had the conversation with Mr. Ramos?

12   A    He, well, he was telling everybody just to, stay calm,

13   that Dr. Zamora and some others were going to be coming.  And

14   then they wanted to talk to us, that same day on Thursday.

15   And I got to talk to his lawyers, not in the office.  We had to

16   go to Starbucks.  Because I was very concerned.

17   Q    Okay.

18   A    And I told them about what happened.

19   Q    Okay.  Let's make sure that we've got all the time frames

20   on this correctly, okay?  So, on that Thursday is the search of

21   the office, and then you had the meeting with Mr. Ramos, he

22   tells you, you can take some time off, is that correct?

23   A    No, that was, after, that happened on Thursday.

24   Q    Okay.

25   A    Then on Friday, Dr. Zamora came back to the office and had

Moreno - Direct / By Ms. Frazior                    111

1   a meeting with the whole staff in the nurse's station.

2   Q    Were you present in that meeting?

3   A    Yes, ma'am.

4   Q    Okay.

5           **THE COURT:**  So, Thursday was the search and Friday

6   was the meeting by the doctor with his whole staff?

7           **THE WITNESS:**   The whole staff in the nurse station.

8   **BY MS. FRAZIOR:**

9   Q    All right.  And what was told to you in that Friday

10  meeting?

11  A    That he was very upset, that they had no right to come in.

12  And just to stay calm.  I don't remember whatever else he said,

13  but he said more stuff.

14  Q    Okay.  Did you come to work the following Monday?

15  A    Yes, ma'am.

16  Q    Did you come to work the following Tuesday?

17  A    Yes, ma'am.

18  Q    And then the following Wednesday?

19  A    Half a day.

20  Q    What happened on the half day?

21  A    Well, prior to that, Dr. Zamora had called me to his

22  office and there was attorneys there, and another lady.  I want

23  to say she was a lawyer.

24  Q    Okay.  Without telling us anything that was discussed in

25  that meeting, did you continue to work for the Center for

1   Arthritis and Osteoporosis after that meeting?

2   A    Yes, ma'am.

3   Q    You did?  Okay.  How long did you work there for?

4   A    That was Tuesday, Wednesday I was still an employee.  I

5   was an employee from that Wednesday for another month.  They

6   asked me to, Rey Moreno and myself, to take some time off.  I

7   asked them why, and said, well, they don't want for you to be

8   here present.

9   Q    Okay.  Who told you that?

10  A    Mr. Felix Ramos.

11  Q    Okay.  And did you continue to be just on PTO for a month?

12  A    I asked him if it was going to be my personal PTO time,

13  because they don't pay for, like, PTO, it's our time.  He

14  mentioned that no, that the office was going to pay for that,

15  or Dr. Zamora.

16  Q    All right.  How long did that last for?

17  A    It was going to be only for a week.  It extended for three

18  more weeks, or four weeks, it totaled up to four weeks more or

19  less.

20  Q    What happened at the end of that timeframe?

21  A    They called us and they gave us --

22  Q    Who called you?

23  A    -- mister, well, they didn't call us, they sent a text.

24  Q    Who sent you a text?

25  A    From there on there was no more calls.  Mr. Felix Ramos.

1  Q    Okay.  And what did the text say?

2  A    That, just to come by for the check.

3  Q    Okay.  Were you informed that you were terminated at that

4  point?

5  A    No, ma'am.

6  Q    Okay. So, you're coming to pick up your check.  Were you

7  thinking you were going to start back up at work the next day?

8  A    Well, I was thinking that I was going to come back to

9  work.  But, the letter mentioned that I was terminated.

10  Q    Okay.  What letter?

11  A    The letter that, there was a, I don't remember his name,

12  he was, he mentioned he was an ex FBI agent, and he was working

13  at that time for, or he was working for them at that time,

14  where, and he was the one that gave me that, that letter.

15  Q     Okay.

16         **THE COURT:**  Working for them, you mean the doctor?

17         **THE WITNESS:**  Dr. Jorge Zamora.

18  **BY MS. FRAZIOR:**

19  Q    All right.  So, after Mr. Ramos sent you that text

20  message, did you go up to the office to get your check?

21  A    Yes.

22  Q    Did you meet with anybody there?

23  A    That gentleman.

24  Q    Okay.  That gentleman being the ex --

25  A    Ex FBI agent.

1  Q    -- okay.  And was there anybody else present in that

2  meeting?

3  A    There wasn't, no.

4         **THE COURT:**  And you don't remember his name?

5         **THE WITNESS:**  No, sir.

6  **BY MS. FRAZIOR:**

7  Q    Did he ask you to tell him about, or did you tell him

8  about what had happened at the clinic?

9  A    He asked me to come back, they asked me to come back, I

10  don't remember who, Mr. Felix, was that gentleman.  And, but,

11  not to go to the office, but through the (indisc.) site, that's

12  a spa site, to meet with him.

13  Q    All right.  And did you meet with him?

14  A    Yes, I did.

15  Q    How long did you meet with him for?

16  A    Maybe for an hour.

17  Q    And were you terminated at the end of that hour?

18  A    I was already terminated.

19  Q    Okay.  Okay.  So, at that point you no longer work for the

20  clinic.

21  A    No.

22  Q    Were you given a reason for your termination?

23  A    No, ma'am.

24  Q    What kinds of things did you discuss in that meeting with

25  the PI, what were the topics of discussion?  What was the

1    purpose of that meeting?

2            **MR. LEE:**  Objection, Your Honor.  Relevance.

3            **THE COURT:**  Go ahead.

4    **BY MS. FRAZIOR:**

5    Q    What was the purpose of that meeting with the private

6    investigator?

7    A    He was asking me what did I, what, I don't remember

8    everything, what we discussed.  But, I did mention to him about

9    those images.

10   Q    Okay.  And did he tell you any, I mean, did you get any

11   information from him about --

12   A    No.

13   Q    -- what was going on?

14   A    He just told me not to, just well, he had, I did mention

15   to be honest, whatever is asked, just be honest.  And he asked

16   me to sign a paper.

17   Q    Uh huh.

18   A    And I did, but I didn't get a copy of that.

19   Q    Do you remember what was on the paper?

20   A    Whatever we had discussed.

21   Q    Okay.  So, was he interviewing you about your time at the

22   clinic?

23   A    Yes, ma'am.

24   Q    Okay.

25           **THE COURT:**  And his comment to you is just be

1    truthful?

2         **THE WITNESS:**  Yes, sir.

3    **BY MS. FRAZIOR:**

4    Q    All right.  At any point in time, did you apply for

5    unemployment benefits?

6    A    Yes, ma'am.

7    Q    What happened then?

8    A    They were denied.

9    Q    Why were they denied?

10   A    They mentioned that I was harassing the employees.

11   Q    Okay.  To your knowledge, have you ever harassed any

12   employees at the Center for Arthritis and Osteoporosis?

13   A    No, ma'am.

14   Q    Were you ever given any notice that you'd harassed any

15   employees?

16   A    No, ma'am.

17   Q    Are you aware of anybody making any complaints about being

18   harassed?

19   A    No, ma'am.

20   Q    Did you pursue it further?  The unemployment.

21   A    I did.  I did try to appeal it.  Well, that was, what I

22   didn't know about all of this situation, they asked me, they

23   asked me if I wanted to appeal it.  And I did.  And then they

24   sent me a letter with all this information about me harassing

25   employees.

Moreno - Direct / By Ms. Frazior                117

1   Q    In what way?

2   A    They're saying that I was talking nasty to them, and I

3   mean, I never had a write up or a warning in almost 15 years.

4           THE COURT:  But, you didn't have a hearing for the

5   appeal with the--

6           THE WITNESS:  No, sir.

7           THE COURT:  -- unemployment?  You didn't pursue that?

8           THE WITNESS:  No.

9           THE COURT:  You just decided to drop it or what

10  happened?

11          THE WITNESS:  Yes, sir.

12  BY MS. FRAZIOR:

13  Q    Why did you decide to drop it?

14  A    Well, I needed work.  I mean, I have a family to maintain,

15  house payments.

16  Q    Did you go on to get another job?

17  A    I'm working with my brother in law.

18  Q    How long did it, how long did it take you to get the job

19  you have now?

20  A    I started looking for a job the following week.  I

21  interviewed with another rheumatologist, and different family

22  practices.  Eight months it took me to get a job.

23  Q    Okay.

24  A    More or less.

25  Q    Mr. Moreno, you worked there for 15 years, is that right?

Moreno - Direct / By Ms. Frazior                           118

1    A    Almost 15 years.

2    Q    Why did you stay there so long if you had concerns about

3    what was going on?

4         MR. LEE:  Objection, Your Honor.  I don't think there

5    was testimony about this until the very end.

6         THE COURT:  I didn't get the impression that he

7    testified that he had questions from the very start.

8         MS. FRAZIOR:  I didn't say that, Your Honor.  I just

9    asked why he stayed --

10        THE COURT:  Why did you stay so long when you had

11   concerns during this whole time?  I mean, I don't even know --

12        MR. LEE:  I don't think there's testimony in that

13   regard.

14        THE COURT:  -- this was worded like, from the very

15   start.  And I didn't get that impression from his testimony

16   that he testified to that effect.   But, go ahead and try to

17   pin it within a certain time period.

18   BY MS. FRAZIOR:

19   Q    Did you continue to work at the Center during all of the

20   Medicare audits?

21   A    Yes, ma'am.

22   Q    Did you continue to work there after you had been asked to

23   add documents to patient files?

24   A    Well, after, yes, ma'am.

25   Q    Okay.  Why did you do that?  Why did you continue to work

Moreno - Direct / By Ms. Frazior                    119

1    there?

2    A    I felt that I needed to be loyal to Dr. Zamora.  He helped

3    me with my wife.  In my case, I mean seeing those patients, I

4    saw other patients feel better.  My family was there, my mom

5    was there and my dad was there.  So, he always was good to me

6    in a way that I was getting paid to work, nobody was going to

7    offer me that pay and I had just bought a house, so I had a

8    mortgage to pay too.  But, mostly because of the loyalty.

9    Q    You and I have met before, right?  This is not our first

10   time meeting, correct?

11   A    Yes, ma'am.

12   Q    Okay.  And you testified earlier, you testified before the

13   grand jury.  Have you been interviewed a couple of different

14   times throughout this investigation?

15   A    Yes, ma'am.

16   Q    Have you met different agents and different prosecutors on

17   the case?

18   A    Yes, ma'am.

19   Q    Okay.  And are you under subpoena here to testify today?

20   A    Yes, ma'am.

21        **(Pause)**

22        **MS. FRAZIOR:**  I pass the witness.

23        **THE COURT:**  Mr. Lee?

24   //

25   //

1                      **CROSS EXAMINATION**

2    **BY MR. LEE:**

3    Q    Mr. Moreno.

4    A    Yes, sir.

5    Q    You and I have never met, correct?

6    A    Correct.

7    Q    Okay.  Now, you worked for Dr. Zamora-Quezada for about 15

8    years, correct?

9    A    Almost 15 years, correct.

10   Q    Okay.  And you never quit working for him, correct?

11   A    Correct.

12   Q    All right.  And you understood that when you were working

13   for him, you were a medical assistant, correct?

14   A    Correct.

15   Q    All right.  And you understood that you were a citizen who

16   had -- strike that.  While you were working for him, you

17   wouldn't, you would not have continued working for him, if you

18   believed you were committing a crime, correct?

19   A    Yes, sir.

20   Q    All right.  You wouldn't have committed a crime, correct?

21   A    Correct.

22   Q    All right.  You had loyalty to him, but you weren't going

23   to commit a crime for Dr. Zamora, correct?

24   A    Well, in that case, the ultrasounds.

25   Q    You were concerned about the ultrasounds, correct?

1  A    Correct.

2  Q    And that was different, right?

3  A    Yes.

4  Q    So, that was, but up until then, you didn't have concerns

5  that you brought to Dr. Zamora, correct?

6  A    Correct.

7  Q    So, that was just about two months prior to the FBI

8  searching his offices, correct?

9  A    Correct.

10  Q    That was the first time you brought a concern to

11  Dr. Zamora, correct?

12  A    Prior to that, my concern was the notes as well.

13  Q    Okay.  So, but again, that's all, that's again in that

14  period shortly before?

15  A    Since the next started back in 2007, more or less.

16  Q    Okay.  All right.  Now --

17       **(Pause)**

18  Q    -- and when you brought, you and Reymundo brought your

19  concerns about those ultrasound images, the doctor told you to

20  just put into the file that no image was found, correct?

21  A    At that point, yes sir.

22  Q    Right.  And you, that's what you did, correct?

23  A    Correct.

24  Q    All right.  So, he didn't order you to continue putting in

25  images, correct?

1   A    Correct.

2   Q    All right.  And you kept working there afterwards,

3   correct?

4   A    Correct.

5   Q    You didn't get fire the next day, correct?

6   A    Correct.

7   Q    You didn't get fired the next week, correct?

8   A    Correct.

9   Q    You didn't get put on leave, correct?

10   A    Correct.

11   Q    You kept working, correct?

12   A    Correct.

13   Q    And you kept working on the files, correct?

14   A    Correct.

15   Q    All right.  You only got fired, or put on leave, after the

16   FBI had come in, correct?

17   A    Correct.

18   Q    Okay.  So, even though you raised a concern, so when you

19   raised a concern to Dr. Zamora about the ultrasounds, he told

20   you, he didn't order you to do anything you weren't comfortable

21   with, correct?

22   A    At that point, correct.

23   Q    Right.  Okay.  Now, in the course of your time working

24   there, you were involved as a medical assistant, you were there

25   with him sometimes when he saw patients, correct?

1    A    Yes, sir.

2    Q    Okay.  And, but you weren't with him every single time,

3    correct?

4    A    Correct.

5    Q    All right.  So, and during the entire 15 years, okay, in

6    the initial time that you were working there, most records were

7    done on paper, correct?

8    A    Correct.

9    Q    Okay.  And some time in the 15 years, we moved, you moved

10   to electronic medical records, correct?

11   A    Well, a lot of the notes were done on paper.  Every note

12   was done on paper.

13   Q    All right.  Okay.  But, in the beginning, it was

14   definitely, it was primarily handwritten, later it was

15   handwritten notes that got scanned and put into the system.

16   A    Yes.

17   Q    And those handwritten notes were also typed up into the MR

18   system.

19   A    Correct.

20   Q    Okay.  Now, when you were with him in the exam room, you

21   were there, you could observe him as he saw patients, correct?

22   A    Yes.

23   Q    All right.  And you said, on direct examination, that you

24   believed he was thorough in his examinations, correct?

25   A    Correct.

Moreno - Cross / By Mr. Lee                    124

1   Q    All right.  And you believed that when a new patient came

2   in, typically, he saw the patient, correct?

3   A    Most of the time, yes sir.

4   Q    Okay.  And you don't think there's anything wrong with a

5   rheumatologist who owns and runs the Center seeing a new

6   patient, rather than a physician assistant, correct?

7   A    Correct.

8   Q    Okay.  There's nothing wrong with that, correct?

9   A    Not to my knowledge.

10  Q    Okay.  And when you were in the room with the doctor as

11  he's doing examinations, he would dictate things, correct?

12  A    Dictate?  What do you mean by dictate?

13  Q    He would, would he talk, would he give you instructions --

14  A    Verbally?

15  Q    -- he would tell you what to write.

16  A    Yes, sir.

17  Q    Okay.  What kinds, he would tell you the diagnoses he was

18  making, correct?

19  A    The way that, the MA is in the room, he will say the

20  diagnosis, okay, RA.  And following, he had a, he had a, a

21  different one through ten on the fee ticket.  And the way he

22  wanted the diagnosis to be put.  But he will do it verbally,

23  correct.

24  Q    All right.  And then you, as the MA in the room, you would

25  be the scribe, correct?

1   A    I would write it down.

2   Q    You'd be taking the notes, correct?

3   A    Yes.

4   Q    All right.  It was your responsibility to complete the

5   notes, correct?

6   A    Correct.

7   Q    Okay.  And when he was in the room and seeing the

8   patients, he would also order, he would also make the plan for

9   the patient, correct?

10  A    Correct.

11  Q    And that was your job, as the scribe, to write up,

12  correct?

13  A    To write down on the MA note, correct.

14  Q    Okay.  And again, as you said on direct examination,

15  sometimes you could get the note done on time, but sometimes

16  you couldn't, correct?

17  A    Correct.

18  Q    Because sometimes during the exam, you're actually

19  involved in the treatment, correct?

20  A    Yes.

21  Q    Okay.  You're involved in helping give the injections, or

22  doing whatever, right?

23  A    Or instructions with the patient.

24  Q    Okay.  Now, when you were, now in terms of those notes,

25  you didn't put anything, when you were the scribe for the

1    doctor, you didn't put anything into the notes that wasn't what

2    the doctor said, correct?

3    A    Correct.

4    Q    All right.  So, you reported accurately what the doctor

5    diagnosed, correct?

6    A    We were, sometimes they were not mentioned, the actual

7    swelling or pain, but once you put rheumatoid arthritis, we're

8    thinking, okay, patient has swelling or pain.

9    Q    Well, and you know that's something that you're familiar

10   with from your time --

11   A    Correct.

12   Q    -- working there, correct?

13   A    Uh huh.

14   Q    Patients with rheumatoid arthritis typically have

15   swelling, correct?

16   A    Correct.

17        **(Pause)**

18   Q    Now, and when you were, again, when you were participating

19   in the treatment of a patient, as time went on, you would

20   finish, one thing you would do is you would finish notes,

21   correct?

22   A    What?  I'm sorry?

23   Q    You would finish the notes for a visit, correct?

24   A    It's, we tried to.

25   Q    Okay.  But, that was one of your responsibilities,

1    correct?

2    A    Correct.  One of them, yes.

3    Q    Okay.  And another responsibility was when you did a

4    procedure yourself, correct?

5    A    Correct.

6    Q    All right.  And it was your responsibility to do the

7    documentation for those --

8    A    Correct.

9    Q    -- correct?  And when you were documenting a visit, you

10   didn't put any false information into that --

11   A    Correct.

12   Q    -- visit note, correct?

13   A    That is correct.

14   Q    And when you did a procedure, you didn't put any false

15   information into the note for that procedure --

16   A    Correct.

17   Q    -- correct?  All right.  Now, there would be, sometimes,

18   lab results done, lab results would be created, correct?

19   A    Correct.

20   Q    You never created fake lab reports, correct?

21   A    No, sir.

22   Q    Okay.  And are you familiar with, have you in the course

23   of your working for the doctor, are you familiar with something

24   called a Vectra test?

25   A    Yes, sir.

1  Q    Okay.  And that's, is that a report that you would see

2  from time to time, in your work on patients?

3  A    If I'm not mistaken, yes, for the rheumatoid arthritis.

4  Q    Right.  And you would see those reports, correct?

5  A    Correct.

6  Q    You never created a fake Vectra report, correct?

7  A    No, sir.

8  Q    Okay.  And from time to time, you would see radiology

9  reports, correct?

10 A    Correct.

11 Q    You never created a fake radiology report, correct?

12 A    No, sir.

13 Q    Okay.  And from time to time, you would see reports of

14 MRIs, correct?

15 A    Correct.

16 Q    You never created a fake MRI report, correct?

17 A    No, sir.

18 Q    At any time in your time working there?

19 A    No, sir.

20 Q    Okay.  And from time to time, you would see reports of

21 duplex scans for patients, correct?

22 A    Ultrasounds?

23 Q    I'm sorry.  Strike that.  From time to time, you would see

24 reports of ultrasounds, correct?

25 A    Correct.

1  Q    Okay.  And again, focusing on the report, the report, when

2  you're talking about the report, you're talking about the

3  written aspect of a report, correct?

4  A    Correct.

5  Q    And that said, the report would say that an ultrasound was

6  done on a particular day, and give the reading for the report,

7  correct?

8  A    Yes, sir.

9  Q    You never created a fake ultrasound report, correct?

10 A    No, sir, correct.

11 Q    Okay.

12      **(Pause)**

13 Q    So, again, a part from some of these audits that you've

14 mentioned, which we'll get to more later, in the normal course

15 of events, in treating patients, you never created any kind of

16 fake documentation, correct?

17 A    Say that again.

18 Q    Putting aside the audits that we're, that you were asked

19 about on direct examination --

20 A    Correct.

21 Q    -- in the normal course of events, you never created any

22 fake --

23 A    No, sir.

24 Q    -- documentation for those patients, correct?

25 A    Correct.

Moreno - Cross / By Mr. Lee                                    130

1  Q    And you're not aware of anyone else creating, again,

2  putting aside these audits, you're not aware of anyone creating

3  fake documentation for those patients either, correct?

4  A    Correct.  Uh huh.

5  Q    Okay.  So, again, and we'll get into this more, the only

6  times that you're saying that anything was done for patients,

7  was for the specific patients, who were specifically requested

8  in audits or subpoenas, correct?

9  A    Correct.  Just to clarify that, when we were sometimes

10 working on some notes, writing the symptoms, so, sometimes, if

11 it was not on the actual fee ticket, we will put in the fee

12 ticket some, to cover the actual labs, but it was part of some

13 of the symptoms.

14 Q    Okay.

15 A    All right.

16 Q    But again, if the patient's diagnosed with rheumatoid

17 arthritis, you put in a symptom that you believed was

18 consistent with that diagnosis, correct?

19 A    Correct.

20 Q    Right.  And you weren't putting in a symptom that you knew

21 to be false, correct?

22 A    Correct.

23 Q    Okay.  You believed, with that diagnosis, that that

24 symptom would have been true, correct?

25 A    From my understanding, yes.

Moreno - Cross / By Mr. Lee                    131

1   Q    Okay.  So again, just to, in terms of the patient files,

2   if a patient was not on a subpoena list, or part of an audit

3   request, or anything like that, you would say that those files

4   were accurate to the best of your knowledge, correct?

5   A    As to my knowledge, yes.

6   Q    Okay.  And again, and we'll get into this more, in terms

7   of the files that were part of the audit, the only thing that

8   you're aware of, in terms of, in terms of the files that were

9   requested, let's say, you're not, you don't have a problem with

10  the ultrasound reports, you just have a problem with some of

11  the images?

12  A    Correct.

13  Q    Okay.  And you don't have any problems with the lab

14  results that were produced, correct?

15  A    No, correct.

16  Q    You're not, you never faked a lab report that was

17  produced, correct?

18  A    No, sir.

19  Q    Okay.  And the procedures that you did, you didn't create

20  any fake procedure notes, correct?

21  A    No.

22  Q    Okay.  And in terms of visit notes, you didn't knowingly

23  create any fake visit notes, correct?

24  A    No, sir.

25  Q    You just finished the documentation when it hadn't been

Moreno - Cross / By Mr. Lee                    132

1    done, correct?

2    A    Correct.

3    Q    Okay.  So, again, in terms of the audit requests, the only

4    thing that you're saying you had some issue with were

5    ultrasound images, correct?

6    A    That is correct.

7    Q    Okay.  And, Mr. Moreno, you were the one who was working

8    on the, one of the people working on the files, correct?

9    A    Correct.

10   Q    They were a lot of people working on the files, correct?

11   A    Correct.

12   Q    You weren't the one who actually mailed out the files,

13   correct?

14   A    No, sir.

15   Q    So, there were other people who looked at the files after

16   you, correct?

17   A    Yes.  Correct.

18   Q    You don't actually know what actually went out to the

19   government, or to the auditor, or whoever requested the files,

20   correct?

21   A    Correct.

22   Q    And you don't know what the final shape of those forms and

23   files was, correct?

24   A    Correct.

25   Q    Okay.  And you say you raised some concerns about two

1  months before May, 2017, correct?

2  A     Approximately.

3  Q     Okay.  So that's maybe some time in February or March,

4  2017?

5  A     Approximately, yes sir.

6  Q     Okay.  So, you don't know when files were actually

7  produced to the grand juries in this case, correct?

8  A     Correct.

9  Q     All right.  You don't know what those files actually

10  contained, correct?

11  A     Correct.

12  Q     All right.  You don't know if those files that were

13  produced to the grand jury actually contained the images you

14  were concerned about, or don't contain those images, correct?

15  A     Correct.

16  Q     All right.  You just don't know, correct?

17  A     Well, I mean, just suggested, because we gave them in a

18  box to Dr. Zamora, to his office, no, I don't know.  Correct.

19  Q     You don't know who actually produced that to the

20  government, correct?

21  A     Correct.

22  Q     All right.  And again, you don't know what actually got

23  produced.

24  A     Correct.

25  Q     So, if you, if there was an image that had been created at

1   some point, but you then raised a concern, you don't know

2   whether those images actually got produced or not, correct?

3   A    What do you mean?

4   Q    Well, you again, you don't know what actually got

5   produced, right?

6   A    Well, in a way I do, because we're the one working with

7   the charts in the conference room.  We put them in a box and we

8   take them to Dr. Zamora.  But, from there on, I don't know.

9   Q    Well that's my point.

10  A    Okay.

11  Q    Okay.

12  A    I just wanted to make that clear.

13  Q    Okay.  After it got to Dr. Zamora, did you see Dr. Zamora

14  mailing these out?

15  A    No, sir.

16  Q    Okay.  Do you know if he gave them to someone else?

17  A    No, sir.

18  Q    You just don't know, right?

19  A    No.

20  Q    Okay.  So, but if you raised a concern if an image weren't

21  actually produced, well, then the images that, well, you don't

22  actually know whether or not the images you raised a concern

23  about were actually provided, correct?

24  A    Correct.

25  Q    Okay.

1          **MR. LEE:**  Your Honor, this, I'm not quite, I have a

2    lot more to get through.  I don't know, in terms of, and heard

3    from your deputy, or should I?  I can continue.

4          **THE COURT:**  Like, how much more do you have?

5          **MR. LEE:**  I have, well I have probably about another

6    hour or two to go.

7          **THE COURT:**  Another hour?

8          **MR. LEE:**  Yes.

9          **THE COURT:**  How many questions do you have?

10          **MR. LEE:**  A lot of questions, Your Honor.

11          **THE COURT:**  Well, I know that the people that are

12    here for hearings that were at 4:00 o'clock are here.  And so,

13    I don't think I'm going to keep the jury here another hour

14    while you finish.

15          Ladies and gentlemen, you can go ahead and go home.

16    I get to stay here.  But, we'll see you all tomorrow morning at

17    9:00 o'clock.  Again, we thank you for your service.  Don't

18    forget the instructions, don't read or listen to, nor watch

19    anything, or do any investigation on your own about this case.

20      **(Pause while jury exits)**

21          **MS. FRAZIOR:**  I just wanted to put on the record that

22    the witness is now on cross examination, obviously we will not

23    be speaking to the witness at all during the break.  And I just

24    wanted to make sure that the record was clear about that.

25    We'll have no contact.

1          THE COURT:  Okay.

2          MR. MARTINEZ:  And along those lines, real quickly,

3   and I would, I'm assuming the experts are exempted from that?

4          MS. FRAZIOR:  Oh, yeah, we don't have anybody here

5   right now.  So.

6          MR. MARTINEZ:  Okay.  I mean, I just want to make

7   sure for the record that experts are exempted under Rule 615.

8          MS. FRAZIOR:  I don't have any objection to that.

9          THE COURT:  Okay.  Mr. Moreno, thank you very much,

10  we'll see you tomorrow morning at 9:00 o'clock, sir.

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Have a good evening.

13      **(Proceeding adjourned at 4:21 p.m.; end of Afternoon**

14  **Session)**

15

16

17

18

19

20

21

22

23

24

25

137

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>December 11, 2019</u>

              Signed                                      Dated




                    *TONI HUDSON, TRANSCRIBER*