UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  7:18-CR-00855 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | |
| JORGE ZAMORA-QUEZADA, | ) | Thursday, December 12, 2019 |
| MEISY ANGELICA ZAMORA, | ) | |
| ESTELLA SANTOS NATERA, | ) | (1:51 p.m. to 4:18 p.m.) |
| FELIX RAMOS, | ) | |
| | ) | AFTERNOON SESSION |
| Defendants. | ) | |

JURY TRIAL - DAY 7

BEFORE THE HONORABLE RICARDO H. HINOJOSA,
UNITED STATES DISTRICT JUDGE

**APPEARANCES**:                    See next page


Court Interpreter:        Steven Mines (Standby)

Court Recorder [ECRO]:    Antonio Tijerina

Transcribed By:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, Texas 78468
                          361 949-2988



Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES FOR:</u>


Plaintiff:                  ADRIENNE FRAZIOR, ESQ.
                            EMILY GURSKIS, ESQ.
                            REBECCA YUAN, ESQ.
                            CYNTHIA VILLANUEVA, ESQ.
                            Office of the United States Attorney
                            1701 W. Business Hwy. 83
                            Suite 600
                            McAllen, TX 78501


Jorge Zamora-Quezada:       BENIGNO TREY MARTINEZ, III, ESQ.
                            TOMAS TIJERINA, ESQ.
                            STEPHEN LEE, ESQ.
                            1201 E. Van Buren St.
                            Brownsville, TX 78520


Meisy Zamora:               CHRISTOPHER SULLY, ESQ.
                            5804 N. 23rd St.
                            McAllen, TX 78504


Estella Natera:             AL ALVAREZ, JR., ESQ.
                            4409 N McColl Rd
                            McAllen, TX 78504


Felix Ramos:                JAIME PENA, ESQ.
                            Pena Garza PLLC
                            900 Kerria Ave
                            McAllen, TX 78501

1                            INDEX

2  <u>GOVERNMENT'S WITNESSES</u>    <u>DIRECT</u>    <u>CROSS</u>    <u>REDIRECT</u>   <u>RECROSS</u>

3  AIDEE DE JESUS

4    BY MS. FRAZIOR          10                    128

5    BY MR. LEE                      59/81

6    BY MR. SULLY                      92

7    BY MR. PENA                     120

8

9  <u>GOVERNMENT'S EXHIBIT</u>                                 <u>RECEIVED</u>

10 E67                                                  31

11

12 <u>DEFENDANTS' EXHIBITS</u>                              <u>RECEIVED</u>

13 30                                                   79

14 31                                                   92

15

16

17

18

19

20

21

22

23

24

25

1          **McAllen, Texas; Thursday, December 12, 2019; 1:51 p.m.**

2                              **(Call to Order)**

3          **(Jurors present)**

4          **THE COURT:** Please be seated.  Good afternoon, ladies

5     and gentlemen.

6               Go ahead and call your next witness.

7          **MS. FRAZIOR:** The United States calls Aidee De Jesus.

8          **MR. ALVAREZ:** Your Honor, can we approach before we

9     begin?

10         **THE COURT:** Okay.  If you-all need to approach me,

11    please tell Mr. De La Garza that.  That way we don't have the

12    jurors just waiting here while you-all are approaching the

13    bench and we can bring them in when we finish here.

14              Can you-all come on up here?

15         **(Begin bench conference at 1:51 p.m.)**

16         **MS. FRAZIOR:** Can she go ahead and get seated?  Oh,

17    she needs to be sworn in.

18         **THE COURT:** Yes.

19         **MR. ALVAREZ:** We apologize, Judge, that we made that

20    request but this has to do with the testimony of this witness.

21    We have an OIG report from 2018 where she's talking

22    specifically about my client and talking about actions that

23    occurred when she had already left the clinic and she's saying

24    Ms. Natera instructed all the billers to --

25         **THE COURT:** You can't talk about anything after she

1  left.

2          **MS. FRAZIOR:**  I don't think she is, your Honor.  I

3  think she's talking about what happened while she was there as

4  she worked --

5          **THE COURT:**  It will have to be about when she was

6  there.

7          **MS. FRAZIOR:**  Yes, of course.

8          **THE COURT:**  She can't talk about when she wasn't

9  there.

10         **MS. FRAZIOR:**  Yes, of course.

11         **MR. PENA:**  Here is another concern, your Honor.  It's

12  just like it happened with the last witness which is our

13  understanding was that they were not going to be getting into

14  instances of medical care about patients.

15         **THE COURT:**  Is this a doctor?

16         **MS. FRAZIOR:**  No, she's a biller.

17         **MR. PENA:**  No, but she's going to give examples but

18  they have not identified any of the patients or any of the

19  bills for which patients.

20         **MS. FRAZIOR:**  Right.  She's (indisc.).

21         **THE COURT:**  She can't give (indisc.) was that we need

22  her or not.  She --

23         **MS. FRAZIOR:**  No, she can just give the (indisc.) of

24  those things she saw.

25         **MR. PENA:**  Well, that's what her report is full of.

6

1   Her report is that she says that the doctors, that they're only

2   seeing patients for five minutes and things like that.

3           **THE COURT:**  Well, she can do that.

4           **MR. PENA:**  Well, she's not -- she's in the billing,

5   your Honor.  She's not in there in the clinic.  She's --

6           **MS. FRAZIOR:**  She is.  She's in all of the clinics.

7   She's a billing supervisor.  She had Ms. Natera's job.

8           **THE COURT:**  But she can't testify about what she

9   thinks someone or if she doesn't know.

10          **MS. FRAZIOR:**  No, she can -- what she saw, your

11  Honor, obviously.  Yeah, what she saw.

12          **THE COURT:**  She would have to be limited to something

13  she actually saw, not what somebody told her ---

14          **MS. FRAZIOR:**  Yes.

15          **THE COURT:**  **--** not what she thinks happened.

16          **MS. FRAZIOR:**  Yes.

17          **MR. PENA:**  Well, and that's the concern is that --

18  it's very clear, your Honor, because they're going to try to

19  bring that up to force us to object in the middle of the

20  testimony.

21          **MS. FRAZIOR:**  I don't know how they -- we would know

22  that.

23          **MR. PENA:**  That's why we're bringing it up now.

24          **THE COURT:**  Well, I mean, you can make that objection

25  if they -- if they're the ones that looked at it, that's the

1    situation but -- so I wouldn't worry about that part.

2         MR. ALVAREZ:  And there's also a portion of the

3    witness' statement about -- that my client always told Tomas

4    Moreno, the MA, to change the superbill and there's a

5    discussion about that and the Court had even asked him a

6    question.  Well, did she change it to do something illegal?

7    And the guy said, "No."

8         MS. FRAZIOR:  Well, that's the issue.  She took the

9    two girls to Tomas Moreno to have them add codes to it that

10   they could then go back and --

11        MR. PENA:  That's the part she doesn't know.

12        THE COURT:  But how would she know that --

13        MS. FRAZIOR:  Because she was the billing supervisor,

14   your Honor, and she will testify --

15        MR. PENA:  She's the billing supervisor.  I --

16        MS. FRAZIOR:  She'll testify, your Honor, to what she

17   saw.

18        THE COURT:  I -- have you worked in a medical office?

19        MS. FRAZIOR:  No, your Honor.

20        THE COURT:  The billing supervisor isn't responsible

21   whether things happened or not.

22        MS. FRAZIOR:  Yeah.

23        THE COURT:  They just send the bills.

24        MS. FRAZIOR:  Well, we will be explaining all the

25   circumstances around how she -- what she saw, what she heard --

```
 1   well, not what she heard -- what she saw, what she experienced

 2   first-hand, your Honor.  I'm not trying to go into

 3   impermissible hearsay.

 4         THE COURT:  Well, it would have to be that and

 5   believe me, if it's not --

 6         MS. FRAZIOR:  Yeah, I understand.

 7         THE COURT:  -- the objection is going to be sustained

 8   and just say, please limit yourself to the things that this

 9   person actually hears.

10         MS. FRAZIOR:  Yes, I -- this is what we do on all of

11   our witnesses.

12         MR. PENA:  No, your Honor, they're in a desperate

13   state right now and they're going to try to elicit this

14   testimony.  I just wanted to make sure it was --

15         MR. ALVAREZ:  There has to be good faith, Judge.

16   They cannot go into, say, she asked someone to change it when

17   we already know from the testimony of Tomas Moreno that she

18   didn't do anything wrong with him.

19         MS. FRAZIOR:  Well --

20         MR. ALVAREZ:  In fact, she enjoys a great reputation

21   of being (indisc.).

22         MS. FRAZIOR:  Testimony (indisc.) with certain

23   people.  Certain people may have seen different things.

24   Certain people may have a different motivation (indisc.).

25         MR. ALVAREZ:  She's talking about what Tomas Moreno
```

1    and Natera did.  How would the confusion -- we already talked

2    to Tomas Moreno.  There was no confusion there.

3              **THE COURT:**  If she wasn't there, she can't testify --

4              **MS. FRAZIOR:**  She can't testify about it.

5              **THE COURT:**  **--** about it.

6              **MS. FRAZIOR:**  Yeah.

7              **THE COURT:**  She wasn't there.  She didn't hear it.

8    She can't testify about it.

9              **MS. FRAZIOR:**  Yes, agreed.

10             **MR. ALVAREZ:**  It's in the report.  I --

11             **THE COURT:**  So you can stand up and make an objection

12   if --

13             **MR. ALVAREZ:**  Yes, your Honor.

14             **THE COURT:**  -- they get into it -- if for some reason

15   they do but that's --

16        **(End bench conference at 1:55 p.m.)**

17             **THE COURT:**  Go ahead and call your next witness.

18             **MS. FRAZIOR:**  The United States calls Aidee De Jesus.

19             **THE COURT:**  Ma'am, if you don't mind coming up here

20   so you can be sworn in, please.

21             **THE CLERK:**  Raise your right hand.

22             **AIDEE DE JESUS, GOVERNMENT'S WITNESS, SWORN**

23             **THE COURT:**  Go ahead and have a seat right up here,

24   please, ma'am.

25   //

1                        **DIRECT EXAMINATION**

2    **BY MS. FRAZIOR:**

3    Q    Ms. De Jesus, can you introduce yourself to the jury?

4    A    My name is Aidee De Jesus.

5    Q    Can you pull that microphone down real close to your mouth

6    and move it a little forward if you can?

7    A    Aidee De Jesus.

8    Q    Ms. De Jesus, are you married?

9    A    Yes, I am.

10   Q    Where do you live?

11   A    In Donna.

12   Q    Do you have children?

13   A    I have three children.

14   Q    Where do you currently work?

15   A    I work at Doctors Hospital at Renaissance.

16   Q    How long have you been there?

17   A    Going on six years.

18   Q    What do you do for Doctors Hospital?

19   A    I am the supervisor for the billing department.

20   Q    What is your educational background in medical work?

21   A    I started working in the medical field when I was about 20

22   years old.  I went from Medical Office Specialist and I worked

23   myself up slowly throughout all these years.

24   Q    At some point in time -- well, let me ask you this.  Have

25   you been -- worked in multiple clinics over the years?

De Jesus - Direct / By Ms. Frazior                    11

1   A    Correct.

2   Q    About how many would you say?

3   A    About seven clinics.

4   Q    Okay.  And in those clinics, have you always been in the

5   billing area?

6   A    No, not in all of them.

7   Q    What other things have you done for those clinics?

8   A    I worked in the front office, pre-cert, do authorizations.

9   Q    Like insurance authorizations?

10  A    Yes.

11  Q    Okay.  At some point, did you work for the Center for

12  Arthritis and Osteoporosis?

13  A    Yes, I did.

14  Q    When was that?

15  A    Back in 2010.

16  Q    Okay.  And how long did you work there for?

17  A    About five years, five to six years.

18  Q    I want to return to your time as an employee at the Center

19  for Arthritis and Osteoporosis in a moment but were you also a

20  patient?

21  A    Yes.

22  Q    Tell us a little bit about how you came to be a patient of

23  the Center for Arthritis and Osteoporosis.

24  A    Well, the clinic didn't offer health insurance for the

25  employees.  Therefore, the doctors would see us for free since

De Jesus - Direct / By Ms. Frazior                    12

1    we didn't have that coverage.  There was a time I started

2    getting -- my joints were hurting, my back.  You know, I was

3    starting feeling a little sick.

4    Q    Uh-huh.

5    A    You know, and that's when I requested to be seen because,

6    like I said, we didn't have health insurance to go see another

7    doctor.

8    Q    Had you had anything in your family that would make you

9    think that this would be the appropriate place to get treated?

10   A    Yes.

11   Q    What did you have in your family?

12   A    My family -- my sister had rheumatoid arthritis and so did

13   my grandma and my aunts.  So it kind of was genetic-wise.  So,

14   I mean, being with them, they would tell me their symptoms and

15   how they would feel or, you know, things like that.  So when I

16   started kind of feeling certain things, I said, I might as well

17   check myself.  That way I can know and be able to treat it at

18   the beginning, not when it's advanced.

19   Q    Now, who all worked at the Center for Arthritis and

20   Osteoporosis with you?  Well, let me ask you just a few

21   specific people.  Did you work with Dr. Jorge Zamora-Quezada?

22   A    Yes, I did.

23   Q    Did you work with Meisy Zamora?

24   A    Yes, I did.

25   Q    Did you work with Estella Natera?

De Jesus - Direct / By Ms. Frazior                    13

1    A    Yes, I did.

2    Q    Did you work with Felix Ramos?

3    A    Yes, I did.

4    Q    Okay.  So when you were a patient at that clinic, who was

5    treating you?

6    A    At the -- when I was first seen, it was Dr. Zamora.

7    Q    Okay.  Can you tell us a little bit about that first visit

8    and how you were diagnosed?

9    A    Well, I went in the patient room like any other patient

10   and, you know, he looked at my hands and, you know, he already

11   knew a little bit of history because I told him, you know,

12   what, you know, my family had, you know, as in RA.  And then he

13   ordered some lab work and then he said, we'll take it from

14   there and see what it came back.

15   Q    Okay.  So were you diagnosed right then in that first

16   exam?

17   A    When -- after I came back -- I mean, after they did the

18   results but when he examined my hands, he stated to me, yeah, I

19   mean, it -- it is, that you have some inflammation and, you

20   know, (indisc.).  And I said, "Okay."  So in a way, he's like,

21   yes.  As he touched me as he mentioned to me and I said,

22   "Okay."  He said, but we're going to get the result.  That way

23   we know what we can give you.  I said, "Okay."

24   Q    All right.  And then did you have lab results -- or lab

25   work done on yourself there?

De Jesus - Direct / By Ms. Frazior                    14

1    A    Yes, that same day.

2    Q    Where did you -- you had it done at the clinic?

3    A    Yes.

4    Q    Okay.  And did you get the results of that lab work?

5    A    Yes, I did.

6    Q    Did you consult with Dr. Jorge Zamora-Quezada about those

7    lab results?

8    A    Yes, and also with -- Lillian also had seen those labs for

9    me.

10   Q    Who is Lillian?

11   A    She's a PA from there.

12   Q    Okay.

13          THE COURT:  I -- when you say "PA," you mean

14   physician's assistant?

15          THE WITNESS:  Physician assistant, right.

16   BY MS. FRAZIOR:

17   Q    When you then went on to be treated or -- well, let me ask

18   that.  Did you get treatment from the center?

19   A    Yes, I did.

20   Q    What was your understanding of what your diagnosis was?

21   A    Well, she -- they told me that I did have RA.  So --

22          THE COURT:  When you say "they," who do you mean?

23          THE WITNESS:  Dr. Zamora-Quezada --

24          THE COURT:  Who actually told you?

25          THE WITNESS:  -- and Physician Assistant Lillian

EXCEPTIONAL REPORTING SERVICES, INC

1   Williams.

2           **THE COURT:**  They both told you?

3           **THE WITNESS:**  They both because she had reviewed my

4   labs prior but she said, okay, just talk to him when he comes.

5   That way you can see him also.

6   **BY MS. FRAZIOR:**

7   Q    Okay.  So did Dr. Jorge Zamora-Quezada tell you you had

8   rheumatoid arthritis?

9   A    Yes.

10  Q    Did Lillian Williams do a physical exam on you?

11  A    No.

12  Q    Okay.  So when she was talking to you, was she relying on

13  those labs that you had had done?

14  A    Correct.

15  Q    Now, after you no longer worked at the Center for

16  Arthritis and Osteoporosis, did you get -- end up getting

17  health insurance?

18  A    My current employer, yes.

19  Q    Okay.  And then once you got health insurance, did you

20  then go to see another physician?

21  A    Yes, I did.

22  Q    Who did you go see?

23  A    I went to go see Dr. Nelson Mata.

24  Q    At that point in time, were you still under the assumption

25  that you had a diagnosis of rheumatoid arthritis?

De Jesus - Direct / By Ms. Frazior                    16

1   A    Yes.

2   Q    How did you feel about having been diagnosed with that?

3   A    I wanted to continue treatment.  I mean, when I moved to

4   Doctors Hospital at Renaissance, that was my main -- because

5   they provided that.  That way, I could go see another

6   rheumatologist where I can continue treatment, you know --

7   Q    Uh-huh.

8   A    -- but, of course, I had to get referred and that's why I

9   ended up with Dr. Nelson Mata.

10  Q    Okay.  In the time that you were being treated by the

11  Center and Dr. Zamora-Quezada and Lillian Williams, who was

12  financing your treatment?

13  A    The clinic because I didn't have health insurance.

14  Q    Okay.  Now, when we say "financing," does that meaning

15  getting the labs and the X-rays done and that kind of stuff?

16  Those things were covered for you?

17  A    Yes, we didn't pay anything.

18  Q    Okay.  And what about medication?  What kind of medication

19  were you taking?

20  A    The sulfasalazine and that one, I did purchase it because

21  they would give me the generic.  So I was able to buy it.  It

22  was 5 or $10, I think, but not the injections.  The

23  methotrexate, no, but they had it there in the clinic.

24  Q    Okay.  The methotrexate, were you -- you said you took the

25  other medication but not the methotrexate drugs?

1   A    The methotrexate, yes, I did but that one, I didn't

2   purchase it because it was expensive but I could afford the

3   pills, the other medication.

4   Q    Okay.  So one form of treatment you paid for yourself and

5   then the other you received in the clinic?

6   A    Correct.

7   Q    All right.  When you left the Center, were you able to

8   continue on with your medication treatments?

9   A    No.

10   Q    Why not?

11   A    Because I didn't -- I had to go see another doctor and I

12   couldn't afford to pay as a private-pay patient.  So when I

13   started working at DHR, I had to wait a timeframe to the --

14   that my health insurance kicked in.

15   Q    Okay.  So then you get health insurance.  You go to

16   Dr. Mata.  Do you do a physical with him?

17   A    Yes, I did.

18   Q    And what kind of exam or test did he do then?

19   A    He did the -- for the RF panel.  When I went in, he saw

20   the medications that I was taking prior and he asked me why I

21   was taking that and I stated to him who I was diagnosed.  And

22   he's like, who diagnosed you with rheumatoid arthritis?

23   Q    Okay.  Let's not get into anything that anybody said to

24   you.

25   A    Oh.

De Jesus - Direct / By Ms. Frazior                    18

1    Q    I'm sorry.  I should have stopped you there to make sure

2    that we're just getting your understanding.

3    A    Okay.

4    Q    Did Dr. Mata diagnose you with rheumatoid arthritis?

5    A    No, he didn't.

6    Q    Okay.  Did you continue on to take additional medications

7    at that point?

8    A    No, I didn't.

9    Q    Okay.  Now, during the time when you were diagnosed, you

10   said you had some symptoms and you were hurting a little bit;

11   is that right?

12   A    Correct.

13   Q    Did that continue on all the way until you saw Dr. Mata?

14   A    Yes, it did.

15   Q    Did Dr. Mata change your treatment in any way?  Did you

16   start doing something different than what you had been doing at

17   the Center?

18   A    He only continued the Vitamin D and that's all he gave me.

19   Q    Okay.  And did your symptoms improve?

20   A    It did.

21   Q    Have you seen any other physician since then that has

22   treated you for rheumatoid arthritis?

23   A    No.

24   Q    What was your reaction when you found -- when you -- after

25   you visited Dr. Mata and your diagnosis was changed?

1    A    I was relieved but upset at the same time.

2    Q    Why were you upset?

3    A    Because -- I mean, I was taking a medication that my body

4    didn't need and it could have not gone the right way and

5    something could have triggered a deficiency in -- of something

6    that I never had, you know.  So, yes, I was upset because what

7    if something would have triggered something different and I

8    have young children, you know?

9    A    Okay.  All right.  Let's just get a little bit back to

10   some of that treatment that you were talking about getting at

11   the Center for Arthritis and Osteoporosis.  Well, actually let

12   me come back to that in just a moment.

13          Let's talk about your employment there.  When did you

14   start working there?  I think you said 2010?

15   A    Yes, ma'am.

16   Q    Okay.  What was your first job you got hired for?

17   A    I went as in data entry.

18   Q    All right.  And were you part-time or full-time?

19   A    I started part-time because I was going to -- currently to

20   school.

21   Q    What office were you working in?

22   A    In the Edinburg.

23   Q    How many offices did Dr. Zamora-Quezada have?

24   A    At that time when I started, he had three.

25   Q    What locations were they?

De Jesus - Direct / By Ms. Frazior                    20

1   A    The Edinburg clinic, the Brownsville and the San Antonio.

2   Q    Okay.  And what were you doing in that part-time position?

3   What were your job duties?

4   A    I was entering charges on all the superbills from all

5   clinics.

6   Q    Okay.  At some point, did you move into a full-time

7   position?

8   A    Yes, I did.

9   Q    Why did you do that?

10  A    Because the volume of outstanding superbills were a lot.

11  Even when I started, they were very behind in entering.

12  Q    How far behind were they?

13  A    Weeks.  So they just had stacks of superbills there from

14  the Brownsville -- or, you know, waiting to be entered.

15  Q    Okay.  Was it your job to help get them up to speed or get

16  them caught them caught is what I meant.

17  A    I was the only one there in the Edinburg at that time.

18  Q    Okay.  All right.  Now, you mentioned that you were in the

19  Edinburg office.  Were you entering bills from different

20  offices, too?

21  A    From the Brownsville.

22  Q    Okay.  At some point, did the San Antonio billing transfer

23  over to Edinburg?

24  A    Yes, it did.

25  Q    Okay.  What time period was that?

De Jesus - Direct / By Ms. Frazior                    21

1   A    About three years afterwards.

2   Q    After you started?

3   A    Yes.  It was a transition because it's -- since it's

4   always been over there, it was a transition slowly.

5   Q    Okay.  So the billing was originally in San Antonio and

6   then moved over to Edinburg; is that --

7   A    Correct.

8   Q    Did you ever travel to San Antonio to handle billing

9   situations or anything there?

10  A    Yes, I did.

11  Q    How did you go when you got there?

12  A    In the doctor -- Dr. Zamora's private plane.

13  Q    Did you -- who did you go with?

14  A    With Dr. Zamora, Dr. Meisy.

15  Q    Anybody else?

16  A    The pilot.

17  Q    Okay.

18          **THE COURT:**  Well, the pilot would be important,

19  right?

20  Q    All right.  Ms. De Jesus, at some point, were you promoted

21  at the Center in Edinburg?

22  A    Yes.

23  Q    What were you promoted to?

24  A    As the billing supervisor.

25  Q    Why did you receive that promotion?

1  A    There was a lot of issues or contradictions -- there was a

2  lot of problems in the San Antonio clinic as in staff, as in

3  there was no structure.  So he -- Dr. Zamora wanted us to build

4  it to -- for it to come back as in myself and Janie Solis which

5  was the practice administrator at that time.

6  Q    Who offered you the position of billing supervisor?

7  A    Janie Solis which is the practice and Doctora Meisy --

8  Dr. Meisy.

9  Q    When you say "Doctora Meisy," who are you talking about?

10 A    Meisy Zamora.

11 Q    Okay.  Did you call her Doctora Meisy at the clinic?

12 A    Yes.

13 Q    Did everyone call her that?

14 A    Everybody called her like that.

15 Q    Do you know what her medical training is?

16 A    As far as I know, she was a plastic surgeon.

17        **MR. SULLY:**  Objection, your Honor, lack of personal

18 knowledge.

19        **THE COURT:**  Yes, she would -- you just know it

20 because someone told you, not that you know it for a fact,

21 right?

22        **THE WITNESS:**  I saw her plaque in her office.

23 **BY MS. FRAZIOR:**

24 Q    Okay.  So what do you know her medical training to be?

25 A    She was -- she never did anything there.

De Jesus - Direct / By Ms. Frazior                23

1          **THE COURT:**  She can testify about what the plaque

2    says.  I don't know that you can --

3          **MS. FRAZIOR:**  Okay.

4    **BY MS. FRAZIOR:**

5    Q    What did the plaque say that you saw?

6    A    It was in Spanish.

7    Q    Okay.  Do you read Spanish or speak Spanish?

8    A    Yes.

9    Q    Okay.  Do you recall what it said?

10   A    It said "cirujana."

11   Q    Okay.

12   A    So surgeon.

13   Q    Okay.  Why were you offered -- I think you -- I think

14   you -- actually I think you gave us a little bit of information

15   about why you were offered the position.  Did you have a

16   specific conversation with Meisy Zamora about taking on the

17   billing supervisor role?

18   A    It was offered to me but the details as it was a plan was

19   between me and Janie Solis.

20   Q    Okay.  With the problems that you mentioned in

21   San Antonio, what kind of problems were they having that

22   necessitated the billing moving over to Edinburg?

23   A    The delay in the superbills.  They stated that they --

24   since they would take the two facilities -- the two clinics and

25   they would -- when Dr. Zamora would fly out to San Antonio, the

1    delay as in entering charges were too slow.  So something was

2    going on.  There was a lot of conflict between employee to

3    employee.  So there was a lot of issues -- personal issues

4    among the employees that the work wasn't being done.

5    Q    Were there audits going on at the same time?

6    A    When I started, no.

7    Q    Were there claim recoupments going on?

8    A    Yes.

9    Q    Okay.  What was happening with the claim recoupments?

10   First of all, what is a "claim recoupment"?

11   A    At the process, the payment does -- the insurance carrier

12   does pay the claim.  However, if they state that they're

13   requesting medical records, we submit medical records.  Medical

14   records are not sufficient.  They'll come and recoup because

15   they're saying, yes, we did pay you this claim.  However, what

16   you submitted to us is not sufficient evidence to establish a

17   medical necessity.  So --

18   Q    All right.  So that was a problem that was going on that

19   needed to be addressed?

20   A    Correct.

21   Q    Okay.  Did you at that point have any time -- have any

22   experience doing claim recoupments?

23   A    I had done it in other clinics but very limited because

24   we -- the volume that he was getting letters compared to my

25   previous clinics, no.  It was a lot of volume.

De Jesus - Direct / By Ms. Frazior                          25

1   Q    Okay.  Did you learn a lot in the process of responding to

2   those claim recoupments while working at the Center?

3   A    Yes.  And I had my past experience as I worked at other

4   appeals in other clinics.

5   Q    Speaking of learning a lot, what kind of on-the-job

6   training was offered at the Center for Arthritis and

7   Osteoporosis?

8   A    Training as in?

9   Q    Training in billing or training in medical practices,

10  anything that you experienced, the kind of training that was

11  offered to the staff.

12  A    When I entered, I didn't get any training.  They just

13  train you what -- how to work the actual system which was

14  NexGen at that time.  My training was my past experience as to

15  learning.  I already knew the web portals where I can go to

16  grab anything that I might need to appeal or to justify the

17  claim or attach attachment by going through the portals.

18  Q    Okay.  What would you do if you had a question about a

19  billing procedure or somebody on your staff had a question?

20  A    It would be -- the chart would be given back to the MAs.

21  Q    Okay.  What about though if there was a procedural

22  question?  What would you do?  Like, if you just didn't know

23  how to get a claim through or something like that.

24  A    As -- can you elaborate a little bit?

25  Q    Yeah.  If you had a question about how to do something

De Jesus - Direct / By Ms. Frazior                    26

1   just in billing, not about superbills or anything like that

2   but, like, maybe what the appropriate code was for something or

3   how to address certain claims of medical necessity or something

4   like that, what would you do if you had those questions?

5   A    The -- really the letters -- when they send me to the

6   letter, they'll give you quite a lot of detail of what is the

7   claim being denied for.  So they basically tell you what they

8   need from you and the time range.

9   Q    Now, in your current position, are you offered training?

10  A    Where I work right now, yes, we are.

11  Q    What kind of training are you offered now?

12  A    We have training.  We go to seminars.  We do webinars.  So

13  there's a lot -- as it's getting updated -- as Medicare

14  guidelines are being updated or any other, we make sure that

15  our staff is knowledgeable and know the new guidelines.

16  Q    While you were working at the clinic in the billing

17  department, walk us through what your specific job duties were

18  as the billing supervisor.

19  A    As the billing supervisor, I oversee the billing staff and

20  at that time, also there was -- some girls still stayed in the

21  San Antonio.  So they were still -- like I said, the transition

22  was slowly.  So I oversee to make sure that, you know, how --

23  for us not to fall behind in entering charges, what is it that

24  we're appealing, what is being denied, you know, do an aging

25  report, anything that would fall to see why they're rejecting

1  it, why are all these denials and how are we targeting.

2  Q    How many people were you supervising?

3  A    I -- at that time, I had six people which was just the

4  billing staff.

5  Q    And those people reported to you?

6  A    Correct.

7  Q    Okay.  And what was their day-to-day job duties?

8  A    One of them would enter all charges.  Like I said, I had

9  two people -- I'm sorry -- two people to enter charges.  One of

10 them, of course, was still in training and then I had two other

11 people who would do the actual appeals, any rejections, any

12 denials and work on my aging report.

13 Q    So those individuals that worked for you, are you all in

14 the same area?

15 A    Yes.

16 Q    Okay.  And how big of an area is the billing section?

17 A    It had -- they had six cubicles and then our printer in

18 the back and then the file room.

19 Q    Would you say you worked in pretty close contact with

20 those other billers that were in that same section?

21 A    Yes.  My office was right next to them.

22 Q    Okay.  And was one of those billers who worked for you

23 Estella Natera?

24 A    Correct.

25 Q    Okay.  Now, I'm going to ask you.  Do you see Estella

De Jesus - Direct / By Ms. Frazior                    28

1    Natera in the courtroom here today?  And if you do, can you

2    identify her by an article of clothing she's wearing?

3    A    Yes, the black suit and the white shirt.

4         **MS. FRAZIOR:**  May the record reflect that the witness

5    has been --

6         **THE COURT:**  The record reflects she's --

7         **MS. FRAZIOR:**  -- identified Estella --

8         **THE COURT:**  -- identified Ms. Natera.

9         **MS. FRAZIOR:**  Thank you.

10   **BY MS. FRAZIOR:**

11   Q    All right.  In that role in your billing, did you -- were

12   you looking at superbills on a pretty frequent basis?

13   A    Yes.

14   Q    Okay.  Did you -- were you seeing things on the superbills

15   that were causing you concern?

16   A    Almost all our superbills were circled.  Every single --

17   practically almost -- a lot of the procedures and labs.

18   Q    Okay.  What does that mean by "circled"?  Almost all the

19   superbills were circled.

20   A    Every time when a patient is seen, every exam that is

21   going to be done, it's circled.  So you have -- a superbill has

22   every single code or everything that we bill out where we use.

23   Q    Okay.  And were you familiar with what the procedure was

24   for patients coming to visit the clinic on first, second and

25   third visits?

De Jesus - Direct / By Ms. Frazior                    29

1    A    As the new patients and the follow-ups, yes.

2    Q    Okay.  At the point in time that you're there, is it --

3    were you familiar with the procedure for laboratory tests for

4    first-time and follow-up patients?

5    A    Correct.

6    Q    What was that procedure?

7    A    We called it the -- I mean, they would call it the

8    "works."  So it's anything from an RF panel, a Sjogren's panel,

9    the thyroid, the TSH, the (indisc.).  It was quite a few of

10   them.

11   Q    Okay.  So that -- is that something that caused you

12   concern at the time?

13   A    It -- when I started, I mean, like I said, it's a

14   specialty.  So I said, okay, they do all these exams, I guess,

15   to determine.

16   Q    Okay.

17   A    You know, but it was very frequent.

18   Q    And what would you do if you saw a superbill that didn't

19   have all the right information on it in order to be submitted

20   to insurance providers?

21   A    It would go back to the MAs.

22   Q    Okay.  And what would the MAs do with that?  Let's talk

23   about what information we're talking about.  What information

24   on the superbill would be missing that would need to go back to

25   the MAs?

De Jesus - Direct / By Ms. Frazior                         30

1    A    We would have some superbills that might just -- when you

2    have three diagnoses.  Okay.  But then you have all these labs

3    that were done.  So we're like, okay, we know some of these are

4    not -- we don't have sufficient diagnosis to bill out all of

5    these labs.  Maybe there were -- they missed it or they went to

6    another patient.  Something happened or they ordered X-rays but

7    in the X-ray superbill, there was a blank.  So we're, like,

8    okay, why did we do them -- first of all, did we actually do

9    them and, second, if we did, what is the diagnosis for that?

10   So the whole chart was returned back to the medical assistants.

11              **MS. FRAZIOR:**  May I approach the witness?

12              **THE COURT:**  Sure.

13        **(Counsel approaches)**

14   BY MS. FRAZIOR:

15   Q    All right.  I'm handing you what's marked as Government's

16   E67.  Are you familiar with that?

17   A    Yes, I am.

18   Q    What is it?

19   A    It's a superbill.

20        **(Pause)**

21   BY MS. FRAZIOR:

22   Q    All right.  Moving to Government's E67.

23              **MR. LEE:**  No objection given the conversation we've

24   had.

25              **THE COURT:**  It's admitted.

De Jesus - Direct / By Ms. Frazior                     31

 1              **MS. FRAZIOR:**  Thank you.

 2         **(Government's Exhibit Number E67 is received in evidence)**

 3              **MS. FRAZIOR:**  If I could have the Elmo.  Great.

 4    **BY MS. FRAZIOR:**

 5    Q    Ms. De Jesus, looking at this document, it's E67 --

 6              **MR. SULLY:**  I'm sorry to interrupt but our screens

 7    are flickering on and off and I guess it's happening over

 8    there, too.

 9              **THE COURT:**  It's Christmas.

10         **(Pause)**

11              **THE COURT:**  Has the flickering stopped or it's still

12    going on?

13              **MR. SULLY:**  We're good.

14              **MS. FRAZIOR:**  We're good?  Okay.

15    **BY MS. FRAZIOR:**

16    Q    All right.  Looking at this document, you mentioned that

17    this is a superbill.  Does this look similar to the superbills

18    that you used when you worked for the Center?

19    A    Correct.

20    Q    Okay.  And a moment ago -- this one actually has some

21    marks you can see at the top that look like it's been white-

22    outed a little bit.  Is that just to make this a blank one that

23    you can look at?

24    A    Well, we had a master one.

25    Q    Okay.  You had a --

1   A    So they -- we --

2   Q    -- you had a blank one, too?

3   A    -- had a nicer version.

4   Q    Okay, a nicer version.

5   A    So we had a master that we made copies from.

6   Q    All right.  So on this one, you can see that there is a

7   section -- let's see.  Okay.  Now, looking at this mid area

8   here in the middle, what is that for?

9   A    To show the -- this is where you would mark whatever

10  injections if the patient was going to get an injection and all

11  the lab work because once a patient is seen, it will go to the

12  labs.  That way, it can identify to the lab personnel what was

13  ordered for the patient to be drawn.

14  Q    Okay.  Now, and a minute ago, you testified that you would

15  see these and there would be many areas circled, many

16  procedures circled; is that correct?

17  A    Correct.

18  Q    And this one is just for laboratory and other items like

19  that.  There was another portion of the superbill for X-rays;

20  is that correct?

21  A    Yes, the second part.

22  Q    Okay.  Now, we talked a moment ago about if there was a

23  diagnosis missing that wouldn't -- one of these lab tests might

24  not pay.  Where would the diagnosis be placed?

25  A    The diagnosis -- all of the diagnoses would be placed

De Jesus - Direct / By Ms. Frazior                    33

1   between 1 and 7, all of these.

2   Q    Right over here in this area?

3   A    Correct.

4   Q    Okay.  And so if a superbill like this came to your office

5   to be billed out and it didn't have the diagnosis that was

6   necessary for one of these laboratory tests to be paid, where

7   would it then go?

8   A    It would go to the medical assistants.

9   Q    Okay.  And then who would take it to the medical

10  assistants?

11  A    It could be the billing lead --

12  Q    Okay.

13  A    -- or any of the data entry that was entering the charges.

14  Q    Okay.  Did -- and when that happened, would it then return

15  to you with -- or to the billing department with a diagnosis

16  added to it?

17  A    Once it was completed.

18  Q    Okay.  And do you have any idea -- to your personal

19  knowledge, do you have any idea how that process went about as

20  to how a diagnosis code would be added to it?

21  A    No.

22  Q    Did you have occasion to see superbills come in where --

23  well, can you give us an example of a superbill coming in where

24  the diagnosis did not match the services that had been circled?

25  A    When we would get -- like I said, if we had some X-rays

De Jesus - Direct / By Ms. Frazior                    34

1  done on the patient, you have X-rays done wrist and hand, you

2  know, but then you only have shoulder pain.  So we're, like,

3  okay.  So in our -- first of all, did the patient have it done?

4  Q    Uh-huh.

5  A    Okay.  So that's why it would go back because we would

6  say, okay, we only have a shoulder pain diagnosis.  However, we

7  have a wrist exam, an elbow.  Did they not have it done?  If

8  they did, we don't have any diagnosis for that.

9  Q    Okay.  All right.  We were talking a moment ago about

10  recoupments and denials that happened in the office.  What

11  would be your procedure for handling a recoupment?

12  A    When we received the letters for recoupment, we would look

13  at what exactly that they're denying for.

14  Q    Uh-huh.

15  A    Some of these recoupments was only a certain procedure;

16  some of them was a whole complete claim.

17  Q    Uh-huh.

18  A    Afterwards of course, like I said, they would be very

19  detailed as if they say they wanted progress notes, past

20  x-rays, previous lab work from a date range.

21  Q    Uh-huh.

22  A    So, we would look into the medical chart to see what we

23  had in that date range and submit it to the carrier.

24  Q    Okay.  Now, if you encountered a problem with that, who

25  would you go talk to at the center?

De Jesus - Direct / By Ms. Frazior                   35

1   A    No one.

2   Q    Okay.  Do you remember having specific conversations with

3   Dr. Zamora-Quezada about recoupment?

4   A    Yes.

5   Q    Okay.  Can you tell us about -- well, when would these

6   conversations have occurred?

7   A    The issue -- we would have meetings with him; me and my

8   practice administrator, Jim Solis, due to we were adjusting

9   these accounts.

10  Q    Okay.  What does that mean?

11  A    Adjusting, if there was no justification, if it becomes

12  unfavorable and the denial is upheld and they say, "No, you

13  didn't meet the medical necessity", we would just -- that means

14  we would zero out the patient's account.

15  Q    Okay.  And then did you have conversations with

16  Dr. Zamora-Quezada about zeroing out the patient's account?

17  A    Correct.

18  Q    Okay.  Where did those conversations occur?

19  A    In his office.

20  Q    Okay.  Would you go to him or would he call you?

21  A    He would always call us, me and Janie.

22  Q    How would he do that?

23  A    Through the intercom or Doctor Meisy will call us through

24  the intercom to go into his office.

25  Q    Okay.  And then when you went to his office and you --

De Jesus - Direct / By Ms. Frazior                    36

1  would he question you about what had happened?  Why the

2  claim --

3  A    Yes.

4  Q    Okay.

5  A    And we would, you know, go into detail, well, you know,

6  it's this or it could have been the injections, or this, and he

7  would want to know why.

8  Q    Okay.  What was his attitude in this conversation?

9  A    He would be upset.

10 Q    Okay.  What kind of -- how would he demonstrate he was

11 upset?

12 A    Oh, he was very upset.  I mean --

13 Q    How did you know he was upset?  What did he do?

14 A    His tone of voice.  His tone of voice; I mean, he would

15 speak to us a lot in Spanish so...

16 Q    Okay.  Would he raise his voice?

17 A    All the time.

18 Q    Okay.  Did anything physical ever happen?

19 A    No.

20 Q    Okay.  Do you recall --

21         **THE COURT:**  You can say it in Spanish if you want

22 because we have an interpreter.

23         **THE WITNESS:**  Okay.  Okay.

24 //

25 //

1    **BY MS. FRAZIOR:**

2    Q    What kind of things did he say in Spanish?

3    A    It's a bad word, so I don't know if I want to say it.

4         **THE COURT:**  Well, it wouldn't be the first time we

5    heard that word.

6         **THE WITNESS:**  You know, sometimes he would tell us

7    (speaks in Spanish), because what we were telling him, he

8    didn't agree.

9         **THE COURT:**  Are you going to translate?

10        **THE INTERPRETER:**  It was a -- it was trash or --

11        **THE COURT:**  Yeah, that's not very much of a bad word.

12        **THE WITNESS:**  When you say in a high tone, it does

13   kind of, so...

14   **BY MS. FRAZIOR:**

15   Q    Okay.  Would you have conversations about the clinic

16   losing money because of this?

17   A    Correct.

18   Q    Okay.  And who would you have those conversations with?

19   A    With Dr. Zamora.

20   Q    Okay.  Now, did you -- were you concerned about billing

21   the patient for these claims?

22   A    Yes.

23   Q    Why is that?

24   A    Because we're not allowed to bill the patient.

25   Q    Why not?

De Jesus - Direct / By Ms. Frazior                38

```
1   A    Because that's why we have a contract.  If it's a Medicare

2   patient, a Medicare/Medicaid patient, that's where we're

3   contracted -- the facility, the doctor is contracted and

4   accepts if Medicare doesn't pay, it doesn't pay it.  And the

5   patient is not liable for that.

6   Q    All right.  And did you --

7           THE COURT:  So, are you saying that the bill was sent

8   for the part that Medicare and Medicaid didn't pay or just a

9   copy of the general bill was sent?

10           THE WITNESS:  The -- we would -- I was adjusting the

11   accounts.  I was not billing the patients.  Dr. Zamora stated

12   that we should bill the patient because if we didn't get paid,

13   but I would say no, because we're not -- they're not

14   responsible for that; as being contract by Medicare, they're

15   not responsible.  They're Medicare/Medicaid patients.

16   BY MS. FRAZIOR:

17   Q    All right.  When -- do you remember a time when you stood

18   up to Dr. Zamora-Quezada?

19   A    Yes.

20   Q    When was that?

21   A    We had encounters, and it's mostly because of the volume

22   of the clinic, of the intake of the patients was not what he

23   wanted.

24   Q    Okay.

25   A    You know, and it's -- his tone of voice, you know --
```

De Jesus - Direct / By Ms. Frazior                    39

1  Q    Okay.  Let me ask you just specific questions about this.

2  Okay.

3         So, did you have quotas at the clinic?

4  A    Yes, we did.

5  Q    Okay.  How were those communicated to you?

6  A    We had it through via email or we would talk to Dr. Meisy,

7  and Janie would work -- she would come to the office and,

8  because every day we would submit those totals of patients seen

9  on a daily basis to him at the end of the clinic.

10 Q    Okay.  I just want to caution you real quickly on

11 something.  We're not allowed to talk about anything anybody

12 told you unless it's --

13 A    Okay.

14 Q    -- one of the people we've been talking about

15 specifically.

16 A    Okay.

17 Q    Dr. Zamora-Quezada, Estella Natera, Felix Ramos, or Meisy

18 Zamora, okay?

19 A    Okay.

20 Q    So, we don't want to talk about any other rumors or things

21 we heard about, okay?

22 A    Okay.

23 Q    So, speaking specifically about quotas.  Did you have

24 quotas for how many patients needed to be seen?

25 A    Yes.

De Jesus - Direct / By Ms. Frazior                    40

1   Q    What about x-rays?

2   A    No.

3   Q    Not that you recall or no, you didn't have --

4   A    Not that I recall.

5   Q    Okay.  What about injections?

6   A    Yes.

7   Q    What about infusions?

8   A    Yes.

9   Q    Okay.  What would you -- so, you mentioned that there

10  would be an email sent to you about what the quotas needed to

11  be; is that correct?

12  A    Uh-huh.  Correct.

13  Q    How would you go about ensuring, as somebody in the

14  billing department, what quotas would you be responsible

15  fulfilling?

16  A    I was not only overseeing the billing staff, it also

17  converted, I was overseeing the front office and also the

18  injection department as a precert, so when those quotas were

19  advised to us, of course, I would have to go to the departments

20  and speak to them or have a short meeting and say, this is

21  what, you know, needs to be done; what Dr. Meisy is requesting,

22  Dr. Zamora is requesting, make sure that, you know, we get on

23  it --

24  Q    Okay.

25  A    -- first thing.

De Jesus - Direct / By Ms. Frazior                      41

1    Q    So, if you needed to fulfill the new patient quota, what

2    would you do?  Or the patient visit.  Let's not talk about new

3    patients, but the patient visits; what would you do if you had

4    a quota, you could look at the schedule and see not enough

5    people are going to be coming in, what would be the thing that

6    you would do to handle that?

7    A    We --

8            MR. SULLY:  Objection, your Honor.  I believe it

9    misstates testimony; I think she said that there were no quotas

10   for seeing patients; just for injections and infusions.

11           MS. FRAZIOR:  I don't think so.  I think she said no

12   quotas for x-rays.

13           THE COURT:  You can just clarify it, so we don't have

14   this argument between the both of you.

15           MS. FRAZIOR:  Sure.  Sure.

16   BY MS. FRAZIOR:

17   Q    Were there quotas for patient visits?

18   A    For new patients.

19   Q    For new patients; okay.  So, what would you do in order to

20   make sure that new patient quotas were being fulfilled?

21   A    We had a list of the new patients, because we would have a

22   lot of referrals from other doctors that were on a waiting

23   list, so we would grab those in case they had not been referred

24   to somebody else, and call those patients up.

25   Q    All right.  Were the new patients scheduled on certain

De Jesus - Direct / By Ms. Frazior                    42

1    days of the week?

2    A    When Dr. Zamora was there.

3    Q    Okay.  Why is that?

4    A    He was -- only wanted to see the new patients.

5    Q    Who would see follow-up patients?

6    A    The physician assistant, Williams.

7    Q    All right.  Do you remember having conversations with

8    Doctor -- well, Meisy Zamora about not fulfilling your quotas?

9    A    Yes.

10   Q    Okay.  And did that happen on few or many occasions?

11   A    Many occasions.

12   Q    Okay.  Can you give us an example of those kind of

13   conversations?

14   A    She would go to my office and tell me, you know, the

15   previous day of the amount, what had happened about, let's say,

16   the knee injections; why you didn't meet, and I said, "Well,

17   yes, we did have those amounts; however, patients didn't show

18   up, they canceled, we didn't have preauthorization".  I mean,

19   things happen.  I told her, "Things happen".

20   Q    Uh-huh; and what would she say to you?

21   A    Well, she said that we have to make it happen.  And, you

22   know, at one time she says, and I'm going to say it in Spanish,

23   (speaks in Spanish), and I would like --

24          **THE INTERPRETER:**  That I should find them under the

25   stones.

De Jesus - Direct / By Ms. Frazior                    43

1          THE WITNESS:  So, I'd be like, okay.  So...

2          MS. FRAZIOR:  Okay.  And --

3          THE COURT:  But she was asking you to send the bills

4    with regards to things that had actually been done; not to make

5    them up, did she?

6          THE WITNESS:  No, this was to schedule the patients.

7    Scheduling the patients.

8          THE COURT:  Schedule the patients to be --

9          THE WITNESS:  To be seen.

10         THE COURT:  -- to be seen.

11         THE WITNESS:  Yes.

12         THE COURT:  And that was because you had a waiting

13   list, and she wanted them to be seen.

14         THE WITNESS:  Well, we only had a waiting list on the

15   new patients, not on the injections.

16         THE COURT:  And so, but they were going to be

17   scheduled anyway, right?  They had to be scheduled or --

18         THE WITNESS:  Some -- a lot of the patients canceled,

19   or a lot of the patients did not want to get it done.

20         THE COURT:  Okay.  And those were not going to come.

21         THE WITNESS:  Correct.

22         THE COURT:  Go ahead.

23   BY MS. FRAZIOR:

24   Q    And so, what did you need to do to make sure that people

25   were coming in for the injections?

De Jesus - Direct / By Ms. Frazior                    44

1  A    She would tell me to tell the staff when they're calling

2  to confirm or when they called the no shows, to let them know

3  how important it was for them to be seen, how important for

4  them not to miss their appointments because they're going to

5  jeopardize their health, you know, to convince them for they

6  needed to make sure they kept their appointments.

7  Q    All right.  Do you remember having conversations with

8  Dr. Zamora-Quezada about billing where Meisy Zamora would

9  intervene?

10  A    Yes.

11  Q    Okay.  What kinds of things would happen in those

12  meetings?

13  A    We would discuss -- Dr. Meisy didn't have a lot of

14  knowledge in billing; I mean, she would sit through our

15  meetings.

16  Q    Uh-huh.

17  A    You know, there was a time that he wanted us to show her

18  because he wanted her to get in there and really learn how it

19  works.  That's why there was a lot of tension because she

20  really didn't understand the whole concept of the rules and

21  everything.

22  Q    Okay.  And so, would you explain what the rules were to

23  her?

24  A    Yes.

25  Q    Okay.

De Jesus - Direct / By Ms. Frazior                45

1  A    But she still didn't understand them.

2  Q    Okay.  All right.  And do you remember how the staff

3  kept -- or the clinic staff kept medical records?

4  A    When I started, all the medical records were paper charts.

5  Q    Uh-huh.

6  A    But when that transition, she said that it required

7  everybody to go electronic, we slowly started that transition

8  in scanning all the medical records where they can be routed

9  electronic versus having paper charts.

10 Q    Okay.  And when you were working on audits, what was the

11 process for putting together the paper charts in order to

12 fulfill the audit?

13 A    Looking for the -- mostly will be one of the audits that I

14 experienced, they were old charts, so they would have to hunt

15 them where they had them in storage.

16 Q    Okay.  And where did they store those charts?

17 A    They had two storages.

18 Q    Uh-huh.  Where was the first one?

19 A    One of the storage was a closed with a door like in a

20 certain area -- like, what do you call it, a storage unit.

21 Q    Uh-huh.

22 A    And the other one was in another location.

23 Q    Okay.  Where was the other one?

24 A    We called it the "barn".

25 Q    Did you go to the barn?

De Jesus - Direct / By Ms. Frazior                               46

1   A    Yes.

2   Q    Okay.  I'm showing you Government's N1002.  Is that the

3   barn that you are referencing?

4   A    Yes.

5   Q    Okay.  When you went there, what was the purpose?

6   A    We were looking for some charts for an audit for Medicare.

7   Q    Okay.  And did you actually go into this location?

8   A    Yes.

9   Q    Okay.  And what was the process for pulling the charts out

10  of the location?

11  A    The charts were up to the sky.  I -- to be honest, I

12  didn't even want to even pull the thing because it was very

13  dirty, a lot of dead animals in there.  So, but they were

14  pulling the charts from boxes.

15          THE COURT:  And when you say, "Up to the sky", you

16  mean up to the roof?

17          THE WITNESS:  Up to --

18          MS. FRAZIOR:  Yes.

19          THE WITNESS:  -- yeah.  Up -- everything that --

20  BY MS. FRAZIOR:

21  Q    And let me show you Government N1.  Is that kind of

22  consistent with --

23  A    Yes.

24  Q    -- how they were stacked up in that building?

25  A    Yes.

1    Q    All right.  Can you see what this is in this first little

2    section right here?

3    A    That looks like the second part of -- well, one of the

4    superbills that attaches what the patient got done also and for

5    their follow-ups.

6    Q    Okay.  You yourself, when you were -- became a former

7    patient, did you try to get your medical records from

8    Dr. Zamora-Quezada?

9    A    Yes, I did.

10   Q    What did you do to try to get them?

11   A    I called them because I really didn't want to go to the

12   clinic.

13   Q    Uh-huh.

14   A    I called them, and I told them I could sign it -- sign the

15   release where they can release them to my doctor.

16   Q    Uh-huh.

17   A    The first time I called, they asked me for my date of

18   birth.  I give it to them.  They said that I didn't show

19   anything in the system.  And the girl that I spoke -- I don't

20   remember who she was.  I told her I know that I was seen; I

21   worked there.

22   Q    Okay.  Did you ever get your medical records?

23   A    No.

24   Q    Have you ever seen your medical records from Dr. Zamora-

25   Quezada?

1   A    No.

2   Q    Okay.  Let's talk a little bit again about Ms. Natera.

3   Who hired her at the Center for Arthritis and Osteoporosis?

4   A    I did.

5   Q    Why did you hire her?

6   A    I needed -- like I said, we were transitioning the

7   billing, so I needed more billing staff, so we had posted a

8   help wanted.

9   Q    What position did you hire her for?

10  A    For billing.

11  Q    And what kind of employee did you find her to be?

12  A    When I interviewed her, she had a lot of experience

13  because she worked at other clinics, you know, and that's what

14  I was looking for because it was easier; I didn't have to train

15  as much, just the system versus everything in general.  So, she

16  had a lot of background that supported something that I needed

17  in my clinic.

18  Q    And how long did you work with her for?

19  A    I would say two years.

20  Q    Did you have conversations with her about her aspirations

21  at the clinic?

22  A    Yes.

23  Q    What kind of conversations did you have with her?

24  A    She --

25           **MR. ALVAREZ:**  Object, your Honor, for relevancy as to

 1    the aspirations at the clinic.

 2              **THE COURT:**  Go ahead.

 3    **BY MS. FRAZIOR:**

 4    Q    Go ahead.  You can answer the question.

 5    A    As in the goals, what she -- her job duties.

 6    Q    Uh-huh.  And where did she hope to go at the clinic?  What

 7    did she hope to do there?

 8    A    I mean, when we talked, I mean, she just -- first of all,

 9    she just wanted a job; she needed a job, so I gave her a job.

10    And I mean, just do what she can do, and that's pretty much --

11    I mean, there was no goals for her or try to advance or

12    anything like that.  It was just she was grateful to have been

13    hired.

14    Q    Okay.  Did you have conversations with her about her

15    getting a raise?

16    A    Yes.

17    Q    What conversations did you have with -- regarding that?

18    A    There was began to be more of a workflow, so she wanted

19    more money.  And of course, I said, "Well, I would have to

20    discuss it with them".  I mean, it's not up to me; it's up to

21    them.

22    Q    Uh-huh.

23    A    With Dr. Zamora.

24    Q    Was she willing to take on extra duties in order to get a

25    raise?

De Jesus - Direct / By Ms. Frazior                              50

1   A    No.

2   Q    Okay.  At some point, did your job duties diminish a

3   little bit at the clinic?

4   A    Yes.

5   Q    Or let me not say "duties", but your knowledge and things

6   that you were working on.

7   A    Yes.

8   Q    Why is that?

9   A    I started seeing that they no longer included me in their

10  meetings.

11  Q    Why?

12  A    According to --

13          **MR. LEE:**  Objection, speculation.

14          **MS. FRAZIOR:**  If she knows.  I mean, she --

15          **THE COURT:**  She said she started to see, so --

16          **THE WITNESS:**  And I did --

17          **THE COURT:**  -- and how did you see?  Or you just felt

18  that it as opposed to --

19          **THE WITNESS:**  I -- because I would -- no, because I

20  would go to the billing, and I would ask like, "Where's

21  Estella?", and they're like, "Oh, she's over there with

22  Dr. Zamora and Dr. Meisy".

23          So, I -- it started to look more and more like that,

24  and I confronted Dr. Meisy about it.

25  //

De Jesus - Direct / By Ms. Frazior                           51

1   **BY MS. FRAZIOR:**

2   Q    What did Dr. Meisy -- well, what did Meisy Zamora say when

3   you --

4   A    She told me that for me not to worry; that it, like, my

5   position, I'm still the billing supervisor, I'm still, you

6   know, everything, but just she knows that I have a lot on my

7   plate so Estella is assisting me while I focus more on the

8   front office and the injections and the precert, and all of

9   that.  But for me not to worry that, you know, there's nothing

10  going on.

11  Q    All right.  And so these meetings that you mentioned that

12  were happening between Dr. Zamora-Quezada and Estella Natera,

13  was there anybody else present to your knowledge?

14  A    No.

15  Q    Okay.  And would those have been meetings that you

16  generally would have been participating in prior to this time

17  period?

18            **MR. LEE:**  Objection.

19            **THE COURT:**  How would she know --

20            **MR. LEE:**  How could she possibly know?

21            **THE COURT:**  -- if these have not happened?  Objection

22  sustained.

23  **BY MS. FRAZIOR:**

24  Q    All right.  And in your role as the billing supervisor, it

25  is your job to address concerns of the staff; is that correct?

```
 1  A    Correct.

 2  Q    Did there come a time when Estella Natera took over that

 3  role?

 4  A    Yes.

 5  Q    Okay.  How did that happen?

 6  A    The staff would come to me and say, you know --

 7           MR. LEE:  Objection, hearsay.

 8           THE COURT:  No.  Go ahead.

 9           THE WITNESS:  The staff will come to me and say, you

10  know, Estella wants me to do -- she wants me to complete all of

11  this --

12           MR. ALVAREZ:  Your Honor, objection to the hearsay.

13           THE COURT:  But nobody told you that you were no

14  longer the billing supervisor, right?

15           THE WITNESS:  No.

16           THE COURT:  Okay.  And so --

17           THE WITNESS:  She was giving the orders to them as to

18  what to work priority versus other --

19           THE COURT:  Well, did you talk to her about that?

20           THE WITNESS:  Yes.

21  BY MS. FRAZIOR:

22  Q    Okay.  When did you talk to Estella Natera about that?

23  A    I would tell her what's going on.  She would give me

24  attitude, and she said if I had a problem, to talk to

25  Dr. Zamora.
```

De Jesus - Direct / By Ms. Frazior                    53

1    Q    Okay.  Did you raise the concerns with Dr. Zamora?

2    A    I raised it with Dr. Meisy.

3    Q    Okay.  And what -- is that the conversation we just talked

4    about a second ago?

5    A    Uh-huh.

6    Q    Okay.  So, okay.  So, were you seeing a decrease in your

7    duties during this timeframe?

8    A    Correct.

9    Q    Okay.  What kind of duties were you no longer having?

10   A    Well, she was in charge; she was now more giving all the

11   information of what was being billed out, what were -- where

12   were the girls were at at that moment, the billing, the

13   denials, you know, everything that I would report or give to

14   him, she was taking over that.

15            **THE COURT:**  And that was who?

16            **THE WITNESS:**  Estella.

17   **BY MS. FRAZIOR:**

18   Q    All right.  Let's talk a little bit about how you ended

19   your employment with the center.  Did you quit or were you

20   fired?

21   A    I quit.

22   Q    Okay.  Tell us about the circumstances around you

23   quitting.

24   A    It started to get very tense.  What had happened the

25   previous day is I had a patient came in on a complaint that a

De Jesus - Direct / By Ms. Frazior                      54

1   medication was charged to him.

2   Q    Uh-huh.

3   A    And he wanted -- and when he called the insurance, they

4   stated to him that it was delivered to our facility -- to the

5   clinic.

6   Q    Uh-huh.

7   A    So, I proceeded to go to the infusion department, spoke to

8   the nurse, and she had stated that she had seen it there, but

9   it was administered to another patient.

10  Q    Okay.  What did you do then?

11  A    I don't -- so I was going to call the patient.  I don't

12  know how Dr. Meisy found out that I was over there.  She was

13  upset.

14        **MR. SULLY:**  Objection, your Honor.  Lack of personal

15  knowledge.

16        **THE COURT:**  How did you --

17        **MR. SULLY:**  She said she didn't know.

18        **THE COURT:**  -- did she tell you that she knew you

19  were someplace?

20        **THE WITNESS:**  Yes.  She called -- she called me.

21        **THE COURT:**  And --

22        **THE WITNESS:**  That same -- like, 15 minutes later she

23  called me.  Somebody had to have told her I was over there.

24        **MS. FRAZIOR:**  Okay.  At any rate --

25        **THE COURT:**  When she called you where?

De Jesus - Direct / By Ms. Frazior                    55

1          **THE WITNESS:**  To my office.

2          **THE COURT:**  Okay.  And you were at the office.

3          **THE WITNESS:**  I was at the -- with -- and the

4   infusion department's right across where I'm sitting, so you

5   just walk and you get there.  So when she confirmed that, I

6   was -- I went back to my desk to call the patient.  So that's

7   when she called me.

8          **THE COURT:**  Go ahead.

9   **BY MS. FRAZIOR:**

10  Q    Okay, all right, so you had a conversation with Meisy

11  Zamora about this; what did she say to you?

12  A    She was upset that why was I interfering in another

13  department because it's delaying, because at that time there

14  was patients being infused.  I didn't think that I was

15  interrupting.  I would always go to that department all the

16  time.  So she prohibited me from me going to that department

17  from here thereon.

18  Q    Okay.  Did you get reprimanded for that?

19  A    The following day.

20  Q    All right, and that patient complaint, was that the only

21  patient complaint you ever received?

22  A    To my knowledge, yes.

23  Q    About you, was that patient complaining about you?

24  A    No, it complained about that medication.

25  Q    Okay.

De Jesus - Direct / By Ms. Frazior                    56

1  A    That was the complaint they wanted to talk to me about.

2  Q    Did you ever as a member of the billing department receive

3  other patient complaints?

4  A    Yes.

5  Q    What were patients complaining about, or what kind of

6  complaints did you receive in the billing department?

7  A    Some of the complaints were what they were getting charged

8  for.  They don't remember why he did it or they didn't agree

9  with that and, you know, I would try to talk to them, they --

10 you know, tell them, okay, let's look at your bill, and all of

11 this.  And they would still not have it.  And they said, you

12 know what, I'm just going to go and report him because this is

13 not right.  And I said, okay.

14 Q    Okay, to be fair, you've worked in many clinics, right?

15 A    Correct.

16 Q    And complaints happen all the time; is that right?

17 A    Yes.

18 Q    Okay.  Were the complaints that you were seeing at the --

19 at Dr. Zamora-Quezada's clinic out of the norm?

20 A    Yes.

21 Q    Okay.  All right, after you got reprimanded for that

22 complaint about the medication, what happened after that?

23 A    The following day, the physician assistant, Lillian, and -

24 - came to my office, handed out me a write-up, and then she

25 proceeded to call Rene, which he was the manager from the San

1   Antonio.  And I was reading what it was stating, stating that I

2   violated going to another department, that I stopped

3   production, so forth, and they were giving me a three-day

4   suspension without pay.

5   Q    Okay, did you take that suspension?

6   A    No.

7   Q    What did you --

8   A    I quit right there and I ripped it.

9   Q    All right, let me just back up on one other thing real

10  quickly I want to talk to you a little bit about.  Do you --

11          **MS. FRAZIOR:**  Well, let me approach the witness real

12  quick.

13  Q    I'm handing you what's marked as Government's E-4; do you

14  recognize this document?

15  A    It's a cheat note.

16  Q    Okay, you know what it is, okay.

17  A    Yes.

18  Q    Is this a document that you saw while you were working at

19  the clinics?

20  A    At the -- I saw that at the San Antonio clinic but it was

21  cut out smaller --

22  Q    Okay.

23  A    -- and pasted on --

24  Q    Okay, have you seen it --

25  A    -- they had other charges.

De Jesus - Direct / By Ms. Frazior                    58

1   Q    -- all together like this, this document?

2   A    It was cut off.  It was --

3   Q    What was --

4   A    -- more minimized.

5   Q    Okay.

6   A    Like it was minimized smaller for that is not stuck there,

7   it was stuck --

8   Q    Okay.

9   A    -- when they're entering charges.

10  Q    Okay, but the information that was on this document, did

11  you see that --

12  A    Yes.

13  Q    -- on the cut or the smaller, condensed (indisc.)

14  A    Yes.

15  Q    Okay.  And was this the document that was kept in the

16  regular course of business of the Center for Arthritis and

17  Osteoporosis?

18  A    I saw it in the San Antonio office.

19  Q    Okay, do you know if it was made by a person with personal

20  knowledge of the events or the information reflected in it?

21  A    I do not know who created it.

22  Q    Okay.  And, all right, then I'm just going to move on.

23  Did you use this document in your work as a biller?  Did --

24  A    At A and O?

25  Q    Yes.

De Jesus - Cross / By Mr. Lee                           59

1    A    No.  I never used any cheat notes when I did the data

2    entry.

3              MS. FRAZIOR:  I pass the witness.

4              THE COURT:  Mr. Lee?

5              MR. LEE:  Thank you, your Honor.  Hi, good afternoon,

6    Ms. De Jesus, correct?

7              THE WITNESS:  Correct.

8              MR. LEE:  Great.

9                        CROSS EXAMINATION

10   BY MR. LEE:

11   Q    And you and I have never met, correct?

12   A    No.

13   Q    And we (indisc.) correct?

14   A    No.

15   Q    Okay.  When you became a billing supervisor at the Center,

16   there was a large backlog of superbills, correct?

17   A    Correct.

18   Q    All right.  There were a lot of services that you

19   understood had been performed but had not yet been billed,

20   correct?

21   A    Correct.

22   Q    All right.  Because and so in those cases, you and your

23   staff worked to deal with those superbills and submit the bills

24   for those services to the patients' insurers, correct?

25   A    Can you repeat the question?

1   Q    All right, let me try again.  All right, so when you were

2   working to clear the backlog, a big part of that was taking

3   those superbills and then turning them into claims that you and

4   your staff submitted to Medicare or Blue Cross/Blue Shield, or

5   whoever, correct?

6   A    There were claims that had to be submitted.

7   Q    Right, and you --

8   A    We (indisc.) --

9   Q    -- did, correct?

10  A    Yes.  Only myself because there was nobody else.

11  Q    Okay, so you're the one who pressed the button --

12  A    Did data entry.

13  Q    You're the one who actually pressed the button to send

14  things on to Medicare or Tricare or whoever, correct?

15  A    Correct.

16  Q    Okay.  And in many cases, the date that you submitted the

17  claim was much later than the date the service had been

18  performed, correct?

19  A    Yes.

20  Q    Okay, and that's because there was a backlog, right?

21  A    Correct.

22  Q    Okay.  And those superbills, I want to talk about those a

23  little bit.  So you understood given the way the practice

24  worked that the superbills were one part of the patient's

25  record, correct?

1  A    Correct.

2  Q    All right, and when a patient came to the Center let's say

3  for a visit, the doctor or Lillian Williams or some other

4  doctor would conduct the visit with the patient, right?

5  A    Correct.

6  Q    All right, and there would often be a medical assistant

7  involved with the visit, correct?

8  A    Correct.

9  Q    All right.  And in most times, typically it would be the

10 medical assistant's job to take notes from the visit, correct?

11 A    All the time there's a medical assistant inside with the

12 doctor.

13 Q    Right.  And it's the medical assistant's job to complete

14 the note for the visit, correct?

15 A    Correct.

16 Q    All right, and that would be part of the -- that would be

17 the multipage form or EMR record that would describe what

18 happened and what was diagnosed and treated during the visit,

19 correct?

20 A    Correct.

21 Q    Okay, and that's the patient chart, correct?

22 A    Yes, everything goes in there.

23 Q    All right.  And then separately there's a superbill,

24 correct?

25 A    There's -- everything is in one single chart.

De Jesus - Cross / By Mr. Lee                                        62

1   Q    Okay.

2   A    It's a whole package.

3   Q    But it's two different -- but it's -- they're not the same

4   thing, right?  The superbill is not the same thing as the visit

5   note, correct?

6   A    No.

7   Q    Right.  The visit -- the MA is supposed to finish the

8   visit note and MA also finishes the superbill, correct?

9   A    Correct.

10  Q    All right.  And it was the medical assistant's job to do

11  both of those, correct?

12  A    Correct.

13  Q    Okay.  And in terms of the way things worked at the

14  Center, the superbills, once those were completed, those would

15  go on to the billing department, correct?

16  A    Once the superbill was completed and it went to all the

17  departments, if there was any orders for lab or anything, at

18  the end it would come to my department.

19  Q    Okay, so if the doctor did a visit with the patient and

20  that would be where the superbill would start and then it would

21  go on to the various departments for the labs or tests

22  procedures that were being ordered, and then it would arrive to

23  you, correct?

24  A    And then it would go to checkout.

25  Q    Okay, so but eventually the superbill --

De Jesus - Cross / By Mr. Lee                    63

1   A    Yes.

2   Q    -- goes to you, correct?

3   A    At the end, yes.

4   Q    Okay, so but the patient chart, the visit note does not,

5   right?

6   A    No.

7   Q    Okay, that's handled differently, correct?

8   A    Correct.

9   Q    So when superbills would come to you and when you would

10  process claims, if you had questions, you would go back to the

11  medical assistant, correct?

12  A    Correct.

13  Q    Okay, and that's because the medical assistant was the one

14  who's responsible for handling both parts of the chart,

15  correct?

16  A    Because that person is the one that's inside with the

17  doctor --

18  Q    Right.

19  A    -- and knows what they were speaking.

20  Q    So that person knows what was ordered and what was done,

21  correct?

22  A    Yes.  They're the ones inside --

23  Q    Okay.

24  A    -- in the exam room.

25  Q    So and sometimes in your experience the medical

De Jesus - Cross / By Mr. Lee                          64

1   assistants, when they're billing out the superbills, would make

2   mistakes, correct?

3   A    Correct.

4   Q    Okay.  Sometimes they -- now, you understand, you were

5   testifying earlier, that in filling out the chart, they need to

6   mark the procedures that need to be done, correct?

7   A    Correct.

8   Q    And they would also separately on the superbill mark the

9   diagnosis, correct?

10  A    Yes.

11  Q    Okay.  And sometimes as you were testifying on direct

12  examination, there sometimes might be a disconnect where a

13  procedure was circled but the diagnosis -- but there wasn't a

14  diagnosis that automatically seemed to match, correct?

15  A    Correct.

16  Q    Okay.  And that was why you would go back to the medical

17  assistant, correct?

18  A    Correct.

19  Q    Because you wanted them to -- because they were the ones

20  who (indisc.) in the room, they were the ones who could figure

21  out what had gone wrong, correct?

22  A    Or what lacked on that record.

23  Q    Right.

24  A    Yes.

25  Q    Okay.  But when you went back to the medical assistants to

De Jesus - Cross / By Mr. Lee                                    65

1    look back -- when you sent superbills back to the medical

2    assistants, you weren't telling them to put false information

3    on the diagnoses, correct?

4    A    No.

5    Q    No.  You expected them to go check the patient note that

6    they also were creating and then figure out what went wrong on

7    the superbill, correct?

8    A    I expected them to ask the doctor or of course they were

9    in there.

10   Q    Right.

11   A    That's protocol anywhere, any clinic you -- I've worked.

12   Q    Right.

13   A    You ask the doctor.

14   Q    Right.  So going back, sending the superbill back to the

15   medical assistant, that was to just -- you understood that when

16   you did that, you were just trying to figure out why there was

17   this discrepancy, correct?

18   A    Correct.

19   Q    All right.  You didn't think there was anything wrong

20   about going back to the medical assistant with these questions,

21   correct?

22   A    Correct.

23   Q    Okay.  Now, you testified that -- and then when the

24   superbills came to you, then what you would do would be you

25   would take the superbills and then you would convert them into

De Jesus - Cross / By Mr. Lee                                66

1    the claim that was submitted to the patient's insurer, correct?

2    A    Correct.

3    Q    Okay.  And you would do that -- now, when you -- and then

4    you would be the one to actually hit the button, correct?

5    A    Correct.

6    Q    Okay.  And you made sure before billing that the --

7    because the way the process goes, because it goes from the

8    doctor to the various departments to checkout to you, when

9    would the various like the infusion department or a lab

10   department release the superbill from them?

11   A    Like I said, that single superbill will go all the clinic.

12   Q    Right.

13   A    All the clinic.

14   Q    All right.

15   A    They didn't have their own separate superbill.

16   Q    Right.  Let's say a doctor ordered a lab to be done, okay,

17   so the medical assistant would -- the medical assistant who was

18   in the room at the time would circle the lab that is to be

19   done, correct?

20   A    Correct.

21   Q    Okay.  And then the superbill would go to the lab

22   department, correct?

23   A    Once -- when the medical assistant is in with the doctor,

24   the superbill is already -- everything is ordered.

25   Q    Right.

De Jesus - Cross / By Mr. Lee                    67

1    A    She is not just in charge of doing the labs.

2    Q    Right.

3    A    When the superbill is there, it's already has all the

4    labs.  If it -- if the patient's going to get x-rays, the x-

5    rays are marked, not the x-ray tech marks it.  If it's going to

6    get an infusion or a weekly infusion, the infusion, we'll mark

7    it once it's completed.  But once that superbill leaves that

8    room, it already is completed with everything that the

9    patient's going to have done.

10   Q    Everything the doctor ordered.

11   A    Yes.

12   Q    Right, okay.  And then the superbill goes on to let's say

13   the lab department, right?

14   A    It goes to the lab, correct.

15   Q    Okay.  When does the superbill leave the lab department?

16   A    If once it finishes with the lab, the technician will

17   look, what else is the patient going to have done.  If it says

18   is getting x-ray done, he will walk the patient to the x-ray,

19   which we had the little side chairs, and they will wait there

20   for x-rays.

21   Q    Okay.  And so --

22   A    And leave the chart.  We had trays and we would put

23   numbers to say they know this one was first before this lady

24   and so forth.

25   Q    Right.  Okay, so by the time a superbill got to you, every

De Jesus - Cross / By Mr. Lee                    68

1  lab that would have been ordered by the doctor originally had

2  been done, correct?

3  A    Correct.

4  Q    And every procedure that he had ordered that was marked on

5  the superbill had been done, correct?

6  A    Correct.

7  Q    Okay.  And when you got the superbill, you converted that

8  into the claim that was then billed, correct?

9  A    Correct.

10 Q    Okay.  And you, because it's your job, you made sure that

11 if a service had been marked on the superbill and if it had --

12 and knowing that it had been done, you then submitted it to the

13 patient's insurance company, right?

14 A    Yes.

15 Q    Okay.  So -- and so, again, if we were -- and you

16 understand that the insurance companies, they received those

17 claims, correct?

18 A    Correct.

19 Q    And you understand that then they received the claim and

20 then typically they tend to pay those claims within those short

21 amount of time, correct?

22 A    Correct.

23 Q    Okay.  And if a service was not on the claim you

24 submitted, the insurance company wouldn't pay for it, correct?

25 A    If we didn't bill it, of course not.

1    Q    If you didn't bill it, the insurance company wouldn't pay

2    for it, right?

3    A    Of course.

4    Q    Right.  And you made sure to when -- so when you submit a

5    claim -- I'm going to strike that actually.

6         Okay, all right, now, you were asked some questions by the

7    Government about the doctor, about various things like -- well

8    let me talk about new patient visits, okay, let me just go

9    specifically to that.  Okay, you testified on direct

10   examination that there was a backlog in terms of getting new

11   patients into the center, correct?

12   A    Correct.

13   Q    Okay.  So these were people -- now, when you (indisc.)

14   referrals like this, we're talking about people who some other

15   doctor in the area had referred to Dr. Zamora, correct?

16   A    Correct.

17   Q    Okay.  So some other doctor in the community thought that

18   it would be helpful for the patient to be seen by Dr. Zamora,

19   correct?

20   A    Correct.

21   Q    Okay, that's what a referral to a rheumatologist is,

22   correct?

23   A    Correct.

24   Q    All right, and these are people who had been waiting to

25   get in to see Dr. Zamora, correct?

1   A    Correct.

2   Q    Okay.

3           THE COURT:  Mr. Lee, the light doesn't bother you?

4           MR. LEE:  A little bit --

5           THE COURT:  Okay.

6           MR. LEE:  -- but I'm okay.  I'll move.

7           THE COURT:  No, it -- no, I'm just trying to make you

8   comfortable.  But if it doesn't bother you, it doesn't --

9           MR. LEE:  I've been through much worse, your Honor.

10          THE COURT:  -- we don't mind seeing your shadow of

11  your face there either -- your head really.  But, no, go ahead,

12  whatever's comfortable for you is fine with me.

13          MR. LEE:  All right, we'll see where I end up moving

14  to.

15  BY MR. LEE:

16  Q    All right, okay, so these new patients, when -- so when

17  there was talk about getting new patients scheduled, that was

18  to bring in patients who needed to see a rheumatologist,

19  correct?

20  A    Correct.

21  Q    All right, and when you were told to schedule those new

22  patient visits, you didn't think there was anything wrong with

23  that, did you?

24  A    No, because we had a list of those patients waiting, we

25  had a waiting list.

De Jesus - Cross / By Mr. Lee                                        71

1    Q    Right.  And, okay, now you were asked on -- when the

2    Government asked you about getting these new patient referrals

3    in, they used -- the word "quotas" came up.  Is -- but you -- I

4    think you at one point you refer to daily count.  All right,

5    what words do you recall Dr. Zamora using when talking to you

6    about getting these new patients scheduled?

7    A    A quota.

8    Q    Okay.  Did he use words like "productivity?"

9    A    Yes.

10   Q    All right, is that a word he used?

11   A    Yes.

12   Q    All right.  Now, you see the smile when I asked you that.

13   Why did you smile when I asked?

14   A    Because it was drilled on us.

15   Q    Okay.

16   A    So we -- it was drilled almost all the time --

17   Q    Okay.

18   A    -- of meeting that goal.

19   Q    Okay.  So you -- so productivity is something you heard it

20   sounds like a lot, correct?

21   A    Yes.

22   Q    Okay.  "Daily count," is that a term you heard?

23   A    Daily count is what we saw on a daily basis, a grand

24   total.

25   Q    Okay, so in terms of the new patients, you sometimes heard

1    the word "quota" but you also heard "productivity," correct?

2    A    Correct.

3    Q    Okay, all right, so not just "quota," correct?

4    A    No.

5         **MS. FRAZIOR:**  Objection, asked and answered.  I think

6    the same question's been asked --

7         **MR. LEE:**  Okay.

8         **MS. FRAZIOR:**  -- multiple times.

9    **BY MR. LEE:**

10   Q    All right, now in terms of infusions, that was something

11   that the Government also asked you about on direct examination,

12   correct?

13   A    Correct.

14   Q    All right.  And infusions, when it came up, that was about

15   getting patients in for infusions to receive the infusions that

16   the doctor had ordered, correct?

17   A    Correct.

18   Q    Okay.  All right, and again with infusions, did the word -

19   - was the word "quota" used in terms in connection with

20   infusions?

21   A    We had a quota for every department.

22   Q    All right, were other words also used?

23   A    Productivity, --

24   Q    Okay.

25   A    -- quota.

1   Q    Okay, and when the doctor -- when you were told by the

2   doctor or others to get patients in for infusions that had been

3   ordered, you didn't think there was anything necessarily wrong

4   with that, did you?

5   A    The problem I had with that is that these -- we could not

6   fulfill that for the point (indisc.) some of these -- we -- the

7   space was so small and these patients were here sometimes up to

8   four hours, --

9   Q    Okay.

10  A    -- that there's no way what he wanted can be accomplished.

11  Q    You sometimes had too many people showing up --

12  A    Yes.

13  Q    -- at one point, okay.  All right, and in terms of

14  injections, again, was the word "productivity" also used in

15  terms of injections?

16         MS. FRAZIOR:  Objection, we'll stipulate that

17  "productivity" was another word for "quotas" at the clinic.

18         THE COURT:  Well, you have a stipulation from the

19  Government --

20         MR. LEE:  We'll accept.

21         THE COURT:  -- that --

22         MS. FRAZIOR:  All right.

23         THE COURT:  -- "productivity" was used.

24  //

25  //

De Jesus - Cross / By Mr. Lee                    74

1    **BY MR. LEE:**

2    Q    Now, in terms of some of the tests -- oh, and again,

3    Ms. De Jesus, you've now -- you've worked in medical billing

4    for many years now, correct?

5    A    Correct.

6    Q    All right, and you're familiar with the various procedures

7    that were on the superbill as well as other medical procedures,

8    correct?

9    A    Correct.

10   Q    All right, and you're familiar with something called --

11   with how visits are billed, how a doctor's visits with an

12   established patient are billed, correct?

13   A    Can you elaborate how --

14   Q    All right, you understand that when there's a procedure

15   done or a visit done, there's something called a CPT code that

16   goes along with the various medical services, correct?

17   A    Correct.

18   Q    All right.  And you understand that among those things,

19   visits with established patients are associated with the

20   various CPT codes, correct?

21   A    Correct.

22   Q    All right, and you also understand that a visit with an

23   established patient can be billed using various codes,

24   including 99212, --

25   A    Nine, nine, two, one, two, --

De Jesus - Cross / By Mr. Lee                    75

1  Q    -- 99213, --

2  A    -- two, nine, nine, two, --

3  Q    -- 99214, --

4  A    -- one, five.

5  Q    -- 99215, correct?

6  A    Correct.

7  Q    All right, and you understand that those visits, they're

8  billed based on the complexity of the medical visit, correct?

9  A    Correct.

10 Q    Okay.  And you understand that they're -- that it's

11 dependent ultimately on the complexity of the visit and not on

12 the specific amount of time spent with the patient, correct?

13 A    As far as I know on new patients, yes.

14 Q    Okay, all right.  Now, in terms of going back through some

15 of the different departments, you mentioned various labs, you

16 mentioned various labs, various other departments.  Are you

17 familiar with someone named Miguel Oneto?

18 A    Yes.

19 Q    All right, and who is he?

20 A    He would interpreter, he would interpret some of our

21 readings.

22 Q    All right, and was he an employee of the Center or was

23 he -- did he work outside the Center?

24 A    Outside.

25 Q    Okay, and he read some of the images for the Center,

De Jesus - Cross / By Mr. Lee                                    76

1    correct?

2    A    Yes.

3    Q    All right.  Now, you were asked on direct examination

4    about your experience as a patient of the Center, correct?

5    A    Correct.

6    Q    Okay.  And you -- during the time that you were at the

7    Center, you were seen -- you recall being seen for medical

8    reasons at various points over the years that you worked at it,

9    correct?

10    A    Correct.

11    Q    All right.  Now, sitting here today, do you remember when

12    you were first seen in a medical capacity by anyone at the

13    Center?

14    A    What -- can you repeat it?

15    Q    When did you first -- you said that at some -- when do

16    you -- do you recall when you first were evaluated for any kind

17    of pain or any kind of symptoms?

18    A    Besides that or in general?  Because like I said, we

19    didn't have health insurance.  Of course he would see me for a

20    cold, I -- various things if something happened.

21    Q    Okay, so sometimes you'd go to the doctor because you had

22    a cold, correct?

23    A    Uh-huh.

24    Q    Okay, and sometimes you would go to him for other

25    medical --

De Jesus - Cross / By Mr. Lee                    77

1    A    Other, yes.

2    Q    -- issues that came up.  Relatively (indisc.) relatively

3    minor ones.

4    A    Correct.

5    Q    Okay.  And then sometimes at some point you went to him

6    because you were feeling more pain, correct?

7    A    Yes.  And I was concerned --

8    Q    Okay.

9    A    -- because of my history, my family history.

10   Q    All right.  Now sitting here today, do you -- can you

11   distinguish those visits or do you just have a general

12   recollection of being seen for medical issues over the time

13   that you've worked at the Center?

14   A    I don't quite understand your question.

15   Q    Do you remember the first visit when you went to the

16   doctor or to Lillian Williams to be evaluated because of some

17   of the pain you were feeling?

18   A    Do I -- yes.

19   Q    Okay.

20   A    Because I talked to her about it and that's why she said,

21   well, talk to -- let him see you.

22   Q    Okay.  And when you say "her," you're referring to Lillian

23   Williams, correct?

24   A    William, yes.

25   Q    Okay.  Now, I know it sounds like you haven't -- now,

De Jesus - Cross / By Mr. Lee                                78

1   okay, and it sounds like prior to you were not -- you have not

2   seen the medical records that were created at the time,

3   correct?

4   A     Correct.

5   Q     Okay.  And part of that is because those medical records,

6   when they were created, they went off to somewhere else and

7   there was no superbill, correct?

8   A     Correct, because the -- we were employees so we would --

9   Q     Okay.

10  A     -- just go in the room.

11  Q     Right, okay.  All right, --

12        MS. FRAZIOR:  Mr. Lee, could I just know what exhibit

13  we're going to go through?

14        MR. LEE:  Right.  Your Honor, at this time, the

15  defense would move to admit defense Exhibit 30, which is the

16  patient file relating to Ms. De Jesus.

17        MS. FRAZIOR:  No objection from the Government, but I

18  do object to going through any of those exhibits with this

19  witness as she hasn't seen them before, she's not familiar with

20  them, and if they're in evidence, that's more proper for

21  closing argument.

22        THE COURT:  It's her file; is that right?

23        MR. SPEAKER:  Her patient record.

24        MR. LEE:  It's her patient record, your Honor.

25  //

1          **THE COURT:**  Yeah, it's admitted.

2       **(Defendant's Exhibit Number 30 was received in evidence)**

3          **MS. FRAZIOR:**  So -- what's that?  And she just

4    testified that she's never seen these records before and hasn't

5    had a chance to review them.  She's also not an expert witness

6    so I would say that's more appropriate for closing argument.

7          **THE COURT:**  Well I think she can just look at them

8    and see if there's anything in there that she thinks didn't

9    happen before they're admitted but --

10         **MS. FRAZIOR:**  Okay, let's give her a moment to do

11   that.

12         **THE COURT:**  Yes.

13         **MR. LEE:**  Okay.

14         **THE COURT:**  And you're saying they're her patient

15   files at Dr. Zamora's --

16         **MR. LEE:**  Yes.

17         **THE COURT:**  -- office?

18         **MR. LEE:**  Yes.

19         **THE COURT:**  Okay, well show them to her.

20         **MR. LEE:**  Right.

21         **THE COURT:**  Ms. De Jesus, you never looked at your

22   patient file?

23         **THE WITNESS:**  I've never.  When I went in to see him,

24   like I said, we were never given charts.  We just -- they say

25   go right now in between patients.  We would go in and out.

80

1          **THE COURT:**  So you've never --

2          **THE WITNESS:**  So I never seen what was circled,

3   what -- it was just --

4          **THE COURT:**  You never looked at your own file.

5          **THE WITNESS:**  No.  I mean, -- oh, that's a big file.

6   This is all mine?

7          **MR. LEE:**  This is the defense Exhibit 30.  If you

8   could just take a moment and flip through that.

9      **(Pause)**

10         **THE COURT:**  You all can have a quick break.  We're

11  not going to move, okay?  That way I don't get a note.  Please

12  rise for the jury.  And you all come right back when you finish

13  and we're -- well, we'll let you know when she finishes going

14  through this record.

15     **(Jurors exit at 3:10 p.m.)**

16         **MR. PENA:**  Your Honor, can my client just go to the

17  restroom very quickly?

18         **THE COURT:**  Yes.

19         **MR. PENA:**  Okay, go ahead.

20         **THE COURT:**  Anybody that needs to go to the restroom,

21  it's fine.  She's obviously has a lot of pages to look at.

22     **(Recess taken from 3:11 p.m. to 3:21 p.m.)**

23         **MARSHAL:**  All rise for the jury.

24      //

25      //

De Jesus - Cross / By Mr. Lee                                    81

1          (Jurors enter at 3:21 p.m.)

2               THE COURT:  Please be seated.  Go ahead and proceed,

3     sir.

4               MR. LEE:  Thank you, your Honor.

5                    CROSS EXAMINATION (CONTINUED)

6     BY MR. LEE:

7     Q    Ms. De Jesus, did you have a chance to look through what's

8     been admitted into evidence as Exhibit 30?

9     A    Yes.

10    Q    All right, and looking at this, do you recognize the form

11    of what you're seeing?

12    A    A superbill, yes.

13    Q    Right.  You see some superbills in this file, correct?

14    A    Correct.

15    Q    All right.  Now, during the course of your time working at

16    the Center, did some of these superbills come to you in the

17    billing department?

18    A    Correct.

19    Q    All right, because even though you didn't see the patient

20    charts, you still saw the superbills that came to you, correct?

21    A    The superbills would go to the billing department.

22    Q    Right, okay, and so --

23    A    When I was a billing supervisor, I was not entering

24    charges.

25    Q    Right, okay.  And, all right, so and I want to put up on

De Jesus - Cross / By Mr. Lee                               82

1   the screen -- do you remember -- I'm going to put on the screen

2   page ten of Government -- of defense Exhibit 30.  All right,

3   now looking at this, you first saw this record is for a visit

4   that you had on October 25th, 2011, correct?

5   A    Correct.

6   Q    Okay, and you have no reason to doubt that this was the

7   date of a visit you had, correct?

8   A    I don't know the exact date I was --

9   Q    Right, you would rely on the record to track that,

10  correct?

11  A    Correct.

12  Q    Okay.  And looking at this, this record states that

13  patient type, new patient, you have no reason to doubt that

14  this was the first time that you were seen as a patient here at

15  the Center, correct?

16  A    Correct.

17       **(Pause)**

18  Q    I'm highlighting the portion says:  "Summary of previous

19  care."  And it refers to you as a 34-year-old female coming

20  today complaining of multiple joint pain, correct?

21  A    Correct.

22  Q    And that's consistent with what you recall (indisc.) --

23  A    Yes.

24  Q    -- your symptoms back then?

25  A    Correct.

De Jesus - Cross / By Mr. Lee                                   83

1   Q    And you recall reporting -- and this refers to you

2   reporting a family history of rheumatoid arthritis, correct?

3   A    Correct.

4   Q    And that's consistent with your recollection, too,

5   correct?

6   A    But not in certain documented here, no.

7   Q    All right.  Is -- you did have a family history of

8   rheumatoid arthritis, correct?

9   A    Yes, but not my mother.

10  Q    Okay.  Your aunt.

11  A    My aunt, yes.

12  Q    Your maternal grandmother.

13  A    Yes.

14  Q    Okay.  So it's at least correct about those two relatives.

15  There may have been some --

16  A    Those two relatives, yeah.  And Missy my sister, --

17  Q    Okay.

18  A    -- which was the main one.

19  Q    All right, so there may have been a mistake done by

20  whomever created this chart, correct?

21  A    Correct.

22  Q    All right.  And I'm going to put on the right-hand side of

23  the screen page 14 of the exhibit.  And it states here that

24  this document has been reviewed and electronically signed by

25  Lillian Williams, correct?

De Jesus - Cross / By Mr. Lee                84

1  A    Correct.

2  Q    All right.  Now, generally speaking, the doctor saw some

3  patients and Lillian Williams saw other patients, correct?

4  A    Correct.

5  Q    All right.  So this visit that you had was with Lillian

6  Williams, correct?

7  A    No, it was not.

8  Q    All right, you had many visits with Dr. Zamora over

9  (indisc.) --

10 A    I had --

11 Q    -- correct?

12 A    -- that specific visit to treat it.  I talked to Lillian

13 about my symptoms and she said, you need to see the doctor,

14 we'll put you in between.  As a new patient for these, I did

15 not see Lillian for it.  I was seen with her for follow-ups,

16 and she's the one who prescribed.  But the one that examined me

17 the first time was Dr. Zamora.

18 Q    Okay, all right.  All right, now -- and is it your

19 recollection that you were diagnosed with rheumatoid arthritis

20 at some point, correct?

21 A    Correct.

22 Q    All right.  And is it your recollection that you were

23 diagnosed with rheumatoid arthritis the first time that you

24 were seen in this way?

25 A    When he examined my hands.  And when he examined, that's

1  what he said the symptoms of the way my hands, they were

2  swelling, he's a doctor, he's a rheumatologist, you know, he --

3  that's what I'm saying, he's the one who examined.  Dr. Zamora

4  examined me and that's when he said, yes, because he checked my

5  hands, he checked the stiffness and all of that.  That's what

6  he told -- he's the one who told me.

7  Q    Okay.  You were seen multiple times over the years by

8  Lillian Williams on some occasions and Dr. Zamora on some

9  occasions, correct?

10 A    Correct.

11 Q    All right, and you recall being diagnosed with rheumatoid

12 arthritis at some point, correct?

13 A    Correct.

14 Q    All right.  Now, you also -- do you also recall being

15 diagnosed with other conditions?

16 A    Correct.

17 Q    All right, and do you recall being diagnosed with

18 rheumatoid arthritis at some point but then the -- but then

19 Lillian Williams or someone else correcting that and saying

20 that you did not have rheumatoid arthritis?

21 A    She did never say to me that I did not have rheumatoid

22 arthritis.

23 Q    All right, if the file showed that at some point you were

24 diagnosed with rheumatoid arthritis during a visit that was

25 written by Lillian Williams and that -- and then showed in

De Jesus - Cross / By Mr. Lee                              86

1   later visits by Lillian Williams that you did not have

2   rheumatoid arthritis, would you disagree with the file?

3   A    Of course.

4   Q    Okay.  Now, on this visit, do you recall you were -- there

5   were multiple labs ordered for you, correct?

6   A    Correct.

7   Q    Okay.  You recall getting a lot of labs, correct?

8   A    I had a lot of vials taken out, yes.

9   Q    Right.

10  A    That's why I said there was -- it had to have been a lot

11  of tests.

12  Q    Right.  And you weren't billed, you didn't have to pay for

13  any of those tests, correct?

14  A    Correct.

15  Q    And Dr. Zamora didn't bill anyone for those tests,

16  correct?

17  A    Not the employees.

18  Q    Right.  It was all done as a courtesy, correct?

19  A    Correct.

20  Q    Now I'm now going to put on the screen what's been marked

21  as page one of defense Exhibit 30, and this is the superbill

22  that corresponds to the visit we were just looking at, correct?

23  A    Correct.

24  Q    All right.  And looking at the top of the screen, there's

25  some handwriting; can you read that for the record?

De Jesus - Cross / By Mr. Lee                    87

1   A    "Employee."

2   Q    And in the box marked insurance information, can you read

3   that for the record?

4   A    "Courtesy."

5        **THE COURT:**  And "courtesy" means that there would be

6   no charge, I take it.

7        **THE WITNESS:**  Correct.

8        **THE COURT:**  Not that there's an insurance company

9   called Courtesy.

10       **THE WITNESS:**  Correct.

11  **BY MR. LEE:**

12  Q    All right, I'm now going to turn to page 27 of this

13  exhibit, and page 28.  Okay, Ms. De Jesus, do you recognize

14  this form?

15  A    Yes.

16  Q    All right.  Is this a patient history and physical that

17  was used, the template that was used in the Center?

18  A    Yes.

19  Q    All right.  And looking at this, do you recognize some of

20  the handwriting here?

21  A    I can barely even see it.  It's really faded.

22  Q    Okay, all right, I'll move on.  All right, I'm going to

23  move going to December 6, 2011.  You also had a visit on

24  December 6, 2011, correct?

25  A    I don't remember way back, sir, to give you an exact date.

De Jesus - Cross / By Mr. Lee                     88

1    Q    Okay.  You would rely on the records for that, correct?

2    A    Correct.

3    Q    All right, do you recall -- and I'm going to put up on the

4    screen the superbill -- actually, I'm going to move on to a

5    different page.  Okay, this is another superbill corresponding

6    to you, correct, for the date, December 20th, 2011, correct?

7         **MS. FRAZIOR:**  What page is this, Mr. Lee?

8         **MR. LEE:**  This is page 46.

9    **BY MR. LEE:**

10   Q    This is another superbill, correct?

11   A    It's a superbill.

12   Q    All right.  And you weren't charged for any of the

13   services that are covered here on the superbill, correct?

14   A    Correct.

15   Q    Over the course of several years at the Center, you had

16   multiple labs done and weren't charged for any of them,

17   correct?

18   A    Correct.

19   Q    And you didn't have health insurance at the time so the

20   doctor couldn't have billed a health insurer for any of those

21   tests or procedures, correct?

22   A    Correct.

23   Q    All right, so he had no financial interest in ordering

24   those tests for you, correct?

25   A    Correct.

De Jesus - Cross / By Mr. Lee                              89

1    Q    All right, now, you testified on direct examination that

2    at some point after leaving the Center, you end up going to see

3    Dr. Mata, correct?

4    A    Correct.

5    Q    All right.  And Dr. Mata's not a rheumatologist, correct?

6    A    He's internal medicine.

7    Q    Okay, again, so he's not a rheumatologist.

8    A    Correct.

9    Q    All right.  And when you went to him, he had various labs

10   taken of you, correct?

11   A    Correct.

12   Q    All right.  Did Dr. Mata tell you that one of those labs

13   showed a positive rheumatoid factor for you?

14   A    No.

15   Q    Did Dr. Mata tell you that one of those labs showed a

16   sedimentation rate that was outside the normal range?

17   A    No.

18        **(Pause)**

19   Q    Now, you testified on direct examination about working on

20   some recoupments, correct?

21   A    Correct.

22   Q    All right, and those are instances when an insurer will

23   ask -- will make an initial request to have money returned,

24   correct?

25   A    Correct.

De Jesus - Cross / By Mr. Lee                                    90

1   Q    All right, and that is something that you dealt with while

2   working for Dr. Zamora and while working with other doctors,

3   correct?

4   A    Correct.

5   Q    All right.  And now these other -- now, Dr. Zamora's

6   clinic had a very large patient population, correct?

7   A    Correct.

8   Q    He had a very large volume of services, correct?

9   A    Correct.

10  Q    All right.  And you said that there was a higher number of

11  recoupments, but sitting here today, can you tell what

12  percentage of recoupments there were based on services compared

13  to what you saw for other doctors and their volumes?

14  A    I had never seen a clinic get so many letters.  Our mail

15  was outrageous compared to various clinics that I worked to.  I

16  had never seen such a large volume --

17  Q    Okay.

18  A    -- of requests.

19  Q    And some of those recoupments ended up with the doctor

20  paying money back, correct?

21  A    They would recoup it from another patient or --

22  Q    Right.

23  A    -- from another check that they were supposed to get.

24  Q    Okay.  And sometimes the insurer would be satisfied by the

25  paperwork you provided, correct?

De Jesus - Cross / By Mr. Lee                                    91

1   A    Yes.

2   Q    Okay, so sometimes it worked out one way, sometimes it

3   worked out the other way, correct?

4   A    Correct.

5   Q    Okay.  Now, you worked -- you said -- testified on direct

6   examination that you worked with doctors I believe at seven

7   different clinics, correct?

8   A    Correct.

9   Q    All right, and how many doctors in total have you handled

10  the billing for?

11       **(Pause)**

12  A    Four clinics.

13  Q    How many doctors have you worked with?

14  A    About seven doctors.

15  Q    Okay, so you're talking about seven doctors.  And all of

16  the services that you've heard the doctor -- that you testified

17  on direct examination of how the doctor would complain

18  sometimes about how there'd be recoupment or about something

19  like that, some issue with the -- with getting paid, correct?

20  A    Correct.

21  Q    All right, and you understood that all those services had

22  actually been performed, correct?

23  A    Correct.

24  Q    All right.  Dr. Zamora, he's not the only doctor you've

25  experienced to complain about not getting paid for services

De Jesus - Cross / By Mr. Sully                    92

1   he's done, correct?

2   A    Correct.

3        **(Pause)**

4        **MR. LEE:**  All right, your Honor, the Government --

5   the defense moves to admit defense Exhibit 31, the file from

6   Dr. Mata.

7        **MS. FRAZIOR:**  No objection.

8        **THE COURT:**  It's admitted.

9        **(Defendant's Exhibit Number 31 was received in evidence)**

10       **MR. LEE:**  And no further questions at the time.  I

11  pass the witness.

12       **THE COURT:**  Mr. Sully?

13       **MR. SULLY:**  Thank you, your Honor.  Good afternoon,

14  Ms. De Jesus.

15       **THE WITNESS:**  Good afternoon.

16       **MR. SULLY:**  My name is Chris Sully, and I represent

17  Meisy Zamora.

18                    **CROSS EXAMINATION**

19  **BY MR. SULLY:**

20  Q    You and I have never met before, right?

21  A    Correct.

22  Q    But you have met with either agents for the Government or

23  prosecutors for the Government before, right?

24  A    Correct.

25  Q    About how many times would you say that you've met with

De Jesus - Cross / By Mr. Sully                     93

1   them before today?

2   A    Today only or in general?

3              THE COURT:  No, before today --

4   Q    Before today.

5              THE COURT:  -- he meant.

6   A    About three times.

7   Q    About three times.  And do you recall more or less when

8   those three times were?

9   A    Yesterday, about two months ago, and then about a year and

10  a half ago (indisc.)

11  Q    Okay, so yesterday, two months ago --

12  A    I don't have the exact times that --

13  Q    What's that?

14  A    I don't remember the exact dates or --

15  Q    Okay.  The -- so two months ago and then before that did

16  you meet with them around June of 2018, after the doctor was

17  arrested?

18  A    I met with them way after that, I believe.  I'm not very

19  sure --

20  Q    Okay.

21  A    -- exactly the date or -- no.

22  Q    But you also --

23  A    I can't say yes.

24  Q    -- met with them in March of 2017 at a Starbucks, right?

25  Do you remember that?

1  A    That was my first encounter.

2  Q    Okay, so that was your first encounter.  And then did you

3  meet with them again sometime in 2018, sometime in the summer?

4  A    To be honest, I can't tell you yes or -- you know, because

5  I don't recall.

6  Q    Okay.

7  A    I -- that I know that I met, yes.  Do I know the dates?

8  No.

9  Q    All right.  But at least the two times recently and then

10  at least another couple of times --

11  A    Correct.

12  Q    -- maybe, you know, more than a year ago.  Now, during the

13  five or six years that you were working at Dr. Zamora's clinic,

14  did you ever have Medicare?

15  A    No.

16  Q    Medicaid?

17  A    No.

18  Q    Tricare?

19  A    No.

20  Q    Or Blue Cross/Blue Shield?

21  A    No.

22  Q    In fact, you didn't have any type of insurance or

23  healthcare benefit program, right?

24  A    No.

25  Q    So all of the times that you saw Dr. Zamora, there was

1    never a bill sent to any of these programs or any other type of

2    insurance program, right?

3    A    Correct.

4    Q    During any of the times that you met with the Government,

5    did they ever tell you that you were one of the patients listed

6    in the indictment as part of the conspiracy to defraud the

7    programs that I just listed for you?

8         **MS. FRAZIOR:**  I do object to hearsay, asking what the

9    Government told her or -- it's not even defined as to who he's

10   talking about?

11        **THE COURT:**  He can go ahead and ask her that.

12   **BY MR. SULLY:**

13   Q    Were you aware of that, Ms. De Jesus?

14   A    Can you repeat the question?  I'm sorry.

15   Q    During all of the times that you met with the Government

16   to prepare to testify today, did they ever tell you that you

17   were listed in the indictment as one of the patients that Meisy

18   Zamora, Dr. Zamora, and Estella Natera allegedly conspired to

19   use to defraud the programs, Medicare, Medicaid, Tricare, or

20   Blue Cross/Blue Shield, that I just asked you about?

21   A    When I spoke to them, I mean, it was basically questioned

22   if I was seen.  I mean, we didn't go into that detail as you

23   per se.

24   Q    Okay.

25   A    So I can't -- no.

De Jesus - Cross / By Mr. Sully                    96

1   Q    So they didn't inform you of that.

2   A    When I met with them from the beginning, it was mostly

    what had happened, what I know, and how long I worked, and so

4   forth.

5   Q    All right.

6            THE COURT:  Was it ever mentioned to you that you're

7   listed in the indictment as that particular patient?

8            THE WITNESS:  After I -- they questioned me if I was

9   ever seen by Dr. Zamora.

10           THE COURT:  So there was a discussion at some point

11  to tell you --

12           THE WITNESS:  At one point.

13  BY MR. SULLY:

14  Q    But they never actually showed you the indictment or told

15  you that you were actually listed in it.

16  A    No.

17  Q    Would you like to see the page of the indictment that

18  lists you?

19  A    (Indisc.)

20           MR. SULLY:  May I approach the witness, your Honor?

21           THE COURT:  Sure.

22  BY MR. SULLY:

23  Q    I'm showing you page six of the indictment in this case

24  for Count One.  In paragraph I think it's "C" that you're

25  looking at, do you see the initials "ADJ" there?

De Jesus - Cross / By Mr. Sully                    97

1    A    Yes.

2    Q    And those are your initials, right?

3    A    Well, my initials are not ADJ.

4    Q    Oh.

5    A    My initials is AD.

6    Q    Okay.

7    A    De Jesus is one word.

8    Q    One word, all right.

9    A    Yes.

10   Q    So if they mistakenly believed that it was two words, then

11   it would be ADJ, right?

12   A    Correct.

13   Q    But you're saying that it should actually be AD.

14   A    AD, that's it.

15   Q    Okay.  And so when they -- when you met with the

16   Government, did they talk to you about the case?

17   A    Yes.

18   Q    And they talked about what your testimony would -- about

19   your testimony, right?

20   A    They talked to me about -- question me what had had

21   happened just that my story, how --

22   Q    Okay.

23   A    -- it happened, just answering questions.  That's it.

24   Q    And did they also talk to you about what other people were

25   saying about the case, other testimony besides yours?

De Jesus - Cross / By Mr. Sully                98

1   A    No.  It was just about what happened when I was working

2   there.

3   Q    Okay.  What else did they talk to you about or go over

4   specifically about your testimony?

5   A    As in from the beginning, ever since I started working

6   there, how I got the position, who I overlooked, basically

7   everything you're -- everybody's asking me.

8   Q    All right.  And what I just asked you clarifying that you

9   were never a member of any of those programs that I just

10  listed, that there were never any bills submitted by

11  Dr. Zamora's clinic for your treatment to any of those programs

12  or any insurer, did they ask you about that, too?

13  A    They asked me if I had insurance.  I said, no.

14  Q    Okay.

15  A    I did not have insurance.

16  Q    So you made it clear to them that you didn't have any kind

17  of insurance with none of those programs or any other program

18  when you were a patient of Dr. Zamora's.

19  A    They only question if I had insurance.  They didn't go

20  specific as carrier as you are.

21  Q    Okay.

22  A    So they just asked did you have health insurance.  No, I

23  didn't.

24  Q    Okay.

25  A    That's (indisc.)

De Jesus - Cross / By Mr. Sully                    99

1   Q    And obviously the programs I just asked you about are

2   different types of insurance but --

3   A    Correct.

4   Q    -- you didn't have any type of insurance, right?

5   A    No.

6   Q    Okay.  And you made that clear to them at least during one

7   of the meetings that you met with them before testifying,

8   right?

9   A    Correct.

10  Q    Did you mention that to them before the indictment was

11  filed in this case, before the charges were filed in this case?

12  A    I do not recall.  I can't say --

13  Q    Okay, you don't remember when that first came up.

14  A    I'm not going to say I do because I do not.

15  Q    Oh, okay.  But you're sure that you told them that.

16  A    They questioned me since I was seen, of course, and I

17  said, you know, I was not charged because of course I was

18  courtesy as an employee.

19  Q    Okay.  During any of the time that you were working at the

20  clinic or you were a patient at the clinic, did you ever see

21  either Meisy or Estella Natera or Dr. Zamora try to use you,

22  your treatment as a patient, in order to try to defraud or get

23  any money out of any of these programs that we have been asking

24  about?

25  A    No.  I do not have health insurance.

De Jesus - Cross / By Mr. Sully                    100

1  Q    Okay.

2            THE COURT:  And they didn't charge you, right?

3            THE WITNESS:  They didn't charge me.  There was

4  nothing to bill out.

5  BY MR. SULLY:

6  Q    All right.  So you were seen for free by Dr. Zamora,

7  right?

8  A    That was our courtesy to all the employees.

9  Q    Now, when you were working at Dr. Zamora's clinic, there

10 were a lot of patients, right?

11 A    Correct.

12 Q    And at one point the Government also asked you about that,

13 right, about how many patients were at the clinic?

14 A    Correct.

15 Q    And at one point you told them that you estimated there

16 were approximately 5,000 patients; is that correct?

17 A    In general as his listing --

18 Q    Right, the total --

19 A    Yeah, a total patients --

20 Q    -- patients on file, right.

21 A    -- in general (indisc.) --

22 Q    Obviously not in any given day.

23 A    Correct.

24 Q    And you also testified that there was a long waiting list

25 based on referrals for patients to get their first patient

1  visit, their new patient visit, right?

2  A    Yes, correct.

3  Q    Do you recall approximately how long that waiting list

4  would be?

5  A    We had -- as in the wait time?

6  Q    Sure.

7  A    Or as in --

8  Q    How long would the patient --

9  A    -- how long the list was or -- be more specific.

10 Q    Well, do you know how long -- up to how long patients

11 would have to wait on that list to get their first visit?

12 A    Dr. Zamora was only in the clinic three times out of the

13 week, so of course as we were getting they were just in a list.

14 We would go by as how they were on the list per se first come

15 as we were getting them.  It was not just referrals, it was

16 self-referrals or second opinions.

17 Q    All right.  And do you remember how long that list was?

18 A    It was saved to the desktop so I can't tell you if there

19 was the amount of them on that list.  No, I can't tell you.

20 Q    All right.  But you would agree it was a long list, the

21 waiting list.

22 A    Correct.

23 Q    And as far as the injections or the infusions, you said

24 that sometimes patients would have to wait for hours to get

25 those, right?

De Jesus - Cross / By Mr. Sully                                102

1    A    Correct.

2    Q    So there was also -- you may not remember the exact number

3    but there were lots of patients that were waiting to get those

4    procedures, too.

5    A    On a Zamora day, the office was full, you can say jam-

6    packed.   There was people that would even stand because there

7    was no seating.

8    Q    Okay.   And sometimes you said you would have no-shows,

9    right, people who wouldn't show up for their appointments.

10   A    Correct.

11   Q    And that would be a problem because you've set aside that

12   time, you know, with the doctor and the schedule and the person

13   doesn't show up and another patient could have been seen during

14   that time, right?

15   A    In general or just as a new patient, as an --

16   Q    Well, when --

17   A    What appointment?

18   Q    -- you have an appointment and somebody doesn't show up,

19   that's time that the doctor could have been seeing another

20   patient, right?

21   A    Well, if they're coming to see an injection, they don't

22   see the doctor.

23   Q    Right, or that they could have been receiving their

24   injections, right?

25   A    Correct.

De Jesus - Cross / By Mr. Sully                    103

1    Q    And so it was important for you not just when you were

2    working at Dr. Zamora's clinic but also at some of the other

3    places that you worked for staff to call patients and remind

4    them of their appointment so they can come in, right?

5    A    We will call a day before.

6    Q    Okay, and that's a common practice not just at

7    Dr. Zamora's clinic but also other places that you've been.

8    A    Correct.

9    Q    And you would agree there's nothing wrong with calling

10   patients and reminding them to make sure that they make their

11   appointments, right?

12   A    Correct.

13   Q    You testified briefly about how sometimes you would go to

14   the storage and look for copies of records; remember that?

15   A    I didn't go randomly to the storage.  I went twice to the

16   storage because of that specific audit that they requested me

17   to assist.  I didn't go on an everyday hunt there, no, I

18   didn't.

19   Q    Right.  You didn't go for pleasure just to check --

20   A    No, or because every single audit he was audited, I was

21   there, no.

22   Q    Got it.

23   A    Let's clarify that, no.

24   Q    And when you went, it was for an audit, it wasn't in

25   connection to any kind of grand jury investigation or subpoena,

De Jesus - Cross / By Mr. Sully                    104

1    right?

2    A    It was a Medicare audit.

3    Q    Okay.  And when you went to the storage to look for

4    records, you weren't trying to falsify or fabricate records,

5    you were simply trying to look for existing records that might

6    be there.

7    A    Yes, because they stated that's what they would probably

8    be there because these were very old charts and that's where

9    they would -- could be if they were not destroyed.

10   Q    I think you mentioned at some point was it NextGen, the

11   electronic records program?

12   A    Yes.

13   Q    Okay, so even though at some point the clinic started

14   using NextGen, there were some very old records that might not

15   have been entered into that system; were those the ones you

16   were looking for?

17   A    The paper charts.

18   Q    Okay.  As far as the superbill, the billing, how it

19   worked, you said that at some point you tried to explain that

20   to Meisy, right?

21   A    As the billing function as in how it works, --

22   Q    Right.

23   A    -- as in billing guidelines --

24   Q    Oh, okay.

25   A    -- per se, you know, how a recoupment happens, how long do

1    we have to submit an appeal, depending on the carrier.  Every

2    carrier has a timeframe.

3    Q    Okay.  So you tried to explain some of that with her but

4    she didn't seem to understand, you didn't get very far with

5    that, right?

6    A    No.

7    Q    Okay.  When you were there at the clinic, Meisy would buy

8    a turkey and TV's and gifts for the employees during the

9    holidays; do you remember that?

10   A    I was not during that time.  I heard about that but I did

11   not fall on those times, no.

12   Q    Oh, okay.  You weren't around for those times.

13   A    I wasn't around --

14   Q    Okay.

15   A    -- those times, no.

16   Q    But you were aware of that.

17   A    I heard.

18   Q    Okay.  And were you aware of any times that Dr. Zamora

19   disagreed with Meisy about maybe spending too much on those

20   gifts or things like that?

21   A    The only time I know that they disagreed is when I was

22   employed there on our employees' bonus for Christmas.  But --

23   Q    Okay.

24   A    -- on anything previous, I'm not aware.

25   Q    Okay.  But it had to do with how much was being spent on

De Jesus - Cross / By Mr. Sully                    106

1   the bonuses for Christmas --

2   A    Correct.

3   Q    -- is what you're saying.  So let's talk about toward the

4   end of your testimony, I think you started talking about your -

5   - basically when you got into some disciplinary issues with the

6   clinic; remember when you were talking about that?

7   A    Correct.

8   Q    And you said that it started, you received a warning

9   regarding something about a patient in another department in a

10  prescription.  Can you explain what the --

11  A    There was a patient complaint.

12  Q    -- first warning was about?

13  A    There was --

14  Q    Okay.

15  A    -- a patient complain, a patient was supposed to get a

16  certain medication which was the Orencia.  He called the care

17  because he was getting billed for it.  He called his insurance

18  company.  His insurance company, yes, we mailed it out to the

19  actual clinic because that's where you were going to get

20  services.  So the patient called, complained.  Of course all

21  the complaints would come to me if an administrator wasn't

22  there.  So I ended up with that call.

23  Q    Okay.

24  A    So my duty was to go and ask, do we have this medication?

25  Because this person wanted it back where he can return it back

De Jesus - Cross / By Mr. Sully                    107

1   for that way that he's not getting a very large bill.  I

2   believe he stated it was about 5,000.

3   Q    All right.

4   A    And that's why he was very upset.

5   Q    Okay.  So that was in regards to a patient that was

6   complaining.

7   A    Correct.

8   Q    And I think you mentioned there was at least one other

9   patient complaint besides that one, right?

10  A    I only spoke about him.

11  Q    Oh, okay.

12  A    That was that, what ended up with that disciplinary action

13  because of that.

14  Q    Okay, so that was the only patient complaint that you

15  received.

16  A    We had other complaints but -- billing complaints, but

17  you're talking about what happened because of that

18  disciplinary.  That's why I got a disciplinary, because of that

19  specific incident.

20  Q    Okay.  Now, besides that incident, that patient complaint,

21  did you ever get into any disciplinary trouble?  You also got

22  into some disciplinary trouble because of your attitude or how

23  you were treating other coworkers; you remember that?

24  A    I had talked to -- it had never -- I have always been a

25  supervisor very stern, you know.  I expect if there is a form

De Jesus - Cross / By Mr. Sully                    108

1   of working but never belittling my staff at all, okay?

2   Dr. Meisy at one time did come, and that's when I notice

3   because I've always had meetings with my staff.  And then all

4   of a sudden the staff is complaining and they -- I confirmed it

5   with my staff and they said, they never even mentioned you, we

6   never even talked about you during these meetings.

7   Q    Okay, --

8   A    And that's why I was like, okay, so why is this coming up?

9   I've worked here all these years and then all of a sudden --

10  Q    So you somehow became aware that there were staff

11  complaints against you, not -- we're not talking about

12  patients, now we're talking about --

13  A    Apparently.

14  Q    -- other staff.  Oh, okay.  And so you received a warning

15  as a result of that or what came out of that?

16  A    She just talked to me about it and I told her that I

17  disagreed, that how is that I work with this, my staff, all

18  this time and then all of a sudden I'm this type of person.  If

19  you're a certain person, you're going to see the first time you

20  have interaction; not years later.

21  Q    Okay.  But as a result of that situation, you actually

22  received a formal warning, right?

23  A    She didn't warn me, she didn't give me no disciplinary.

24  She just talked to me about it and she said not to worry about

25  it, you know, they're probably upset about something, and

1    that's it.

2    Q    Okay, so you --

3    A    There was no reprimand there, she didn't get after me,

4    none of that.

5    Q    Okay, so you're saying that you didn't receive a warning

6    because of that.

7    A    She didn't warn me, she didn't give me no warning.  She

8    just discussed a concern of one of the employees that I was

9    being and I wasn't, no.

10   Q    Okay.

11   A    I disagree with what she stated.

12   Q    And then at some point after that, you received a

13   warning --

14        THE COURT:  You disagreed not that somebody had told

15   her that, you disagreed that --

16        THE WITNESS:  I disagreed with what she was telling

17   me because I asked, okay, where is that, bring the employee in

18   because apparently that never happened, there was no such

19   meeting.  Whatever she stated was told to her never happened so

20   that's why I say, well, I mean, you can't, you know --

21        THE COURT:  And how do you know it never happened?

22        THE WITNESS:  Because I went and after I finished

23   with her, I went to my staff, okay, was there a meeting right

24   now, what happened, because I was not even here, what happened

25   that I stated to you guys?  And all the employees stated we

De Jesus - Cross / By Mr. Sully                    110

1   didn't even talk about you, you were not even mentioned.  So

2   where --

3            THE COURT:  Okay, and she had met with them

4   individually; is that right?

5            THE WITNESS:  Dr. Meisy was -- we always saw

6   Dr. Meisy when she was coming in.  Dr. Meisy did not meet with

7   staff.  We are the ones --

8            THE COURT:  Okay, could have happened.

9            THE WITNESS:  -- who met with the staff.

10            THE COURT:  It could have happened but it couldn't

11   have happened, it could be that somebody else, that one of them

12   also said something that wasn't true so we don't really --

13            THE WITNESS:  Could be.

14            THE COURT:  -- know; is that correct?

15            THE WITNESS:  Correct.

16            THE COURT:  Go ahead.

17   BY MR. SULLY:

18   Q    And so moving on, at some point you received a warning

19   from Rene Lucio at some point after that, right?

20   A    It wasn't a warning.  It was a suspension --

21   Q    Oh, okay.

22   A    -- that was -- that's the only contact that I have and

23   that's when I quit.

24   Q    Okay.  So you didn't receive a second warning before you

25   received the suspension from Rene Lucio.

De Jesus - Cross / By Mr. Sully                    111

1   A    No.  Rene Lucio was not my immediate manager or anything.

2   He was a manager in San Antonio.

3   Q    Oh, okay.

4   A    So he was -- I was not over him.

5   Q    Okay, I understand that but just to be clear, is your

6   testimony that you didn't receive a second warning before you

7   received the suspension?

8   A    No.  He --

9   Q    Okay.

10  A    -- is the one who gave me my suspension.

11  Q    Okay.  So then do you remember when Rene Lucio gave you

12  the suspension?

13  A    It was in May.  I mean, I had just quit.  It was May of

14  2015.

15  Q    Of 2015?

16  A    I think it was 2015.

17  Q    Oh, okay.  And he gave you a suspension.  Was it also in

18  relation to complaints by other staff about how you were

19  treating them?

20  A    No.

21  Q    All right, what --

22  A    Lillian William walked into my office and had the write-up

23  on her hand.  And she gave it to me and she said, hold on, let

24  me call Rene.  Rene is from San Antonio.  There was a

25  conference call over the phone.  I started reading it because

De Jesus - Cross / By Mr. Sully                        112

1   it had all this things.  And I said, no, this ain't -- and then

2   I went on the bottom and it said three days with suspension

3   with no pay.

4   Q    Okay.

5   A    I didn't even finish -- I didn't even want to finish the

6   rest.  I just tore it and threw it at her --

7   Q    Okay.

8   A    -- and I walked out.

9   Q    You said I think earlier that you ripped it up.

10  A    I ripped it up.

11  Q    Oh, okay.  And then after you ripped it up, you threw the

12  pieces at Lillian --

13  A    Yes.

14  Q    -- Williams, was it?

15  A    Yes.

16  Q    Okay.  And besides giving you the copy of the suspension,

17  had Lillian Williams done anything against you besides that?

18  A    No.  I actually had a -- I never had any issues with her

19  so it was very surprising for her to come into my office and do

20  that and be very rude about it because I've never had any

21  issues with her.

22  Q    Okay.  So even though you hadn't had any issues with her

23  and she was simply giving you the form from Rene Lucio, you

24  decided to basically throw it in her face, that was your

25  reaction to her.

1   A    Because of the way she treated when she walked in.

2   Q    Okay.  Because of her attitude --

3   A    And then it wasn't --

4   Q    -- towards you.

5   A    -- just her handed it to me.  It was a conversation after

6   that also.

7   Q    Okay.  She didn't throw it in your face, though, right?

8   A    She threw it in my desk --

9   Q    Okay.

10  A    -- as I was sitting.  She didn't even knock.  She just

11  walked in my office.

12  Q    Okay, so --

13            THE COURT:  She just threw it like that or she --

14            THE WITNESS:  Yeah, I was --

15            THE COURT:  -- actually put it down?

16            THE WITNESS:  -- sitting -- no.  I was sitting down,

17  doing my work, she grabbed it like that (witness indicates).  I

18  was working.  I was not aware she was even coming into my

19  office.

20  BY MR. SULLY:

21  Q    And so she threw it on your desk and then you threw it in

22  her face.

23  A    I told -- no.  I grabbed it --

24            THE COURT:  You tore it up before you threw it in her

25  face.

De Jesus - Cross / By Mr. Sully                    114

1  Q    You tore it up first, I'm sorry, I forgot.  You tore it

2  up, right?

3  A    After I read it, you know, and she said, I need to escort

4  you out.  I'm not a criminal for to be escorted out of a clinic

5  that I've worked for so many years.  I was -- the way she

6  treated me, no.  And I'm sorry, it was a reaction, I was upset.

7            MR. SULLY:  May I approach the witness, your Honor?

8            THE COURT:  Sure.

9  BY MR. SULLY:

10 Q    Ms. De Jesus, I'm showing you what's been marked for

11 identification as defense Exhibit 300, if I'm correct on the

12 numbers; do you recognize that as a -- well, do you recognize

13 that document?

14 A    Yes.

15 Q    Is that a copy of the form that you said was thrown on

16 your desk and then you threw back at Ms. Williams?

17 A    Correct.

18 Q    And that's the form that indicates the suspension that

19 you've been testifying about, right?

20 A    Correct.  But the employer statement is not this statement

21 that is written here.

22 Q    Okay, you disagree with the --

23 A    Yes.

24 Q    -- statement on there, okay.  But you do agree that that's

25 the form that you just testified about (indisc.) --

De Jesus - Cross / By Mr. Sully                    115

1    A    It's our disciplinary -- it was the disciplinary form for

2    all employees.

3    Q    Okay.  But that one was the one specifically for you when

4    you were suspended, right?

5    A    Not the one that they showed me when they walked in with

6    it, no.

7    Q    Okay.

8    A    Because this is not what was written on it.

9    Q    Okay.  So other than the statement part that you disagree

10   with, the rest of it you recognize that as the form that you

11   were testifying about.

12   A    It's the form for all the employees.  It's not the form

13   that was handed to me when they walked in my office, no.

14   Q    Okay.

15   A    This is not correct.

16   Q    And when you say "this," you're referring --

17              THE COURT:  The rest of it, the --

18   A    The employer's statement is not correct.

19   Q    Okay.

20   A    But is displaying here what I read when I was there was

21   the incident that occurred in the infusion department.  This

22   was not written there.

23   Q    Okay.

24   A    And that's why I said I disagree, because that is my job

25   to find out.

1   Q    Right, okay.

2   A    So that's why I disagree.  No, this is not the paper that

3   was handed to me that I ripped.

4   Q    Okay.  So but other than that, you recognize that as the

5   employee corrective action form that's filled out --

6   A    For all the employees, yes, for all the employees that

7   need a disciplinary action or were -- yes, this is what we use.

8   Q    Okay.  And something like that was filled out and given to

9   you even though you disagree with --

10  A    Not this one.

11  Q    -- the statement part.

12  A    This is not given to me.

13  Q    Okay.  May I retrieve that?

14  A    Yes.

15          MR. SULLY:  Your Honor, with the caveat that she

16  doesn't agree with the part that she indicated, we would offer

17  Defendant's Exhibit 300.

18          MS. FRAZIOR:  No, I'm going to have to object.  She

19  has not authenticated it, it's not a business record, it's not

20  even correct, doesn't have the correct information from what

21  she --

22          THE COURT:  Right, I mean that's --

23          MS. FRAZIOR:  Yeah.

24          THE COURT:  Everything else, the form is the same

25  except for that --

De Jesus - Cross / By Mr. Sully                    117

1              THE WITNESS:  Yeah.

2              THE COURT:  -- part, right?

3              THE WITNESS:  The statement is not correct.

4    That's --

5              MS. FRAZIOR:  Okay, yeah.

6              THE WITNESS:  -- not why they were doing that.

7              THE COURT:  That statement is not correct --

8              THE WITNESS:  No.

9              THE COURT:  -- but the form itself is --

10             THE WITNESS:  The form for all the --

11             THE COURT:  -- what you would have gotten.

12             THE WITNESS:  -- employees is correct --

13             MS. FRAZIOR:  Yeah.

14             THE WITNESS:  -- because that's what we used for

15    the --

16             THE COURT:  And yours had a statement but not that

17    statement.

18             THE WITNESS:  Correct.

19             THE COURT:  Okay, it'll be admitted but that has to

20    be whited out.

21             MS. FRAZIOR:  Okay.

22             MR. SULLY:  Yes, your Honor.

23             THE COURT:  That section that she says -- is there

24    anything else in there that was different?

25             MS. FRAZIOR:  Can -- may I voir dire the witness on

EXCEPTIONAL REPORTING SERVICES, INC

De Jesus - Cross / By Mr. Sully                    118

1    it real quickly, your Honor, just a few more questions --

2              THE COURT:  Sure.

3              MS. FRAZIOR:  -- to see if anything else needs to be

4    removed.  Is there anything else that --

5              THE COURT:  That's what I was trying to ask her, is

6    there anything else on there --

7              MR. SULLY:  Your Honor, I'll just withdraw it --

8              THE WITNESS:  I'm sorry --

9              MR. SULLY:  -- to speed things up if that's okay.  I

10   mean, I'll just --

11             MS. FRAZIOR:  (Indisc.)

12             MR. SULLY:  Yeah.

13             MS. FRAZIOR:  Okay.

14             MR. SULLY:  That's fine.

15   BY MR. SULLY:

16   Q    So, Ms. De Jesus, we talked about the patient's complaint,

17   we talked about the staff complaints.  Before you decided to

18   resign from the clinic, there was also complaint against you

19   that you were basically stealing Xanax, that you were

20   prescribing Xanax to yourself; that was also alleged against

21   you, recall that?

22   A    No, I do not recall that.

23   Q    Okay, you were being prescribed Xanax by Lillian Williams,

24   right?

25             MS. FRAZIOR:  Objection, may we approach?

1          THE COURT:  Yeah, you can but I think that this is

2    the valid question.

3          MR. SULLY:  I'll just withdraw the question, your

4    Honor.  I'm almost done.

5          THE COURT:  You don't want -- okay.

6          MS. FRAZIOR:  Your Honor, can we have it stricken

7    from the record that he's (indisc.) --

8          THE COURT:  Yeah.  The jury's totally to disregard

9    that last question and not consider it.

10   BY MR. SULLY:

11   Q    Just a couple more questions, Ms. De Jesus.

12         THE COURT:  And in case you're wondering, approaching

13   doesn't mean that they like me.  It has to do with I have to

14   decide legal issues so that's why the approaching happens.  Go

15   ahead.

16         MR. SULLY:  Thank you, your Honor.

17   BY MR. SULLY:

18   Q    So when you ultimately left the clinic and stopped working

19   there, Estella Natera is the one who took over your position as

20   billing supervisor, right?

21   A    Correct.

22   Q    Even though she had been under you and you had been the

23   one who had hired her.

24   A    She was a billing lead.

25   Q    Right, and she worked under you.

De Jesus - Cross / By Mr. Pena                    120

1          THE COURT:  She was a what?

2          THE WITNESS:  She was a billing lead.

3          THE COURT:  Oh.

4          THE WITNESS:  So if I wasn't available, they would

5    come to her.

6    BY MR. SULLY:

7    Q    All right, but she was under you, she was one of the

8    employees that you supervised before she took your position.

9    A    Correct.

10          MR. SULLY:  I'll pass the witness, your Honor.

11          THE COURT:  Mr. Alvarez, did you have any questions?

12          MR. ALVAREZ:  I have no questions of this witness,

13   your Honor.

14          THE COURT:  Mr. Pena, did you have any questions?

15          MR. PENA:  Yeah, just very quickly, your Honor.  Do

16   we have the -- a superbill?

17        (Mr. Pena/Ms. Speaker confer)

18                      CROSS EXAMINATION

19   BY MR. PENA:

20   Q    Very -- I just want to clarify a couple things as I'm --

21   A    Okay.

22   Q    -- trying to understand the testimony that you're giving

23   today, and it's basically two areas.  Number one was to testify

24   as to what the Government has marked as E-67, which is the

25   superbill; you recall that?

De Jesus - Cross / By Mr. Pena                                121

1   A    Correct.

2   Q    It's my understanding that you're testifying today that

3   that superbill, when you saw it from 2010 to 2015, the medical

4   providers at the clinic were filling it all out, it was all

5   circled.  I think what you said was --

6   A    I said majority.

7   Q    Yeah, I think you said almost all circled every single

8   code; that's your testimony.

9   A    Correct.

10  Q    Okay.  And so you would say that all these labs for all

11  the patients you were seeing for those five years, they were

12  circling all of them and there's --

13  A    I did not say all of them.

14  Q    Okay, what did you say?  You said --

15  A    Did I say all of them?  I did not --

16  Q    No, you said --

17  A    -- say all of them.

18  Q    -- almost all circled.

19  A    Almost, so that doesn't mean all of them.

20  Q    Okay, and so during that --

21          **THE COURT:**  "Almost" means like how many?

22          **MR. PENA:**  Yeah.

23          **THE WITNESS:**  Almost --

24          **MS. SPEAKER:**  Almost --

25          **THE WITNESS:**  -- because if you can see a superbill,

1   if you can see a lot of circles -- oh, sorry, oh, I didn't know

2   that would do that.

3        **(Laughter)**

4            I was just going to kind of --

5            **THE COURT:**  Well that's not almost all of them yet.

6            **THE WITNESS:**  To me, almost all of them is like if

7   you're going, you're circling, you're circling, you're

8   circling, you're going -- and it's in my previous practice that

9   I work, you see one here, one or two here, one here, and that's

10  it.

11           **MR. PENA:**  Right, and you --

12           **THE WITNESS:**  Not going all in here and to here.

13  **BY MR. PENA:**

14  Q    And you saw the same thing here in the office visit they

15  were circling all these and circling all these.

16  A    No.

17  Q    Okay, you're talking about the labs.

18  A    I'm talking about the labs.

19  Q    Okay.

20  A    The office visit we cannot circle.  You could only bill

21  one office visit.  You can't --

22  Q    Okay, --

23  A    -- visit every single level.

24  Q    -- I was testing you and you passed.

25  A    Yeah.

1   Q    All right, okay, you caught me on that one.  But on the

2   other ones -- so what you're saying is despite you seeing that,

3   between 2010 and 2015, as the billing supervisor, you were

4   having all the billers bill for it.

5   A    Correct.

6   Q    You didn't ever go and question that.

7   A    He's a rheumatologist, okay?  That's what you -- every

8   clinic I worked is a specialty.  Everybody runs their clinic

9   and they have certain exams.  Of course I'm not going to

10  question.  First of all, he's the doctor and he knows what

11  specifically lab work needs to be done to end up with a

12  diagnose to find out what exactly is wrong with a patient.

13  That's not my job, that's his job.

14  Q    Got you.  So I just wanted to make sure that when you're

15  testifying here today, you're not here to say that there's

16  anything improper in what you saw as the billing supervisor in

17  what he was doing because you're not here to question the

18  medical judgment of the doctor, correct?

19  A    I'm here to say what I saw and why I was working there.

20  Q    Right.  And you would agree with me that it's -- we could

21  look at all the other billing records for that period of time

22  and we can compare the actual records themselves and we can

23  look to see if they're all circled, correct?

24  A    Correct, you can compare hers -- his and compare Lillian

25  Williams.

De Jesus - Cross / By Mr. Pena                          124

1    Q    Right, and we can look at those and we can see if they're

2    all circled or not or almost all circled.

3    A    Almost, not --

4    Q    Okay.

5    A    -- all of them.

6    Q    Got you.  The second thing it's my understanding, because

7    it appears you just found out today that the Government added

8    you as one of the patients in the actual indictment of the

9    case, correct?

10   A    Correct.

11   Q    You had no idea prior to today, correct?

12   A    Correct.

13   Q    And you understand that the basis of that indictment is

14   that you were misdiagnosed with rheumatoid arthritis, correct?

15   A    Correct.

16   Q    And so our understanding from what we've seen, and we

17   didn't go into all this detail, but we saw that you were

18   treated from 2011 until about 2015, when you left the practice,

19   correct?

20   A    Correct.

21   Q    And during that time treated for rheumatoid arthritis.

22   A    Correct.

23   Q    Then you said you went and spoke to a Dr. Mata, correct?

24   A    Correct.

25   Q    And that Dr. Mata is not a rheumatologist.

De Jesus - Cross / By Mr. Pena                    125

1    A    He's an internal medicine.

2    Q    Internal.  And we've learned here in this case that it's

3    one of the first steps and then they go to more training to

4    actually become a rheumatologist; were you aware of that?

5    A    No, I was not.

6    Q    Okay.  But you do understand that he's not a

7    rheumatologist.

8    A    Correct.

9    Q    And that he ran labs on you.

10   A    Correct.

11   Q    And he never showed you his medical records and he never

12   showed you his labs, did he?

13   A    No.  I mean, I went for a follow-up, he went through all

14   my lab work, and he concluded, no, you do not have --

15   Q    He just told you straight out you don't have any --

16   A    He went through every single thing, don't have

17   cholesterol, don't have -- the only thing I was anemic.  That's

18   all it was.

19   Q    That's all he told you.

20   A    Yeah, that's all I have.  He went through all my labs, --

21   Q    Okay, would you like --

22   A    -- my lab results.

23   Q    Would you like to look at the labs?

24   A    Sure.

25        **MR. PENA:**  Your -- may I approach, your Honor?

De Jesus - Cross / By Mr. Pena                              126

1          **THE COURT:**  Go ahead.

2   **BY MR. PENA:**

3   Q    Let me show two pages from Exhibit 31 that's in evidence.

4   I'm going to show you the first one.

5          **MS. FRAZIOR:**  Could you (indisc.) what pages from 31

6   there?

7          **MR. PENA:**  Yeah, it is 19795.

8   **BY MR. PENA:**

9   Q    You see that?

10  A    Uh-huh.

11  Q    And you see there where it says: "rheumatoid factor."

12  A    Uh-huh.

13  Q    And you see it says:  "X-A!"

14  A    Uh-huh.

15  Q    And then it says what?

16  A    "Positive."

17  Q    Positive.  Dr. Mata didn't tell you that you were positive

18  for rheumatoid factor, did he?

19  A    No.

20  Q    He didn't tell you not only did it say positive, it had an

21  "A" and exclamation point, doesn't it?

22  A    No.

23  Q    He didn't say that to you.

24  A    No.

25  Q    And then let's look at the second page.  Here's another

```
 1   page in the medical record which is 19793 --

 2              THE COURT:  And these are the medical records from

 3   the doctor?

 4              MR. PENA:  From Dr. Mata, yes, your Honor.

 5              THE COURT:  Okay.

 6   BY MR. PENA:

 7   Q    You can see here it says:  "sed. rate test" and it says

 8   you see that 31?

 9   A    Uh-huh.

10   Q    And then you see the range is zero to 30; you see that?

11   A    Correct.

12   Q    So that would be outside the range.

13   A    Well that's written range there.

14   Q    Well, and this is coming from Dr. Mata's records.

15   A    Correct.

16   Q    Okay.  And so you understand that's also out of range,

17   isn't it?

18   A    According to the written here, yes.

19   Q    Okay.

20   A    Whatever -- whoever wrote it --

21   Q    Right, --

22   A    -- wrote on it.

23   Q    Well I'll represent to you that (indisc.) from Dr. Mata,

24   who's your doctor, --

25   A    Correct.
```

1  Q    -- who you saw.  And so he gave you -- he did not give you

2  these results that could be significant to a rheumatologist,

3  correct?

4  A    Correct.  If he saw anything abnormal, he --

5  Q    You would --

6  A    -- would have referred me.

7  Q    You would have expected him to have referred you --

8  A    For you --

9  Q    -- to an actual rheumatologist, correct?

10 A    Correct.

11 Q    Okay.  Well let me represent to you that Dr. Mata's been

12 listed as a witness in this case, if you want me to ask him for

13 you why he didn't refer you.

14         **THE COURT:**  What?  You're not asking for anybody

15 here.  You can ask whatever you want to but --

16         **MR. PENA:**  All right, pass the witness, your Honor.

17         **THE COURT:**  Did you have anything else?

18         **MS. FRAZIOR:**  Yes, your Honor.

19                    **REDIRECT EXAMINATION**

20 **BY MS. FRAZIOR:**

21 Q    Ms. De Jesus, you don't have rheumatoid arthritis, do you?

22 A    Not to my knowledge, no.

23         **MR. PENA:**  I'm going to object, your Honor.

24         **MR. SULLY:**  Objection, your Honor.

25         **MR. PENA:**  She hasn't laid foundation, she's not an

1    expert obviously.

2           **MS. FRAZIOR:**  She's --

3    **BY MS. FRAZIOR:**

4    Q    Are you taking any kind of medications for --

5    A    I don't have any medication.

6    Q    -- rheumatoid arthritis?

7    A    I'm not on any.

8    Q    How long has it been since you took medication for

9    rheumatoid arthritis?

10   A    Since I left Dr. Zamora's.

11   Q    And have you had any health issues related to that since

12   that time?

13   A    No.

14   Q    In fact, we don't really need to compare Lillian

15   Williams's superbill with Dr. Zamora's, correct?  We can just

16   look at your superbill.  You don't have insurance.  Is this the

17   kind of circling you were seeing, looking at Government's --

18   or, excuse me, defense Exhibit 30 real quickly and showing you

19   the name, that it's yours there at the top.  You can see there

20   that it's your first visit.  Is this -- does this superbill for

21   you, who does not have insurance, have fewer circles than

22   somebody who did at the clinic?

23   A    Correct.

24   Q    Why do you think that is?

25          **THE COURT:**  I -- that's her --

De Jesus - Redirect / By Ms. Frazior                    130

1          **MR. SPEAKER:**  Objection, your Honor.

2          **THE COURT:**  Yes.

3          **MR. SPEAKER:**  Calls for speculation.

4          **MS. FRAZIOR:**  Took a little bit.

5          **THE COURT:**  It didn't take me a little bit.

6          **MS. FRAZIOR:**  It didn't.

7          **THE COURT:**  And, you know, both sides really at some

8    point, you all know what the law is.  And we could save some

9    time if we would stop this on both sides.  And when I said that

10   they come up here, they do have to come up here because either

11   whether it's the Government who asks for it or the defense who

12   asks for it, because I have to decide sometimes whether they

13   can go into certain type of questions and so that's what this

14   is about.  And nobody's trying to keep anything away from you

15   other than making sure that the both sides are within what they

16   can legally do with regards to asking questions or introducing

17   evidence.

18   **BY MS. FRAZIOR:**

19   Q    Ms. De Jesus, were you familiar with the medical

20   assistants drafting their notes at the clinic?

21   A    Yes.

22   Q    Did you have occasions to see medical assistants drafting

23   their notes long after the visits?

24   A    Yes.

25   Q    Okay, did you have an occasion to see somebody drafting

De Jesus - Redirect / By Ms. Frazior                    131

1    medical notes right off of the superbill and nothing more?

2    A    Yes.

3    Q    In your current practice where you work, is that an

4    appropriate practice or not?

5    A    No.

6    Q    And a couple of questions were asked of you about Meisy

7    Zamora and her lack of understanding with respect to the

8    billing information.  Did you try to explain billing

9    information to her many times?

10   A    Yes.

11   Q    Okay, did she follow your advice?

12   A    No.

13   Q    Okay.

14   A    She -- no matter, she wouldn't understand.  She didn't

15   understand the billing guidelines and because of every

16   different carrier has its own.

17   Q    Did she continue to push the quotas on the staff at the

18   clinic, even though she didn't follow the billing guidelines?

19            MR. SULLY:  Objection, leading, your Honor.

20            THE COURT:  So when did you leave there?

21            THE WITNESS:  In 2015.

22            THE COURT:  Okay, so you don't have any idea what she

23   did or didn't do after you left, right?

24            THE WITNESS:  After I left, no, but when I was there,

25   yes.

De Jesus - Redirect / By Ms. Frazior                    132

1   **BY MS. FRAZIOR:**  During the time that you were there --

2   A     During --

3   Q     -- and only speaking about the time that you were there,

4   the five years that you were there, did she continue to push

5   quotas on the staff even though you had instructed her about

6   the billing regulations?

7   A     Correct.

8             **MS. FRAZIOR:**  Pass the witness.

9             **THE COURT:**  And the way that you know that is because

10  you heard her say it or how did you --

11            **THE WITNESS:**  I would walk with her to talk to the

12  staff about it or when if it wasn't us both together, it was me

13  by myself instructing the staff.

14            **THE COURT:**  Does anybody else --

15            **THE WITNESS:**  I was --

16            **THE COURT:**  -- have any other questions?  Did you --

17  I didn't mean to interrupt you.  Did you have something else

18  you were going to say?

19            **THE WITNESS:**  No.

20            **THE COURT:**  Okay.

21            **MR. LEE:**  Nothing further, your Honor.

22            **THE COURT:**  Okay, you may go ahead and be excused,

23  ma'am.  Thank you very much.

24            **THE WITNESS:**  Thank you.

25         **(Witness excused)**

1          **THE COURT:**  Ladies and gentlemen, it's time for you

2    to leave so I can handle the rest of the cases that are set for

3    today.  Don't forget that tomorrow we don't have court, not

4    because it's Friday the 13th but just because it's a day we

5    weren't going to be able to have court with you all.  Don't

6    forget my instructions.  You're not to discuss this case with

7    anybody, including yourselves, until you start deliberating.

8    You go ahead and that's when you can start discussing the case

9    among yourselves.  Don't do any research or any investigation,

10   don't read or listen to any about this case.  And despite

11   whether other people make their own investigations, you're

12   not -- you cannot make any investigations or -- you have to

13   decide the case on the facts as -- the evidence as presented

14   here in the courtroom and on the law as I give it to you.  You

15   have been a very patient jury.  In 36 years, I've seen a lot of

16   jurors.  You have been the most patient -- one of the most

17   patients (sic).  I may give you a prescription that says you're

18   very patient.  But I hope you have a good weekend.  Please rise

19   for the jury.

20       **(Jurors exit at 4:17 p.m.)**

21          We're going to start Monday at 9:00.  Do you want to

22   start earlier?

23       **(Laughter)**

24          **MS. FRAZIOR:**  Your Honor, briefly, I just wanted to

25   say with that last comment, I wasn't trying to say that I was

1    trying to get evidence in or anything along those lines.  I

2    just realized there was a pause and then everybody jumped up at

3    the same time.

4              THE COURT:  No, that --

5              MS. FRAZIOR:  Okay, I just wanted to make sure that

6    everybody's clear on that.

7              THE COURT:  No, I certainly understand that.

8              MS. FRAZIOR:  Okay.

9         (This proceeding was adjourned at 4:18 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

135

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    **December 17, 2019**

            **Signed**                                                        **Dated**



*TONI HUDSON, TRANSCRIBER*