UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 7:18-CR-00855 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | |
| JORGE ZAMORA-QUEZADA, | ) | Monday, December 16, 2019 |
| MEISY ANGELICA ZAMORA, | ) | |
| ESTELLA SANTOS NATERA, | ) | (1:43 p.m. to 4:34 p.m.) |
| FELIX RAMOS, | ) | |
| | ) | AFTERNOON SESSION |
| Defendants. | ) | |

JURY TRIAL - DAY 8

BEFORE THE HONORABLE RICARDO H. HINOJOSA,
UNITED STATES DISTRICT JUDGE

APPEARANCES:               See next page

Court Interpreter:      Marie E. Foraker (Standby)

Court Recorder [ECRO]:  Antonio Tijerina

Transcribed By:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, Texas 78468
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>


Plaintiff:                    EMILY GURSKIS, ESQ.
                              REBECCA YUAN, ESQ.
                              CYNTHIA VILLANUEVA, ESQ.
                              Office of the United States Attorney
                              1701 W. Business Hwy. 83
                              Suite 600
                              McAllen, TX 78501


Jorge Zamora-Quezada:         BENIGNO TREY MARTINEZ, III, ESQ.
                              STEPHEN LEE, ESQ.
                              1201 E. Van Buren St.
                              Brownsville, TX 78520


Meisy Zamora:                 CHRISTOPHER SULLY, ESQ.
                              5804 N. 23rd St.
                              McAllen, TX 78504


Estella Natera:               AL ALVAREZ, JR., ESQ.
                              4409 N McColl Rd
                              McAllen, TX 78504


Felix Ramos:                  JAIME PENA, ESQ.
                              Pena Garza PLLC
                              900 Kerria Ave
                              McAllen, TX 78501

INDEX

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SYLVIA CARRILLO | | | | |
| BY MR. MARTINEZ | | 4 | | |
| BY MR. SULLY | | 51 | | |
| BY MR. PENA | | 52 | | |
| BY MS. YUAN | | | 62 | |
| SARA ROBLES | | | | |
| BY MS. GURSKIS | 72 | | 135 | |
| BY MR. MARTINEZ | | 92 | | |
| BY MR. SULLY | | 130 | | |
| BY MR. PENA | | 133 | | |

| DEFENDANT'S EXHIBITS | RECEIVED |
|---|---|
| 80, 81 | 4 |
| 90, 91 | 94 |

**McAllen, Texas; Monday, December 16, 2019; 1:43 p.m.**

**(Call to Order)**

**(Jurors present)**

THE COURT:  Please be seated.  Mr. Martinez, go ahead and proceed.

MR. MARTINEZ:  Thank you, Judge.  For purposes of the record, we'd offer Exhibits 80 and 81 and ask they be admitted into Evidence.

MS. YUAN:  No objection.

THE COURT:  They're admitted.

MR. MARTINEZ:  May I proceed, Judge?

THE COURT:  Sure.

**(Defendant's Exhibit Numbers 80 and 81 were received in evidence)**

CROSS EXAMINATION

BY MR. MARTINEZ:

Q    Good afternoon, Ms. Carrillo.

A    Good afternoon.

Q    You may need to pull that microphone closer to you just so everybody can hear you.  My name is Trey Martinez and I represent Dr. Zamora-Quezada, okay?

A    Okay.

Q    We've never met before.  Is that right?

A    No.

Q    Okay.  And one of the things that I wanted to do is go

over some of your records with you.  All right?

A    Okay.

Q    Prior to seeing -- let me start off with this.  You're not a doctor.  Is that correct?

A    No.

Q    Okay.  You're not an expert in the area of rheumatology, are you?

A    No.

Q    You're not here to testify for this Jury whether or not Dr. Zamora or any other doctor diagnosed you correctly or incorrectly, are you?

A    No.

Q    Okay.  And you would rely on an expert in order to determine that, right?

A    Yes.

Q    And given all the different tests that you took both in California and Rio Grande City in Dr. Zamora's Clinic, as well as Dr. Christensen's, those are all based upon their physical examination, as well as the labs, and other things that other doctors or experts rely upon, correct?

A    Yes.  Correct.

Q    Now, obviously, Dr. Zamora wasn't the first doctor that you've seen in regards to some of your issues, correct?

A    Correct.

Q    Okay.  And based upon the records that I've seen if we go

back, let's just say, to 2016 you were out in California.  Is that right?

A    Yes.

Q    Okay.  And if we could go to Exhibit 80 with Bates Stamp Number 0533.

     **(Pause)**

Q    Is it coming up?  We need to go to the top of that, Ms. Sanchez.  And, in fact, based upon this record, any reason to dispute that one of the first labs that you did was at Oak Valley Medical District?  Do you see that?

A    Yes.

Q    Okay.  And this was in Oakdale, California?

A    Yes.

Q    Okay.  And is that where you live out in California?

A    I live in Empire, California.

Q    Okay.  Is this close to this Clinic that was there?

A    Yes.

Q    Okay.  And when you had your labs done there, what was the reason for doing those labs out in California?

A    I wanted to get some medication because they had told me before that I have Rosacea.  So, I wanted a refill -- a medi -- for Rosacea.

Q    Okay.  And you went to go see a doctor out in Oakdale, California, in -- back in 2016?

A    Yes.

Q    Do you see that on the screen there?

A    Yes.

Q    All right.  In August of 2016 you went in for Rosacea and they ended up doing some labs.  Is that correct?

A    Yes.

Q    Okay.  And can we go down to the labs, Ms. Sanchez?  Okay.  And I know you already told this Jury that you're not an expert, but you wouldn't know the significance of 114 C3, would you?

A    No.

Q    Okay.  You'd rely on an expert for that, correct?

A    Yes.

Q    All right.  You wouldn't know the significance of 25.6 for C4, correct?

A    Yes.

Q    And you'd rely on an expert for that?

A    No.

Q    You -- you wouldn't?

A    I'm sorry.  Can you repeat that?

Q    You would rely on an expert in order to tell us --

A    Oh, yes.

Q    -- what the significance of a 25.6 C4.  Is that correct?

A    Yes.

Q    Okay.  And then last, if you go down to cardio CRP and you see it goes 1.4 and then down to the bottom there, where it

talks -- you would rely on an expert in order to determine whether or not 1.4 with a CRP is significant or not, correct?

A    Yes.

Q    Okay.  And if you go to Bates Stamp Number 0535.  Once again, the continuation of these labs, right?  And I'm not going to go over single lab, but just trying to make a point here as regards to, once again, you'd rely on an expert in order to tell the Ladies and Gentlemen of the Jury what a anti-chromatin antibody or positive finding is for that.  Is that correct?

A    Yes.

Q    Okay.  If you go down to November the 15th of 2016 and Bates Stamp Number 0554 and once again just so the Ladies and Gentlemen of the Jury understand the timeline here.  This is all prior to ever seeing Dr. Zamora.  Is that correct?

A    Yes.

Q    Okay.  And this is at the Arthritis and Rheumatism Center?  Correct?

A    Yes.

Q    Okay.  And that's also in California.  Is that right?

A    Yes.

Q    Okay.  I know it's hard to read, but what is the city that that's in?

A    Manteca, California.

Q    Manteca, California.  And then, if you go down to the

bottom, this is your name to the left-hand corner, right?

A    Yes.

Q    And then we have November the 15th of 2016.  Is that correct?

A    Yes.

Q    Okay.  And then, if we actually get into this record, -- okay.  We actually have your chief complaint in the upper right-hand corner.  You see that?

A    Yes.

Q    Okay.  And I know that you described it as Rosacea, but it says "facial rash in the setting of a positive ANA."  Do you see that?

A    Yes.

Q    Okay.  And, once again, you don't know the significance of a positive ANA in combination with your facial rash.  Is that right?

A    That's right.

Q    Okay.  So, let me go over here to this board.  And we talked about this board with Dr. Christensen.  I'm going to put these right here, Ms. Yuan.

        THE COURT:  All right.

        MR. MARTINEZ:  Thank you, Judge.

        (Pause)

Q    Okay.  So, you saw in your lab findings -- this is in California.  Remember, the positive ANA?

A    Yes.

Q    Okay.  There's no reason to dispute that -- that lab finding, right, that was done out in California?

A    Correct.

Q    Okay.  And that was prior to your ever visiting Dr. Zamora.  Is that correct?

A    Yes.

Q    Okay.  And then, the other thing that you saw when you go back to your lab and you see it on this chart here, a positive anti-chromatin antibody.  Do you see that in your medical record?

A    Yes.

Q    On the next -- I'm sorry.  It's up on the right -- up in the right, "Chief Complaint," that she also has a positive anti-chromatin antibody?

A    Yes.

Q    So, once again, and this is the AC -- this is based upon the record that was done out in California.  Is that right?

A    Correct.

Q    Okay.  Thank you.  Even though you went in for Rosacea, if Dr. Christensen came up here and sees there's signs or symptoms of Lupus, would you have any reason to dispute that?

A    Dr. Christensen?

Q    Correct.  Any reason to dispute Dr. Christensen's testimony if she said these are all signs or -- positive ANAs

are a sign or symptom of Lupus and anti-chromatin antibody is a

positive sign or symptom of liver disease associated with anti-

immune -- autoimmune disorder.  Any reason to dispute any of

that?

A     No.

Q     Okay.  And at the time, did you have a butterfly rash on

your face?

A     Yes.

Q     Okay.  Would you have any reason to dispute that that's

also associated with Lupus?

A     No.

Q     So, prior to ever seeing Dr. Zamora, we have a sign or

symptoms of Lupus on one occasion, correct?

A     Yes.

Q     And you have a positive symptom of ACA, which is

associated with a liver disease with an autoimmune disorder.

Is that correct?

A     Yes.

Q     And then, if we get into your records, we add the facial

rash associated with that, right?

A     Yes.

Q     Okay.  We talk about the positive ANA, the anti-chromatin

antibody, and then later on in this record, do you have a

positive C-Reactive Protein?

A     (Indisc.)

Q    Okay.  And if you go down to the third line, the HPI.  It says "her platelets have decrease and her CRP is high."

A    Yes.

Q    Okay.  If Dr. Christensen associated elevated high CRP with rheumatoid arthritis, any reason to dispute that?

A    No.

Q    Okay.  And these are all signs or symptoms based upon records that were in California?  Is that correct?

A    Correct.

Q    In addition to that, we talk about the butterfly rash it says in your records?

A    Yes.

Q    Do you see that there?  It says she says that she has a rash on her face, which looks like a butterfly rash.  Is that correct?

A    Yes.

Q    Okay.  And once again, if we go to your records, you have a butterfly rash.  If Dr. Christensen came up and said a butterfly rash is also associated with Lupus, any reason to disagree with that?

A    No.

Q    So, here we have positive CR -- or elevated CRP, C-Reactive Protein, which is a sign or symptom of rheumatoid arthritis, correct?

A    Correct.

Q    You have a positive ANA, which is a sign or symptom of Lupus.  Is that correct?

A    Correct.

Q    You have a positive for butterfly rash, which is a sign or symptom of Lupus?

A    Correct.

Q    And then, you have a positive ACA which is an associated liver disease with an autoimmune disorder.  Is that correct?

A    Correct.

Q    Okay.  And these are all based upon records that were done in California prior to the time you saw Dr. Zamora?

A    Correct.

Q    Any reason to disagree with a doctor who looks at all that --

A    No.

Q    -- and says -- I'm sorry.  Let me finish my -- it's okay. Any reason to disagree with a doctor who looks at all that and says even prior to seeing Dr. Zamora, you could have potentially rheumatoid arthritis?

A    No.

Q    Okay.  Could have Lupus?

A    No.

Q    Could have a liver disease associated with autoimmune disorder?

A    No.

Q    Okay.  Do you know if your liver disease is associated in any way, shape, or form with your thyroid?

A    No.

Q    Okay.  Would you rely on an expert in order to discuss that with the Jury?

A    Yes.

Q    Okay.  In addition to that, you also complained about joint pain in your wrist and knees.  You see that?  In your record?

A    Yes.

Q    Okay.  And when you're talking about joint pain in your wrist and knees, is it in both wrists and both knees?

A    Yes.

Q    Okay.  So, it's bilateral and symmetrical joint pain in both your wrists and knees?

A    Yes.

Q    Okay.  So, if this is associated in your records in California and Dr. Christensen came up here and said yeah, that's associated with rheumatoid arthritis, you wouldn't have any reason to dispute any of that, would you?

A    No.

Q    And this is all part of the time that you saw Dr. Zamora, isn't it?

A    Yes.

Q    Okay.  And then, you go on to complain about muscle

weakness, going up and down stairs.  Do you remember that?

A     Yes.

Q     And then, you have -- do you see that in your records there?

A     Yes.  Yes.

Q     No reason to dispute that you told some doctor in California about your muscle weakness, especially going up and down stairs, right?

A     Correct.

Q     Is that because you had it?

A     Yes.

Q     Okay.  And then, in fact, you go on to describe the fact that you're extremely tired and very fatigued.

A     Yes.

Q     Right?

A     Yes.

Q     Okay.  No reason to dispute any of that?

A     No.

Q     Okay.  And then, you go on to talk about pain in both sides of your hips.  On the bottom -- on the bottom line?  Right before the last line, right towards the end, you see "she also has pain on both sides of her hips, especially when she lies down."  Is that correct?

A     Correct.

Q     So, even as you're lying down, you have pain bilateral and

symmetrical on both sides of your hips.  Is that right?

A     Yes.

Q     Okay.  So, not only do you have pain in your wrists and your knees on both sides, correct?

A     Correct.

Q     You have it in both sides of your wrists, both sides of your knees, and you have it in both sides of your hips?

A     Correct.

Q     Okay.  And this is all prior to the time that you go see Dr. Zamora, right?

A     Yes.

Q     And then, if you go to the last line or the second part of that chart down there, we're going to blow up your family history.  And, in fact, you told the doctors out in California prior to ever going to see Dr. Zamora or anyone at his clinic, that your sister also has rheumatoid arthritis.  Is that right?

A     Yes.

Q     Okay.  And would you agree that that also could be something that's taken into account when you're talking about RA at Dr. Christensen's?

          **MS. YUAN:**  Objection.  Lack of foundation.

          **THE COURT:**  What foundation did you want?

          **MS. YUAN:**  That she -- he's asking her to apply a non-medical treatment and what symptoms are for rheumatoid arthritis.

MR. MARTINEZ:  I'll rephrase --

MS. YUAN:  She's already testified --

MR. MARTINEZ:  -- my question, --

MS. YUAN:  -- she's no doctor.

MR. MARTINEZ:  -- Judge.

THE COURT:  Okay.  All right.

BY MR. MARTINEZ:

Q    Family History, is it true that your sister had rheumatoid arthritis, --

A    Yes.

Q    -- based upon these records?  Okay.  And, once again, this is all based upon a record that was done out in California prior to the time that you ever saw Dr. Zamora.  Isn't that true?

A    Yes.

Q    So, prior to the time that you see Dr. Zamora, and this is back in 2016, we have what I call bilateral and symmetrical joint pain in your knees, and your wrists, and your hips, correct?

A    Correct.

Q    And if we're looking at that chart right there and then you also have elevated CRP or C-Reactive Protein, correct?

A    Yes.

Q    We also have positive ANA, based upon your records?

A    Yes.

Q    We also have a butterfly rash, correct?

A    Yes.

Q    And we also have a positive ACA, correct?  Or anti-chromatin antibody?

A    Yes.

Q    Okay.  And then, you also have a family history of rheumatoid arthritis with your sister.  Is that right?

A    Yes.

Q    And then, if we go to your next visit in California, on 11/30 of 2016.  Let's go to Bates Stamp 0558.  I know it's hard to see.  We're going to blow this up for you.  This is your next visit to your California clinic.  If you go to the top so we can go to the date of that, Ms. Sanchez?  Okay.  Once again, this is at the Arthritis and Rheumatism Center in California.  Is that correct?

A    Correct.

Q    And this is for November the 30th of 2016.  You see that?

A    Yes.

Q    And then on November 30th, 2016, if you actually get into the record, let's go -- just go midpoint because I know it's hard to see.  I'm sorry?  She -- starting with the Chief Complaint and to the History of Present Illness, right there.  Okay.  Your chief complaint is a rash in the setting of Lupus.  You see that?

A    Yes.

Q    So, at this point in time, based upon everything that is set out in these records, your doctors out in California have at least diagnosed you with Lupus.  Is that correct?

A    Yes.

Q    Okay.  And then, if you go to Bates Stamp Number 0561, again, another visit out in California.  You see that December the -- looks like the 26th or 28th of 2016?

A    Yes.

Q    Okay.  And then, "we continue to talk about the problems." Do you see that on the top?

A    Yes.

Q    Once again, we're following up with the Lupus diagnosis from your previous visit.  Is that right?

A    Correct.

Q    Although we still have the physical examination with the problems in your knees, your wrists, and your hips.  Is that correct?

A    Yes.

Q    We still have the elevated C-Reactive Protein, correct?

A    Yes.

Q    Okay.  And then, in regards to this record, it basically goes all the way back to the top, to your November 15th, 2016, visit.  If you look at the History of Present Illness on the top, Ms. Sanchez?  And then, the Interval History down towards the bottom?  Ooop, did I do that?  And this is this current

visit.  Is that correct?

A    Yes.

Q    Okay.  And, in addition to having the above, you have started having some heart palpitations.  Is that correct?  Do you see that?

A    Yes.

Q    Okay.  And prior to that, you had complained of shortness of breath on the next line.  See that?

A    Yes.

Q    Okay.  And those doctors out in California, they also gave you an X-ray for that shortness of breath.  Is that right?

A    Yes.

Q    Okay.  And we talked about it, an X-ray that you had in regards to Dr. Zamora.  Is that right?

A    Correct.

Q    Okay.  No reason to dispute that there is a reason for Dr. Zamora, at any point in time, to order any of those X-rays that the Prosecution showed you, right?

A    Right.

Q    Okay.  Okay.  And then, if we go down to Bates Stamp Number 0532 in Exhibit 80.  This is a lab that you went and did still out in California.  Is that right?  Do you see that up at the top?

A    Yes.

Q    Okay.  And, once again, this is prior to the time that you

ever saw Dr. Zamora?

A      (Indisc.)

Q      Correct?

A      Correct.

Q      Okay.  And then, you see on the bottom -- or in the middle there, it says ANA, positive?

A      Yes.

Q      Okay.  And then there's a flag there that looks like an H, which would mean high.  Do you see that?

A      Yes.

Q      Okay.  Do you know the sign or significance of positive ANA?

A      No.

Q      Okay.  So, this is the second time that we see a positive ANA based upon records out in California.  Is that correct?

A      Yes.

Q      Okay.  And then, in those same labs at 0536, that's the same date.  You see --

A      Can't read --

Q      -- the labs?

A      -- can't read the date.

Q      It's hard.  It's hard, looks like February of 2017 up.  Do you see that?

A      Yes.

Q      Okay.  And then, you have anti-chromatin with a positive

there at the bottom?

A    Yes.

Q    Okay.  And then, you have the anti-smooth muscle.  You see that?

A    Yes.

Q    Okay.  And both of those are high.  Is that right?

A    Yes.

Q    Okay.  And -- so, this is the first time that we see the anti-smooth muscle in some of these California records, which is a liver disease associated with autoimmune disorder.  Do you see that?

A    Yes.

Q    And this is all on the California records prior to the time that you ever saw Dr. Zamora.  Is that right?

A    Correct.

Q    And then we go to another visit in California on April the 4th of 2017 in Bates Stamp Number 0564 -- okay.  And this is you, once again, going to the Arthritis and Rheumatism Center in California.  Is that right?

A    Yes.

Q    And you see the visit on April the 4th of 2017?

A    Yes.

Q    Okay.  And then, we're going to talk about your chief complaint.  Basically, you're here for a follow-up.  Is that right?

A     Yes.

Q     And then, in addition to that, we're talking about, once again, your rash.  Your rash on your cheeks, -- "continues to have rash on her cheeks in a butterfly pattern."  Is that right?

A     Yes.

Q     And then, we talk once again about your pain in your wrists, and knees?

A     Yes.

Q     Correct?

A     Yes.

Q     And then, you, once again, on this day you talk about still having heart palpitations?

A     Yes.

Q     Right?  And then, it talks about previous complaints of your shortness of breath.  Is that correct?

A     Yes.

Q     Okay.  And then, you continue to feel tired and fatigued, but you're feeling a little bit better on this day.  Is that right?

A     Yes.

Q     Okay.  And then, a little bit later on you're complaining of bilateral trochanteric bursitis.  Is that correct?  Based upon your last visit.

A     Yes.

Q    Okay.  And you know what trochanteric bursitis is?

A    No.

Q    And then, if we go to your assessment on Bates Stamp Number 0566, your assessment back in April of 2017 is Lupus. Do you see that?

A    Yes.

Q    Okay.  And one of the things that you had complained about to the Ladies and Gentlemen of the Jury was Methotrexate, right?

A    Yes.

Q    Okay.  And, in fact, this doctor ever -- prior to ever going to Dr. Zamora's clinic, had actually started you on Methotrexate, back in California, didn't they?

A    Yes.

Q    Okay.  Why you're complaining about it from Dr. Zamora, do you have any complaints for the doctors out in California that started you on Methotrexate back in April of 2017?

A    No.

Q    Okay.  And then, they continued to treat you and starting Folic Acid.  Do you see that?

A    Yes.

Q    Hydroxychloroquine.  Do you see that?

A    Yes.

Q    Hydrocortisone.  And then, they actually ask about more labs.  Is that correct?

A    Yes.

Q    Do you know whether you did more labs with the folks out in California while you're doing this for those period of months?  Do you remember taking more labs?

A    Yes.

Q    Okay.  And then, they want you to come back in six weeks?

A    Yes.

Q    Okay.  And then, I think one of the things that you talked to the Ladies and Gentlemen of the Jury about was your concern about being pregnant and that nobody had ever told you anything about some of the concerns with that.  Remember that?

A    Yes.

Q    Okay.  And, in fact, even out in California before anybody ever saw Dr. Zamora or anybody his clinic, you talked to them about wanting to get pregnant.  Is that correct?

A    I don't recall.

Q    Okay.  So, if you go down to Number 7, it says there "she wants to get pregnant."  Is that correct?

A    Yes.

Q    Okay.  And I believe that doctor, way back when, says "I reiterated to her the importance of being symptom free for the last six months before trying to get pregnant."  Correct?

A    Yes.

Q    Okay.  "That she should have lab work done which will tell us how active her disease is in addition to her clinical

symptoms." Is that correct?

A    Yes.

Q    So, when you tell the Ladies and Gentlemen of the Jury that the first time that you brought up the issues of pregnancy with Dr. Zamora, that's not the case at all is it, because you brought it up in California? Is that right?

MS. YUAN: Objection, Your Honor. I think that misstates the evidence.

THE COURT: Well, it's --

MS. YUAN: I don't think she said the first time she ever brought up pregnancy was with Dr. Zamora.

MR. MARTINEZ: If she could not make speaking objections, Judge, that would be great.

THE COURT: What?

MR. MARTINEZ: Speaking objections. I object to the sidebar, but I mean --

THE COURT: This is not a sidebar. I mean, she is saying something here. She's making an objection. When was the first time that you've asked that question about pregnancy?

THE WITNESS: I don't recall.

THE COURT: But you did ask -- you testified you asked Dr. Zamora that?

THE WITNESS: Oh, yes. I did ask Dr. Zamor --

THE COURT: But you don't recall asking this doctor that?

**THE WITNESS:** This was back like in two years. This was in 2016.

**MR. MARTINEZ:** Let's go -- let's -- may I continue, Judge?

**THE COURT:** Go ahead.

**BY MR. MARTINEZ:**

Q    Let's go back and look at the date this -- if we go to the top of the page, okay. This date for that document is -- in fact, is not in 2016, correct?

A    No. It's 2017.

Q    Okay. So, the issues of pregnancy were something that were brought up, once again, prior to ever seeing Dr. Zamora. Is that correct?

A    Correct.

Q    Okay. Meanwhile, you may not have remembered this. You brought it up with these doctors out in California. Is that correct?

A    Correct.

Q    But you were very well aware the concerns of having Lupus and trying to get pregnant at the same time, correct?

A    Correct.

Q    And, once again, you had already been started on Methotrexate prior to ever being seen by Dr. Zamora and anyone else at his clinic, right?

A    Yes.

Q    Okay.  And then, if we go to September the 10th of 2017 on Bates Stamp Number 0579.  Once again, another visit to the Arthritis and Rheumatism Center there in California.  You see that?

A    Yes.

Q    And you see the date of the visit there?

A    Yes.

Q    Okay.  What's the date of that visit?

A    September 10th, 2017.

Q    Okay.  And, once again, prior to ever seeing Dr. Zamora.  Is that right?

A    Yes.

Q    And then, you have some of your interval history?

A    Yes.

Q    Okay.  And then, here on the bottom line there you have still your complaint of ache of legs.  Is that correct?

A    Yes.

Q    Again, we hadn't seen that before prior to this record.  Is that right?

A    Yes.

Q    Okay.  And you have pain in lower back.  Do you see that?

A    Yes.

Q    And we hadn't seen that prior to this record in September of 2017?

A    Can you repeat that please?

Q    We hadn't seen that complaint prior to this in 2017.  Is that correct?

A    Correct.

Q    Okay.  And then, we have trochanteric bursa and hips.  Is that correct?

A    Yes.

Q    Okay.  And the trochanteric I'll represent to you is the hips, but you're still complaining of your hips at this point in time.  Is that right?

A    Yes.

Q    So, in addition to your wrists, and your knees, and your hips that we saw about earlier, we know have ache of legs, correct?

A    Yes.

Q    Okay.  And now, we've included your lower back?

A    Yes.

Q    And this is all prior to ever seeing Dr. Zamora in November of 2017, correct?

A    Yes.

Q    And then, if you go to -- one of the things that you had discussed with the Prosecution is that there was no reason for anybody to put down that you had an issue with either goiter or your thyroid.  Remember that?

A    Yes.

Q    Okay.  And if we go to Bates Stamp Number 0542, you look

at your Family History here.  Okay.  Do you see that?  And this is actually at the SCMA Roma Family Health Clinic.  You see that?

A    Yes.

Q    And the doctor that you saw was Dr. Valerie Rodriguez?

A    Nurse Practitioner Valerie Rodriguez --

Q    Nurse Practitioner, excuse me, Valerie Rodriguez.

A    Yes.

Q    And then, this was actually in October of 2017.  Do you see that?

A    Yes.

Q    Okay.  Once again, prior to ever seeing Dr. Zamora, right?

A    Correct.

Q    Okay.  And if you look at your Family History, your sister, in fact, you reported had hypothyroidism?

A    Yes.

Q    Okay.  And do you know whether or know hypothyroidism is associated with a goiter?

A    No.

Q    Would you rely on an expert to talk to the Ladies and Gentlemen of the Jury about that?

A    Yes.

Q    Okay.  So, here we have now a history of hyperthyroidism (sic -- hypothyroidism), correct?

A    Yes.

Q     Okay.  We've got shortness of breath?

A     Yes.

Q     Based upon the records ever prior to you seeing Dr. Zamora or anyone else.  So, we have shortness of breath, hyperthyroidism, correct?

A     Correct.

Q     All right.  We have pain in your wrists, correct?

A     Yes.

Q     In your hands?

A     Yes.

Q     Your elbows?

A     Yes.

Q     You had chest pain or shortness of breath that you described earlier.  Is that right?

A     When I seen this doctor in California?

Q     When you seen the doctors in California.

A     Yes.

Q     Okay.  And all of this prior to seeing Dr. Zamora, correct?

A     Yes.

Q     And then let me get to Dr. Zamora's records, all right?

A     Okay.

Q     So we go to Dr. Zamora's records.

      And your first visit to him was on November the 10th of 2017.  Remember that?

A    Yes.

Q    Okay, and if we can go to Bates Stamp Number 0469.

You remember going into his clinic and then filling out a form regarding your patient history and your physical?

A    Yes.

Q    Okay, and if you go up to the top, this is your name, correct?

A    Yes.

Q    Okay, and you filled this out, right?

A    Yes.

Q    Okay, and this is your date of birth?

A    Yes.

Q    Correct?

A    Yes.

Q    And this is the date of your first appointment; is that right?

A    Correct.

Q    And then, in regards to your diagram or your pain review, you filled that out as well.  You see that?

And you circled different areas that you were having pain with; is that correct?

A    Yes.

Q    Okay, and so you circled your ankles.  You see that?

A    Yes.

Q    Your knees?

A      Yes.

Q      Your wrists?

A      Yes.

Q      One shoulder?

A      Yes.

Q      And then you have different angles from that, correct?

A      Correct.

Q      Okay, and then you go down to your history, and you have your sister with arthritis, correct?

A      Yes.

Q      Okay, and then you have rheumatoid arthritis with your sister; is that correct?

A      Yes.

Q      And then you have yourself down with lupus; is that right?

A      Yes.

Q      Okay, and this is all prior to the time that you ever saw any physician, P.A., M.A., there, at Dr. Zamora's clinic; is that right?

A      Yes.

        **MR. MARTINEZ:**  If you can keep on going down -- I'm sorry -- to the next page, which would be 0470.

        And this is, still again, for the record, Exhibit 80, Judge.

**BY MR. MARTINEZ:**

Q      Okay, and so then we have -- if we go down to your review

of symptoms.

You remember filling in this when you started marking some of the issues that you had?

Any reason to dispute that you filled this out?

A    No.

Q    Okay, so when you had the heart and lungs, you see you have irregular heartbeat; is that correct?

A    Yes.

Q    Okay, and that's similar to the palpitations that you described in your California?

A    Yes.

Q    Right?

A    Yes.

Q    And you didn't include shortness of breath, but you include shortness of breath in your California record; is that correct?

A    Yes.

Q    Okay, and then we go to your blood.

You had easy bruising?

A    Yes.

Q    You remember that?

A    Yes.

Q    And then, general, you have fatigue and weakness, correct?

A    Correct.

Q    Okay, and then you have -- in your nervous system, you

have headaches?

A      Yes.

Q      Correct?

       And do you know if headaches have anything to do with sinusitis?

A      No.

Q      Okay, are your sinuses associated with headaches at times?

A      When I get a cold.

Q      Right.  And does it produce headaches?

A      Sometimes.

Q      Okay, any reason to disagree with the doctor, when you're complaining of headaches, to go examine your sinuses?

A      I wasn't complaining about my sinuses.

Q      No.  You were just complaining of headaches?

A      Right.

Q      Is that correct?

       Okay, so you rely on a doctor to determine what the significance of headaches are; is that correct?

A      Yes.

Q      All right.  Any problem with them ordering X-rays based upon the complaint of headaches?

A      No.

Q      And then you have muscle spasm and cramps; is that right?

A      Yes.

Q      Okay, and then we go down to the muscle, joint, and bone.

And you've already told the Lady and Gentlemen of the Jury about your different joint pain and joint swelling; is that correct?

A    Yes.

Q    Okay, and these are all the different areas that you described that are on both sides of your body, correct?

A    Yes.

Q    Okay, and they go from one side of your shoulder, but then everything else is both -- on both sides of your body, going from your wrist, to your hands, to your knees, your elbows, and all the way down; is that correct?

A    Correct.

Q    Okay, and this is all stuff that you described to people at A & O clinic; is that right?

A    Yes.

Q    And then if you go to Bates Stamp Number 0466.

Okay, and in regards to the visit there -- you see that, at the top, at 11/10/17?

A    Yes.

Q    You see that?

And you were shown this by the prosecution?

A    Yes.

Q    And this is your first visit; that's why it says, "New," at the event, correct?

A    Yes.

Q    And then you have -- your rendering physician at this point in time is Dr. Zamora-Quezada; is that correct?

A    Correct.

Q    And then you went over the diagnosis with the prosecution. And we have SLE or lupus; you see that?

A    Yes.

Q    Okay, and we already have a prior doctor indicating lupus, from California; is that right?

A    Correct.

Q    We have rheumatoid arthritis, correct?

A    Yes.

Q    Okay, and we have all the signs and symptoms, based upon the bilateral symmetrical pain of rheumatoid arthritis; is that right?

A    Yes.

Q    We have elevated CRP levels from California doctor; is that correct?

A    Yes.

Q    And you complained, with your prior doctor, of hip bursitis; you see that?

A    Yes.

Q    Okay, that consistent with your complaints here, with Dr. Zamora?

A    Yes.

Q    Okay, and then we see shoulder bursitis.

And you circled your shoulder in that diagram; remember that?

A    Yes.

Q    Is that consistent with your complaint here, with Dr. Zamora?

A    Yes.

Q    Okay, we have knee osteoarthritis; you see that?

A    Yes.

Q    Okay, and you've been complaining, both in California, as well as your diagram here, with Dr. Zamora, of pain in your knees -- both knees; is that correct?

A    Yes.

Q    Is that consistent with knee osteoarthritis?

        MS. YUAN:  Objection, Your Honor; foundation.

        THE COURT:  What more foundation do you want here?

        MS. YUAN:  She's not a doctor.  She wouldn't know what's consistent with a diagnosis of knee osteoarthritis.

        THE COURT:  Can you lay a predicate for her?

BY MR. MARTINEZ:

Q    Have you been complaining to folks out -- your doctors, in California, as well as a diagram, before you saw Dr. Zamora of pain in both of your knees?

A    Yes.

Q    And so this has been ongoing pain for some period of time; is that correct?

A    Yes.

Q    All the way back, to California?

A    Yes.

Q    Okay, and then we have fibromyalgia, correct?

A    Yes.

Q    Okay, and do you know what fibromyalgia is?

A    It's kind of like arthritis?

Q    Like general pain all over your body?

A    Yes.

Q    Have you been described that before by your doctors?

A    No.

Q    Okay, and did you have general pain all over your body?

A    Yes.

Q    Okay, and then you have, "GIO"; do you see that?

A    Yes.

Q    Okay, do you know what GIO stands for?

A    No.

Q    Have you ever heard of glucocorticoid-induced osteoarthritis?

A    No.

Q    Okay, and then we have bottom hand and wrist; H, slash, W pain; do you know if that stands for hand and wrist?

A    Yes.

Q    Okay, did you complain both out in California as well as with Dr. Zamora of hand and wrist pain?

A     Yes.

Q     Okay, and is this on both sides --

A     Yes.

Q     -- of your body?

      And then you have in there, "elbow pain"; is that correct?

A     Yes.

Q     Okay, and then you've complained, both out in California, as well as here, with Dr. Zamora, of pain on both sides of your body; is that right?

A     Yes.

Q     Okay, and then we have goiter.  Do you see that?

A     Yes.

Q     And you have a family history of a sister who has got hyperthyroidism; is that right?

A     Yes.

Q     Based upon some of the stuff that you talked about in Roma; is that right?

A     Yes.

Q     And you saw that record?

A     Yes.

Q     Okay, and then we have chest pain.  You see that?

A     Yes.

Q     And this is something that you've complained about prior to seeing Dr. Zamora; is that right?

A     Yes.

Q    Okay, and then we have sinusitis.

And we talked about you complaining of headaches; is that correct?

A    Headaches, yes.

Q    Okay, and all this is consistent with complaints that you had either out in California or stuff that you circled or described prior to ever seeing anybody at Dr. Zamora's clinic; is that correct?

A    Yes.

Q    Okay, this is all on your records?

A    Yes.

Q    And for anyone to indicate that none of this is in your records would be wrong; is that correct?

A    Correct.

Q    Okay, and then why don't we go to 0501.

Have you ever heard of a Vectra test?

A    No.

Q    Okay, you see what it says there at the top?  It says, "Disease activity test"?

A    Yes.

Q    Okay, and then you see your Vectra score there, at 35?

A    Yes.

Q    Okay, and then if you can go to the bottom of that Vectra test, please.

Okay, and you see your score there, with a collection --

November the 10th, 2017; is that right?

A    Yes.

Q    Okay, that was your first visit to Dr. Zamora; is that right?

A    Yes.

Q    Okay.

          MR. MARTINEZ:  And then if you go, again, to the bottom of that, Ms. Sanchez.

BY MR. MARTINEZ:

Q    And if you go to where it says, "Vectra DA; disease activity levels."

     You see that?

A    Yes.

Q    And it says, "Low, 1 to 29; moderate, 30 to 44; and high, 45 to 100."

     You see that?

A    Yes.

Q    And with a test of 35, is that in the moderate range of rheumatoid arthritis -- rheumatoid arthritis disease activity?

          MR. MARTINEZ:  You can go ahead and show her the 35, Ms. Sanchez.

BY MR. MARTINEZ:

Q    Is that in the moderated range of rheumatoid arthritis disease activity?

A    Yes.

Q    Okay, one of the things that you talked about with the Lady and Gentlemen of the Jury before we went to lunch is Dr. Salinas, remember him?

A    Yes.

Q    Okay, and after you saw Dr. Zamora, was Dr. Fulgencio Salinas the doctor that you saw the remainder of the time that you were at A & O clinic?

A    Yes.

Q    Okay, and you trust Dr. Salinas?

A    Yes.

Q    Okay, and, in fact, I believe it was your testimony that he said you don't have fibromyalgia, right?

A    Yes.

Q    That you don't have rheumatoid arthritis?

A    Yes.

Q    And that you don't have lupus?

A    Yes.

Q    Is that correct?

     And that's what you said what he told you?

A    Yes.

Q    Correct?

     Now, why don't we look at Dr. Salinas' records.  Okay, so if we go to Zamora-0508 -- you see that?

A    Yes.

Q    Do you know what that is?

A    My state disability form, from California.

Q    Did you, in fact, apply for disability?

A    Yes.

Q    Okay, and this is back in 2017?

A    Yes.

Q    Okay, and you had a diagnosis that was required for this disability.  And that diagnosis comes out to rheumatoid arthritis, correct?

A    Yes.

Q    You have fibromyalgia?

A    Yes.

Q    And then you have lupus; is that right?

A    Yes.

Q    Okay, and then if we go on to the next page of this disability application -- that you submitted; is that right?

A    Yes.

Q    Okay, you have there, on the bottom, your physician, Dr. Fulgencio Salinas.  You see that?

A    Yes.

Q    And you see the handwritten part and then his signature; is that correct?

A    Yes.

Q    So when you're, in fact, telling the Lady and Gentlemen of the Jury that he told you that you didn't have fibromyalgia, that you didn't have rheumatoid arthritis, or didn't have

lupus -- in fact, there's records that would indicate otherwise; is that correct?

A    Yes.

Q    And this is the record from Dr. Salinas telling you this and that you relied on in order to get this disability?

A    Yes.

Q    Okay, does this refresh your recollection that, in fact, Dr. Salinas didn't tell you that?

A    No.  Dr. Salinas told me that.

Q    He told you that, but the records indicate otherwise?

A    Yes.

Q    Is that what the records are showing here?

A    Yes.

Q    And then you don't just apply for disability once; you apply for disability twice; is that correct?

A    I got an extension, yes.

Q    Okay, and if we go to Bates Stamp Number 0684 -- you see that?

     And is this, once again, your application for disability, out in California?

A    Yes.

Q    Okay, and if you look at the date it was sent -- in 2018, correct?

A    Yes.

Q    Okay, and then if you go down to the current conditions,

once again, you have rheumatoid arthritis, lupus, and

fibromyalgia.  You see that?

A    Yes.

Q    Okay, and then if we go to the next page, on 0682 of your

application.

You see down there, at the bottom?  You see that

signature?

A    Yes.

Q    Okay, and now if I go to the top there, it says the

physician there -- that's Dr. Salinas.  And then, at the

physician's signature, on the bottom, you see that?

A    Yes.

Q    So this is the second time that Dr. Salinas tells you that

you have fibromyalgia, lupus, and rheumatoid arthritis; is that

correct?

A    Yes.

Q    This is the doctor that you trusted?

A    Yes.

Q    You still trust him?

A    Yes.

Q    Then if we go to your last visit with Dr. Zamora, on March

the 14th of 2018 -- you know what?  Let me go back.

And so, on March the 14th of 2018, that was your last

visit to Dr. Zamora; is that correct?

A    Yes.

Q    Okay, but you still saw -- not Dr. Zamora, but you saw Dr. Fulgencio Salinas, correct?

A    Yes.

Q    And this is the physician that's helped you out since the first visit from Dr. Zamora?

A    Yes.

Q    Okay.

A    Dr. Zamora, I only seen him once.

Q    You only saw him the first time.

A    Yes.

Q    Is that correct?

And he's got the same diagnosis that Dr. Salinas has; is that correct?

A    Yes.

Q    Okay, and so, if you go to 0661 -- I believe the Government showed you this on that date, of 3/14/2018.  Do you see that?

A    Yes.

Q    Okay, and then the rendering physician's name is Dr. Fulgencio Salinas; is that correct?

A    Yes.

Q    Now, you admit the fact that Dr. Salinas was the one that saw you on that day?

A    Yes.

Q    Okay, and then if we go down to the diagnosis, on the

bottom, once again, Dr. Salinas has a diagnosis of rheumatoid arthritis, correct?

A    Yes.

Q    SLE, which is lupus?

A    Yes.

Q    Okay, and we have shortness of breath, see that?

A    Yes.

Q    Knee OA?

A    Yes.

Q    Fibromyalgia?

A    Yes.

Q    GIO?

A    Yes.

Q    And then it goes on with some other code; is that correct?

A    Yes.

Q    And this is what Dr. Salinas had in your diagnosis; is that correct?

A    Yes.

Q    And this is the doctor that you trust, correct?

A    Yes.

Q    You still trust today, correct?

A    Correct.

Q    Okay, and this is the doctor, now, that you've seen on three different occasions of diagnosis of rheumatoid arthritis, lupus, and fibromyalgia; is that correct?

A    Correct.

Q    And then if we go to 0675, okay?

And I want to point out the -- this is a lab that was done on 3/14/2018.  You see that?

A    Yes.

Q    You see the doctor, up to the left?  That was a lab that was ordered by Dr. Salinas?

A    Yes.

Q    Okay, and then if you go to the ESR or the sed rate.

You see that sed rate of 21?  You see that?

A    Yes.

Q    And you see the normal range, over to the right, where it says, "0 to 20"?

A    Yes.

Q    Okay, and then you see, in the middle, what we call, "the flag," is called high; is that right?

A    Yes.

Q    Okay, so given the range that you see, would your ESR or your sed rate be high?

A    Yes.

Q    Okay, and then you have your C-reactive protein, which is on the line underneath that.

And then you have -- you see the number there; 16.10?

A    Yes.

Q    Okay, you see the range over there, to the right?  The

range is 0.0 to 3.5; you see that?

A    Yes.

Q    And that's also high?

A    Yes.

Q    Correct?

A    Yes.

Q    Okay, and would you leave it up to an expert to determine the significance of an elevated sed rate or an elevated CRP rate?

A    Yes.

Q    Okay, and then let's go to 0680.

This is another Vectra test on your record, do you see that?  You see that on the top, where it says, "Vectra disease activity test"?

A    Yes.

Q    And this was collected on March 14th of 2018; is that correct?

A    Yes.

Q    Okay, and then you have a Vectra score of 68, you see that?

A    Yes.

Q    Okay, and if you go down to the bottom.

And there, it says, "Vectra disease activity levels," and high says, "45 to 100"?

A    Yes.

Q    And so if you had 68, you would be in the high level of rheumatoid arthritis disease activity score; is that correct?

A    Yes.

Q    Okay, could it be reasonable to you, Ms. Carrillo, based upon all the records that you've seen, that Dr. Zamora and anybody in his clinic, including Dr. Salinas, diagnosed you with everything they put on their diagnosis sheet?

A    Yes.

          **MR. MARTINEZ:**  Your Honor, I have no further questions.

          **THE COURT:**  Mr. Sully, did you have any questions?

          **MR. SULLY:**  Yes, Your Honor, just a couple.  Thank you.

                        **CROSS EXAMINATION**

**BY MR. SULLY:**

Q    Good afternoon, Ms. Carrillo.

A    Good afternoon.

Q    Before testifying, you met with the Government several times, right?

A    Yes.

Q    And they never showed you any of the records that Mr. Martinez just went over with you?

A    No.

          **MR. SULLY:**  I'll pass the witness, Your Honor.

          **THE COURT:**  Mr. Alvarez, did you have any questions?

**MR. ALVAREZ:** No questions, Your Honor.

**THE COURT:** Mr. Pena, did you have any questions?

**CROSS EXAMINATION**

**BY MR. PENA:**

Q    Ms. Carrillo, so you met with the Government and they didn't show you any of those records?

**THE COURT:** She answered that question right now.

**BY MR. PENA:**

Q    But they did talk to you about the questions they wanted to ask you, correct?

A    Correct.

Q    And then they told you, as long as you follow along with these questions and just answer these questions, that would be what your testimony would be, correct?

A    Correct.

Q    But now, looking at these records, you realize there's a lot more to the story than what the Government asked, correct?

A    Correct.

Q    Matter of fact, there's a couple times you testified.  One was about methotrexate.

     You never told the jury that you actually started on methotrexate in California, correct?

A    I wasn't aware I was taking that medication.

Q    Okay, so you're saying that's a case -- although the medical records show it, the doctor never told you that you

were taking methotrexate?

A    No.

Q    Okay, so you had no idea, up until today?

A    Yes.

Q    Number two, you testified regarding the medical records. I remember you told the jury that, after the visit with Dr. Salinas --

A    Yes.

Q    -- that you say that he told you that you did not have rheumatoid arthritis, you lost confidence in Dr. Zamora, correct?

A    Yes.

Q    And that's when you decided to ask for medical records?

A    I was in pain already.

     I had gone to see Dr. Mussett for another referral so they could send me to a different rheumatologist.

Q    Right, so --

A    Right.

Q    So if I can understand it, what you're saying is that you went up to the medical staff, there at the clinic, and you said, "I want..." --

A    My medical records.

Q    -- "my medical records."

A    Right.

Q    And that was after that visit, correct?  The visit with

Dr. Salinas?

A    Yes.

Q    You never got the records?

A    No.

Q    You told us about these different conversations that you had and then you made it appear they were very rude to you?

A    Yes.

Q    And up until today, you never received a copy of those records -- or a copy of those records were never sent to any other doctors who were treating you, correct?

A    Correct.

Q    Okay, even though -- did you do a request for one?

A    Yes.

Q    Okay, now, one of the other doctors that you saw was a Dr. Bay (phonetic), correct?

A    Yes.

Q    And Dr. Bay is one of your treating physicians?

A    No.

Q    Okay, you were just seeing him.

A    State of California referred me out to Dr. Bay.

Q    Okay, and so -- and Dr. Bay was one of the doctor that you had Dr. Zamora's clinic send medical records to, correct?

A    I believe so.

Q    Okay, that's -- well, you did it, not just once, but you did it twice, correct?

A    Not with the same doctor, no.

Q    Okay, well, let's go to Defense Exhibit Number 80, which is already in evidence.

     I'm going to be going on the ELMO.

A    Dr. Bay passed away and they referred me out to a different provider.

Q    Correct.  But at some point he was alive, and he was a doctor that you were referred to, correct?

A    Yes.

Q    And I'm going to show you what's already in evidence, which are the medical records that you were going over with Mr. Martinez.

     And you see here, which is Bates Stamp 738.  And you see there, at the top, that it says, "Medical record release form"?

A    Yes.

Q    And that's your name there?

A    Yes.

Q    And then you see here, "I release the following medical information to," and then you see that it says, "Dr. Louis Bay," and then it gives his information?

A    Yes.

Q    Which included X-rays, laboratory, and progress notes?

A    Yes.

Q    Correct?

     And then that is signed by you, there, at the bottom.  Do

you see that?

A    Yes.

Q    And then if we go back, we can actually see, in the records, on November 22, 2017, at 10:00 a.m., a fax was sent. And you can see, as destination, 11 pages were sent. And it's okay. Do you see that?

A    Yes.

Q    Okay, and then there's a copy of the fax cover sheet, do you see that?

A    Yes.

Q    Okay, so on November 22nd, you made a medical request to the clinic, and they sent those records to Dr. Bay?

A    I'm thinking, yes.

Q    Okay, well, did you ever communicate with Dr. Bay?

A    He passed away.

Q    Okay, do you have any reason to disagree with the fact that these medical records were sent, and a copy of all these pages of medical records, that are in Exhibit Number 8 -- do you have any reason to dispute that?

A    No.

Q    Now, the visit you had with Dr. Salinas, where you said you found the information -- where he told you, you didn't have rheumatoid arthritis -- per your review with Mr. Martinez, that was on December 6th, correct?

A    Yes.

Q    If we go back and look at the same medical records --
which are Exhibit 80, first page, which is going to be Bates
Stamp 711 -- there is another medical records transfer request,
do you see that?

A    Yes.

Q    And you see that it's asking, again, for medical notes,
labs, radiology?

A    Yes.

Q    And it's signed by you, correct?

A    Yes.

Q    And so this also was signed by you on 12-8-2017.

    That would have been two days after the visit with
Dr. Salinas that you said that you requested medical records,
correct?

A    Yes.

Q    But wouldn't this be the actual request for medical
records that you're talking about, where you say that the staff
was rude to you?

A    No.

Q    No.  You're saying this is another request?

A    Yes.

Q    Okay, and in that request, you say they never gave you the
records?

A    No.

Q    But then, two days after that visit, you're saying that

the medical staff did comply.

And we have a fax confirmation sheet, on page 709, you see that?

**MS. YUAN:**  Objection, Your Honor.  It's misstating the evidence.

**THE COURT:**  What part is that?

**MS. YUAN:**  Her last visit wasn't until March of 2018.

**THE COURT:**  Her last visit was March 2018.

**MR. PENA:**  No, I understand that.

BY MR. PENA:

Q    But you had a visit with Dr. Salinas, and you said it was your first visit with Dr. Salinas that you sat with him and you told him you did not have rheumatoid arthritis?

A    Not on my first visit, no.

Q    Okay, so then let me see if I understand your testimony.
You say you saw Dr. Zamora the first time?

A    Yes.

Q    He diagnosed you with rheumatoid arthritis?

A    Yes.

Q    Then you saw Dr. Salinas again --

A    Yes.

Q    -- that same year.  And then again -- or in December?

A    Yes.

Q    He diagnosed you also with rheumatoid arthritis?

A    Yes.

Q    And then you said you had another visit with Dr. Salinas after that.

A    After my gallbladder removed; surgery.

Q    You had your gallbladder removal surgery --

A    In March -- in, I don't know, I think February.

Q    In February.

So you're saying you had -- you saw Dr. Salinas, you had your surgery, he had already -- he had still continued the diagnosis, rheumatoid arthritis, and then you're saying he changed his mind?

A    I don't recall the dates.  I don't remember the dates. I'm confused with my dates.

Q    And that's what I'm trying to clarify here.  Because my --

A    Okay.

Q    -- understanding was -- from your testimony was that you saw Dr. Salinas for the first time, and you asked him about how was your rheumatoid arthritis doing.

And that his response was, "You don't have rheumatoid arthritis."

A    Not on the first time that I seen Dr. Salinas.

Q    Okay, so then he did tell you, on one of those -- or the first visit that you --

A    Well, he --

Q    -- did have rheumatoid arthritis?

A    He was treating for that, yes.

Q    Okay, so it's not a surprise to you, then he complied and requested disability, correct?

A    Right.

Q    That you saw with Mr. Martinez?

A    Right.

Q    And he had no problem with it at that time?

A    Right.

Q    And then you saw the last request for disability -- you saw was actually after your last visit, in April.  Do you recall that?

A    Yes.

Q    And, still, you requested disability from the State of California, telling the State of California, from Dr. Salinas, that you have rheumatoid arthritis, correct?

A    Yes.

Q    Okay, but as far as -- if you were to represent to this jury -- or the jury were to take from your testimony that you requested medical records from Dr. Zamora, and his clinic would never give you the record --

     The truth is, at two previous times that you requested records, the clinic not only got a copy of the record, but they faxed a record to the requesting physician, correct?

A    To the office, yes.  But they never gave them to me in person.

Q    Okay, so but if you wanted to get a copy of the records,

you could have gone to Dr. Bay.

A    But they didn't have the medical records from California. And I wanted all my medical records.

Q    Okay, so the only one -- did you ask Dr. -- I forgot her name -- the doctor at DHR.

MR. MARTINEZ:  Christensen.

BY MR. PENA:

Q    -- Christensen -- Dr. Christensen never had --

THE COURT:  Did you ask permission to say something from there?

MR. MARTINEZ:  I'm sorry, Judge.

THE COURT:  Go ahead.

BY MR. PENA:

Q    Dr. Christensen never had the benefit of looking at the records in California, did she?

A    No.

Q    You never told Dr. Christensen that Dr. Zamora had the records, correct?

A    Yes.

Q    But she didn't bother to ask for those records?

A    No.  I went myself and asked for the medical records.

Q    But there -- and you said you signed a release, correct?

A    Myself, yes.

Q    But in the medical records of Dr. Zamora, you know that there is no other release than the two releases that you signed

for Dr. Bay, correct?

A    I signed a medical release form.

Q    Okay.

         **MR. PENA:**  Pass the witness, Your Honor.

         **THE COURT:**  Do you have some more questions of her?

         **MS. YUAN:**  Yes, Your Honor.

         **THE COURT:**  Go ahead.

         **MS. YUAN:**  Thank you.  May I approach again, Your Honor?

         **THE COURT:**  Sure.

                      **REDIRECT EXAMINATION**

**BY MS. YUAN:**

Q    Good afternoon, Ms. Carrillo.

A    Good afternoon.

Q    So you saw a series of doctors over the course of 2016 to 2018?

A    Yes.

Q    Some in California?

A    Yes.

Q    And then you came back to the Valley, where you saw Dr. Zamora at his clinic?

A    Yes.

Q    So I'd like you to just look at a couple of those records again.

     Let's look at Government Exhibit C-3, at page 41.  These

are your records from Dr. Christensen.

And we will zoom in on the top part, where it says the name of the provider, and then the musculoskeletal.

What is the date on this, Ms. Carrillo?

**MR. MARTINEZ:** Your Honor, just going to object. I think she referred to this as Dr. Christensen's record.

But I believe it's Arthritis and Rheumatism Center.

**MS. YUAN:** Exhibit C-3 is Dr. Christensen's patient file for Ms. Silvia Carrillo. So this is within Exhibit C-3.

**MR. MARTINEZ:** So this is with Dr. Christensen; not hers?

**MS. YUAN:** Correct, correct.

**MR. MARTINEZ:** I misunderstood, Judge. I apologize.

**THE COURT:** Go ahead.

BY MS. YUAN:

Q    What is the date on this?

**MS. YUAN:** If, Ms. Barton, you could please highlight that.

**THE WITNESS:** November 15, 2016.

BY MS. YUAN:

Q    And then, to the right, who is the provider; the doctor?

A    Anupam Chahal.

Q    Is Dr. Chahal the doctor that you saw in California?

A    Yes.

Q    Looking at hands, what does it say next to, "hands"?

A    No swelling or -- no swelling.

Q    What does it say next to, "wrists"?

A    No swelling

Q    Next to Elbows?

A    No swelling.

Q    Next to Shoulders?

A    No swelling.

Q    Next to Knees?

A    No swelling.

Q    Next to Ankles.

A    No swelling.

**(Pause)**

Q    So let's move ahead in the timeline.  Now looking at

Government C-3.  Again, your patient file from Dr. Christensen.

Looking at page 38 --

         Zooming in on the top portion please.

Q    -- what's the date on this, Ms. Carrillo?

A    September 9th -- September 19, 2017.

Q    Who is the provider or the doctor that you saw on

September 19th, 2017?

A    Anupam Chahal.

Q    That same Dr. Chahal?

A    Yes.

Q    What does it say next to Hands on this day.

A    No swelling.

Q    Next to Wrists.

A    No swelling.

Q    Next to Elbows?

A    No swelling.

Q    Next to Shoulders?

A    No swelling.

Q    Knees?

A    No swelling.

Q    Ankles?

A    No swelling.

     **(Pause)**

Q    Now let's go to the same exhibit, Government Exhibit C-3 at page 16.

          Zooming in on the top portion.

Q    And this is your Patient File from Dr. Christensen.  What is the date on this file?

A    March 13th, 2018.

Q    Was that your first visit with Dr. Christiansen here in Edinburg?

A    Yes.

Q    What does that say next to Hands?

A    No swelling.

Q    Next to Wrists?

A    No swelling.

Q    Next to Knees?

A    No swelling.

Q    Ankles?

A    No swelling.

Q    Feet?

A    No tenderness or swelling.

     **(Pause)**

Q    And then on the same exhibit going to page 65 please for your second visit with Dr. Christiansen, zooming in at the top, what was the date of your second visit with Dr. Christiansen?

A    April 10th, 2018.

Q    Looking at the bottom, what does it say next to Hands?

A    No swelling.

Q    Wrists?

A    No swelling.

Q    Knees?

A    No swelling or tenderness.

Q    Ankles?

A    No swelling.

Q    Feet?

A    No tenderness or swelling.

     **(Pause)**

Q    And then finally let's move to the other exhibit which is your Patient File from Dr. Zamora-Quezada and his clinic.  So this is going to be Government Exhibit 32 and we'll start at

page 66.

Zooming in on the top, what is the date of this visit?

A     November 10th, 2017.

Q     Who did you see on that first visit at Dr. Zamora's clinic?

A     Dr. Zamora-Quezada.

Q     Scrolling down in this document three pages to page 69 of Government Exhibit 32, and then zooming in on the part where it says muscle skeletal and joint man.

Ms. Bartone, if you can highlight in the middle of muscle skeletal where it says Hands Left.

Q     What does it say after that, Ms. Carrillo?

A     Hands left swelling.

Q     And then what about Right?

A     Swelling.

Q     And then moving down to the next paragraph starting with Right Wrist, what does it say after that?

A     Positive pain -- positive for pain swelling.

Q     Left Wrist?

A     Positive for pain swelling.

Q     On the right hand?

A     All MCP joints are positive for pain and swelling.

Q     And what about all IP joints?

A     All IP joints are positive for pain and swelling.

Q    And the Left Hand?

A    On the left hand, all MCP joints are positive for pain and swelling.

Q    And all IP joints?

A    All IP joints are positive for pain and swelling.

Q    What about Hips.  Does it say anything about swelling there?

A    Left hip -- left hip positive for pain swelling, left hip positive for pain swelling.

Q    Does this record from Dr. Zamora-Quezada describe a lot of swelling?

A    Yes.

Q    Let's look at the next visit with Dr. Zamora's clinic.  If you can please go to page 257, Government Exhibit 32.

What's the date on this next visit, Ms. Carrillo?

A    December 6, 2017.

Q    Who did you see on your second visit?

A    Dr. Fulgencio Salinas.

Q    Who is Dr. Fulgencio Salinas; do you know?

A    He's a doctor that works with Dr. Zamora-Quezada.

Q    Going to page 259 of this document scrolling down, and again let's look at the same Muscle Skeleton and Joint Man.

On the top where it says Hands, what does it say for Hands?

A    Left pain and swelling.

Q    For the Right Hand?

A    Right pain and swelling.

Q    Going down a couple of lines to Foot and Ankle?

A    Foot ankle left pain swelling.

Q    What about the Right?

A    Right pain swelling.

Q    And then going down to left -- Left Wrist?

A    Left wrist is positive for pain swelling.

Q    Right Hand?

A    On the right hand all MCP joins are positive for pain and swelling.

Q    What about IP joints?  Were they positive for pain and swelling?

A    All IP joints are positive for pain and swelling.

Q    On the Left Hand?

A    On the left hand all MCP joints are positive for pain and swelling.  All IP joints are positive for pain and swelling.

Q    What the about the ankle, the Right Ankle?

A    Right ankle is positive for pain swelling.

Q    Left Ankle?

A    Left ankle is positive for pain and swelling.

Q    Right Foot?

A    On the right foot all MTP joints are positive for pain swelling.  All IP joints are positive for pain and swelling.

Q    Left Foot?

A    On the left foot all MTP joints are positive for pains and swelling.  All IP joints are positive for pain swelling.  All MTP joints are positive for pain and swelling.

Q    But a lot of swelling in your Zamora-Quezada patient file, Ms. Carrillo?

A    A lot of positive and swelling.

Q    And then finally looking at the same exhibit, Exhibit 32, your Patient File from Dr. Zamora-Quezada, going to page 212, the top, what is the date on this visit?

A    March 14th, 2018.

Q    Who did you see on your last visit at Dr. Zamora-Quezada's clinic?

A    Dr. Fulgencio Salinas.

Q    And then looking down at the Review of Systems, do you see Swelling?

       Ms. Bartone, if you could highlight it for us.

A    Yes.

Q    Is the word Swelling circled there?

A    Yes.

     **(Pause)**

Q    Can you see this here (indicating)?

A    Now I can.

Q    So based on the records we've just looked at is it fair to say that in your Patient Files from Dr. Zamora and other physicians, the only time that swelling was documented was in

the patient files from Dr. Zamora?

A     Yes.

Q     Did anyone in California ever diagnose you with rheumatoid arthritis?

A     No.

Q     Who -- did Dr. Christiansen diagnose you with rheumatoid arthritis?

A     No.

Q     Who are the only doctors that diagnosed you ever in your life with rheumatoid arthritis?

A     Dr. Zamora-Quezada.

        **MS. YUAN:**  No further questions.

        **THE COURT:**  Does anybody have any other questions?

        **MR. MARTINEZ:**  No further questions, Judge.

        **THE COURT:**  You may go ahead and step down, Ms. Carrillo.  Thank you very much.

        **THE WITNESS:**  Thank you.

    **(Witness steps down)**

        **THE COURT:**  Go ahead and call your next witness.

        **MS. GURSKIS:**  The government calls Sara Robles.

    **(Pause)**

        **THE COURT:**  Ms. Robles, if you don't mind coming up here to the front so you can be sworn in please ma'am.

    **(Pause; witness summoned)**

        We need a break.  The jury has spoken.  Very quietly

but they need a break.

Please rise for the jury.

**(Jurors exit courtroom)**

Ms. Robles, we're going to take about a 10 or 15 minute break and then you'll come back right there.

**MS. ROBLES:** So (indisc.) --

**THE COURT:** Thank you.

**(Recess taken from 3:00 p.m. to 3:16 p.m.)**

**(Jurors present)**

**THE COURT:** Please be seated.

Now we can go ahead with the next witness on.

**MS. GURSKIS:** United States calls Ms. Sara Robles.

**(Pause)**

**THE COURT:** Ms. Robles, again, if you don't mind coming up here so you can be sworn in.

**THE CLERK:** Raise your right hand.

**SARA ROBLES, GOVERNMENT'S WITNESS, SWORN**

**THE COURT:** Go ahead and have a seat right up here, ma'am.

**DIRECT EXAMINATION**

BY MS. GURSKIS:

Q    Good afternoon.

A    Hi.

Q    Pull the microphone a little closer to you so we can make sure we hear your responses.  Thank you.

A    Is this good?

Q    It's perfect.

A    Thank you.

Q    Please state your name for the record.

A    My name is Sara Robles.

Q    What is your occupation, Ms. Robles?

A    I am sort of a general manager for an A/C company.

Q    What does AC stand for?

A    Air conditioning.

Q    Where do you live, Ms. Robles?

A    I live in Edinburg.

Q    Did you grow up in the Edinburg area?

A    I did.

Q    Where did you go to college?

A    I went to UTPA.

Q    I'm going to walk you back a little bit in time to when you were first a student at UTPA.  What were you studying?

A    I was studying chemistry and biology.

Q    When you first started at UTPA, how were your grades?

A    They were pretty good.  Straight As.

Q    Say pretty good.

A    Pretty much.

Q    I'm sorry.

A    Straight As pretty much.

Q    And how was your physical health when you first started at

UTPA?

A     It was manageable.

Q     Directing your attention to June of 2015, at that time did you become a patient of Dr. Jorge Zamora-Quezada?

A     Yes.

Q     Do you see Dr. Zamora-Quezada in the courtroom here today?

A     Yes.

Q     Can you identify him based on an article of clothing he's wearing?

A     Blue shirt.

          MS. GURSKIS:  Your Honor, may the record reflect --

          THE COURT:  The record will reflect she's pointed out Dr. Zamora-Quezada.

          MS. GURSKIS:  Thank you, Your Honor.

Q     At which clinic or clinics did you visit Dr. Zamora-Quezada?

A     The Arthritis and Osteoporosis Center.

Q     In what town?

A     It's still Edinburg?

Q     Why did you decide to see a rheumatologist in June of 2015?

A     I went to the doctor at UTPA and the doc -- Dr. Escalona (phonetic) there thought that I had fibromyalgia but she -- and she tried to prescribe some medication to manage it.  But I was still in a lot of pain so she sent me to a specialist.

Q    And Dr. Escalona is a primary care practice nurse.  Is she a specialist?

A    She's primary care.

Q    Okay.  And that was the health clinic at UTPA at your college?

A    Yes.

Q    Do you recall her running any lab tests for you at that time?

A    Yes.

Q    What do you recall about those lab tests?

A    I recall she ran some bloodwork and she also had a test for thyroid condition.

Q    Do you recall the results of those tests?

A    Yes.  The lab work was fine and it was negative for the thyroid conditions.

Q    But I think as you just said, you were feeling some pain.

A    Yes.

Q    So Dr. Escalona referred you to a specialist.  Who was the first specialist she referred you to?

A    She wanted me to go to Dr. Nunnery in Harlingen but the wait time was pretty long so she referred me to Dr. Zamora-Quezada then.

Q    What do you remember about your pain before that first visit to Dr. Zamora-Quezada's clinic?

A    I had pain all over my body, my legs my arms.  I also had

pain in my hands, stomach aches.  I needed -- I went to Dr. Zamora-Quezada because I was having trouble just concentrating in class.  It would be really difficult.

Q    Did you also have some issues in the chemistry and biology labs at school with your hand?

A    Yes.  I had pain in my hands.  I would have to perform very fine movements for the experiments that we would do and sometimes they would be shaky or repetitive movements made them hurt a lot.

Q    How long would you say you were experiencing those shaky hands before you went to see Dr. Zamora-Quezada?

A    I want to say maybe around a year.

Q    Let's talk more specifically about that first visit with Dr. Zamora-Quezada in June of -- June 8th, 2015.

Ms. Bartone, can you please publish Dr. Zamora-Quezada's Patient File for Sara Robles which has been previously admitted as Government Exhibit C-57.  And Ms. Bartone, if you could turn to page 7 of that document.

Ms. Robles, did you have health insurance in June of 2015 when you first visited Dr. Zamora?

A    No.

Q    Let's focus here on the upper right-hand corner.  Do you see what time you arrived at the clinic?

A    2:00 p.m.

Q    If you go up to the box --

Ms. Bartone, if you could highlight that box in the upper right-hand corner that says Appt.

A    Oh, does that say 1:30?

Q    It does.  And then what time does it say next to the initial DR?

A    3:15.

Q    What time does it say next to Lab?

A    3:20.

Q    Let's talk in a little more detail about that first visit with Dr. Zamora-Quezada.

Did you meet with Dr. Zamora-Quezada personally on your first visit to the clinic?

A    Yes.

Q    Between 3:15 and 3:20, in that five minutes that you were meeting with Dr. Zamora-Quezada, can you describe for the jury what happened?

A    It was just very fast.  He came in and it was pretty overwhelming.  He started just grabbing my hand and just pulling my arms.  And he started putting pressure on certain points of my body.  He took my hands and he asked me if I had pain; I told him yes.

And at some point he laid me back on the exam table and he opened my jeans and he gave me two shots.  He just said it was for the pain but I -- on my hips.  I was pretty overwhelmed.  I started to panic and then he -- afterwards he

started giving me prescriptions, a lot of prescriptions.  I think, around eight.

Q    Let's break that up a little bit for the jury.

So you said you were starting to panic.  Can you talk to the jury a little bit more about kind of the emotions you were feeling during that visit?

A    I was just feeling pretty overwhelmed.  I started to breathe a little bit faster.  I just -- it was a lot going on with the injections.  I just -- I started kind of feeling pressure in my chest and -- yeah, that's how it was.

Q    And did you receive --

Ms. Bartone, if you could zoom back out and zoom please into that bottom right-hand corner.

Q    Ms. Robles, do you recall receiving a diagnosis from Dr. Zamora-Quezada during that first visit?

A    He said that I had fibromyalgia; rheumatoid arthritis and he also mentioned a thyroid condition.

Q    How did you react to that diagnosis of rheumatoid arthritis?

A    It was scary.  It's -- I knew that it just doesn't go away and he made it very clear that it would never go away.  Just I guess a little bit of relief too that I had a name to what was going on.

MS. GURSKIS:  Ms. Bartone, if you could zoom back out and let's focus in on the labs here that were ordered for you.

Q   Do you recall receiving any bloodwork on that first visit?

A   During that first visit they drew the blood and they were going to do the tests.

Q   You mentioned some medications that you were prescribed by Dr. Zamora.  Do you recall how many prescriptions you received on that first visit?

A   I think it was around eight.

        **MS. GURSKIS:**  Ms. Bartone, if you could please pull up page 23 of Dr. Zamora-Quezada's Patient File for Ms. Robles.

Q   Ms. Robles, do you see some of the prescription copies here on this document?

A   Yes.

Q   Do you see gabapentin?

A   Yes.

Q   Do you recall being prescribed gabapentin?

A   Yes.

Q   Do you see the duloxetine?

A   Yes.

Q   Do you recall being prescribed duloxetine?

A   Yes.

        **MS. GURSKIS:**  Zooming back out please Ms. Bartone.

Q   Do you see Xanax?

A   Yes.

Q   Do you recall Dr. Zamora-Quezada prescribing Xanax for you?

A    Yes.

Q    What about ergocalsothal (phonetic)?

A    Yes.

Q    Turning to the following page, page 24, I believe that this fifth prescription, do you see hydroxychloroquine?

A    Yes.

Q    And then sulfasalazine?

A    Yes.

Q    And then do you see folic acid?

A    Yes.

Q    And Tylenol with codeine?

A    Yes.

Q    So I think you were right with that number of the eight prescriptions.

Do you remember anything about getting these prescriptions filled after your visit with Dr. Zamora?

A    Yes.  After my visit I went to Walmart, the pharmacy, to go fill them.  I didn't have insurance at this point.  So I gave them the prescriptions and the pharmacy asked me if I wanted to fill all of them.  And she asked me if I had insurance and I told her it was private pay.  And she told me the total would come out to about $1,000 for a one-month supply.

Q    One thousand dollars for those eight prescriptions for one month?

A     Yes.

Q     Did you end up following through on that first visit with all those eight prescriptions?

A     I did not.

Q     Which of those prescriptions did you end up following on that first appointment, if you recall?

A     The ones that I didn't were the hydroxychloroquine and the duloxetine, I believe.

          **MS. GURSKIS:**  Ms. Bartone, if you would please turn to page 14.  Let's zoom in on the History of Patient Illness -- Present Illness, I'm sorry.

Q     Ms. Robles, if you could just take a second to look at this to yourself for a moment and then just look over at me when you're done reviewing it.

          **(Pause)**

A     Okay.

Q     Does this accurately reflect the systems you were feeling when you first visited Dr. Zamora-Quezada?

A     Yes.

Q     Would you say all of the symptoms are accurate in terms of how you were feeling?

A     Yes.

Q     Let's turn your attention to document C -- Government Exhibit C-29 which is your Patient File from the Student Health Services Clinic at UTPA.  So turning your attention to June

16th, 2015, which is the date on this first page of this file, that's about a week after that first visit with Dr. Zamora-Quezada.  Did you return to the University Student Health Clinic about a week later?

A    Yes, I did.

Q    Why did you return to the clinic a week later after seeing Zamora-Quezada?

A    I had concerns about getting eight prescriptions and also being diagnosed so quickly and just the overall experience of that first visit.  So I went to my primary care physician so that she could give me her opinion on that.

        **MS. GURSKIS:**  Okay.  Ms. Bartone, if you could please zoom back out and then highlight the Subjective section there at the bottom of the page.

Q    So moving to that Subjective section:

        "She did not like the experience.  She feels that he
        was abrupt, did not explain much."

        Is that an accurate reflection of how you were feeling at the time of that visit?

A    Yes.

Q    And then the last line there:

        "He gave her several medications which she reports
        were not explained to her."

        Does that accurately reflect how you were feeling?

A    Yes.

Q    And then let's turn to the following page, page 2, that second line there.  "She is concerned."  Were you concerned about taking medications that you didn't need?

A    Yes.

Q    Did you also report that you had a panic attack during that first visit with Dr. Zamora?

A    Yes.

Q    And then zooming back out please Ms. Bartone, looking under Plan here, zooming into that section.

What did your primary care provider, Dr. Escalona advise you after that first follow up, after your visit with Dr. Zamora-Quezada?

A    She advised me to go start the treatment to see how I would feel.

Q    Because she's a primary care provider and not a rheumatologist?

        MR. MARTINEZ:  Objection --

A    Yes.

        MR. MARTINEZ:  -- Your Honor.  It calls for speculation.

        MS. GURSKIS:  I'll withdraw that question.

        THE COURT:  Go ahead.

        MS. GURSKIS:  Turning to page 4 -- I'm sorry, page 3, Ms. Bartone, the date in the upper right-hand corner..

Q    Do you see where it says "June 29, 2015," Ms. Robles?

A     Yes.

Q     Did you return to the UTPA clinic on June 29th?

A     I did.

Q     Why did you return to the clinic on June 29th?

A     I wanted to get my records from Dr. Zamora-Quezada so that I could take them to my primary care physician so that she could look at them and advise me based on that.

Q     Was your primary care physician actually administering some of the injections that Dr. Zamora-Quezada had ordered for you at that time?

A     She -- I went to the clinic and I got one vitamin injection, vitamin B injection, but other than that, the other shots were with Dr. Zamora-Quezada.

Q     Let's turn back to your patient file from Dr. Zamora-Quezada.

        Ms. Bartone, if you could please pull up page 44 of Government Exhibit 57, Sara Robles' Patient File for Dr. Zamora.

Q     Ms. Robles, did you get health insurance in approximately September of 2015?

A     Yes.

Q     And what health insurance plan did you get?

A     Blue Cross Blue Shield.

Q     Turning to page 45, looking at the top of this page under Insurance Information, does this reflect that you had Blue

Cross Blue Shield at the time of this appointment with

Dr. Zamora-Quezada?

A    Yes.

Q    And turning your attention to the date underneath the

Appointment, that was on September 17th, 2015?

A    Uh-huh (affirmative).

Q    And turning your attention to under Event, what does it

say under Event?

A    Second 10:30 a.m. B-12.

        **MS. GURSKIS:**  If you could please zoom back out,

Ms. Bartone.  Let's zoom in on the labs here that were ordered

during the second visit.

Q    Ms. Robles, do you recall having significantly more labs

done on your second visit than on your first visit?

A    Yes.

Q    And (indisc.) that was when you had Blue Cross Blue Shield

health insurance as opposed to the first visit -- which I think

Ms. Bartone has pulled up on the right side of the screen --

when you did not have health insurance?

A    Yes.

        **MS. GURSKIS:**  Ms. Bartone, if you could please turn

to page 51 of Ms. Robles' Patient File from Dr. Zamora-Quezada.

Q    Ms. Robles, do you recall receiving additional x-rays

during your second visit with Dr. Zamora-Quezada?

A    Yes.  There were a couple of x-rays.

MS. GURSKIS: We can zoom in here. I'm not sure how well you can see this on your monitor.

Q   Do you recall receiving knee x-rays of both of your knees?

A   Yes.

Q   Do you recall receiving ankle x-rays on both of your ankles?

A   Yes.

Q   Do you recall receiving x-rays on both of your feet?

A   Yes.

Q   Do you recall receiving a chest x-ray?

A   Yes.

Q   Do you recall receiving an e-ray of your sinus?

A   Yes.

Q   Do you recall receiving a bone density scan?

A   Yeah, yes.

MS. GURSKIS: And zooming back out please, Ms. Bartone, if you could pull up the Ultrasound section on the bottom left-hand corner.

Q   Ms. Robles, do you recall receiving a thyroid ultrasound on that visit?

A   Yes.

Q   So now this is September of 2015. You had been seeing Dr. Zamora-Quezada for about two months. How were you feeling after these first two months in Dr. Zamora's care?

A   As far as the pain was concerned, I was feeling about the

same amount of pain but I was also feeling the side effects of the medications.  I would be really groggy during the day.  I'd have insomnia.  I -- I would clench my jaw.  That would bring pain unconsciously like when I would be asleep.  The shaking in my hands was really bad.  Yeah, I had those side effects.

Q    So in addition to the pain not improving, I think you said you were feeling groggy, feeling some other side effects.

A    Yes.

        **MS. GURSKIS:**  Ms. Bartone, if you could please turn to page 53 of Ms. Robles' Patient File and zoom in please on the upper half of the page.

Q    So I think you told the jury this is your second visit. You've now been under the care of Dr. Zamora for about two months.  Moving to the middle of the paragraph where it says, "Relieving Factors," under History of Present Illness, would it be accurate to say that you were feeling better from the prescriptions that Dr. Zamora was giving you?

A    No.

Q    In fact you were feeling worse.

A    Yes.

Q    Did you ever have MRIs done by Dr. Zamora-Quezada?

A    No.

Q    Do you recall him instructing you to get MRIs?

A    One of the PAs that saw me said yes, that I should get MRIs for my hands.

Q    Your hands?  Anywhere else on your body that you recall?

A    She just said for my hands.

Q    So turning -- so you were in Dr. Zamora's care for approximately five months.  You mentioned on your second visit you weren't seeing much improvement.  In the five months that you were seeing him, did you feel any improvement on your physical health?

A    No.

Q    Can you describe that in more detail for the jury?

A    There was a lot of pain.  I remember that because I had a lot of pain and the side effects.  It also started to affect my mental health.  I had a lot of anxiety, some depression.  Yeah, everything was getting worse.

Q    You said "anxiety, depression."  Would you say the medications affected your confidence at all?

A    Yes.  It was very difficult to function, to go to class. And I was a very high-performing student and so starting to not do so well in my classes that affected me quite a bit.

Q    So just to expand on that a little bit.  You said before when you first started seeing Dr. Zamora-Quezada you were pretty much a straight A student.

A    Yeah.

Q    Five months into your care with Dr. Zamora-Quezada, what were your grades like?

A    I started getting Bs, Cs.  It was a struggle.  I started

taking less classes towards the end.

Q    Did the slip in your grades and your general health affect your plans after college?

A    Yes.  I wanted to go to the master's program in chemistry but I didn't have the grades to continue my scholarship.  And my mental health was -- I just couldn't do it.

Q    When did you end treatment with Dr. Zamora-Quezada?

A    I think it must have been like after four visits or so when the PA wanted -- she said that she wanted me to get MRIs on my hands.  And that the doctor would probably recommend infusions after that.  I -- I just -- it was too much for me.  I didn't think that I needed it or that I -- it was too much so I stopped going.

Q    Turning your attention to Government Exhibit C-19 which is Sara Robles' Patient File from Dr. Eugene (phonetic) Nunnery.

        Ms. Robles, in January of 2016, did you get a second opinion from another rheumatologist?

A    Yes.

Q    From whom?

A    Dr. Nunnery.

Q    What do you recall about the first visit with Dr. Nunnery?

A    It was different.  He -- he let me in right away.  He saw me right away.  And he still did the physical examination but it was slower.  He told me what he was doing.  He made me like walk up and he saw my walk and everything.  And afterwards he

told me that he didn't think that I had rheumatoid arthritis.
That he did think that I had fibromyalgia but not the
rheumatoid arthritis.  But that he was going to run some tests,
some bloodwork and some x-rays to confirm.

Q    So did he have a follow-up appointment with you to discuss
the x-rays and labs he had run and how that might affect your
diagnosis?

A    Yes.

          **MS. GURSKIS:**  Ms. Bartone, if you could please turn
to page 6 of Government exhibit 19, Dr. Nunnery's file for Sara
Robles.

Q    Looking at the bottom half of that page, do you see where
it says Date in the bottom right-hand corner?

A    Oh, February 4th, 2016.

Q    On February 4th, 2016 on your second visit with
Dr. Nunnery, is that when you had a conversation about
fibromyalgia?

A    Yes.

Q    And what did you learn about whether you had rheumatoid
arthritis?

A    He said that I didn't have rheumatoid arthritis.

Q    Did Dr. Nunnery prescribe any treatments for you?

A    He did and then he told me to stop other treatments.

Q    He told you to stop the other treatment?

A    Yes.

Q    Do you still see Dr. Nunnery, Ms. Robles?

A    I don't.

Q    Why not?

A    Since I stopped taking medication, I've felt a lot better. So, I didn't think there was reason to continue seeing him.

Q    Ms. Robles, are you a U.S. citizen?

A    No.

Q    Are you seeking to become a U.S. citizen?

A    Yes.

Q    How are you seeking to do that?

A    I have applied for a U Visa --

Q    On what grounds?

A    -- or I'm in the process of applying.

Q    And on what grounds are you seeking?

A    Say a victim of a crime.

Q    Is that related to this case here today?

A    Yes.

Q    Finally, how would you measure your pain now versus when you were seeing Dr. Zamora-Quezada?

A    I still have pain, but it's a lot more manageable.  It's better to have the pain and just kind of deal with it than to deal with all the side effects and all the stress from having to go to the visits and just -- and everything that was going on.

Q    What differences have you observed in your day-to-day

life, if you compare right now versus when you were under the treatment and care of Dr. Zamora-Quezada?

A    I can enjoy things.  I've gotten back to a regular sleeping cycle.  I sleep my eight hours, instead of like the four that I would sleep.  I don't feel groggy anymore.  I feel a little bit of pain, but I don't have the pain in my jaw anymore.  So, better.

Q    What about your mental health?

A    It's better.  I have some anxiety still, but it's a lot more manageable.

            MS. GURSKIS:  I pass the witness.

            THE COURT:  Mr. Martinez?

            MR. MARTINEZ:  Judge, may I proceed?

            THE COURT:  Sure.

                    **CROSS EXAMINATION**

**BY MR. MARTINEZ:**

Q    Good afternoon, Ms. Robles.

A    Good afternoon.

Q    My name is Trey Martinez and I represented Dr. Jorge Zamora-Quezada.  We've never met before today, correct?

A    Yes.

Q    Okay.  And I want to ask you a few questions --

A    Okay.

Q    -- in following up with what it is that you testified for the Government here today and I want to go over a few of your

records.  Okay?

A    Okay.

Q    And so, it's my understanding that based upon the records that you started seeing Dr. Jorge Zamora-Quezada back in June of 2015.  Is that correct?

A    That's correct.

Q    Okay.  And then, I believe, Ms. Gurskis intimated a range of five months within which you saw Dr. Zamora.  Is that right?

A    Around --

Q    Would you go --

A    -- there.

Q    -- based -- I'm sorry.  Would you go based upon the records?

A    Around there, I think, that it was.

Q    Would you like for me to show you the records?

A    Yes.

Q    Okay.  Great.  If we can start off with -- you know what?  For purposes of record, Judge, let me introduce Exhibits 90, 91 -- Exhibit 91 --

         THE COURT:  Exhibit's not in, 91?  Is there any opposition?

         **(Pause)**

         **MS. GURSKIS:**  No objection.

//

//

**THE COURT:**  They're admitted.

**(Defendant's Exhibit Numbers 90 and 91 were received in evidence)**

MR. MARTINEZ:  Thank you, Judge.

BY MR. MARTINEZ:

Q    So, if we go to Bates Stamp Number 20679.  While that's coming up, one of the things that you described to the Prosecutors, before you actually went to go see Dr. Zamora and the reason you went to see Dr. Zamora was because you had pain all over your body.  Is that correct?

A    That is correct.

Q    And I believe you said your legs, correct?

A    Correct.

Q    Your hands?

A    Correct.

Q    Your arms?

A    Correct.

Q    And then you also had stomach aches.  Is that correct?

A    That is correct.

Q    Okay.  Prior to you seeing Dr. Zamora did you in fact have some mental health issues prior to that time, as well?

A    I did.

Q    Okay.  And so, you're not blaming him for any mental health issues, are you?

A    After I started seeing Dr. Zamora-Quezada, it became

worse.

Q    Okay.  But you had these prior to the time you saw him?

A    I did.

Q    And when you went to go see Dr. Zamora-Quezada, let me see if I can get -- you went and filled out a form that most new patients do.  Is that correct?

A    That is correct.

Q    Okay.  And let me blow up just a first part of that.  Ms. Sanchez?  Okay.  And this is you, Ms. Sara Robles, is that right?

A    That is correct.

Q    Okay.  And this is the form that you filled out.  Is that right?

A    That is correct.

Q    Okay.  And this is your date of birth?

A    That is correct.

Q    Okay.  And this is the date of your first appointment.  Is that correct?

A    Correct.

Q    Okay.  And when it talks to you about briefly describing your present symptoms you wrote in your own words, "fatigue, body aches, and tender ribs."  Is that right?

A    That is correct.

Q    Okay.  And then, when we continue further on in this document, on the next page, which would be Bates Stamp Number -

- I'm sorry -- 20680, you actually go and checkmark different things, called "A Review of Systems." Is that correct?

A   That is correct.

Q   Okay. And at the top it says, "As you review the following list, please check any of the problems that apply to you." Is that right?

A   That is correct.

Q   Okay. And we start off to the left with mouth. You had sores in your mouth?

A   Correct.

Q   Okay. Do you know if that has any association with some of the problems that you were experiencing, based upon your arthritic conditions?

A   No.

Q   Okay. Was that ever described to you in any way, shape, or form?

A   No.

Q   Okay. If we go to your kidney, your bladder, you had various issues there that we won't get into. Is that correct?

A   That is correct.

Q   Okay. And then, you go into your muscle, joint, and bone issues. Is that right?

A   Yes.

Q   Okay. And you had morning sickness? Is that right?

A   Yes.

Q    Okay.  And did you have morning sickness for two minutes or two hours?

A    I think --

**(Pause)**

Q    You wouldn't go complain for morning sickness for two minutes, would you?

A    No.  Probably, two hour (laughing).

Q    Okay.  And then, also, you had joint pain.  Is that correct?

A    That is correct.

Q    And this is part of the joint pain that you described for the Ladies and Gentlemen of the Jury, as well as for Dr. Zamora and his staff.  Is that right?

A    That is correct.

Q    Okay.  And then, if you continue, going on to the second half of this.  You see that?  And then, we have heart and lungs.  You see that?  And you check off pain in chest, right?

A    Yes.

Q    Irregular heartbeats?

A    Yes.

Q    Sudden changes in heartbeat?

A    Yes.

Q    Shortness of breath.  Is that right?

A    That's right.

Q    Okay.  And then, you go down to your stomach.  You have

nausea?

A    Correct.

Q    You have heart -- I'm sorry.  Go ahead.

A    Correct.

Q    You have heartburn?

A    Yes.

Q    And you have some other things associated with that, right?

A    Yes.

Q    Okay.  And then, you go to general and you have, going down to fatigue and weakness.  Is that right?

A    Yes.

Q    Okay.  And then we get down to your nervous system and you have headaches, correct?

A    Correct.

Q    Dizziness?  And then sensitivity of pain in your hands and feet.  Is that right?

A    Yes.

Q    Okay.  And then psychological, we have a number of different things, including difficulty sleeping, easily losing patience.  Did you get angry a lot?

A    Sometimes.

Q    Okay.  Anxiety?  Is that correct?

A    Yes.

Q    And then, depression.  Is that right?

A    Yes.

Q    Okay.  And then, when you go on to the next page, we go to Bates Stamp Number 20681.  Okay.  You then circled, basically, a large sections in your body.  Is that correct?

A    That is correct.

Q    Okay.  So, we go from your -- I guess, your -- is that your shoulders, all the way down to your arms?

A    Yes.

Q    Okay.  And then, you have pain in -- it looks like your right -- the back of your right leg, correct?

A    Yes.

Q    Pain in your left leg?

A    Yes.

Q    And then, in your left lower leg and then, on this diagram of the body facing us you have pain in your right lower leg, too?

A    Yes.

Q    So, at this point in time, you have pain in both legs.  Is that right?

A    I do.

Q    Okay.  And on both sides of your leg?

A    Yes.

Q    Okay.  And then, on both arms?

A    Yes.

Q    Okay.  On both sides of your arm?

A     Yes.

Q     Okay.  Going all the way up and down to your shoulder.  Is that correct?

A     Yes.

Q     Okay.  And then, you circle, I guess, a large section of your upper body.  Is that right?

A     Yes.

Q     Okay.  And so, is this pain that you have it -- from your neck down to your lower back pain or what is that?

A     I just kind of circled.  It's just with the pain that I have at certain moments I would have pain in my arm, or I would have pain in my leg, or I would have pain in my shoulders, or sometimes it would spread.  So, it was -- I just had pain all over and it was just at different times.

Q     Okay.  And was this pain on both sides of your body?

A     It was.

Q     Okay.  And then, it said the quality of pain that you circled that is dull and constant?  Is that right?

A     Yes.

Q     And it wasn't just in the morning, at night.  It was fact, it was all day?

A     I circled all day because it would come and go.  So, whatever time of the day I could be in pain.

Q     And then, in addition to that, you said the pain radiated to other parts of your body.  Is that right?

A     That is correct.

Q     And you go down to the last part of this.  Okay.  And then, we have a family history, including your father, who's in good health, I guess, at the time you saw Dr. Zamora?

A     Yes.

Q     Correct?  And then, you have your mother who's in good health.  Is that correct?

A     Yes.

Q     Okay.  And then, you have all these family history issues that you circled down at the bottom.  Is that right?

A     Yes.

Q     One thing I forgot to point out, you actu -- you circled a small, one-finger in your hand.  Is that right?

A     Yes.

Q     And this was your, -- I guess, your right third fingertip? Is that correct?

A     Yes.

Q     Okay.  And as you sit here today, you're not a doctor.  Is that right?

A     That is correct.

Q     Okay.  You're not a rheumatologist?

A     That is correct.

Q     You're not here to tell the Ladies and Gentlemen of the Jury whether either the diagnosis or the treatment by Dr. Zamora was either correct or incorrect, right?

A    That is correct.

Q    Okay.  You would rely on an expert in order to determine that?

A    Yes.

Q    Okay.  And experts in this field, they would look at different things like your physical examination -- such as the physical examination that was done either by Dr. Zamora or Dr. Nunnery.  Is that right?

A    That is correct.

Q    And they would also look at the different labs that were ordered.  Is that correct?

A    That is correct.

Q    Okay.  Not only did Dr. Zamora order labs, Dr. Nunnery ordered labs, correct?

A    Correct.

Q    Okay.  And then, the Student Health Services, they also ordered labs, didn't they?

A    Correct.

Q    Okay.  You don't have any reason to believe that that would be unreasonable, given your condition, right?

A    Correct.

Q    Okay.  Do you know anything about rheumatoid arthritis?

A    The basics.

Q    Okay.  Have you read up on the fact that there's bilateral, symmetrical joint pain from different -- several

joints in your body?

A    Yes.

Q    Okay.  Did you have that based upon your physical examination and what it is that you circled here?

A    I did have the pain.

Q    Okay.  Would it be unreasonable for Dr. Zamora and any other doctor at ANO Clinic, based upon your bilateral, symmetrical joint pain that you read up, to determine that you had early signs of rheumatoid arthritis?

A    It wouldn't be unreasonable.

Q    It would not be unreasonable, right?

A    (Indisc.)

Q    Correct?

A    Correct.

Q    Okay.  And then, in addition to that, you had pain all over your body.  Is that correct?

A    That is correct.

Q    Okay.  And then, Dr. Nunnery, as well as -- I believe it was -- Dr. Escalona talks about this different pain all over your body.  Is that correct?

A    That is correct.

Q    So, Dr. Escalona, Dr. Nunnery, as well as Dr. Zamora, they come in and they describe this all-over body pain as myalgia. Is that correct?  Have you heard that before?

A    Yes.

Q    Okay.  Have you heard the term fibromyalgia?

A    Yes.

Q    Okay.  So, you had Dr. Zamora and your other two doctors saying you had pain all over your body and, therefore, that would be appropriate to diagnose you with fibromyalgia, as well.  Is that correct?

A    Yes.  Fibromyalgia is correct.

Q    Okay.  So, in addition to rheumatoid arthritis, it would be reasonable for these doctors to look at you, based upon what you know and pain all over your body, to diagnose you with fibromyalgia, correct?

A    Fibromyalgia.

          THE COURT:  Well, she's not a medical expert.

          MR. MARTINEZ:  She's not.  Just based upon her understanding, Judge.

          THE COURT:  And I said that because I saw the Government standing up, so --

          MR. MARTINEZ:  I know you did.

          THE COURT:  -- I figured that was going to be their objection.

BY MR. MARTINEZ:

Q    And if we go to -- to continue your visit with Dr. Zamora and ANO Clinics, we go to 20685.  Okay.  This is that same visit you were super-billed.  I think you were shown that before.  Do you see that?

A    Yes.

Q    Okay.  And this is your first visit.  Is that right?

A    Yes.  That was my first visit.

Q    And then, at some point in time, we get into the labs at -- the Government pointed out.  You see that?

A    Yes.

Q    Okay.  If we can blow those up.  Okay.  And the Government pointed out that these were labs ordered on your first visit.  Remember that?

A    Yes.

Q    Okay.  And they were the labs they showed you on your second visit?

A    Yes.

Q    Okay.  Not every single lab in either one of those visits was ordered.  Is that right?  Based upon your review of what was circled?

A    Well, I got the blood work done.

Q    You did.  But when she's asked you to see what's circled, not every lab was circled in either this visit or the second visit.  Is that correct?

A    I don't know.

        THE COURT:  You -- your testimony is that the ones that were circled were the ones that were ordered?  Is that your testimony?

        THE WITNESS:  Based upon the -- of the record.  Based

upon the records.

THE COURT:  Well, and what he's trying to get you to say is that the ones that were not circled were not ordered.  I take it, that's what you want her answer --

Q    That's right, simple, or is every lab circled here?

A    I mean, based upon the records.  Like I didn't see, like results for all of them.

Q    My question is, every lab circled here?

A    Yes.

Q    Okay.  And if we go to, let's say, your written -- so, when you go in to see Dr. Zamora-Quezada, you said that he came in and there was some implication that he went in and saw you, and did everything and gave you a shot in five minutes?

A    Yes.

Q    Remember that?  Okay.  Are you telling the Ladies and Gentlemen of the Jury that he came in, did a physical examination of you, and did an examination of your wrists, as well as all your joints and then, gave you a shot in a five minutes?

A    I wouldn't be able to tell you like, oh, it was five minutes.  It was quite overwhelming.  So, I just know it was a short period of time.

Q    Okay.  But you're not telling the Ladies and Gentlemen of the Jury that he was in there and did all that in five minutes are you?

A     No.

Q     Okay.  In regards to Zamora, Bates Stamp Number 20694, and this is, again, part of your -- I said 2-0-6 -- there you go, 20694.  And if you go down to your "Fibromyalgia tender points."

A     Yes.

Q     Okay.  If you go to "Connective Tissue."  You see that there?

A     Yes.

Q     Okay.  There are 18 out of 18 total tender points.  Do you see that?

A     Yes.

Q     Do you know whether or not those 18 out of 18 tender points are associated with the myalgias of fibromyalgia?

A     I -- uhm --

Q     If you don't know that's fine, too.

A     -- I don't know.

Q     Okay.  You'd rely on an expert in order to discuss that?

A     Yes.

Q     Okay.  And then, if we go to -- so, at the same time, that you were seeing Dr. Zamora, I think you said a little bit over a week later, you went to go back to Student Health Services.  Is that correct?

A     That is correct.

Q     If we go to 20707.  You see there?  This is a visit.  We

go down to "Currently Taking" and "Patient States," right above the "Objective Physical Examination."  And this is on -- Emma Gonzalez (phonetic), she states that you notice pain improvement since taking the new medication.  Is that correct?

A     Yes.  It states that.

Q     And this is during the time or after the time that you saw Dr. Zamora?

A     It must have been during the time.

Q     During the time.  So, at some point in time, you stated that you were noticing an improvement with taking these new medications.  Is that correct?  To some doc?

A     Yes.

Q     Okay.  And the records will reflect exactly what it is that you stated at some point in time.  Is that right?

A     Yes.

Q     Okay.  You have no problem with going by the records?

A     No.

Q     And then, in addition to that, if you go to 20727, you go back to Dr. Zamora and so, during the time that you're seeing Student Health Services, you're still seeing Dr. Zamora.  Is that right?

A     Yes.

Q     Okay.  And this is a pain diagram and if you go down on the bottom there, you see that?

A     Yes.

Q    Okay.  And there's a discussion of fibromyalgia tender points.  You see that?

A    Yes.

Q    And, at this point in time, no issue with the fact that you still had fibromyalgia tender points and fibromyalgia at this time?

A    I'm sorry.

Q    So, no issue with the fact that you still had fibromyalgia?

A    I still have the fibromyalgia.

Q    You still have it today?

A    Yes.

Q    Okay.  And then, during this visit you complain of pain to both knees.  Is that right?

A    Yes.

Q    Okay.  And pain to your hips, as well?  You see that?

A    Yes.

Q    Okay.  No issue with this record?

A    No.

Q    Okay.  This is stuff that you either told the nurse or told an MA when discussing with them some of our issues on this visit.  Is that right?

A    That is correct.

Q    Okay.  Okay.  And then, if you go to Bates Stamp Number 20734.  Okay.  And this is from your visit on 09/17/15.  And

then we have -- you see that on the bottom there?

A    Yes.

Q    And then you have "labs reviewed with the patient."

**(Pause)**

A    Where?

Q    Let me try to (indisc.).  You can't see here.

**(Pause)**

Q    I'll move on to the next one.  And then, at some point in time, you get on to additional labs.  Do you remember doing that with Dr. Zamora back in September 15th of 2015?

A    Yes.

Q    Okay.  And let's go to 20738.  Okay.  And if you go to "C-Reactive Protein," up in the middle there.  Okay.  Do you know what C-Reactive Protein is?

A    No.

Q    Do you know that's a sign or symptoms of rheumatoid arthritis?

A    I don't know.

Q    You didn't --

        **MS. GURSKIS:**  She just said she didn't.

        **MR. MARTINEZ:**  Okay.  That's fine.

Q    You see your C-Reactive Protein in your lab result there?

A    I see it.

Q    You see your number of 4.21?

A    I see it.

Q    Okay.  Given the range that you have to the right of 0 to 3.50, would that be high?

A    Yes.

Q    Okay.  Would you rely on an expert to tell the Ladies and Gentlemen of the Jury of the significance of an elevated C-Reactive Protein?

A    Yes.  I wouldn't be able to --

Q    Okay.  And then, your last visit with Dr. Zamora comes about on 11/24 of 2015.  And if you go to 20761.  Okay.  And on this date you go see Dr. Zamora, if you go to the pain diagram.  Okay.  And, once again, you describe pain.  But if you look at the diagram, in your shoulders.  Is that correct?

A    Yes.

Q    And then, you have -- it looks like -- pain in these big blocks and they're -- are in your hands.  Is that right?  You see that?

A    I had pains in my hands.

Q    Okay.  And then, it looks like you have issues with your hips.  You see that?

A    Yes.

Q    And you complain about that on this visit with Dr. Zamora.  Is that correct?

A    Yes.

Q    Okay.  And then, in addition to all those, you have pain in both your knees?

A     Yes.

Q     Okay.  And once again we have, based upon your understanding, bilateral, symmetrical joint pain that goes from your shoulders, to your hips, to your hands, and then to your knee.  Is that correct?

A     Yes.

Q     Okay.  And this is in addition to all the other joint pains that you've described earlier.  Is that right?

A     Yes.

Q     At this time?

A     At this time.

Q     Okay.  And then, if we go to Government's Exhibit C29. Can we switch to the ELMO real quick?  These are and I'll show it up on the ELMO.  These are the records from Student Health Services that were introduced by the Government.  Do you see that?

A     Yes.

Q     Okay.  And this date of C29 was your first visit on 6/16 of 2015.  Is that right?

A     Yes.

Q     And that was approximately one week after you saw Dr. Zamora.  Is that right?

A     Yes.

Q     Okay.  And your concern is that you're false -- being falsely diagnosed with rheumatoid arthritis.  Is that right?

A    Yes.

Q    Okay.  And that was one week after you saw Dr. Zamora.  Is that right?

A    That is correct.

Q    And, yet, you continue to see him and folks at his clinic for another five months, correct?

A    Correct.

Q    Okay.  And then, you have your different reports that you're out of it on Lyrica, your head is full of cotton, hard to think and very groggy.  Is that right?

A    Yes.

Q    Okay.  You talk about going to see Dr. Zamora about one week ago?

A    Yes.

Q    Okay, that you didn't like the experience?

A    Yes.

Q    Okay.  And that gave several medications and you said that he was not explaining to them -- to you.  Is that correct?

A    That is correct.

Q    Okay.  And then, we go on to concern about taking medications you may not need.  Is that correct?

A    Yes.

Q    Okay.  You had -- you have panic attack and anxiety attack that you discuss.  Is that right?

A    Yes.

Q    Okay.  And during that whole treatment and while you're in the room with Dr. Zamora, your mom was also present, right?

A    Yes.

Q    Okay.  So, you weren't there alone?

A    I wasn't there alone.

Q    Okay.  And that your mom also reported that she was upset you didn't get any further explanations from the doctor.  Is that right?

A    Yes.

Q    Okay.  And that was all that you reported according to this?

A    Yes.

Q    Okay.  And there's -- this doctor wrote down "there's actually no verification of any of these attacks."  Is that right?

A    Yes.  This is what I told her --

Q    That's what you told her --

A    -- happened.

Q    -- and this doctor says there's no verification of any of this.  Is that right?

A    Yes.

Q    Okay.  And this is your doctor that you went back to -- that you trust.  Is that right?

A    Yes.

Q    Okay.  You still trust Dr. Escalona?

A     Yes.

Q     Okay.  And then, Dr. Escalona now advised you to continue the same medications that Dr. Zamora gave her and that you've only been on there for one week.  Is that right?

A     Yes.

Q     Okay.  And did you continue those medications?

A     As she advised.  Yes.

Q     Okay.  And then, we get back to the other record that we just saw where on 6/29 of '15 you said you're feeling better at those medication.  Remember that?

A     Yes.  The -- overall, my pain was bad.  Sometimes I would feel a little better and sometimes it would vary.

Q     My question to you is, that after that, you say that you're getting better after you're taking these medications.  Is that correct?

A     Yes.

Q     This is one week after you saw Dr. Zamora and started the medications, right?

A     Uh-huh.

Q     And then you go back to the Student Health Services Center on 6/29 of '15.  Is that right?

A     Yes.

Q     Okay.  And this is approximately 13 days after you went back to the Student Health Services Center to complain about Dr. Zamora.  Is that correct?

A    Correct.

Q    Okay.  And at this point in time, you're still seeing Dr. Zamora.  Is that right?

A    Yes.

Q    Okay.  And the summary of this note is that you had mialga and myositis unspecified.  Is that right?

A    Yes.

Q    Okay.  And then, we go down to this next section in which the doctor states that you're here to review the medical records from Dr. Zamora.  Do you see that?

A    Yes.

Q    Okay.  No issue with getting the medical records from Dr. Zamora's office, obviously, to Human Health Service.  Is that right?

A    I had to call them a couple of times and go to the office more than once to get them.

Q    Well, eventually --

A    But eventually I got them.

Q    -- the records were sent, right?

A    Eventually I got them.

Q    And you went to go view those records with the Student Health Services Center.  Is that right?

A    Yes.

Q    And then, this is where we went over that -- where you stated to the doctor that you noticed an improvement since

taking the new medications.  You see that?

A    Yes.

Q    Okay.  And this is, of course, two to three weeks after you saw Dr. Zamora.  Is that right?

A    Yes.

Q    Okay.  And then, three weeks after you go see Dr. Zamora and the second time you go see this doctor, they continue to recommend to take the medications as prescribed and call Dr. Zamora's office with further questions.  Is that correct?

A    Yes.

Q    Okay.  So, now, not only once, but twice, has a doctor after Dr. Zamora that has said continued following Dr. Zamora's advice and take those medications.  Is that correct?  Based upon the records?

A    Based upon the records, yes.  She told me to just kind of see how I would feel with the medication, but she also expressed concern as to what I was telling her during the recent -- during the visit.

Q    But you would if she has concerns with Dr. Zamora or his treatment, that she would probably put those in the record. Don't you think?

A    Oh, I don't know.

        **THE COURT:**  She's not here to tell us what she thinks somebody might do.

Q    Do you - have you seen or been shown any concerns from

Dr. Gonzalez regarding concerns about Dr. Zamora's treatment?

A    Dr. Gonzalez?

Q    This is Doctor -- entered into by Dr. -- I'm sorry, the PA, Dr. Emma Gonzalez for Dr. Escalona?

A    I'm sorry.  Can you repeat the question?

Q    I'm sorry.  Let me -- that was probably -- that was my fault.  Dr. Escalona is the doctor that saw you, correct?

A    That is correct.

Q    Okay.  And you don't know who enters this information into the medical record, do you?

A    No, I don't know.

Q    Okay.  And have you ever been seen, or have you ever been shown any concern that Dr. Escalona had with Dr. Zamora's treatment?

A    Well, she did tell me that, you know, she was concerned but --

Q    My question to you is, have you --

A    -- not in the records.

Q    Not in any of the records; is that correct?

A    That is correct.

Q    In fact, in the records would say or would show that she continues to recommend taking the medication as prescribed by Dr. Zamora's office, right?

A    Correct.

Q    And you understand that.

A     Yes.

Q     And then you continue to go to this clinic, and all the way to 11 of 2015, you see that?

A     Yes.

Q     And here you're here for lab results; is that right?

A     Yes.

Q     Okay.  And of course, these are for labs that are ordered by the health clinic I'm assuming.

A     Yes.

Q     Okay.  No issue with the clinic ordering those labs for you, right?

A     No.

Q     Okay.  And then we talk about as per patient, fatigue is worse, and sleeps for eight hours but doesn't rest.  Do you see that?

A     Yes.

Q     And then we go into going to see Dr. Nunnery in the subjective portion of this medical record, right?

A     I'm sorry; can you repeat that?

Q     It says, "She is here for her labs to discuss, and she is going to be seeing Dr. Nunnery in Harlingen"; is that right?

A     Yes.

Q     Did you eventually go see Dr. Nunnery?

A     I did.

Q     Okay.  "Who is going to revise her medications, and I also

wish for her to see psychiatry"; is that correct?

A    That is correct.

Q    Okay.  Is that because of the mental issues that you described for the jury?

A    Yes.

Q    And these are the issues that you had prior to ever seeing Dr. Zamora; is that right?

A    They weren't as bad prior to seeing Dr. Zamora.

Q    And then when we go to the final assessment a month, about two months later; is that correct?

A    Yes.

Q    The assessment includes anxieties, tremor; is that right?

A    Yes.

Q    Okay.  And even here, they talk about rheumatoid arthritis; is that right?

A    Yes.

Q    Okay.  Chronic fatigue syndrome.  Right?

A    Yes.

Q    And fibromyalgia.

A    Yes.

Q    So, here we have not only Dr. Zamora, but you have another doctor with an assessment of rheumatoid arthritis.

A    Yes.

Q    Fibromyalgia.

A    Yes.

Q    And chronic fatigue; is that right?

A    Yes.

Q    Okay.  Now, let's look at Dr. Nunnery's records.
Eventually you go see Dr. Nunnery, don't you?

A    I did go see Dr. Nunnery.

Q    And the first time that you go see --

         MR. MARTINEZ:  Actually, can we go back to the
computer?  If you go to Bates Stamp 20943.

Q    The first time that you see Dr. Nunnery is in January of
2016; is that right?

A    Yes.

Q    Okay.  And this is approximately six months after you saw
Dr. Zamora.

A    Yes.

Q    And during this time you have also been seeing the Student
Health Services Center; is that right?

A    I have.

Q    Okay.

         MR. MARTINEZ:  And if you go to the upper left-hand
corner of this document, Ms. Sanchez.

Q    You'll see Dr. Nunnery's name up there.

A    Yes.

Q    Okay.  And this is the doctor you'd been seeing in
Harlingen; is that right?

A    Yes.

Q    Or for a very short period of time.

A    Uh-huh.  Yes.

Q    How many times did you see Dr. Nunnery?

A    I saw him, it must have been like three or four times.

Q    Okay.  Would you agree with me that the records would probably accurately reflect the number of times that you went to go see him?

A    Yes.

Q    Okay.  And then we have your problems when you went in to go talk to Nunnery, Dr. Nunnery; is that correct?

A    Yes.

Q    And the problems go with your myalgias; is that right?

A    Yes.

Q    Potentially rheumatoid arthritis.

A    Yes.

Q    Okay.  And then some of the other issues that you just discussed for the jury; is that right?

A    Yes.

Q    Okay.  And then we go down to the History of Present Illness on that same page.  Okay.  And right -- the first sentence on the History of Present Illness, "Patient with some chronic joint pains".  You see that?

A    Yes.

Q    Okay.  And these are all the joint pains that you either circled with Dr. Zamora or you described for the ladies and

gentlemen of the jury; is that correct?

A    Yes.

Q    And then if we go to Bates Stamp Number 20944, we get to the joints there.  Okay?  And if we look at the joints, is this where doctor at any point in time, Dr. Nunnery, described to you, "fibromyalgia"; is that right?

A    For the...

Q    Trigger points.  You remember him talking about trigger points with you?

A    Yes.

Q    Okay.  And did he talk to you what trigger points and how they're related to fibromyalgia?

A    Yes.

Q    Okay.  And then in addition to that -- and you understand that Dr. Zamora in his clinic also diagnosed you with fibromyalgia, correct?

A    Yes.

Q    Okay.  And at this point in time, you've got fibromyalgia by three different doctors, and rheumatoid arthritis by at least two different doctors, right?

A    Yes.

Q    Okay.  And then you go to Bates Stamp Number -- January 28th of 2016, Bates Stamp Number 20945.  Okay.  And very quickly, in summary, in the middle there.

Do you see that on the top?  It says, "Summary of the

patient, chronic aches, and exam at this time not showing any signs of remarkable inflammatory joint, muscle, or skin problems". See that?

A Yes.

Q Okay. And then he goes on to say, "Do not see any signs of definite active rheumatoid arthritis". You see that?

A Yes.

Q Okay. And then, let me show you in Dr. Nunnery's records; have you ever heard of a Vectra test?

A Of a -- I'm sorry? What?

Q I'm sorry; have you ever heard of a Vectra test?

A No.

Q Okay. Has Dr. Nunnery ever explained to you the Vectra test is a test that -- my question to you is, has Dr. Nunnery ever explained to you what a Vectra test is?

  **MS. GURSKIS:** She just said she didn't -- had never heard of a Vectra test.

  **MR. MARTINEZ:** That's not my question.

  **THE COURT:** You've never heard of a Vectra test; is that right?

  **THE WITNESS:** I don't think so.

  **THE COURT:** Or have you heard of a Vectra test?

  **THE WITNESS:** No.

  **MR. MARTINEZ:** It's a Vectra test.

  **THE WITNESS:** I mean, at least not by name.

THE COURT: Okay. Well, since you've never heard of it, then Dr. Nunnery would have never suggested it to you I take it.

THE WITNESS: Yes.

BY MR. MARTINEZ:

Q   Well, let's go ahead and go to Bates Stamp Number 20951. Have you ever seen this record?

A   I have seen that.

Q   Okay. So, this is the Vectra test that you just described for the Court; is that correct?

A   Oh, then, yes. I'm sorry.

Q   Okay.

A   He did show this to me.

Q   Dr. Nunnery did show this to you.

A   Yes.

Q   Okay. And so, let's go to the top there. It says, "The ordering M.D. is Dr. Nunnery". You see that?

A   Yes.

Q   Okay. And the top says, "Vectra disease activity test"; do you see that?

A   Yes.

Q   Okay. And your Vectra score was 32; you see that?

A   Yes.

Q   And the collection date was January 20th of 2016.

A   Yes.

Q    Okay.  And then if you go to the bottom of this Vectra test, did -- I'm sorry.

MR. MARTINEZ:  Let's just blow up that last little part, Ms. Sanchez.

Q    Did Dr. Nunnery -- just that one line.  Did Dr. Nunnery ever explain to you that this was a disease activity test to monitor your rheumatoid arthritis disease activity level?

A    He did explain.

Q    He did.  Okay.  And the score on this test was 32; is that correct?

A    Yes.

Q    Okay.  And is that in the moderate range of the disease activity level for rheumatoid arthritis?

A    That is in the moderate range.

Q    Okay.  And yet, if you go back to 20945.

MR. MARTINEZ:  Is there a way that you can put that up side by side, Ms. Sanchez?

(Pause)

Q    The next one would be 209 -- so you see with this Vectra test with a moderate level of disease activity for rheumatoid arthritis; you see that?  On your left?

A    Yes, I see.

Q    Okay.  And then on the right part of your screen, you see, "Do not see any signs of definitive active rheumatoid

arthritis"?

A    Yes.

Q    Based upon your understanding of what was described to you by Dr. Nunnery, this moderate disease activity level, does that coincide with what he wrote in his notes?

A    He explained to me that there was some inflammation, but that there wasn't rheumatoid arthritis.

Q    Would you rely on an expert to describe the significance of the Vectra test and how it relates to your condition?

A    Yes.

Q    Okay.  And then if we go to 20946.  Okay.  And this is part of Dr. Nunnery's notes, and if you go to, "Complains of" on the top of 1/20/16.

         And you have complaints on that same date that you see Dr. Nunnery of pain to your arms, correct?

A    Yes.

Q    Your legs.

A    Yes.

Q    Your shoulders.

A    Yes.

Q    Your back.

A    Yes.

Q    Your jaw.

A    Yes.

Q    Your hands.

A    Yes.

Q    Your knees.

A    Yes.

Q    Your ankles.

A    Yes.

Q    And was this like you described earlier, pain on both sides of your body?

A    Yes, pain on my body.

Q    Okay.  Consistent with signs or symptoms of rheumatoid arthritis.  Based upon your understanding.

A    Based upon...

Q    Is that a yes?

        **MS. GURSKIS:**  She's not a doctor.

        **MR. MARTINEZ:**  No, based upon her understanding.

        **THE WITNESS:**  I don't --

**BY MR. MARTINEZ:**

Q    You would rely on an expert.

A    Yes.

        **THE COURT:**  How many more questions do you have of this witness?

        **MR. MARTINEZ:**  Your Honor, I have about two minutes and I'll be done.

        **THE COURT:**  The reason I asked that, ladies and gentlemen, is because before you come here, we already have had -- I've already had hearings on other cases that have nothing

to do with this one.  That would have been three hearings this morning before you got here.

When you leave, we have hearings in eight more cases that have nothing to do with this one.  And so, it's not that I send you home early just to send you home early, not till 5:00 o'clock, but because there's other things that are going on and so that means everybody on support staff here and everybody else has to stay here till we finish.

And so, it's my responsibility to try to get everybody here within the working hours but nevertheless, if he's almost done, I guess we'll finish with this.

**MR. MARTINEZ**:  And I can speed this along.

**BY MR. MARTINEZ**:

Q    You'd rely on the records that this wasn't the only time that you saw Dr. Nunnery; is that correct?

A    I'm sorry; can you -- I'm sorry.

Q    January 20th of 2016 wasn't the only time that you saw Dr. Nunnery; is that right?

A    No, I had seen him for different visits, yeah.

Q    You saw him after that.

A    Yes.

Q    Okay.  And subsequent to this, you had that Vectra test that we just discussed, correct?

A    Correct.

Q    Which showed moderate levels of rheumatoid arthritis

disease activity, right?

A    I mean, can I say that?  I'm not...

Q    You would rely on an expert in order to describe that?

A    Yes.

Q    Okay.  And then you saw him on at least one other occasion; is that correct?

A    Yes.

Q    Okay.

          MR. MARTINEZ:  Your Honor, I pass the witness.

          THE COURT:  Mr. Sully, did you have any questions?

          MR. SULLY:  Yes, Your Honor, I do have just a few questions if that's okay.

          THE COURT:  Go ahead.

          MR. SULLY:  Thank you, Your Honor.

                    **CROSS EXAMINATION**

**BY MR. SULLY:**

Q    Good afternoon, Ms. Robles.

A    Afternoon.

Q    We've never spoken to each other before, right?

A    Right.

Q    But you've spoken with the Government several times before testifying.

A    Correct.

Q    About how many times have you met with them?

A    Three or four.

Q    About three or four?

A    Yes.

Q    And the records that Mr. Martinez just went over with you, the Government did not show you those records before?

A    Yes, I had seen those records; some of those records before.

Q    Okay.  You had seen some, but not all of the records that were just covered.

        THE COURT:  You had not seen --

        THE WITNESS:  No, you know what?  I'd seen all of them; I'm sorry.

        THE COURT:  All of the ones that you were asked about you've seen before?

        THE WITNESS:  Yes.

BY MR. SULLY:

Q    All right.  And earlier you mentioned that you were in the process of seeking a U visa, right?

A    Yes.

Q    And that's basically permission from the Government so that you can be legally in the country, right?

A    Correct.

Q    Now, Ms. Robles, I'm going to ask you a few questions about that, and I'm not going to criticize you in any way.  I'm also an immigrant, but I just want to ask you about your understanding of that process.  Is that okay?

A     Yes.

Q     As far as you know at this point, the Government has not made a decision yet as far as whether to grant you a U visa, right?

A     That is correct.

Q     You haven't actually received it yet, right?

A     No, I haven't received it.

Q     Okay.  I'm sorry; I didn't hear you -- your response to that question.

      And you're obviously hoping that at some time after you're done testifying, the Government will decide to give you that U visa that you're applying for, right?

A     Right.

Q     And you understand that the Judge in this case doesn't decide whether you get that U visa, right?

A     Oh, I understand that.

Q     And the jury in this case doesn't get to decide whether you get the U visa.

A     I understand.

Q     And none of the people here at the Defense table, we don't have any power over whether you get a U visa or not, right?

A     I understand.

Q     Do you understand that that's solely the Government's decision whether or not to give you a U visa after you're done testifying?

A     I understand.

          MR. SULLY:  I pass the witness, Your Honor.

          THE COURT:  Mr. Alvarez, did you have any questions?

          MR. ALVAREZ:  No, thank you, Your Honor.

          THE COURT:  Mr. Pena?

          MR. PENA:  If the Court won't be upset, just a couple of questions.

          THE COURT:  Go ahead.

          MR. PENA:  Okay.  And I'll do it from my counsel table.

**CROSS EXAMINATION**

**BY MR. PENA:**

Q     Just to clarify a little bit more on the U visa, just so that we understand, the U visa is a visa that -- a type of visa that you can get if you assist in the prosecution or investigation of a crime, correct?

A     Correct.

Q     And the Government has to decide whether or not you were helpful in that investigation or prosecution, correct?

A     Correct.

Q     And if they find or determine that you were helpful, then they can give you a certification so that you may get that U visa, correct?

          THE COURT:  It isn't like these attorneys can do it. They would have to make a recommendation to the Immigration

Service possibly, but they're not the ones that can give you this. Do you understand that?

THE WITNESS: Yes. Yes, I've been told that there was somebody else who was like the victim's advocate.

BY MR. PENA:

Q Right. Victim's advocate based on their recommendations.

A Oh, I just thought there was --

THE COURT: You do realize that the Immigration Service can listen to the recommendation, but are not forced to follow their recommendation.

THE WITNESS: Yes, I understand.

MR. PENA: Correct, Your Honor.

THE COURT: Yes, that's the law.

BY MR. PENA:

Q But it's your hope then, and I guess when you met with them, they explained to you that they believe or they needed you to help them in this prosecution, correct?

A Yes.

Q Okay.

MR. PENA: I pass the witness, Your Honor.

THE COURT: Go ahead.

MS. GURSKIS: Very briefly.

//

//

//

**REDIRECT EXAMINATION**

**BY MS. GURSKIS:**

Q    Ms. Robles, prior to seeing Dr. Zamora, did anyone diagnose you with rheumatoid arthritis?

A    Dr. Escalona tested me for it, but then she said that I didn't have it.

Q    After seeing Dr. Zamora.

          **THE COURT:**  And that's the doctor over at UTPA?

          **THE WITNESS:**  Yes.

**BY MS. GURSKIS:**

Q    So, to the extent rheumatoid arthritis is identified in your patient file, is that based on your report from your visit with Dr. Zamora-Quezada?

A    Yes, that is based upon it.

Q    After seeing Dr. Zamora-Quezada, did anyone ever diagnose you with rheumatoid arthritis?

A    No.

Q    Did Dr. Zamora diagnose you with rheumatoid arthritis?

A    Yes.

Q    Do you have rheumatoid arthritis?

A    No.

          **MS. GURSKIS:**  I pass the witness.

          **THE COURT:**  Does anybody have any other questions?

          **MR. MARTINEZ:**  No further questions.

          **THE COURT:**  You may go ahead and step down,

Ms. Robles.  Thank you very much.

**(Witness steps down)**

THE COURT:  Ladies and gentlemen of the jury, we'll go ahead and take our recess for the day.  Don't forget my instructions.  You can't discuss this case with anybody including yourselves.  People at home may ask you questions; tell them, "The guy with the black robe said I can't say anything until the case is over".

You've been very patient.  We appreciate that very much.  It's much easier when I don't see any faces and the attorneys don't see any faces from the jury box indicating like, when is this going to finish, or you-all are taking too long.  In fact, you've been quite patient.

Anytime you send me a note, we will take a break.  And we'll see you-all tomorrow morning at 9:00 o'clock.  But I did explain why we don't go past 5:00 o'clock here because we do have eight hearings that we're going to hear right now that have nothing to do with this case.

Please rise for the jury.

**(Jurors exit courtroom at 4:34 p.m.)**

THE COURT:  We will see you-all tomorrow morning.

MS. GURSKIS:  Thank you.

THE COURT:  Nine o'clock.

**(This proceeding was adjourned at 4:34 p.m.)**

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          <u>December 19, 2019</u>

          Signed                                    Dated

*TONI HUDSON, TRANSCRIBER*