UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION


UNITED STATES OF AMERICA,  )  CASE NO:  7:18-CR-00855
                          )
          Plaintiff,      )        CRIMINAL
                          )
     vs.                  )      McAllen, Texas
                          )
JORGE ZAMORA-QUEZADA,     )  Tuesday, December 17, 2019
MEISY ANGELICA ZAMORA,    )
ESTELLA SANTOS NATERA,    )   (1:50 p.m. to 4:00 p.m.)
FELIX RAMOS,              )
                          )     AFTERNOON SESSION
          Defendants.     )


JURY TRIAL - DAY 9

BEFORE THE HONORABLE RICARDO H. HINOJOSA,
UNITED STATES DISTRICT JUDGE



APPEARANCES:            See next page


Court Interpreter:      Marie E. Foraker (Standby)

Court Reporter [ECRO]:  Antonio Tijerina

Transcribed By:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, Texas 78468
                        361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**<u>APPEARANCES FOR:</u>**

Plaintiff:                    EMILY GURSKIS, ESQ.
                              REBECCA YUAN, ESQ.
                              CYNTHIA VILLANUEVA, ESQ.
                              Office of the United States Attorney
                              1701 W. Business Hwy. 83
                              Suite 600
                              McAllen, TX 78501


Jorge Zamora-Quezada:         BENIGNO TREY MARTINEZ, III, ESQ.
                              STEPHEN LEE, ESQ.
                              1201 E. Van Buren St.
                              Brownsville, TX 78520


Meisy Zamora:                 CHRISTOPHER SULLY, ESQ.
                              5804 N. 23rd St.
                              McAllen, TX 78504


Estella Natera:               AL ALVAREZ, JR., ESQ.
                              4409 N McColl Rd
                              McAllen, TX 78504


Felix Ramos:                  JAIME PENA, ESQ.
                              Pena Garza PLLC
                              900 Kerria Ave
                              McAllen, TX 78501

INDEX

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SCOTT FRESHOUR | | | | |
|   BY MR. LEE | | 4 | | |
|   BY MR. SULLY | | 21 | | |
|   BY MR. ALVAREZ | | 30 | | |
|   BY MS. GURSKIS | | | 32 | |
| | | | | |
| DR. MONTY TEW | | | | |
|   BY MS. GURSKIS | 36/63 | | | |
|   BY MR. LEE | | 79 | | |

| DEFENDANTS' EXHIBIT | RECEIVED |
|---|---|
| 302 | 18 |

**McAllen, Texas; Tuesday, December 17, 2019; 1:50 p.m.**

**(Call to Order)**

**(Jurors enter Courtroom)**

THE COURT:  Please be seated.

Mr. Lee, go ahead; proceed.

MR. LEE:  Thank you, your Honor.

THE COURT:  Just you-all got an extra 20 minutes for lunch.

Go ahead.

MR. LEE:  Thank you, your Honor.

**CROSS EXAMINATION (CONTINUED)**

BY MR. LEE:

Q   All right, Mr. Freshour, before the break, we had been going through the monitor reports, and we had just finished going through the final pages of Government Exhibit D-30; the August 24, 2011 report, correct?

A   Okay.

Q   All right.

A   If you tell me that was the one we were looking at, I'll go with you on that one.

Q   Okay, all right.  All right, I now have on the screen the first two pages of Government Exhibit D-40.

This is Dr. Zamora's response to the last monitor report, correct?

A   Yes.

Q    All right, and I'm just going to -- please read, for the record, the first two paragraphs of Government Exhibit D-40.

A    All right.  "I have read, in detail, the conclusive findings of the most recent chart review conducted by your office.

"Careful analysis has led me to the conclusion that, despite your statements, adequate evidence is present to support that my practice has acted according to requirements and recommendations of the board.

"The review suggests suspicion of symptoms and questions our choice of subsequent treatment plans selected for patients in my care.

"Our established protocols are responsive to patient history, present symptoms, and patient demographics.

"Successful patient care and their successive improvement are not based on duplicating or, for that matter, limiting our clinical expertise on the medical status quo."

Q    Please read, for the record, the next paragraph of Dr. Zamora's letter.

A    "There will always be ground for difference of opinion as it pertains to treatment options, more so within a specialty as diverse as ours.

"Thus the issues pointed out in your report are a simple matter of difference of opinion, rather than lack of justification on my part for the exams ordered."

Q    And please read, for the record, the final two paragraphs of the first page of Government Exhibit D-40.

A    All right.  "I would like to give you some statistics of the patients selected for this cycle.

"Diabetes mellitus was present in 40 percent; arterial hypertension was present in 46.7 percent; and osteoporosis was present in 50 percent, and thyroid disease in ten percent.

"The chief complaint in 26 patients out of 30 totals was generalized joint pain; in other words, fully 86.6 percent of the individuals selected for this review cycle was patients with chronic, severe, widespread pain, with multiple comorbidities.

"See table."

Q    All right.  And, Mr. Freshour, looking at the next page, there's no table on the next page, correct?

A    Correct.

Q    All right, and looking at the last two paragraphs -- last two paragraphs of the letter, which are at the top of the second page, can you please read that for the record.

A    "Educated medical remedial opinion generates diverse options for treatment that are open for discussion.

"Our educated decisions are designed to improve the pain management care of our patients and, in fact, vanishes any hindrance from their recovery.

"Last, but not least, it will be evident, as you read my

response per case, that other key areas of the encounter with our patients were, in fact, accounted for.

"In consideration of your observations, we will continue to make certain that we are in compliance with TMB record-keeping standards."

Q    All right, and the Texas Medical Board received this response from Dr. Zamora, correct?

A    Yes, sir.

Q    All right, and the monitor reviewed Dr. Zamora's files one more cycle, correct?

A    Correct.

Q    All right, and there were about 30 files requested.  And Dr. Zamora provided those files, correct?

A    Yes, sir.

Q    And the monitor prepared another report -- a final report, dated October 21, 2011, correct?

A    Yes, sir.

Q    All right, and I'm going to put on the screen -- go to Government Exhibit D-32.

I'm going to clear the screen the almost last -- two of the almost last pages of this exhibit.

A    Okay.

Q    All right, and similar to what we saw before, there is -- as we can see from the page on the left, there's review of a particular patient file, and then there's an additional comment

section that begins at the bottom of that page, correct?

A     Yes, sir.

Q     All right, and then it continues on with a various number of paragraphs, correct?

A     Yes.

Q     All right, can you please read, for the record, the first paragraph -- paragraph one, under, "Additional comments."

A     Yes.  "I still sense that Dr. Zamora over-reads the severity of arthritic changes on the many X-rays he orders.

     "I had considerable difficulty opening many of the images from this quarters' review for some reason."

Q     Okay, please read paragraph two for the record.

A     "Dr. Zamora continues ordering a number of lab studies that I feel are rarely indicated by the presenting features of the patient.

     "Anti-actin antibodies, immunoglobulin levels, antithyroid antibodies, and complement proteins levels, in particular, as noted before.

     "In this quarterly review, not only is any hint of shoulder pain used as a justification for antithyroid antibodies, but complaints 'owa' allergy-related symptoms and/or consideration of a spondyloarthropathy are used to justify checking EG levels and anti-streptococcal antibodies.

     "These are not medically necessary tests in the context in which they are being used."

Q    Please read, for the record, paragraph number three.

A    "Previously, I noticed that, frequently, those patients said to have an anti-inflammatory polyarthritis are also then described as having hand pain, knee pain, foot pain, *et cetera*.

"These diagnoses are redundant and insinuate that the number of codes is being inflated to encourage the perception that more and more care is being provided.

"This comment has not changed."

Q    Please read paragraph four for the record.

A    "Previously, I felt it was suspicious that, when Dr. Zamora described a patient as having swelling in the physical exam, all of the joints of the hands, and usually the MTPs as well, were said to reveal swelling, which is statistically unlikely.

"In this quarter review, Dr. Zamora tries to differentiate among the joints somewhat.  But the new standard is for him to include that the second and third MCPs are more severely affected than the other MCPs.

"The only problem being that is -- this is said to occur in nearly all of the patients.

"Additionally, almost all of the shoulder exams are said to show crepitus and pain, which also seem unlikely.

"And this comment has not changed."

Q    Please read paragraph five for the record.

A    "When all of the patients receive essentially the same

diagnostic workup, the same steroid injections, the same diagnoses; inflammatory polyarthritis, fibromyalgia, shoulder bursitis, *et cetera*; and similar to identical medication regimens, flags go up.

"This observation still did not change.  Most patients receive one to two steroid injections into the hips, knees, or shoulders at the time of the initial evaluation, along with the same regimen of X-rays and lab tests, except for certain patients with specific forms of insurance that apparently precluded them from having labs drawn in Dr. Zamora's lab."

Q    Please read paragraph six for the record.

A    "The use of the term, 'arthrosis,' in describing X-rays of joints is essentially useless.

"In almost all of the X-rays ordered during this cycle, Dr. Zamora concludes that there is some evidence of joint arthrosis, and that the changes might be compatible with an inflammatory arthritic process.

"But also no serious erosions or more diagnostically useful were noted, aside from the osteoarthritis, which typically appeared to have been clinically suspected.

"I cannot tell that any of the imaging studies obtained during this cycle change much about the ultimate treatment given to his patients.

"This comment has not changed this quarter."

Q    And please read, for the record, paragraph number seven;

the last one on this page.

A    "Patients continue to be seen by Dr. Zamora for their initial evaluation, but then are transferred to other practitioners in the practice for follow-up care."

Q    All right, and turning to the last page of Government Exhibit -- whoops, I'd like to make sure I had the right one on the screen.  Yeah.

     Turning to the last page of Government Exhibit D-32, this is the paragraph that the Government had you read on direct examination, correct?

A    I don't recall.  But if I did --

Q    All right, just to round this out, can you just read for this -- for the record, this last page of the six -- of this exhibit.

A    "My recommendations have not changed from the previous quarterly review.

     "There was some slight improvement this quarter in the one-size-fits-all mentality of previous new-patient visits, diagnoses of fibromyalgia, inflammatory polyarthritis, and widespread joint pain to justify essentially the same X-rays, labs, and steroid injections for nearly all the patients; but not much.

     "Dr. Zamora suggested previously that the selection of the charts for review may have been biased.

     "But my understanding is that the charts are chosen

randomly, and thus reflect the way that the average new patients is evaluated in his clinic.

"Assuming this is correct, not much has changed since the first quarterly review I performed over a year ago."

Q    All right, and this monitor report was sent to Dr. and Ms. Zamora for his review, correct?

A    Yes, sir.

Q    And he provided a written response, correct?

A    Yes, sir.

Q    I'm now putting on the screen the first two pages of Government Exhibit D-41.  All right.

And, actually, before we get into the letter, I just want to direct your attention to the second page.  And it refers there to, "chart review; August 2011," correct?

A    Yes, sir.

Q    All right, but is it your understanding that this is actually a response to the report from October 2011?

A    I believe that's what's been indicated; yes, sir.

Q    All right, so that's just a typo at the top?

A    That's what I'm guessing.

Q    Okay.  All right, please read, for the record, the first paragraph of Government Exhibit D-41.

        **MS. GURSKIS:**  Your Honor, I'm going to object to this as cumulative.

        He's not really asking questions.  He's been having

the witness read things into the record that have been

previously admitted as evidence for the past 45 minutes.

**THE COURT:** They are admitted. I mean, he's just reading exhibits that are already in evidence here.

**MR. LEE:** Okay, so may I continue, your Honor?

**THE COURT:** What?

**MR. LEE:** May I continue, your Honor?

**THE COURT:** They're in evidence. I mean, you can argue them at any point you want to.

But there's nothing he's testifying to, other than reading documents that have been -- already been admitted here.

**MR. LEE:** Yes. The Government showed portions of some of these during his direct examination.

I'm just showing --

**THE COURT:** Well, how many more do you have to show?

**MR. LEE:** This is the last one, your Honor.

**THE COURT:** Okay, well, finish with the last one.

**BY MR. LEE:**

Q    Please read, for the record, the first two paragraphs of Government Exhibit D-41.

A    "I have thoroughly read the chart review findings and observations by the TMB monitoring physician.

"We are pleased to read that, for the most part, the conclusions state a favorable review; thus, adequate evidence is present to support that my practice has majorly acted

according to past and present requirements and recommendations of the board.

"Whenever the monitoring physician has noted an incident where deficiencies in his view were present, I have taken measures to concede and adjust my processes, even when knowing that the professional medical opinion and subsequent patient management plans will differ in depth and width from professional to professional.

"In fact, medical expertise often will generate diverse options for treatment that are open for discussion.

"Nevertheless, we are committed to improving the pain management care of our patients and diminish any hindrance from their recovery."

**THE COURT:**  And Ladies and Gentlemen, these documents are already admitted into evidence.  And although only a portion has been read here, remember that the entire document is the evidence, not just the portions that may have been read by the witness here.

So the whole documents have to be considered as a whole.  And the fact that some parts have been read doesn't mean that that's the entire exhibit.

And you will have the entire exhibits at the jury room when you start your deliberations.

Because they have been admitted.  And it's not just parts that have been admitted or not just the parts that have

been read, but the entire documents have been admitted as evidence here.

Go ahead.

MR. LEE:  Thank you, your Honor.

BY MR. LEE:

Q    Now, Mr. Freshour, this was the last monitor report and response in this monitoring cycle, correct?

A    Yes, sir.

Q    All right, so after the last --

THE COURT:  I think we can turn it off now.

MR. LEE:  Yes.

THE COURT:  If not, we see white on part of your face from the light.

MR. LEE:  Thank you, your Honor.

THE COURT:  I mean, it just shines your part of your head.  And I don't think you're in evidence.

MR. LEE:  No.  I do not want to be in evidence.

THE COURT:  It gives us a shadow over there.

MR. LEE:  All right.

THE COURT:  Go ahead.

BY MR. LEE:

Q    Mr. Freshour, after this last -- after the monitor reports that we've looked at and the responses that we've looked at, the Texas Medical Board did not take any further action against Dr. Zamora, correct?

A    Not related to the terms of the board order; that's correct, yes, sir.

Q    Right.  Well, you were testifying, on direct examination, that Dr. Zamora did not have the best records ever.

But that, given the nature of the improvement, the compliance officer did not feel that the situation met the standard for filing a new complaint, correct?

A    Yeah, I did state that.  Yes, sir.

Q    Okay, and, again, so the Texas Medical Board, after reviewing -- after the compliance officer had all of these monitor reports and all of Dr. Zamora's responses, the Texas Medical Board did not take any further action against Dr. Zamora, correct?

A    Correct -- related to the board order and his compliance with it, yes.

Q    Right.  If the Texas Medical Board had determined that further action was warranted at that time based on the monitor reports, it could have, correct?

A    Yes, it could have.

Q    All right.  But instead the Texas Medical Board -- in terms of the Texas Medical Board, Dr. Zamora had his status cleared in 2011, correct?

A    He had the order terminated, yes, so he is no longer under a Board order, that's correct.

Q    Right.  All right, and in fact that's what the Texas

Medical Board's public database shows for Dr. Zamora, that he was reprimanded but then he did have his status cleared in 2011, correct?

A    I believe that's what the profile indicates today, yes.

Q    I'm going to hand you what's been previously marked as Defendants' Exhibit 302.

A    Okay.

Q    Do you recognize this?

A    Yes.  This is what we call a public physician verification or a public physician profile.  We're required by law to maintain these on all licensed physicians in the State of Texas.  And it's on our website looking out so anyone in the public can get this document.

Q    Right.  So the public can go to the website, type in the doctor's name, or look up a doctor, and find what the status of that doctor is, correct?

A    Yes, that's correct.

Q    All right.  And is this -- does this -- based on your knowledge, is this a true and accurate copy of the public profile for Dr. Zamora from the Texas Medical Board's website?

A    As far as I know, yes, it is.

        **MR. LEE:**  Your Honor, the defense moves to admit defense Exhibit 302.

        **THE COURT:**  Is there any objection to that?

        **MS. GURSKIS:**  No objection, Your Honor.

**THE COURT:**  It's admitted.

**(Defendants' Exhibit Number 302 was received in evidence)**

**MR. LEE:**  May I --

**THE WITNESS:**  Yes, sir.

**MR. LEE:**  Can I switch briefly back to the ELMO?

**BY MR. LEE:**

Q    All right, and just so we have -- the jury can understand what's going on here, this is as it says in the title, public verification of physician profile for Dr. Zamora-Quezada, correct?

A    Yes, sir.

Q    All right, and the date here, that's a reference to the date on which this particular page is printed, correct?

A    That's correct.

Q    All right.  Okay, turning to the second page, this is -- well, actually turning to the first page, at the bottom there's a section:  "TMB filings, actions, and license restrictions," correct?

A    Yes.

Q    All right, and this summarizes in reverse chronological order the actions taken by the TMB, correct?

A    Yes, that's correct.

Q    All right, and so this refers -- so going to the earliest entry in this section, that refers to the complaint filed by the Board in October, 2008, correct?

A     That's correct, yes, sir.

Q     All right.  And November, 2009, the entry there, that refers to what you testified about on direct and on cross examination about the agreed order, correct?

A     That is also correct, yes, sir.

Q     And turning to the bottom of page one, that refers to what you just -- well, can you just read for the jury and the record the last two lines of page one of Defendants' Exhibit 302?

A     Yes.  It says:  "Action date, 11/06/2011, description: status cleared 11/06/2011."

Q     And that refers to what you're talking about earlier about his status was cleared at the end of the monitoring, correct?

A     Right, his status as being under an order, that is correct.

Q     Okay.  And just to be clear, this shows in terms of the Dr. Zamora's registration status, that is delinquent, nonpayment, correct?

A     Yes, sir.

Q     All right.  And that's a status as it is of -- as of December 16th, 2019, correct?

A     Correct.

Q     All right.  And so that refers to the fact that for whatever reason, he has not been paying -- he has not paid his most recent set of dues to the Texas Medical Board, correct?

A     That's what that indicates, yes.  That's what delinquent

nonpayment means, that he hasn't paid his biennial fee to renew his license.

Q    All right.  And that has nothing to do with the actions we were talking about earlier today, correct?

A    No, that has nothing to do with it.  They are required every two years to pay a fee to the State to renew their license.

Q    All right.  And since 2011 -- well, actually, doctors in Texas, they're required to renew their license periodically, correct?

A    Yes, every two years.

          THE COURT:  He just said that.

Q    All right.  And so and since 2011, every two years or so, the Texas Medical Board has renewed Dr. Zamora's license, correct?

A    Upon his payment of his fees, yes, sir.

Q    All right.  And so based on the -- all the monitor reports that we were looking at before, and all the responses by Dr. Zamora, just to be clear, the Texas Medical Board did not initiate any new complaints against Dr. Zamora, correct?

A    Right, not based on those reports or the order, that's correct.

Q    All right.  And if the Texas Medical Board had concluded on the basis of all those monitor reports and Dr. Zamora's responses that Dr. Zamora had committed as you said State or

Federal violations, it could have taken some action back then, correct?

A    Yes.

Q    And it didn't, correct?

A    Correct.

        MR. LEE:  Nothing further at this time,, I pass the witness.

        THE COURT:  Mr. Sully, did you have any questions?

        MR. SULLY:  Yes, thank you, Your Honor.  Good afternoon, Mr. Freshour.

        THE WITNESS:  Hello.

                    **CROSS EXAMINATION**

**BY MR. SULLY:**

Q    Do you know you have the distinction of being the first attorney to testify in this case?

A    No.

Q    No?

A    I was not aware of that.

Q    Possibly the last but (indisc.) excellent reading so far.

        THE COURT:  Well that was a relevant issue.

        MR. SULLY:  Oh, I was just congratulating him, Your Honor, before --

        THE COURT:  In other words not relevant, but go ahead.

        MR. SULLY:  No, Your Honor, not --

**BY MR. SULLY:**

Q    So turning to the relevant issues, Mr. Freshour, in the administrative review that you've been testifying about, specifically the one relates to this case, the standard of proof that applies is much lower than a criminal case, right?

A    I'm sorry, the standard of review for the chart monitor or for Board actions?  Your question's not clear, I'm sorry.

Q    For either one, for either action by the Board, the standard of evidence or proof is much lower than what applies in a criminal case, right?

A    No.  It doesn't apply to a chart monitoring standard.  It only applies in a administrative enforcement proceeding such as filed at the State Office of Administrative Hearings.  That's where there's a burden of proof and a level of evidence, but not related to a chart monitor.

Q    Right.  So as far as the administrative proceedings, or however you described it, that's where there's a burden of proof but it's much lower than in the criminal case.

A    That's true.  It's preponderance of the evidence.

Q    Right, which is nowhere near beyond reasonable doubt, right?

A    That's true.

Q    So even with the lower standard of proof that applies in that type of administrative proceeding, at the end of this thorough multiyear investigation and review, in the end, the

Board did not spend Dr. Zamora's license, right?

A    Well, they did not suspend it because there's -- well, no, they did not suspend his license.  But it is not -- the chart monitor is not assessed a standard of proof as you've described, so that's a bit inaccurate.

Q    Okay.  What I'm asking is the medical board, which is the one that makes decisions regarding the licenses of doctors, right?

A    Yes, sir.

Q    At no point they -- did they decide to suspend Dr. Zamora's license.

A    That's true.

Q    And at no point did they revoke Dr. Zamora's license.

A    That's also true.

Q    They didn't shut down his clinic even for any period of time.

A    We have no authority to shut down the clinic but, no, we didn't.

Q    He was allowed to continue to see and treat patients.

A    That's true, yes.

Q    And after, you know, this investigation and this review concluded, there was no finding by the Board of any intentional misdiagnoses, right?

A    All of the findings of the Board were in the initial agreed order.  There are no subsequent findings that the Board

would enter.  That wouldn't be something that they would do or have authority to do.

Q   Okay.  So they at no point -- because you testified earlier about some findings, but there weren't any findings that had to do with intentional misdiagnosis (indisc.)

A    If you're referring to the agreed order, no.  The findings are what the findings are in there.

Q    Okay.  And so just to clarify, at no point either in the agreed order or at any other time did the medical board issue a finding saying Dr. Zamora is intentionally misdiagnosing patients.

A    Well, again, it's -- the only finding that the Board has made is the agreed order that's been discussed, and those would be the findings that are contained within that.

Q    Okay.  And those -- the findings which would be included in that order, that didn't include any findings of any type of misdiagnoses, intentional or unintentional, right?

A    That's correct.

        MS. GURSKIS:  Asked and answered, Your Honor.

        THE COURT:  Yeah, but he answered it again.

        MR. SPEAKER:  He's already answered.

BY MR. SULLY:

Q    The findings contained in that order didn't include any findings as far as there were no findings as far as harming patients, correct?

A    There was no indications of patient harm within the context of the order, that's true.

Q    And at no point was there a finding that there was a violation of the agreed order that you testified about, right?

A    Right, which would have been subsequent but, no, there was no -- well there was no finding because there wasn't a violation of the agreed order.  The Board couldn't have made a finding unless an action was initiated for violating the order.

Q    Right.  So basically that didn't happen, there was no violation of the order, this order.

A    The Board took no action for a violation of the order, that's true.

Q    Right.  And as far as the findings, there was no findings as far as falsification of records, right?

A    That's true.

Q    There was no findings as far as any kind of crime, right?

A    That's true; although the Board doesn't make criminal findings, they make regulatory violations and findings of State law and statutes, so we don't make criminal findings.

Q    All right.  And you anticipated my next question.  Just so we're clear, when the Board's investigating or making findings about violations of the medical professional rules and regulations, that does not necessarily equal a criminal offense, right?

          **THE COURT:**  He's already testified to that.

MR. SULLY: I'll move on, Your Honor.

BY MR. SULLY:

Q    Even though that's not your -- I guess the Board's area or purview, if in the course of the Board's investigation it did find that a crime was committed, that's something that would be referred to law enforcement, right?

A    It can be, yes.

Q    But that did not occur in this case.

A    There is no criminal referral that I'm aware of, that's true.

Q    As far as the ethical rules that govern medicine, part of that I think you testified about was that it prohibits using a local doctor, a competitor, as a monitor or somebody who reviews the doctor's practice or records, right?

A    Right.

Q    And one -- an additional reason for that is because it would be a conflict of interest to have somebody in that role who could benefit from any negative action that could be taken against, for example, Dr. Zamora.

A    I think potentially, yes, that's what the intent is.

Q    Right. And just so it's clear, if something were to happen, for example Dr. Zamora's practice, if he were to lose patients, that could benefit local doctors or competitors because they could potentially make more money with those patients, right?

A    Sure, sure.

Q    And so as far as the ethics rules, the Board wouldn't consider it proper to have someone who's a competitor or local doctor testifying about or reviewing, otherwise trying to second-guess Dr. Zamora's practices in your (indisc.)

A    Well, when you say ethical rules to testify about another doctor, I would have to disagree with that from the standpoint of for a chart monitor or a reviewer of the action, yes.  But, I mean, doctors testify against local doctors all the time.  I mean, that happens --

            **THE COURT:**  And there's nothing wrong with that, right?

            **THE WITNESS:**  There's nothing wrong with that.  And some of our complaints come from subsequent treaters so, yes, that -- so that is.  There's nothing wrong with that.

            **THE COURT:**  As far as the Texas Medical Board is concerned, there's nothing wrong with that; is that correct?

            **THE WITNESS:**  That is correct.

**BY MR. SULLY:**

Q    All right, but as far as the who testifies in court or not, that's not your role.  But as far as the monitors, that's where the medical board decides that certain people shouldn't be allowed to be monitors, that's the -- I guess the purview of that decision, right?

A    Well, the purview is to select the appropriate monitor,

not that somebody should not, except for, you know, as long as they meet the criteria.  So obviously I've already described the conflict of interest potential.

Q    Right, which would be one potential basis for disqualifying.

A    Or well not disqualifying but not retaining them unless there was perhaps nobody else, which does not occur.  We have a large pool of individuals to choose from.

Q    Right.  As far as the rules of professional conduct I guess you could say for doctors, one of the areas that you've been testifying about has to do with whether there is too many tests, right?  That's one thing that could get reviewed by the medical board.

A    If that was the complaint, yes, the medical board would look at that.

Q    And on the flipside, there can also be a complaint or review if there's an allegation that a doctor's not doing enough tests or isn't timely diagnosing a condition that exists, right?

A    Yeah, and that would be considered potentially a failure to meet the standard of care for failing to diagnose or appropriately do the test, depending on the patient's presenting symptoms, certainly.

Q    Right.  So you would agree it's sort of a double-edge sworn that doctors have to find the appropriate balance between

doing either too much or too little, whether it's tests or the other things that they have to do.

A     I believe it's a very challenging part of the medical profession.  I would say that.

Q     Right.  And often times people can and do disagree as far as what's the appropriate balance between doing too many tests or too little tests or in terms of diagnoses as well, right?

A     Doctors can have differences of opinion on approaches, yes.

Q     And just because there's a difference of opinion or there's an allegation, that doesn't automatically mean that there's a violation of the rules or that there's a necessarily criminal offense either, right?

A     That's true.

Q     As far as the investigation and the findings that you've been testifying about, none of those have anything to do or implicate Meisy Zamora in any way, right?

A     Implicate who?  I'm sorry, I didn't hear.

Q     Meisy Zamora.

A     I don't know.  I know that the Board focuses only on the licensed doctors.  The only time an unlicensed person would come under potential scrutiny of the Board is if there were allegations of unlicensed practice of medicine.  But I'm not --

          THE COURT:  And there is no such thing when it comes to Meisy Zamora, as far as you know.

**THE WITNESS:** No, sir, not as far as I know. I have no idea even who the individual is.

**BY MR. SULLY:**

Q    And do you know who Estella Natera or Felix Ramos are?

A    Have absolutely no idea.

**MR. SULLY:** I'll pass the witness, Your Honor.

**THE COURT:** Mr. Alvarez, did you have any questions?

**MR. ALVAREZ:** I'm going to ask a couple questions, Your Honor.

**CROSS EXAMINATION**

**BY MR. ALVAREZ:**

Q    You said that there was a agency called SOAH.

A    Yes, sir.

Q    And that's the -- what does that stand for?

A    The State Office of Administrative Hearings.

Q    Okay, and is that proceeding conducted by an administrative judge?

A    Yes, who's a licensed attorney acting as an administrative law judge, yes, sir.

Q    And then so the enforcement agency would be your agency, correct?

A    Yes. The medical board is the enforcement agency.

Q    And then the respondent would be Dr. Zamora.

A    Yes, sir.

Q    When you came to that agreement that you were discussing

today, does that judge approve that agreement?

A    That judge has nothing to do with that agreement.

Q    He -- what does he do with respect to the agreement that you all sign?

A    Absolutely nothing, except when we notify him as the agency that we've settled a case, then they dismiss it from the docket at the State Office of Administrative Hearings, the acronym being SOAH, S-A-O-H (sic), State Office of Administrative Hearings.

Q    And the judge signs that dismissal.

A    The judge simply signs the dismissal but has nothing to do with the approval of the order or the authority of the Board, because the Board has the exclusive jurisdiction under State law to enter sanctions against a doctor.  The administrative law judge has no authority to do that.  Even if they go all the way through a trial, they can't render a final decision on a sanction.  They can only make findings of fact and conclusions of law.  They didn't even get to that at this -- in this case because it was dismissed before it ever went to trial.

Q    And it was dismissed at the request of the -- at whose request?

A    The medical board requested it after the agreed order was entered and signed and approved by the medical board.

Q    Very good.

//

MR. ALVAREZ:  Pass the witness, Your Honor.

THE COURT:  Mr. Pena, did you have any questions?

MR. PENA:  No questions for this witness, Your Honor.

THE COURT:  You may go -- did you have some?  Go ahead.

MS. GURSKIS:  Briefly, Your Honor.

THE COURT:  Go ahead.

**REDIRECT EXAMINATION**

**BY MS. GURSKIS:**

Q    Mr. Freshour, you just read dozens of pages on cross; did you write any of the information you read out loud?

A    No, I did not.

Q    You're not a doctor, are you?

A    No, I am not.

Q    So you would rely on the monitor who wrote those reviews and who is a doctor for his perspective on those files?

A    Absolutely.

Q    And for his perspective on whether or not Dr. Zamora-Quezada's patient charts and patient files improved.

A    That's also correct.

Q    Because that's all the chart monitor reviews; is that right?

A    Yes, that's true.

Q    Would it be fair to say that the review is only as good as the information that's contained in those files?

A    Yes, I believe that's correct.

Q    Do you have any reason to believe that any of the Texas Medical Board's chart monitors are biased?

A    Absolutely not.

Q    In fact, I believe you testified that they're chosen for their lack of bias.

A    Their lack of bias, and we're not paying them very much at a hundred dollars an hour, I can assure you.

Q    And taking a step back --

         THE COURT:  Depending on what profession a person's in as to whether a hundred dollars --

         THE WITNESS:  Well, there was --

         THE COURT:  -- an hour is --

         THE WITNESS:  -- as you might say, Judge, that was relative to a physician.  A hundred dollars an hour is not --

         THE COURT:  Okay, but a --

         THE WITNESS:  -- a great wage --

         THE COURT:  -- hundred dollars an hour is a lot for a lot for a lot of people.

         THE WITNESS:  I understand, not to make light of it, but it's important because that's -- we get them at a cut rate for what doctors normally would charge.

         THE COURT:  Go ahead.

//

//

**BY MS. GURSKIS:**

Q    Taking a step back, --

A    Yes.

Q    -- does the Texas Medical Board have an incentive to keep doctors practicing?

A    Well absolutely for the care of the patients and the people of Texas certainly.

Q    Does status cleared on a Texas Medical Board record clear Dr. Zamora-Quezada of any wrongdoing or is that an administrative term to reflect the termination of a chart monitorship?

A    It is the -- it is a reflection of the termination of not only the chart monitorship but the -- all of the terms of the agreed order.  But that is the only thing that's referring to is the status related to an agreed order that's been entered by the Board.

Q    Did the Texas Medical Board ever exonerate Dr. Zamora-Quezada?

A    No.

Q    Because that's not the role of the Texas Medical Bard; is that right?

A    That's absolutely correct.

Q    Is the Texas Medical Board law enforcement?

A    No.

Q    You described a number of complaints, investigations, and

continued issues that the chart monitor and others observed. The Texas Medical Board -- did the Texas Medical Board take any additional action after the termination of the monitorship in 2011?

A    They did not.

Q    In fact, the Texas Medical Board allowed Dr. Zamora-Quezada to continue practicing medicine, despite repeated complaints and repeated deficiencies made over the course of almost 20 years; is that right?

A    That's --

        MR. LEE:  Objection, leading.

        THE COURT:  It's an appropriate question.  Go ahead.

A    Yes.

        MS. GURSKIS:  I pass the witness.

        MR. LEE:  Nothing further, Your Honor.

        THE COURT:  Mr. Sully, anything else?

        MR. SULLY:  No, Your Honor, thank you.

        THE COURT:  Mr. Alvarez?

        MR. ALVAREZ:  No, Your Honor.

        THE COURT:  Mr. Pena?

        MR. PENA:  (No audible response)

        THE COURT:  Mr. Pena?  Everybody else has to stand up, there's no exceptions.

        MR. PENA:  I apologize, Your Honor.

        THE COURT:  You may go ahead and step down, sir,

thank you very much.

THE WITNESS:  Thank you.

**(Witness steps down)**

THE COURT:  Go ahead and call your next witness.

MS. GURSKIS:  Your Honor, the United States called Dr. Monty Tew.

**(Pause)**

THE COURT:  Did you all need to take those?

MS. GURSKIS:  Oh, I'm sorry.

THE COURT:  Those are exhibits I guess.

**(Ms. Gurskis/Mr. Speaker confer)**

THE COURT:  Sir, if you don't mind coming up to the front so you can be sworn in.

THE CLERK:  Raise your right hand.

**DR. MONTY TEW, GOVERNMENT WITNESS, SWORN**

THE COURT:  Go ahead and have a seat right up there, please, sir.

**DIRECT EXAMINATION**

**BY MS. GURSKIS:**

Q    Good afternoon.  Could you please state your name for the record.

A    Monty Tew.

THE COURT:  And how do you spell your name, sir?

THE WITNESS:  It's M-o-n-t-y; and the last name is T-e-w.

**BY MS. GURSKIS:**

Q    Dr. Tew, if you could pull the microphone a little bit --

A    Sorry.

Q    -- closer to yourself.

Dr. Tew, where did you go to college?

A    Baylor, in Waco.

Q    When did you graduate?

A    In 1991.

Q    Where did you --

    **THE COURT:**  They weren't as good in football as they are now, right?

    **THE WITNESS:**  No, sir.  That's true.  But we liked our coach.

    **THE COURT:**  Go ahead.

**BY MS. GURSKIS:**

Q    Where did you complete medical school?

A    Baylor College of Medicine, in Houston, in 1996.

Q    Where did you complete your residency?

A    Massachusetts General Hospital, in Boston, Massachusetts, in 1999.

Q    After your residency, did you complete any fellowships or training?

A    Yes, ma'am.  I did a rheumatology fellowship at UT, in Houston.

Q    And what year did you become board certified?

A     2001, in rheumatology.

Q     Where do you currently work?

A     I work at the Austin Diagnostic Clinic, in Austin.

Q     Have you ever practiced medicine in the Valley?

A     No, ma'am.

Q     Have you ever practiced medicine in San Antonio?

A     No, ma'am.

Q     What is your job title?

A     I'm an adult rheumatologist.

Q     And how long have you worked in Austin?

A     Since July of 2001; so 18 years.

Q     Are you a salaried employee?

A     No, ma'am.

Q     How are you compensated?

A     I'm compensated based on something that's defined as the relative value unit.  So I'm paid based on production of how many patients I see in a given day.

            **THE COURT:**  Sir, you're going to have to speak up a little bit louder, because the jurors are having trouble hearing you.

            **THE WITNESS:**  I apologize.

            **THE COURT:**  I just got a note from them --

            **MS. GURSKIS:**  You can pull the microphone a little --

            **THE COURT:**  -- telling me that.

            **MS. GURSKIS:**  -- closer, if you need.

THE WITNESS:  Sure.  And I'll speak up a bit louder as well.

THE COURT:  You can even move the chair, also, to get closer.

BY MS. GURSKIS:

Q    Approximately how many patients do you see each week?

A    In the course of a week, I will see about 125 patients.

Q    Are you compensated based on the number of patients you see?

A    No.  It's really based on the complexity of the individual patient and how that translates into the billing.

Q    Can you walk us through a typical day for you?

A    Sure.  So I typically arrive at work at about 6:15 in the morning and work on paperwork, preparing for the day's patient load.

And I start seeing patients at 7:00 in the morning.  And I will see two new patients, and then about 14 follow-up patients, and then another new patient at lunch time.

And then I'll get back to work about 1:30 and see ten follow-ups until about 5:00 p.m., and then I will complete the remainder of my paperwork between, typically, 5:00 and 6:00.

And then, in the evening, I will have my computer at home and spend another 30 or 45 minutes going through paperwork.

Q    Dr. Tew, have you ever testified as an expert?

A    No, ma'am.

Q    Are you being compensated by the Government for your testimony here today?

A    Yes, ma'am.

Q    How are you being compensated?

A    I'm being compensated $40 per day.

         MS. GURSKIS:  Your Honor, I would now move to qualify Dr. Monty Tew as an expert in rheumatology.

         MR. LEE:  No objection.

         THE COURT:  He is qualified as such.

         Go ahead.

         MS. GURSKIS:  Thank you, Judge.

BY MS. GURSKIS:

Q    Dr. Tew, I would now just speak to you a little more specifically about the different illnesses you treat.

A    Okay.

Q    Do you treat patients with arthritis?

A    Yes, ma'am.

Q    What is "arthritis"?

A    So arthritis is a general term used to refer to almost any ailment of a joint.  And many of the patients that I see have such problems.

Q    What is "osteoarthritis"?

A    So osteoarthritis is a form of degenerative joint disease that, essentially, all of us will experience, unfortunately, as we get older.

And it's a condition whereby cartilage just wears out. Like the brake pads in a car, if you stop the car enough, eventually, you need to get new brake pads.

And, unfortunately for us humans, we don't have really the ability to grow new cartilage. So as our cartilage wears out, our body compensates for that in ways, unfortunately, that leads to joint pain and stiffness and enriches our orthopedic colleagues over time.

Q    What is "rheumatoid arthritis"?

A    So rheumatoid arthritis, as opposed to osteoarthritis, which essentially all of us develop -- rheumatoid arthritis is a chronic, progressive inflammatory disorder of the immune system in which, for reasons that we don't really understand, the immune system that normally protects us from infection and helps us heal when we have injury, suddenly decides that pieces and parts of our joints don't belong with us anymore.

It causes inflammation in the cells that line the joint normally and help to nourish the cartilage. And over time, that process causes permanent damage to joints resulting in debility, inability to function.

And all along the way, a lot of fun; swelling, pain, stiffness, and difficulty with daily activities.

Q    What is "fibromyalgia"?

A    Fibromyalgia is a chronic pain disorder that causes, typically, a triad of symptoms. Chronic widespread,

unremitting pain, sometimes from head to toe, accompanied by fatigue and poor energy level.

And also, very often encompasses difficulty with normal sleep processes so that patients get into a bad, bad cycle of hurting all over, not sleeping well, having lousy energy during the day, and all the dysfunction that goes along with that, unfortunately.

Q    What is "lupus"?

A    So lupus is another autoimmune disorder that, while rheumatoid arthritis typically affects joints that has some, you know, small percentage of folks who also have more systemic features -- lupus is really an autoimmune disorder that can affect any part of your body, from your head to your toes, causing such things as hair loss, funny sores in the mouth, unusual rashes, and sensitivity to the sun.

It can cause strokes and seizures and heart problems, in terms of inflammation around the heart or lungs.  It can cause kidneys to fail.  It can affect blood vessels.

It can also cause an inflammatory arthritis that can certainly look a lot like rheumatoid arthritis at times.  But the most ailing feature of lupus is that it's more of a multi-system disorder in the majority of the folks who experience it.

Q    What is "remission"?

A    So remission is, as in discussion of cancer, its absence -- to a rheumatologist, remission is absence of symptoms, in

terms of one's ability to get up and get moving in the morning and not experience joint swelling, pain, stiffness, and difficulty with functioning.

Q   The remission you just described, is that with medication or without medication?

A   So in rheumatoid arthritis, a very small percentage of patients will have their disorder go into remission; but it's in the single digits.  That very, very uncommon, unfortunately.

As a rheumatologist, our goal -- you know, one's goal is typically to try to treat to that remitative state.  You have to get someone's inflammation, their pain diminished such that they are able to function just as they did before they developed the disease in the first place.

Q   So how often do you see rheumatoid arthritis in remission with or without the assistance of medication?

A   So with the assistance of medication, you certainly see it not as often as one would like.  It's a disorder that often requires creativity and changing regimens and trying to get as close to that as possible.

Q   What about without medication?

A   Without medication, I think I can count on one hand the number of patients who I saw with rheumatoid arthritis at the beginning, whose disease goes away without treatment.

Q   And that's in approximately 20 years of practicing --

A   Correct.

Q    -- rheumatology?

How often do you see fibromyalgia in remission?

A    Fibromyalgia, similarly, is a disorder -- is a chronic pain disorder that certainly can get better.

It's rare that all of the symptoms go away completely, even with treatment, unfortunately.

Q    How often do you see lupus in remission?

A    You know, it certainly depends on the manifestations that the patient with lupus has.

And lupus certainly is compared with rheumatoid arthritis. It's much more heterogeneous.  You know, not everyone has all the same manifestations.

Certainly, some people with lupus, as it affects the joints and skin and so on, can be fairly straightforward to treat, and can be symptom-free, as long as they remain on treatment.

And then some of those folks, over time, their disease does burn out.  And I would say, probably, at a somewhat higher rate than folks with rheumatoid arthritis.

Q    If someone with rheumatoid arthritis is in remission, how long would that individual stay in remission?

A    That would certainly vary among the person being discussed.  I have plenty of patients who are treated to a state of remission, who seemingly have no symptoms for prolonged periods of time; for years and years, and then can

experience a flare out of the blue.

And, oftentimes, we can't identified why that is.

Q    And that prolonged remission you just described, just so we're clear, that's with the assistance of medication?

A    Typically correct, yes.

Q    Is there a cure for rheumatoid arthritis?

A    There is not, unfortunately.

Q    Is there a cure for fibromyalgia?

A    No.

Q    Is there a cure for lupus?

A    No, ma'am.

Q    Would you say that rheumatoid arthritis, fibromyalgia, and lupus are lifelong diseases?

A    For the vast majority of folks who experience those, that is correct.

Q    How common is rheumatoid arthritis among the general population?

A    So estimates vary somewhere around half the percent of the population.

Q    Half a percent have rheumatoid arthritis?

A    Correct.

Q    What about fibromyalgia?

A    Fibromyalgia certainly much more common.

And somewhere in the course of one's life, somewhere around five percent or so of females can meet the diagnostic

criteria for fibromyalgia.

And both of those are more common among females.  So data are better there.

Q    And, finally, what about for lupus?

A    So lupus is, among those three, far and away the least common.  The group in which lupus has its highest frequency is among African-American women, and it's about one in 300.

So for Hispanic and Caucasian women, it's somewhat less than that; maybe one in 600 to one in 800.

Q    Dr. Tew, can you walk us through what you do on your first visit with a patient?

A    So the vast majority of patients I see for a new patient or a consultative visit or referred by another physician, most often a family practitioner or internal medicine physician.

And they are referred to address a particular question -- you know, "Does this patient have rheumatoid arthritis; does this blood test make any difference to the patient?"

And so when I see those patients, my office staff will have received or requested records from the referring physician, which are reviewed.

The patient fills out a standard new-patient questionnaire that includes all of the relevant -- what's called, "The review of systems," to find out what other things are going on with that patient.

And then I will have a 40 to 45-minute visit with that

patient, in which I will review that history of, "Okay, what brought you here and what's going on?"

And so, in taking that history of the present illness, that will take about half to two-thirds of that time.  Then a physical examination will be performed, and then, after that, we will discuss what further diagnostic evaluation is necessary before rendering a diagnosis or, if it's clear what's going on, what we do about it at that point.

Following that visit, the patient would go for lab studies, if necessary, imaging studies, if necessary, or whatever the case may be.

And then, very often, I will call those patients as those data return from the lab or the radiology department or whatever the case may be, and we'll discuss the results and decide where to go from there.

Q   So you're spending, I believe you said, 40 to 45 minutes with a patient on the first visit?

A   That's correct.  The face-to-face time is that long.

Q   In that face time, would you say you're doing more listening or more talking for purposes of diagnosis?

A   For the purposes of diagnosis, much more listening.

Q   Why is that?

A   Well, the -- you know, to be a rheumatologist, you have to be, first and foremost, interested in internal medicine.  And in internal medicine, the story is usually where you end up

with the proper diagnosis.

So we're discussing all the things that are going on with that patient and that really helps to put the story together as to what is causing the patients problems to begin with.

So if I'm interrupting too much or throwing in, you know, my own stories, that just gets in the way.

Q   Do you typically give a diagnosis on the first visit?

A   Sometimes.  It depends.  If it's a -- if someone had presented with very classic symptoms of a particular illness, it may be very clear exactly what's going on, and we'll discuss it at that time.

Otherwise, you know, we'll be discussing what the possible causes of the patients' presenting complaints reflect.

Q   So are you able to give a diagnosis without lab work?

A   Sometimes you can.

Q   Are there certain illnesses, including the ones we just described -- fibromyalgia, lupus, and rheumatoid arthritis -- where blood work may be more helpful in the diagnosis?

A   So there are other autoimmune disorders out there and for which laboratory testing can be very helpful.

Some of the other autoimmune disorders, like Sjogren's or some of the inflammatory muscle disorders.  Some forms of blood vessel inflammation, called vasculitis, could be useful or useful to evaluate through the lab.

Q   Do you typically prescribe medication on the first visit

A     I do sometimes, yes.

Q     And those sometimes, when you're prescribing medication on the first visit, what are you taking into consideration when you're writing a prescription?

A     Well, it certainly has to do with how certain I am about the diagnosis in the first place and if, whether or not, they've already had laboratory testing done that was relevant to the indication for medication in the first place and the likelihood that the patient would be able to tolerate the medication.

So if it's going to be safe for the person to use a particular medicine and they need something right then, then medication could be prescribed.

Q     You mentioned lab testing.

Without the benefit of lab testing from a prior physician, would you still prescribe medications to a patient on the first visit?

A     It certainly depends on the medication.

If it was a medication that is for, say, rheumatoid arthritis, that's immunosuppressing, that has certain things that need to be done before that medication would be prescribed, then I would wait until those lab results could be obtained.

Q     What are those certain things that you would be looking for?

A    Well, if I were prescribing, say, medications that, here again, could be immunosuppressive, like a medicine called, "methotrexate," that's very commonly used for rheumatoid arthritis or, "leflunomide," another medicine in that family.

There are important things to know about the patient before prescribing the medication relevant to their bone marrow function, their kidney function, liver, and so on, before you would want to prescribe those medicines.

Q    Why is that important?

A    Well, those medicines can all cause toxicity if someone's kidneys are not working properly or if there's an issue with the liver.

Many of the medications I prescribe require ongoing, long term blood test monitoring to look for signs of toxicity.

So those are things that have to be known before the medication could be prescribed.

Q    You mentioned, "toxicity."

For those of us who aren't doctors, can you explain how that might manifest itself on a human body?

A    So, you know, toxicity speaks to systemic side effects for medications.

So say if I had a patient who had an inflammatory arthritis and also had bad kidney, had kidney disease, many of the medications that I could prescribe are metabolized or eliminated through the kidneys.

If the kidneys weren't working properly, then the likelihood of causing a lot of side effects from those medications would be there.

And so the patient may not come back, saying, "I think my white blood cell count is low."  And they might come in, saying, "Gosh, I've been having fevers; I'm getting infections; I feel real lousy."

So they wouldn't have symptoms that would clue them into specifically what was wrong.  But those are things that would be measured in the lab.

Q    In what situations would you order an X-ray on the first visit?

A    So if an X-ray could help discern what type of arthritis were present in a patient, or if someone had a type of arthritis that, say, could have already caused permanent damage in joints, that can help determine what is an underlying cause.

Is this patient, for instance, suffering from degenerative arthritis versus something more inflammatory?

Q    Do you typically give injections on the first visit?

A    At times, yes.

If someone comes in with something that is clearly indicative of the need of that, it's a good treatment.  So if they had bursitis in the shoulder or a hip, or if they come in with a nice hot swollen joint, a rheumatologist would certainly want to take some fluid out of that, you know, if nothing else,

diagnostically, to find out what made that occur.

Q    Would you do that without labs?

A    Those things you could do without labs.

Q    Why is that?

A    Well, the safety of the procedure, in the first place.

Unless someone had some very unusual or unlikely concomitant illness, it would be very safe to stick a needle in there.

Q    What circumstances or what medications would you wait for labs, prior to injecting?

A    Well, the medications I would inject would be ones that wouldn't typically have a lot of systemic toxicity, unless, say, if someone were a brittle diabetic whose blood sugars were not well controlled, then injecting them with steroids would be potentially a bad idea.

Q    Speaking more specifically about rheumatoid arthritis, how do you determine whether a patient has rheumatoid arthritis?

A    So there are certainly plenty of classification criteria out there for making the diagnosis of rheumatoid arthritis.

But I think most rheumatologists, when they have seen a fair number of patients and can recognize a pattern of what is typically asymmetric, affecting on both sides fairly equally, inflammatory arthritis occurring in locations where you would expect that to be the case, the diagnosis is usually fairly straightforward.

MS. GURSKIS:  May I approach the witness, Your Honor?

THE COURT:  Go ahead.

BY MS. GURSKIS:

Q    Can you see this board okay, Dr. Tew?

A    I believe so.

Q    Okay, so for rheumatoid arthritis --

THE COURT:  If you want the jury to look at it, you probably need to turn it.

MS. GURSKIS:  Okay.

BY MS. GURSKIS:

Q    Can you see that okay?

A    Uh-huh.

Q    So when you're evaluating a patient for rheumatoid arthritis, what percentage -- if this is -- this circle kind of represents everything that you're taking into consideration when making that diagnosis, what percentage is the history and physical exam of the patient?

A    I would say that the history and physical exam makes up the vast majority of that diagnosis.

So I would say 80 percent.

Q    Eighty percent?

And what would fall into this smaller 20 percent here?

A    The smaller 20 percent would encompass such things as the laboratory studies and any relevant imaging.

Q    What might you be looking for in the labs?

A    So there are blood test markers for rheumatoid arthritis.

And they can be very helpful to support one's perception that, indeed, rheumatoid arthritis is present.  They can be helpful for offering prognostic markers for the long term.

Patients who have high-level rheumatoid factors and something called, "CCP antibodies," are at greater risk of developing erosions and damage over time.  So it's important to recognize those folks.

The downside is that no blood tests are perfect.  And both the rheumatoid factor and CCP antibody are not 100 percent sensitive; just meaning that there are a lot of folks out there who end up having what we will classify as rheumatoid arthritis, but don't have a rheumatoid factor or a CCP antibody.

There are other antibodies that are being developed out there.  And where they will fall in our use diagnostically, we'll see over time.

Q    You mentioned the rheumatoid factor.  The rheumatoid factor, does that factor in -- or is that taken into consideration in a number of rheumatological conditions; not just rheumatoid arthritis?

A    Certainly.  So I tell patients that the rheumatoid factor is somewhat misnamed.

It's certainly seen in rheumatoid arthritis, but it can be seen among normal healthy folks, it can be seen among folks who

maybe recently had an infection or have lung disease or got a vaccination.

The rheumatoid factor just refers to one's ability -- one's immune system's ability to form antibodies that attach to other antibodies.

Well, that's not specific for rheumatoid arthritis.  So a fair number of folks with things like Sjogren's or lupus will have rheumatoid factors very often.

Q    And how does lab work help with the treatment of rheumatoid arthritis?

A    So there are lab studies that are useful for monitoring ongoing inflammation.

And, most typically, people use something called a sedimentation rate or a C-reactive protein, that are inflammatory markers.

Those can be useful for some patients, in terms of assessing the inflammatory response when taken into context with what one sees on a physical exam and what the patients tells you about their symptoms in terms of their functioning and so on.

There are fancier assays of the -- of inflammatory markers and so on.  And certainly there are plenty of labs trying to develop better technologies to help us assess how active rheumatoid arthritis really is.

Q    So I think you testified that the physical -- the physical

exam really drive the diagnosis.

Would it be fair to say that it also is equally of consideration in the treatment?

A    I would say it's pretty critical that, you know, my patients have to be comfortable with me laying hands on them. Because I need to be examining them regularly and assessing what's going on in their joints.

That is correct.

Q    Would those percentages stay the same for the treatment of rheumatoid arthritis?

A    I would say they would be fairly close.

Q    We spoke a little bit about X-rays.  How do X-rays help with the diagnosis of rheumatological conditions?

A    So an X-ray that shows permanent damage from rheumatoid arthritis is helpful diagnostically, but really unfortunately viewed as a failure now, because what I'd really like to do is determine whether or not my patient has rheumatoid arthritis before they develop a lot of permanent damage.

So I would like to see normal X-rays when that patient is first evaluated; that patient not having experience in a lot of permanent damage.

Because what I know is that, when the damage is present, I can't fix that.  We need to -- we can try to prevent that from recurring in the first place.

So useful diagnostically, many people do serial X-rays,

over time, to assess formation of joint damage and things of that nature. And certainly studies of, you know, long-term outcome measures and studies of proposed new treatments for rheumatoid arthritis.

We'll do that serially, as well, to try to demonstrate the modality being tested; the drug or device or whatever it happens to be is preventing damage over time.

Q    Would there ever be a situation in which the erosion of the joint is not clear from the X-ray, but an MRI would be required to --

A    Yes.

Q    -- show whether --

A    Yeah, that does happen. Absolutely.

Q    Would you order X-rays of a body part someone was not complaining about?

A    There could be situations in which I would, but that would not be the norm, necessarily.

Q    What might be a situation where you would order it?

A    Well, sometimes, if someone is complaining of, say, problems with a hip, and they're fairly convinced that this bodily area is where that pain is coming from, it may, indeed, be from the hip, but it could also be from their spine and they may not be complaining of a lot of back pain, for instance.

So they may have degenerative arthritis in the spine that's compressing a nerve root and causing radiating pains.

So there may be situations in which one would X-ray an area that seemingly is not directly related to the location anatomically of the complaint.

Q    Would you say that happens frequently?

A    It happens occasionally.

Q    Occasionally?

How often do you order X-rays for new patients?

A    Well, it depends on what the new patient is coming in complaining about.

So if a patient came in a complained about what seemed to be bursitis of a shoulder, I may or may not get an X-ray of the shoulder, depending on what we decide to do next.

If someone came in, complaining of symptoms concerning for rheumatoid arthritis, depending on the situation, I may get X-rays of places where I might expect to see erosions occur first.

Q    Would you ever order MRIs of a body part someone was not complaining about?

A    You're getting the example of possibly pain emanating from a structure seemingly anatomically distant to the area where the pain was being experienced.  There are situations in which that would occur.

Q    How often do you order MRIs?

A    I probably order four to six a month, perhaps.

Q    And that's out of -- how many patients do you see a month;

450, 500?

A     450, 500, yes.

Q     Why is that number so small relative to the number of patients you see?

A     Well, the majority of patients that I see don't really have an indication to have an MRI performed.

They're coming in for a follow-up and they're doing well, not having many symptoms, or there's really no question about whether or not there's active inflammation present on their exam.  And my perception of what the patient tells me correlate well.  And at that point, there's not much needed to get that done.

Q     How often do you order ultrasounds?

A     Very infrequently.

Q     Why --

A     Well --

Q     Why is that?

A     The ultrasounds I order would be more for monitoring signs of toxicity if someone had a kidney or liver issue.  In Austin, we don't have very good musculoskeletal ultrasonographers, so I just don't order it very often.

Q     How do you distinguish between a difference of opinion and a misdiagnosis?

A     Either there are -- there are certain things that are open for debate, I guess.  And if something is unclear, we can

certainly have a difference of opinion about what the underlying cause is.

When the cause becomes clear, and if it was called something else previously, then, technically, that would be a misdiagnosis.

That being said, I also tell my patients in rheumatology that one of the most useful tests I have is observation over time. Because, oftentimes, things in rheumatology are not entirely clear from the very beginning.

Q    And I'd like to talk to you about your work with the Texas Medical Board.

A    Okay.

Q    What positions or affiliations have you had through or with the Texas Medical Board?

A    So in years past, I have been a chart monitor, as well as a reviewer of individual cases.

When a patient would bring a complaint against a particular doctor, and the TMB would have a position within that field, a specialty, review the complaint and review the records relevant to that, and give the TMB guidance as to whether or not the complaint was valid or if the practitioner against you, when the complaint was directed, was, in fact, practicing within the scope of good medical practice.

Q    Let's talk a little bit more about your experience as a chart monitor.

A     Okay.

Q     What does the position of chart review monitor entail?

A     So as a chart monitor, depending on how the monitoring is being arranged, the medical board can have a monitor review a certain number of cases of the doctor in question, quarterly, and provide a report directed towards the questions that the medical board has regarding that person's practice.

Q     Why did you decide to become a chart monitor?

A     So I thought it would be useful for me to see what was going on in other practices within our state.

      And I thought it would be educational, from my standpoint, to see what were pitfalls, what types of complaints patients had about rheumatology care, and also, hopefully, to be able to help one of my colleagues in matters in their practices that can be improved.

Q     How long does a chart monitor check typically last?

A     Having really only done it on one time continuously, I would have to say, just from my experience, I did it for five quarters for this particular case.  But I don't know what the norm is.

Q     And that one time that you served as a chart monitor, approximately when was that?

A     That was beginning in the fall of 2010, through most of 2011.

Q     How much were you paid for that role?

A    So chart monitors, along with other case reviewers for the Texas Medical Board, are paid $100 per hour.

Q    Is that more or less than what you would make in your regular practice as a rheumatologist?

A    Less.

Q    Did you serve as a chart monitor for the medical files of Dr. Jorge Zamora-Quezada?

A    I did.

Q    Why were you reviewing Dr. Zamora-Quezada's files?

A    So the questions that I was asked to review primarily centered on his documentation of his visits with new patients and his ordering of diagnostic testing.

Q    Do you recall what complaints, in particular, the board had identified with regard to his testing?

A    I know, with certainty, that it's mentioned at the top of every report that I wrote for them.  So I would hate to misstate it.

Q    Okay, is the purpose of a chart monitor check to punish the doctor being monitored?

A    I don't believe so.

I think the purpose was to offer, hopefully, helpful critique of one's practice, and also to encourage that practitioner to consider how the question was being addressed within their own practice.

And it was my understanding that it was to encourage

improvement in those areas that were being monitored.

Q   Did that goal or premise guide your review of these files as you were working on your chart monitor check?

A   Yes.

THE COURT:  I take it you have more questions; is that right?

MS. GURSKIS:  I do, Your Honor.

THE COURT:  Okay, I think probably right now would be a good time for a ten-minute break.

MS. GURSKIS:  Okay.

THE COURT:  Please rise for the jury.

(Jurors exit the Courtroom)

THE COURT:  We'll see you-all at 3:15.

And, doctor, you'll be back on the stand.

THE MARSHAL:  All rise.

(Court in recess from 3:04 p.m. to 3:22 p.m.)

(Jurors present)

THE COURT:  Please be seated.  Go ahead and proceed, ma'am.

MS. GURSKIS:  Thank you, Your Honor.

DIRECT EXAMINATION (CONTINUED)

BY MS. GURSKIS:

Q   Dr. Tew, when we left off, I think we were just beginning to discuss your chart monitorship back in the 2010 to 2011 time period.  I'd now like to direct your attention to the first

report that you drafted.

MS. GURSKIS: Ms. Bartone, if you could just pull up the first page of D-24, what has been previously marked and admitted as D-24, which is the October 5th, 2010 chart monitor report.

Q   Did you write this report, Dr. Tew?

A   Yes.

Q   What did you review in order to draft this report?

A   So for each of these quarterly reviews, I was sent records on 30 patients who typically were new patients to the practice. And they would receive anywhere from, gosh just guestimating now because this was a number of years ago, it was anywhere from 30 to 60 pages of records per patient, somewhere thereabouts, that would include the clinical notes about the time that the patient was evaluated in the office, as well as any notes from referring physicians that came with that, as well as lab studies and imaging that was ordered within the practice.

MS. GURSKIS: Ms. Bartone, if you could turn to page 12 of Government's Exhibit D-24.

Q   Dr. Tew, do you see where it says this patient, "SM" down at the bottom of the page --

MS. GURSKIS: You can zoom in there, Ms. Bartone, just to see the patient name. And then turning your attention to the following page, page 13, where her files continue. And

if you could zoom in, Ms. Bartone, on the top portion.

Q    Dr. Tew, what stood out to you about this particular patient's file?

A    So in this patient's records, the -- I think the most notable thing about this particular treatment arrangement was that this was a patient who had evidence of low bone mass and was prescribed a medication called Forteo, which is basically human parathyroid hormone.  It's a hormone that humans normally produce that is important in bone metabolism.  It's very effective at raising bone density and preventing fractures. And in this patient, it was notable that the patient had been treated for breast cancer.  But there is some issue with using the drug in patients who've been treated for cancer if they'd ever received radiation therapy.  And I was in this case pointing out the fact that it would be useful to note whether or not that had been done prior to the prescribing of that medication.

Q    Because it would have been harmful -- potentially harmful to her if she had taken that.

A    It would have been considered a contraindication of using that therapy.

         **MS. GURSKIS:**  Okay.  And let's turn, Ms. Bartone, to the final -- if it's possible to do a split screen of the final two pages of this document, pages 20 and 21.

Q    Dr. Tew, what were your overall conclusions and

observations after reviewing this first set of 30 files as part of your term monitorship?

A    I think the what struck me most was that these patients seemed to have, regardless of what their chief complaint was as documented, they seemed to have essentially the same evaluation in the laboratory and very often the same evaluation with imaging studies such that no matter what direction they came to the clinic from, they had very similar workups.

**MS. GURSKIS:**  Ms. Bartone, if you could just highlight the first sentence next to "conclusions."  Oh, the full sentence, please.  Thank you.

Q    What were the -- why did you write that there were troubling trends here based on your review of these files?

A    Well, in my experience, every new patient that I see is I guess there's more heterogeneity.  There are -- everyone doesn't come for the same problem.  But it appeared that all the patients that were seen in the course -- or nearly all of the patients seen in the course of this quarterly review were evaluated the same way.  They all went through the same regiment of lab tests, they all received the same diagnostic studies, they all received very similar diagnoses at the end, which if indeed that population is extremely homogeneous in the way that they present and they all have the same problems, it seems probably perfectly reasonable.  But that's not been my experience.

Q    So in your 18 or 20 years of experience in rheumatology, do you see more of a variety of presentations or symptoms in patients that you see?

A    That's correct.

Q    Let's move to the next report you drafted, which has been previously marked and admitted as Government Exhibit 26.  This has a date of February 5th, 2011.  Did you write this report after reviewing another 30 patient files?

A    Yes.

Q    Directing your attention to your general comments on the I guess towards the end of this, the final two pages.

          **MS. GURSKIS:**  Ms. Bartone, if you wouldn't mind doing the same split screen for pages 18 and 19 of Government's Exhibit D-26.

Q    Dr. Tew, what were your overall observations in this second set of the approximately 30 patient files?

A    You know, I think the trend continued that the patients were evaluated similarly, given the same laboratory studies, often given the same imaging.  A trend that was more notable in this section was that, you know, patients who were said to have inflammatory arthritis, which was the vast majority of these patients, were documented as having inflammation in essentially all of the joints of the hands that one might expect to see in rheumatoid arthritis, which certainly can happen.  But, again, even as patients with rheumatoid arthritis are more homogeneous

than say patients with lupus, for all of those joints in all of those patients to all be simultaneously inflamed and swollen just seems odd. That's not what I've typically -- that's not what I typically see in patients with that condition at presentation.

Q    How often in your practice do you see all of the swelling in all of those hand joints that you just described?

A    For them all to be present simultaneously at presentation is I would say relatively uncommon. You know, rheumatoid arthritis is said to be a symmetric arthritis so typically people have inflammation on both hands, say, but it doesn't necessarily mean that all of the joints, all ten prominent joints on both hands are inflamed similarly. And to have patient after patient after patient in whom that was the description seems somewhat unlikely.

Q    Did you have any concerns here about the lab tests being ordered?

A    Well, again, there is seemingly a panel of tests that's done for all of these patients that is essentially the same for every person in the -- among this 30.

Q    Why would that matter.

A    Well, that would -- here again that would just be unusual to me. Some of these tests may have been done before the patient arrived. They may have been the reason for which the referral was made in the first place. But, again, there were a

lot of tests in some of the panels that were done that I just don't see other people ordering on a routine basis.

Q    Did you observe any patterns with regard to prescriptions?

A    So there were, you know, the majority of the folks in this were given a number of medications for their symptoms simultaneously that in my view can make it difficult to determine which medication is helping and which is causing side effects upon follow-up.  So the answer is, yes, I documented there that, you know, the patients were given this grouping of topical medications, oral medications, anti-inflammatories, medicines that worked on neuropathic pain simultaneously which I think is unusual.

Q    How many prescriptions would you say is more common or standard practice for somebody who might be suffering with rheumatoid arthritis?

A    So here again, depending on the way the person presented, one would like to use as few medications as possible initially to determine, you know, what actually works and what doesn't cause a lot of side effects.

Q    Would you then add or subtract potentially additional medications?

A    Sure, over time.

Q    Did you notice any improvements in this particular report?

A    I think in this quarter, Dr. Zamora did a very good job of documenting his review of outside records.  He didn't always

heed that in terms of what he eventually did but the documentation of that was much better.

MS. GURSKIS: Ms. Bartone, if you could please pull up Government's Exhibit D-28, which is the chart monitor report from May 2nd, 2011?

Q   Dr. Tew, did you write this report after reviewing an additional 30 patients charts of Dr. Zamora's file?

A   Yes.

Q   So at this point, you reviewed about 90 patient files from Dr. Zamora-Quezada.

A   Correct.

Q   Directing your attention to the fourth page in this particular patient --

MS. GURSKIS: Ms. Bartone, if you could zoom in just to paragraph nine and blow that up.

Q   Dr. Tew, what did you mean by seeking certain complaints to apply usual workup of modalities, including panels of certain tests and x-ray studies?

A   Certainly an inference on my part but it -- you know, here again, these patients were all put through the same battery of tests and seemingly some of those were driven by responses on the review of systems and things of that nature.  And his response is that, well, you know, the patient complained of "X," "Y," or "Z" so that indicated the need for these tests. But it appeared those tests were likely to be done regardless.

Q    So would it be standard practice to provide the same set of tests to every patient regardless of their symptoms?

A    I would say no.

Q    Directing your attention to the last two pages, please, of this, pages 20 and 21, what were your observations here with regard to the x-rays ordered by Dr. Zamora-Quezada?

A    So Dr. Zamora-Quezada would read his x-rays and here again there were -- I think there were very, very few reports that were said to be normal.  There were almost always descriptions of things in the x-rays that could be interpreted as indicative of inflammatory arthritis.

Q    What were your observations with regard to the physical examination of patients, if any?

A    Let's see here.  The -- once again, in this quarter versus the -- as compared with the last, you know, when inflammatory arthritis was inferred, you know, all of the joints would said -- would be said to be inflamed simultaneously, which certainly as I mentioned can happened but just seemed somewhat unlikely that for every patient that would be the case.

Q    And turning your attention to -- or directing your attention to point seven, (indisc.) you wrote about inflammatory polyarthritis, fibromyalgia, and shoulder bursitis, how often do you see those conditions all present in the same patient?

A    You know, they can certainly all occur in the same

patient.  But when they are said to occur repeatedly over and over and over again throughout so many of the patients within this section, that gave me pause.

Q   And then in terms of the recommendations section, were there any other patterns that were notable to you that you were observing at this point in his treatment of these patients?

A   I think the pattern really persisted that the patients all received the same evaluation diagnostically, were given very similar diagnoses, the same numerous medications were prescribed, the same physical exam findings were recorded.

Q   That was unusual to you.

A   Well, it was a persistence of that pattern.

Q   Directing your attention to Government's Exhibit D-30 which has been previously admitted, this is the August 24, 2011 chart monitor report that you wrote.

A   Yes.

MS. GURSKIS:  We can just flip to the end of this document, Ms. Bartone.  Let's start with pages 24 and 25, please, under "additional comments."

Q   What observations were you seeing with respect to Dr. Zamora-Quezada's patient file in these records relative -- related to lab studies?

A   I would say that the pattern persisted, that the patients received the same or essentially the same laboratory evaluation as they did in the previous quarters.  And every patient

received the same or essentially the same panel of lab studies.

Q    What about with regard to any swelling that was observed by Dr. Zamora-Quezada?

A    Once again, when swelling was described, it was present in all joints simultaneously.

Q    Why is that unusual to you?

A    As I mentioned before, it can happen but it's, you know, relatively uncommon.  Patients have a little more heterogeneity in terms of what joints are involved, and it's unusual to have all of them always involved simultaneously from patient to patient to patient.

Q    And turning to the last page, page 26, Dr. Tew, why wouldn't every joint that's in pain require an x-ray?

A    Well, particularly when someone is presenting as a new patient and one is concerned about something like rheumatoid arthritis, there's certain joints that when painful early on are more likely to show changes that are going to be diagnostically useful than others.  And I certainly can't enter one's mind and determine why it is that they would order a particular x-ray at least based on the documentation that I received.  It's my experience that most people don't order x-rays on every single painful joint necessarily unless there's some compelling reason that individual joint has to be examined; primarily because in early rheumatoid arthritis, which presumably many of these patients had or were said to

have, you just don't see much early on.

Q   Turning to what has been previously marked and admitted as Government's Exhibit D-32, this would be the October 21st, 2011 report.  So this would now be your fifth group of files for review, that's right?

A   Yes, that's correct.

Q   So by this point you reviewed approximately 150 of his files.

A   Correct.

        **MS. GURSKIS:**  Let's turn to page 23, please, Ms. Bartone.

Q   What additional observations did you make with regard to these patient files?

A   More of the same on some -- in some ways.  Patients describe having swollen joints, having all of them swollen simultaneously, the continued use of a rote type of tests that were done for every patient very similarly and, you know, concern that there are a lot of things there that just didn't necessarily have to be ordered on every single patient, as had been done in the previous four quarters.

Q   If someone had written -- or did you have occasion to review Dr. Zamora-Quezada's replies to your reports that you drafted?

A   You know, I did not recall that I did, here again this being eight or nine years ago and my having difficultly

remembering what I ate for lunch yesterday.  Apparently I did because in my responses, there are mentions of those replies.

Q    If he had written in a response to this last report that your conclusions stated a favorable review of his patient files, would you think that would be an accurate interpretation of your report?

A    I don't think the -- well, I think the word "favorable" would be optimistic.  I think what I documented was that I saw that things pretty well for the most part stayed the same throughout the five quarters that I reviewed in that the same tests were ordered for every patient, the same diagnostic modalities were pursued, the same treatments were prescribed.

Q    So if in his response he had written that you saw an adjustment to those processes, would that be accurate?

A    There were some adjustments and there were some moments of improvement in documentation.  But I think overall what I observed was things stayed largely the same.

Q    Let's turn back to what you had been asked to look for initially.

        **MS. GURSKIS:**  Ms. Bartone, you can just move to the first page of Government's Exhibit D-32, issues identified in the Board order, if you could zoom in on that section.

Q    And, Dr. Tew, this paragraph up here is I think in every chart monitor report that you drafted; is that right?

A    That's correct.

Q    Okay.  So the first issue you were assigned to look for was redundant and sometimes unnecessary diagnostic tests.  Did you see any improvement in that in your review of his files?

A    I think that was actually the most consistent finding, that many of those tests seemed to be redundant, many of them seemed to be necessary for every single patient to have done.

Q    So no improvement from the first report to the last.

A    That's correct.

Q    The second bullet says -- or the second clause says: "Failed to review past records on his patients."  Did you see any improvement in that?

A    There was some improvement in that at different times.

Q    Can you explain that, what you mean by that?

A    Well, there was -- I think it was the second quarter where that was most notable that he was referencing the referring physician's records.  That happened less and less over the ensuing third, fourth, and five quarters, but it was notable for the second.

Q    And the third issue, failed to clearly document the need for treatments he prescribed and diagnostic procedures he ordered, did you notice any improvement in that?

A    That seemed to have stayed about the same throughout the five quarters.

Q    As a chart monitor, did you ever any -- ever have any opportunity to actually see any of these 150 some odd patients

who -- for whom you reviewed records?

A    No, I did not.

Q    So you were relying solely on the documents themselves; would that be fair to say?

A    Yes.

Q    So if the records were false, would you have any way of knowing that?

A    No.

Q    Did you have any concerns about the accuracy of these patient files as you were reviewing them?

A    Well, insofar as as I mentioned the physical examination describing on patient after patient that all of their joints were pretty hot and swollen, that would make me wonder.  That's just not what I've experienced in practice, that's not what I've seen in the practice of others, so that would make me concerned that there is something unusual about that.

Q    So taking a step back to think about, you know, these 150 files from Dr. Zamora that you reviewed, are there a few things that stood out to you in particular?

A    I think the biggest concern was that everyone was treated the same, that my experience has not been that every patient that I see as a new patient is presenting with exactly the same complaints or deserves or needs the exact same evaluation.  And yet these patients were, you know, seemingly it was almost as if there was a lab slip for your first and these are all the

tests you're going to get at the time of your first visit, come Hell or high water. And that seemed unusual.

Q   Did this treatment of everyone being treated the same as you just described, did that give you any concerns about the welfare of the patients?

A   You know, I have to say I was not really asked to evaluate the suitability of individual treatments for patients so I don't know.

Q   Would you consider ordering the same medications, injections, and providing the same diagnosis -- diagnoses practicing medicine?

A   I would consider it an unusual way to practice medicine.

Q   Why is that?

A   Well, that just -- it doesn't fit with what a typical practice reflects. Here again individual patients are all different; even when they end up having the same problem, you don't treat them all exactly the same. And certainly to have people go through, get the same evaluation, be prescribed the same medications at the end is unusual. That's just not what I observe in practice.

          **MS. GURSKIS:**  I pass the witness.

          **THE COURT:**  Mr. Lee?

          **MR. LEE:**  Thank you, Your Honor.  Just going to move this slightly.

          **THE WITNESS:**  Certainly.

**MR. LEE:** Good afternoon, Dr. Tew. Am I saying that right?

**THE WITNESS:** Yes, sir.

**MR. LEE:** Okay. My name is Stephen Lee. I represent Dr. Zamora.

**CROSS EXAMINATION**

**BY MR. LEE:**

Q   You and I have never spoken, correct?

A   No, sir, I don't believe so.

Q   All right, every report that you wrote and that you just discussed was sent to Dr. Zamora, as far as you know, correct?

A   As far as I'm aware, yes.

Q   All right. And based on your review of the records, you believe that Dr. Zamora had -- did respond in writing to some of your -- at least some of your reports, correct?

A   I think he responded to nearly every one, yes, sir.

Q   Right, okay. And all your reports and all of Dr. Zamora's responses were things that the Texas Medical Board could consider, correct?

A   I would assume so but I honestly don't know.

Q   At the end of the day, you're not aware of the Texas Medical Board taking any further action based on your monitor reports at the end of the monitoring cycle, correct?

A   At the end of the monitoring cycle, I have no idea what the TMB did with those reports.

Q    Right.  You have no idea if they took action or didn't take any action based on your reports, correct?

A    That's correct.

Q    All right.  And the last time you looked at Dr. Zamora's practice in any way was in 2011, correct?

A    I believe that's correct.

Q    All right, so you have no knowledge whatsoever of what the practice did after the last report that you created, correct?

A    That's correct.

Q    So you have no idea one way or another if the practice improved his practices, kept them the same, or did something worse after 2011, correct?

A    I would have no way to know that.

Q    Right, you have no knowledge whatsoever beyond 2011, correct?

A    Huh-uh.

Q    All right, and you were asked some questions on direct examination about rheumatology and various ways to diagnose and to treat rheumatology.  You would agree with me that rheumatology is a complicated field, correct?

A    Yes.

Q    All right.  And that there are -- when you diagnose a patient, there are a lot of factors that go into diagnosing a patient, correct?

A    There are many factors, yes.

Q    All right, and you would agree with me that two rheumatologists could look at the same patient and not necessarily come to the same diagnosis, correct?

A    Well, one would be right and one would be wrong I guess.

Q    Right.  But it's possible for two rheumatologists to look at the same patient and have a difference of opinion, correct?

A    Difference of opinion, yes.

Q    Okay.  Now, you talked on direct examination about your work in Austin, correct?

A    Yes, sir.

Q    And you work at the Austin Diagnostic Center, correct?

A    Yes, sir.

Q    All right.  And you've never practiced here in the Valley, correct?

A    I've not.

Q    All right.  Now, in Austin -- well, what is the Austin Diagnostic Center, what kind of practice is that?

A    So it's a multispecialty group that's been in Austin for 60 some odd years.  We have several other rheumatologists and numerous other subspecialists in medicine.

Q    All right, are there other people work there besides rheumatologists?

A    Yes.

Q    All right, what (indisc.) doctors of other specialties.

A    Yes.

Q    Okay.  Do you also work in a hospital setting?

A    Some.

Q    All right.  What other settings do you work in besides an office setting?

A    Office and hospital and that's it.

Q    All right.  And you testified on direct examination that you're compensated based on something you called an RVU; is that correct?

A    Correct.

Q    All right, and RVU is a measure of productivity, correct?

A    Correct.

Q    All right, so can you explain what that means for the jury?

A    So the Federal government established the RVU system whereby physicians are compensated based on the measured amount of work that it takes to get a certain procedure or office visit accomplished, and they have established those values.

Q    All right, and that's something that your practices takes into consideration when determining your compensation, correct?

A    That's correct.

Q    All right, so your practice measures how productive you are, correct?

A    Yes.

Q    And your practice also probably measures how productive other people are, correct?

A    Other people within the clinic, yes.

Q    All right, there's nothing wrong with your practice considering your productivity in determining your compensation, correct?

A    That's correct.

Q    There's nothing wrong with your practice considering productivity in any way, correct?

A    That is true; although, you know, here again, the practice in which I work does audits to make sure that we are coding properly and making sure that we are billing correctly.

Q    Right.  But again looking at productivity, there's nothing wrong with that in and of itself, correct?

A    No, sir, that's correct.

Q    All right.  At your practice, do you work with medical assistants?

A    Yes.  I have a medical assistant with me at my work.

Q    All right, and how do you use your medical assistant?

A    So my medical assistant will room patients, she will take vital signs, she will update medication lists, she will hunt down records from referring physicians or physicians with whom I share patients, she will send records that I generate back to referring physicians, and do a lot of other clerical duties such as those.

Q    Okay, and just you used the word "room" a patient; can you explain what you mean by rooming a patient?

A    Certainly.  She will go to the waiting room and call the patient out from the waiting room and take them to the examination room.

Q    All right.  Do you have your medical assistant go through any kind of a -- intake any information from the patient prior to your seeing the patient?

A    Only to review their medication list.

Q    All right.  Now, you referred to -- you were asked questions about tests and lab work on direct examination, correct?

A    Yes.

Q    All right, I want to go through a few tests.  You're familiar with the rheumatoid factor test correct?

A    Correct.

Q    All right, and that's a test that you commonly order, correct?

A    Yes.

Q    All right, sedimentation rates, you're familiar with that test.

A    Right.

Q    And that's a test that you common order, correct?

A    Very commonly, yes.

Q    CRP, is that another test you commonly order?

A    Yes.

Q    All right, are you familiar with something called the

Vectra test?

A    Uh-huh.

Q    What is a Vectra test?

A    So a Vectra, it's the Vectra DA is the most popular one that's out there, and it's a measure of rheumatoid arthritis disease activity, or said to be so, and it's a proprietary grouping of tests that measures 12 different inflammatory markers in the blood.  And the company that markets that test says that through their proprietary formula, it correlates very well -- the results correlate very well with disease activity.

Q    All right, is this a test that you order from time to time?

A    Very rarely.  I don't feel at this point in time the performance characteristics are as good as the company that manufactures it says it is --

Q    Okay.

A    -- and so I don't -- I have not found that it added much to my assessment of the patients through more traditional means, so at this point in time I don't typically use that test.

Q    All right.  But, again, this is a test that you're familiar with, correct?

A    Yes.

Q    All right.  You mentioned on direct examination something called serial x-rays; what are -- what do you mean when you

refer to serial x-rays?

A    So particularly within the context of studies of new treatments for rheumatoid arthritis, patients undergo x-rays repeatedly of the same joints to determine whether or not permanent damage is accruing over time.  So "serial" meaning that something that occurs repeatedly over time.  And some practices do that on a routine basis.

Q    And when you say some practices, that's not -- it sounds like that's not something you necessarily do.

A    It's not the standard of care to do that every single year, that one has to get x-rays every single year, that's correct.

Q    But from what you said, you're aware that some practices do these, correct?

A    I would say that a small minority of folks do, yes.

Q    Okay, all right.  Now, you were asked about a particular -- when on direct examination, the Government showed you some of your monitor reports and they asked you about one particular patient who had the initials "SM;" do you recall that?

A    I do recall her mentioning a patient "SM," yes.

Q    All right.  Now, Dr. Tew, sitting here today, you don't know what the charges are in this case, correct?

A    In this Federal case.

Q    You don't know the specifics of the charges --

A    No.

Q       -- in this Federal case, correct?

A       No, I do not.

Q       All right, and you don't know whether that patient, "SM," whether that patient is referenced in any way one way or another in the indictment in this case, correct?

A       I would have no knowledge of that.

Q       All right, and of the 150 or so patient files that you reviewed, sitting here today, you don't know one way or another where -- whether any of those patients are referenced in any way in the indictment in this case, correct?

A       I have no knowledge of any of those specifically being mentioned in the indictment in this case.

        **MR. LEE:**  Nothing further, Your Honor.

        **THE COURT:**  Mr. Sully, did you have any questions, sir?

        **MR. SULLY:**  No, thank you, Your Honor.

        **THE COURT:**  Mr. Alvarez, did you, sir?

        **MR. ALVAREZ:**  No thank you, Your Honor.

        **THE COURT:**  And, Mr. Pena -- did you have something Mr. Alvarez?

        **MR. ALVAREZ:**  No, Your Honor.

        **THE COURT:**  Mr. Pena, did you?

        **MR. PENA:**  No, Your Honor.

        **MS. GURSKIS:**  Nothing further from the Government, Your Honor.

THE COURT: Okay, Dr. Tew, you're done.

THE WITNESS: Thank you.

THE COURT: You may be excused, sir.

THE WITNESS: Thank you.

**(Witness excused)**

THE COURT: And we finished right at 4:00 o'clock which is when I have my other hearings, so you all are welcome to go home. Ladies and gentlemen, please be careful on the way home. Thank you for your patience and your attentiveness. And you haven't shown any face of being disappointed with our schedule here and so we -- I thank you very much and I'm sure they do also. And so we'll see you all tomorrow morning at 9:00. Please rise for the jury.

**(Jurors exit at 3:58 p.m.)**

About how many more witnesses does the Government have?

MS. SPEAKER: I'm sorry, Your Honor?

THE COURT: About how many more witnesses do you think you have?

MS. SPEAKER: We can give you an estimate in the morning, Your Honor, --

THE COURT: Okay.

MS. SPEAKER: -- if possible.

THE COURT: That would be nice to just sort of --

MS. SPEAKER: We're going to reevaluate.

**THE COURT:** -- figure out. And obviously we're not doing 23rd, 24th, and 25th, although there will be court but not you all on the 23rd and the morning of the 24th, but it has nothing to do with this case.

**MS. SPEAKER:** Yes, Your Honor.

**THE COURT:** Okay, you all can go ahead and be excused. Thank you all.

**MS. SPEAKER:** Thank you.

**MR. SULLY:** Your Honor, can I ask a quick question? We don't have to address it today but I was just wondering what the scheduling's going to be closer to the new year. I have a few cases scheduled close to then. I was just, you know, (indisc.) which ones to ask to continue or not.

**THE COURT:** Well, I mean, we're going to -- if we're here still going through the new year, we're going to be going to taking the 1st off. But obviously we will continue doing the rest of it and maybe working it until noon on the 31st or something like that. But I'm trying to avoid as much time off as we can here.

**MR. SULLY:** Yes, Your Honor.

**THE COURT:** Thank you all.

**MR. ALVAREZ:** (Indisc.) go through the mid-June -- I mean (indisc.)

**(Laughter)**

**MR. ALVAREZ:** I hope not in June.

**THE COURT:** You can be there if you want. Usually what? I'm hoping we're not going to have to go through the middle of January. Surely it will be done by then. And I don't think that we should go past the middle of January, even if we start having court on Saturdays. I'm not kidding about that because there's too many other things that I have also and so I just can't. You know, like there's six sentencings today and there were some this morning. And so if it's going really slow, we will -- we may very well have courts on Saturday. If you all don't have anything else, you all can be excused, thank you.

**MS. SPEAKER:** Thank you, Your Honor.

**(This proceeding was adjourned at 4:00 p.m.)**

<u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>December 20, 2019</u>

        Signed                                                              Dated

*TONI HUDSON, TRANSCRIBER*